E-FILING  ADR

**Filed**

AUG 3 0 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

1  David M. Arbogast (SBN 167571)
David@SpiroMoss.com
2  Ira Spiro (SBN 67641)
Ira@SpiroMoss.com
3  **SPIRO MOSS BARNESS LLP**
11377 W. Olympic Boulevard, Fifth Floor
4  Los Angeles, CA 90064-1683
Phone: (310) 235-2468; Fax: (310) 235-2456
5
6  Paul R. Kiesel, Esq. (SBN 119854)
kiesel@kbla.com
7  Patrick DeBlase, Esq. (SBN 167138)
deblase@kbla.com
8  Michael C. Eyerly, Esq. (SBN 178693)
eyerly@kbla.com
9  **KIESEL BOUCHER LARSON LLP**
8648 Wilshire Boulevard
10  Beverly Hills, California 90211
Phone:  (310) 854-4444; Fax:  (310) 854-0812
11
Attorneys for Plaintiffs and all others Similarly Situated
12

Jeffrey K. Berns, Esq. (SBN 131351)
jberns@jeffbernslaw.com
**LAW OFFICES OF JEFFREY K. BERNS**
19510 Ventura Boulevard, Suite 200
Tarzana, California 91356
Phone: (818) 961-2000; Fax:  (818) 867-4820

13                **UNITED STATES DISTRICT COURT**

14        **NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION**

15  BRIAN O'DONNELL, MICHAEL VAN
BELLEGHEM, PATRICIA VAN
16  BELLEGHEM, individually and on behalf of all
others similarly situated,
17
18                Plaintiffs,
19
        v.
20
21  BANK OF AMERICA CORPORATION,
BANK OF AMERICA, NATIONAL
22  ASSOCIATION a.k.a. BANK OF AMERICA,
N.A., and DOES 1 through 10 inclusive,
23
                Defendants.
24
25
26
27

CASE NO. C07  04500  RMW

**CLASS ACTION COMPLAINT FOR:**

(1)  **Violations of the Truth in Lending Act, 15
U.S.C.A. §1601,** *et seq*;

(2)  **Violation of Bus. & Prof. Code §17200,** *et
seq.* **- "Unlawful" Business Practices
(TILA);**

(3)  **Violation of Bus. & Prof. Code §17200,** *et
seq.* **– "Unfair" and "Fraudulent" Business
Practices;**

(4)  **Breach of Contract;**

(5)  **Breach of the Covenant of Good Faith and
Fair Dealing; and**

(6)  **Violation of Bus. & Prof. Code  §17200,** *et
seq.* **– "Unlawful" Business Practices (Fin.
Code § 22302).**

                **JURY TRIAL DEMANDED**

28

CLASS ACTION COMPLAINT

1     Plaintiffs, BRIAN O'DONNELL, MICHAEL VAN BELLEGHEM, PATRICIA VAN

2 BELLEGHEM ("Plaintiffs"), individually and on behalf of all others similarly situated allege as follows:

3

4 **I.**

5 **INTRODUCTION**

6      1.      This is an action pursuant to the Truth in Lending Act ("TILA"), 15 U.S.C.A. §1601, *et*

7 *seq.*, California's Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200, *et seq.*, and other

8 statutory and common law in effect. Plaintiffs BRIAN O'DONNELL, MICHAEL VAN

9 BELLEGHEM, and PATRICIA VAN BELLEGHEM ("Plaintiffs"), individually, and on behalf of all

10 others similarly situated, bring this action against BANK OF AMERICA CORPORATION, BANK OF

11 AMERICA, N.A., and DOES 1-10 (collectively "Defendants"), based, in part, on Defendants' failure to

12 clearly and conspicuously disclose to Plaintiffs and the Class Members, in Defendants Option

13 Adjustable Rate Mortgage ("ARM") loan documents, and in the required disclosure statements,

14 accompanying the loans, (i) the actual interest rate on the note(s) (12 C.F.R. § 226.17); (ii) that payments

15 on the notes at the teaser rate will result in negative amortization and that the principal balance will

16 increase (12 C.F.R. § 226.19); and (iii) that the initial interest rate provided was discounted and does not

17 reflect the actual interest that Plaintiffs and Class members would be paying on the Note(s).

18

19 **II.**

20 **THE PARTIES**

21      2.      Plaintiff, BRIAN O'DONNELL ("O'DONNELL") is, and at all times relevant to this

22 Complaint, was an individual residing in San Jose, California. On or about June 8, 2005, Plaintiff

23 refinanced his existing home loan and entered into an Option ARM loan agreement with Defendants.

24 The Option ARM loan was secured by Plaintiff's primary residence. Attached hereto as <u>Exhibit 1</u> is a

25 true and correct copy of the Note and Truth and Lending Disclosure Form pertinent to this action.

26      3.      Plaintiffs, MICHAEL VAN BELLEGHEM and PATRICIA VAN BELLEGHEM

27 ("BELLEGHEM") are, and at all times relevant to this Complaint were, individuals residing in Arroyo

28 Grande, California. On or about May 25, 2006, Plaintiffs refinanced their existing home loan and

CLASS ACTION COMPLAINT

1    entered into an Option ARM loan agreement with Defendants. The Option ARM loan was secured by

2    Plaintiffs' primary residence. Attached hereto as Exhibit 2 is a true and correct copy of the Note and

3    Truth and Lending Disclosure Form pertinent to this action.

4        4.    Defendant BANK OF AMERICA CORPORATION is a Delaware corporation licensed to

5    do, and is doing business in California. At all relevant times hereto, BANK OF AMERICA

6    CORPORATION, through its wholly owned subsidiary BANK OF AMERICA, NATIONAL

7    ASSOCIATION a.k.a BANK OF AMERICA, N.A., was and is engaged in the business of promoting,

8    marketing, distributing and selling the Option Arm loans that are the subject of this Complaint. BANK

9    OF AMERICA CORPORATION transacts business in Santa Clara County, California and at all relevant

10   times promoted, marketed, distributed, and sold Option Arm loans throughout the United States,

11   including Santa Clara County, California. BANK OF AMERICA CORPORATION has significant

12   contacts with Santa Clara County, California, and the activities complained of herein occurred, in whole

13   or in part, in Santa Clara County, California.

14       5.    Defendant, BANK OF AMERICA, NATIONAL ASSOCIATION a.k.a. BANK OF

15   AMERICA, N.A. ("BANK OF AMERICA, N.A."), is a United States corporation licensed to do, and is

16   doing business in California. At all relevant times hereto BANK OF AMERICA, N.A was and is

17   engaged in the business of promoting, marketing, distributing and selling the Option Arm loans that are

18   the subject of this Complaint. BANK OF AMERICA, N.A. transacts business in Santa Clara County,

19   California and at all relevant times promoted, marketed, distributed, and sold Option Arm loans

20   throughout the United States, including Santa Clara County, California. BANK OF AMERICA, N.A.

21   has significant contacts with Santa Clara County, California, and the activities complained of herein

22   occurred, in whole or in part, in Santa Clara County, California.

23       6.    Defendants, BANK OF AMERICA CORPORATION and BANK OF AMERICA, N.A.,

24   shall hereinafter be referred to collectively as "BANK OF AMERICA."

25       7.    Defendants, BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., and

26   DOES 1 through 10, shall hereinafter be referred to collectively as "Defendants."

27       8.    At all times mentioned herein, Defendants, and each of them, were engaged in the

28   business of promoting, marketing, distributing, and selling the Option Arm loans that are the subject of

CLASS ACTION COMPLAINT

1   this Complaint, throughout the United States, including Santa Clara County, California.

2       9.    Plaintiffs are informed and believe, and thereon allege that each and all of the

3   aforementioned Defendants are responsible in some manner, either by act or omission, strict liability,

4   fraud, deceit, fraudulent concealment, negligence, respondeat superior, breach of contract or otherwise,

5   for the occurrences herein alleged, and that Plaintiffs' injuries, as herein alleged, were proximately

6   caused by the conduct of Defendants.

7       10.    Plaintiffs are informed and believe, and thereon allege, that at all times material hereto

8   and mentioned herein, each of the Defendants (both named and DOE defendants) sued herein were the

9   agent, servant, employer, joint venturer, partner, division, owner, subsidiary, alias, assignee and/or alter-

10   ego of each of the remaining Defendants and were at all times acting within the purpose and scope of

11   such agency, servitude, joint venture, division, ownership, subsidiary, alias, assignment, alter-ego,

12   partnership or employment and with the authority, consent, approval and ratification of each remaining

13   Defendant.

14       11.    At all times herein mentioned, each Defendant was the co-conspirator, agent, servant,

15   employee, assignee and/or joint venturer of each of the other Defendants and was acting within the

16   course and scope of said conspiracy, agency, employment, assignment and/or joint venture and with the

17   permission and consent of each of the other Defendants.

18       12.    Plaintiffs are informed and believe, and thereon allege, that Defendants, BANK OF

19   AMERICA and DOES 1-10, and each of them, are, and at all material times relevant to this Complaint,

20   performed the acts alleged herein and/or otherwise conducted business in California.  Defendants, and

21   each of them, are corporations or other business entities, form unknown, have, and are doing business in

22   this judicial district.

23       13.    Plaintiffs are informed and believe, and thereon allege, that DOES 1 through 10,

24   inclusive, are securitized trusts, equity funds, collateralized debt obligations (CDO), CDO underwriters,

25   CDO trustees, hedge funds or other entities that acted as additional lenders, loan originators and/or are

26   assignees to the loans which are the subject of this action.  Plaintiffs will seek leave of Court to replace

27   the fictitious names of these entities with their true names when they are discovered by Plaintiffs herein.

28   / / /

-4-

CLASS ACTION COMPLAINT

14. The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 10, inclusive, and each of them, are unknown to Plaintiffs at this time, and Plaintiffs therefore sue said Defendants by such fictitious names. Plaintiffs allege, on information and belief, that each Doe defendant is responsible for the actions herein alleged. Plaintiffs will seek leave of Court to amend this Complaint when the names of said Doe defendants have been ascertained.

15. Plaintiffs are informed and believe, and thereon allege, that at all times mentioned herein, Defendants, and each of them, including without limitation those Defendants herein sued as DOES, were acting in concert or participation with each other, or were joint participants and collaborators in the acts complained of, and were the agents or employees of the others in doing the acts complained of herein, each and all of them acting within the course and scope of said agency and/or employment by the others, each and all of them acting in concert one with the other and all together.

## III.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction pursuant to 15 U.S.C § 1601 *et seq.* and 28 U.S.C. § 1331.

17. This Court has personal jurisdiction over the parties in this action by the fact that Defendants are either individuals who reside in this District within California or are corporations duly licenced to do business in California.

18. Venue is proper within this District and Division pursuant to 28 U.S.C. §1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in this district, and because there is personal jurisdiction in this district over the named Defendant because it regularly conducts business in this judicial district.

## IV.

## FACTS COMMON TO ALL CAUSES OF ACTION

19. BANK OF AMERICA is one of the world's largest financial institutions, serving individual consumers, small and middle market businesses and large corporations with a full range of

-5-

CLASS ACTION COMPLAINT

1    banking, investing, asset management and other financial and risk-management products and services.

2        20.    The instant action arises out of residential mortgage loan transactions in which

3    Defendants failed to disclose pertinent information in a clear and conspicuous manner to Plaintiffs and

4    the Class members, in writing, as required by law.

5        21.    This action also concerns Defendants' unlawful, fraudulent and unfair business acts or

6    practices. Defendants engaged in a campaign of deceptive conduct and concealment aimed at

7    maximizing the number of consumers who would accept this type of loan in order to maximize

8    Defendants' profits, even as Defendants knew their conduct would cause many of these consumers to

9    lose their homes through foreclosure.

10        22.    Plaintiffs, along with thousands of other similarly situated consumers, were sold an

11    Option ARM home loan by Defendants. The Option ARM loan sold to Plaintiffs is a deceptively

12    devised financial product. The loan has a variable rate feature with payment caps. The product was sold

13    based on the promise of a low, fixed interest rate, when in fact Plaintiffs were charged a different, much

14    greater interest rate than promised. Further, Defendants disguised from Plaintiffs the fact that

15    Defendants' Option ARM loan was designed to, and did, cause negative amortization to occur. Further

16    still, once lured into these loans, consumers cannot easily extricate themselves from these loans.

17    Defendants' Option ARM loan includes a stiff and onerous prepayment penalty making it extremely

18    difficult to extricate from the loans.

19        23.    The Option ARM loan Defendants sold to Plaintiffs violates the Truth In Lending Act

20    (TILA). TILA is supposed to protect consumers; it mandates certain disclosures be made by lenders to

21    borrowers concerning the terms and conditions of their home loans. Defendants failed to make these

22    disclosures in connection with the Option ARM loan sold to Plaintiffs.

23        24.    At all times relevant, Defendants marketed their Option ARM loan product to consumers,

24    including Plaintiffs, in a false or deceptive manner. Defendants marketed and advertised to the general

25    public through brochures, flyers and other substantially identical marketing material, a loan which

26    appeared to have a very low, fixed interest rate for a period of three (3) to five (5) years and no negative

27    amortization. Defendants used this "teaser" rate to lure Plaintiffs into purchasing Defendants' Option

28    ARM loan product. However, the low fixed rate was illusory, a false promise. Plaintiffs and others

-6-

CLASS ACTION COMPLAINT

1  similarly situated did not receive the benefit of the low rate promised to them. Once signed on to

2  Defendants' loan, the interest rate applied to Plaintiffs' loans was immediately and significantly

3  increased.

4       25.    Plaintiffs and others similarly situated were consumers who applied for a mortgage loan

5  through Defendants. During the loan application process, in each case, Defendants promoted,

6  advertised, and informed Plaintiffs and the Class members that in accepting these loan terms, Plaintiffs

7  would be able to lower their mortgage payment and save money. Defendants initiated this scheme in

8  order to maximize the amount of the loans issued to consumers and to maximize Defendants' profits.

9       26.    Based on the Defendants' representations, and the conduct alleged herein, Plaintiffs and

10  Class members agreed to finance their primary residence through Defendants' Option ARM loan.

11  Plaintiffs and Class members were told they were being sold a home loan with a low interest rate of

12  between 1% and 3.0% interest rate (the "teaser" rate), and that the interest rate was fixed for the first

13  three (3) to five (5) years of the loan. Defendants also informed Plaintiffs, and Plaintiffs were lead to

14  believe, that if they made payments based on the promised low interest rate, which were the payments

15  reflected in the written payment schedule provided to them by Defendants, the loan was a no negative

16  amortization home loan. Plaintiffs' payments were to be applied to their principal loan balances as well

17  as to interest.

18       27.    After, the purported three (3) - five (5) year fixed interest period, Plaintiffs were told their

19  rate "may" change. Plaintiffs believed they would then be able to re-finance to another home loan.

20       28.    Plaintiffs believed these facts to be true because that is what the Defendants wanted

21  consumers to believe. Defendants aggressively marketed their product as a fixed, low interest home

22  loan. Defendants knew that if marketed in such a manner, their Option ARM loan product would be a

23  hugely popular and profitable product for them. Defendants also knew, however, that they were

24  marketing their product in a false and deceptive manner. While Defendants trumpeted their low, fixed

25  rate loans to the public, Defendants knew their promise of low, fixed interest was a mirage.

26       29.    In fact, Defendants' Option ARM loan possessed a low, fixed interest *payment* but not a

27  low, fixed interest rate. Unbeknownst to Plaintiffs and Class members, the actual interest rate they were

28  charged on their loans was not fixed (and was in fact considerably higher than going market rates.) And,

CLASS ACTION COMPLAINT

1    after purchasing Defendants' Option ARM loan product, Plaintiffs and Class members did not actually

2    receive the benefit of the low, teaser rate at all in some cases, or at best, received that rate for only a

3    single month. Immediately, thereafter, Defendants in every instance and for every loan, increased the

4    interest rate they charged consumers. The charges incurred by Plaintiffs and Class members over and

5    above the fixed interest payment rate were added to the principal balance on their home loans in ever

6    increasing increments, substantially reducing the equity in these borrowers' homes.

7        30.    Defendants, through the loan documents they created and supplied to Plaintiffs, stated

8    that negative amortization was only a possibility and would occur only if the payments were not

9    sufficient. Defendants concealed the fact that the loan as presented and designed, in fact, *guaranteed*

10   negative amortization. Defendants failed to disclose and omitted the objectively material fact that

11   negative amortization would occur if the consumer followed the payment schedule set forth by

12   Defendants in the loan documents. This information was objectively material and necessary to make the

13   statements made by Defendants, in light of the circumstances, not only misleading because that

14   information would indicate that equity would be consumed if the payment schedule was followed,

15   thereby making it difficult if not impossible to refinance the loan at or around the time the prepayment

16   penalty expired and the interest and payment rates re-set. In this respect, Defendants utterly failed to

17   place any warning on the Truth and Lending Disclosure Form about negative amortization.

18       31.    At all times relevant, once Plaintiffs and Class members accepted Defendants' Option

19   ARM loan, they had no viable option by which to extricate themselves because these Option ARM loan

20   agreements included a draconian three year pre-payment penalty.

21       32.    The Option ARM loans sold by Defendants all have the following uniform

22   characteristics:

23            (a)    There is an initial low interest rate or "teaser" rate that was used to entice the

24                   Plaintiffs into entering into the loan. The rate offered was typically 1%-3%;

25            (b)    The loan has with it a corresponding low payment schedule. The marketing of the

26                   loan with the above teaser was intended to misleadingly portray to consumers that

27                   the low payments for the first three (3) to five (5) years were a direct result of the

28                   low interest rate being offered;

-8-

(c)    The initial payments in the required disclosures were equal to the low interest rate being offered.  The purpose was to assure that if someone were to calculate what the payment would be at the low offered interest rate, it corresponded to the payment schedule.  This portrayal was intended to further mislead consumers into believing that the payments were enough to cover all principal and interest;

(d)    The payment has a capped 2-3 % annual increase on the payment amount;

(e)    This loan includes a prepayment penalty preventing consumers from securing a new loan for a period of up to three (3) years.

33.    Defendants uniformly failed to inform consumers, including Plaintiffs and the Class members, in a clear and conspicuous manner that the fixed "teaser" rate offered by Defendants was actually never applied to their loans, or, at best, was only applied for thirty (30) days.  Thereafter, the true interest charged on the loans was significantly higher than the promised, advertised rate.

34.    Defendants uniformly failed to inform consumers, including Plaintiffs and the Class members, that the payments set forth in Defendants' schedule of payments were insufficient to cover the actual charges and that this was, in fact, a negative amortization loan.

35.    Defendants uniformly failed to inform consumers, including Plaintiffs and the Class members, that when the principal balance increased to a certain level, they would no longer have the option of making the fixed interest payment amount.

## V.

## CLASS ACTION ALLEGATIONS

36.    Plaintiffs bring this action on behalf of themselves, and on behalf of all others similarly situated (the "Class") pursuant to Federal Rule of Civil Procedure, Rules 23(a), and 23(b), and the case law thereunder.  The classes Plaintiffs seek to represent are defined as follows:

**The California Class**:  All individuals who, within the four year period preceding the filing of Plaintiffs' Complaint through the date notice is mailed to the Class, received an Option ARM loan through Defendants on their primary residence located in the State of California.  Excluded from the California Class are Defendants' employees, officers, directors, agents, representatives, and their family members; and

-9-

CLASS ACTION COMPLAINT

**The National Class**: All individuals in the United States of America who, within the four year period preceding the filing of Plaintiffs' complaint through the date notice is mailed to the Class, received an Option ARM loan through Defendants on their primary residence located in the United States of America. Excluded from the National Class are Defendants' employees, officers, directors, agents, representatives, and their family members.

An appropriate sub-Class exists for the following Class Members:

All individuals in the United States of America who, within the three year period preceding the filing of Plaintiffs' complaint through the date notice is mailed to the Class, received an Option ARM loan through Defendants on their primary residence located in the United States of America. Excluded from the National sub-Class are Defendants' employees, officers, directors, agents, representatives, and their family members.

Plaintiffs reserve the right to amend or otherwise alter the Class definitions presented to the Court at the appropriate time, or propose or eliminate sub-Classes, in response to facts learned through discovery, legal arguments advanced by Defendants or otherwise.

37.    <u>Numerosity</u>: The Class is so numerous that the individual joinder of all members is impracticable under the circumstances of this case. While the exact number of Class members is unknown at this time, Plaintiffs are informed and believe that the entire Class or Classes consist of approximately tens of thousands of members.

38.    <u>Commonality</u>: Common questions of law or fact are shared by the Class members. This action is suitable for class treatment because these common questions of fact and law predominate over any individual issues. Such common questions include, but are not limited to, the following:

(1)    Whether Defendants' acts and practices violate the Truth in Lending Act;

(2)    Whether Defendants' conduct violated 12 C.F.R. § 226.17;

(3)    Whether Defendants' conduct violated 12 C.F.R. § 226.19;

(4)    Whether Defendants engaged in unfair business practices aimed at deceiving Plaintiffs and the Class members before and during the loan application process;

(5)    Whether Defendants, by and through their officers, employees, and agents failed to disclose that the interest rate actually charged on these loans was higher than the rate represented and promised to Plaintiffs and the Class members;

/ / /

CLASS ACTION COMPLAINT

(6)     Whether Defendants, by and through their officers, employees and agents concealed information they were mandated to disclose under TILA;

(7)     Whether Defendants failed to disclose the true variable nature of interest rates on adjustable rate mortgage loans and adjustable rate home equity loans;

(8)     Whether Defendants failed to properly disclose the process by which negative amortization occurs, ultimately resulting in the recasting of the payment structure over the remaining lifetime of the loans;

(9)     Whether Defendants' failure to apply Plaintiffs' and the Class members' payments to principal as promised in the form Notes constitutes a breach of contract, including a breach of the covenant of good faith and fair dealing;

(10)    Whether Defendants' conduct in immediately raising the interest rate on consumers' loans so that no payments were made to the principal balance constitutes breach of the covenant of good faith and fair dealing;

(11)    Whether Defendants' marketing plan and scheme misleadingly portrayed or implied that these loans were fixed rate loans, when Defendants knew that only the periodic payments were fixed (for a time) but that interest rates were not, in fact, "fixed;"

(12)    Whether the terms and conditions of Defendants' Option ARM home loan are unconscionable;

(13)    Whether all Class members are entitled to punitive damages;

(14)    Whether all Class members are entitled to actual damages; and

(15)    Whether all Class members are entitled to rescission.

39.     Typicality: Plaintiffs' claims are typical of the claims of the Class members.  Plaintiffs and the other Class members were subjected to the same kind of unlawful conduct and the claims of Plaintiffs and the other Class members are based on the same legal theories.

40.     Adequacy: Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other members of the Class Plaintiffs seek to represent.  Plaintiffs have retained counsel competent and experienced in complex class action litigation and Plaintiffs intend

CLASS ACTION COMPLAINT

1    on prosecuting this action vigorously.   The interests of members of the Class will be fairly and

2    adequately protected by Plaintiffs and their counsel.

3        41.    Ascertainable Class:  The proposed Classes are ascertainable in that the members can be

4    identified and located using information contained in Defendants' mortgage lending records.

5        42.    This case is brought and can be maintained as a class action under Rule 23(b)(1),

6    23(b)(2), and 23(b)(3):

7        (a)    Risk of Inconsistent Judgments: The unlawful acts and practices of Defendants, as alleged

8            herein, constitute a course of conduct common to Plaintiffs and each Class member.

9            Prosecution of separate actions by individual Class members would create a risk of

10           inconsistent or varying adjudications which would establish incompatible standards of

11           conduct for Defendants and/or substantially impair or impede the ability of individual

12           Class members to protect their interests;

13       (b)    Injunctive and/or Declaratory Relief to the Class is Appropriate:  Defendants, and each of

14           them, have acted or refused to act on grounds generally applicable to the Class, thereby

15           making final injunctive relief or corresponding declaratory relief with respect to the Class

16           as a whole appropriate; and

17       (c)    Predominant Questions of Law or Fact:  Questions of law or fact common to the Class

18           members, including those identified above, predominate over questions affecting only

19           individual Class members (if any), and a class action is superior to other available

20           methods for the fair and efficient adjudication of the controversy.  Class action treatment

21           will allow a large number of similarly situated consumers to prosecute their common

22           claims in a single forum, simultaneously, efficiently, and without the unnecessary

23           duplication of effort and expense that numerous individual actions would require.

24           Further, an important public interest will be served by addressing the matter as a class

25           action.  The cost to the court system of adjudicating each such individual lawsuit would

26           be substantial.

27    / / /

28    / / /

CLASS ACTION COMPLAINT

1
2
3
4

## VI.

## FIRST CAUSE OF ACTION

### (Violations of Truth in Lending Laws, 15 U.S.C.A. §1601, *et seq.*,

### (Against All Defendants)

5    43.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

6    44.    15 U.S.C.A. §1601, *et seq.*, is the Federal Truth in Lending Act ("TILA"). The Federal

7    Reserve Board of Governors implements the Federal Truth in Lending Act through Regulation Z (12

8    C.F.R. §226 ) and its Official Staff Commentary. Compliance by lenders with Regulation Z became

9    mandatory October 1, 1982. Likewise, Official Staff Commentary issued by the Federal Reserve Board

10   is also binding on all lenders.

11   45.    The purpose of TILA is to protect consumers. This is stated in 12 C.F.R. § 226.1, which

12   reads:

13   **§226.1 Authority, purpose, coverage, organization, enforcement and**

14   **liability. . .**

15   (b)    Purpose. The purpose of this regulation is to promote the informed

16   use of consumer credit by requiring disclosures about its terms and costs.

17   The regulation also gives consumers the right to cancel certain credit

18   transactions that involve a lien on a consumer's principal dwelling . . .

19   46.    Reg. Z also mandates very specific disclosure requirements regarding home loans with

20   which lenders, including Defendants, must comply:

21   **§ 226.17. General disclosure requirements.**

22   (a) Form of disclosures. (1) The creditor shall make the disclosures

23   required by this subpart clearly and conspicuously in writing, in a form

24   that the consumer may keep. The disclosures shall be grouped together,

25   shall be segregated from everything else, and shall not contain any

26   information not directly related to the disclosures required under §

27   226.18.

28   / / /

CLASS ACTION COMPLAINT

47.    The purpose of the TILA is to assure a meaningful disclosure of credit terms so that the borrowers will be able to compare more readily the various credit terms available to them and avoid the uninformed use of credit and to protect the consumer against inaccurate and unfair credit billing practices.

48.    Defendants' Option ARM loan violates TILA because Defendants failed to comply with the disclosure requirements mandated by Regulation Z and Official Staff Commentary issued by the Federal Reserve Board. Defendants failed in a number of ways to clearly or accurately disclose the terms of the Option ARM loan to Plaintiffs as Defendants were required to do under TILA. These violations are apparent on the face of the TILA Disclosure Forms.

49.    As such, Plaintiffs seek redress under the Truth in Lending Act. This action seeks to obtain rescission for each Class member, injunctive relief, redress, restitution, disgorgement, money damages, attorneys' fees and other equitable relief against Defendants for engaging in unfair or deceptive acts or practices in violation of TILA.

50.    The TILA violations committed by Defendants are more specifically detailed as follows:

A.    **Defendants' Failure to Clearly and Conspicuously Disclose The Actual Interest Rate Violates Truth in Lending Laws**

51.    12 C.F.R. § 226.17 and 12 C.F.R. § 226.19 require the lender to make disclosures concerning the interest rate in a clear and conspicuous manner. Further, a misleading disclosure is as much a violation of TILA as a failure to disclose at all. Defendants failed to meet the disclosure mandates required of them concerning the interest rate Defendants actually applied to Plaintiffs' and Class members' loans, as well as the interest actually charged to Plaintiffs and the Class members.

52.    Defendants' disclosure in the Promissory Note concerning the interest rate is, at best, unclear and inconspicuous. At worst, it is intentionally deceptive. In either instance, it is certainly different than the interest rate set forth by Defendants in the TILA Disclosure Form. The interest rate information set forth by Defendants in the Note conflicts with the interest rate information set forth by Defendants in the TILA Disclosure Form.

53.    The interest rate set forth in the Note is the teaser rate that Defendants, in fact, apply to the loan for a single month. However, Defendants do not make clear in the Note or anywhere else that

-14-

1  this low promised rate (the same rate upon which Defendants base the written payment schedule

2  provided to Plaintiffs) is only offered for the first thirty (30) days of the loan. Defendants employ a most

3  convoluted, confusing and circuitous methodology in describing the interest rate. Somewhere in the

4  Note, Defendants state that the promised low interest rate is the rate until the "change date." A

5  description of the change date is found somewhere else in the Note. The descriptive method employed

6  by Defendants in this regard makes it extremely difficult for anyone to arrive at the conclusion that the

7  change date corresponds to the very first monthly payment Plaintiffs and the Class members made on

8  their loans.

9         54.    The language used by Defendants to disclose the interest rate on Plaintiffs' and the Class

10  members loans was anything but clear and conspicuous. Rather, the disclosures used by Defendants

11  were purposefully unclear and meant to mislead and confuse Plaintiffs and the Class members. In

12  particular, it is virtually impossible to discern when Plaintiffs and the Class members would receive the

13  low interest rate they were promised, if, in fact, it can be determined at all. And, the truth is that

14  Plaintiffs and the Class members *never* received the low interest rate, or in some cases received it for

15  only thirty days. Defendants promise of a low interest rate is and was wholly illusory and deception

16  practiced on Plaintiffs and Class members by Defendants to facilitate sales of their loans to consumers.

17         55.    The Note also sets forth the amount of Plaintiffs' and Class members' initial monthly

18  payments. That amount is equal to what the payment would be if the low interest rate promised to

19  Plaintiffs by Defendants was true and was being applied to the principal balance on the loans. This a

20  further deception committed by Defendants, because the real interest rate charged on the loan by

21  Defendants turns out to be much higher than the low interest rate promised to Plaintiffs and Class

22  members. The payment amount is included to deceive consumers into falsely believing they are, in fact,

23  receiving the teaser rate promised to them.

24         56.    The TILA Disclosure Form is also confusing and deceptive for much the same reason. It

25  shows the scheduled payments for the first three to five years of the loan as being based on the low

26  "teaser" rate Plaintiffs and Class members were promised. In truth, however, this payment schedule has

27  no real relation to the interest rate Defendants actually charged Plaintiffs on their loans.

28  / / /

57.     Lastly, as concerning Defendants' failure to accurately, clearly or conspicuously disclose the actual interest rate applied to Plaintiffs' and Class members' loan, the Note expressly states and/or implies that Plaintiffs' and the Class members payments will pay off principal and interest on the loan. That is, based on the payment schedule and initial monthly payment amount presented to Plaintiffs by Defendants, and set forth in the Note and TILA Disclosure Form, Plaintiffs and the Class members will be paying off principal and interest on their loans by submitting payments in accordance with the payment schedule.  The contractual language in the Note only makes sense, and can only be true, if the interest rate actually applied to Plaintiffs' loans by Defendants were, in fact, the "teaser" rate promised by Defendants.  Thus, Plaintiffs and the Class members believed that the low rate promised to them would be applied to their loans.  However, the true fact is that the payment established by Defendants did not pay any principal on the loan at all.  The payment established by Defendants only covered a portion of the interest actually charged Plaintiffs and the Class members by Defendants each month on these loans.

58.     Taken separately and in totality, all of the unclear and contradictory information given to, and representations made by Defendants, to Plaintiffs and the Class members, violated TILA in that it failed to provide the clear and conspicuous disclosures as required under the Act.

**B.     Defendants' Failure to Clearly and Conspicuously Disclose Negative Amortization Violates the Truth in Lending Laws**

59.     12 C.F.R. § 226.19 sets forth additional specific disclosure requirements for residential home loans:

> **§ 226.19.  Certain residential mortgage and variable-rate transactions.**
>
> . . .
>
> (b) Certain variable-rate transactions. If the annual percentage rate may increase after consummation in a transaction secured by the consumer's principal dwelling with a term greater than one year, the following disclosures must be provided at the time an application form is provided or before the consumer pays a non-refundable fee, whichever is earlier. . .

CLASS ACTION COMPLAINT

1   *(vii) Any rules relating to changes in the index, interest rate, payment*

2       *amount, and outstanding loan balance including, for example, an*

3       *explanation of interest rate or payment limitations, negative amortization,*

4       *and interest rate carryover.* (Emphasis added.)

5       60.     These required disclosures must be made in the TILA Disclosure Form with the other

6   disclosures. The TILA Disclosure Form must state whether the loan *is* a negative amortizing loan and

7   whether unpaid interest *is* being added to principal.

8       61.     In 1995, and continuing each time new Official Staff Commentary was issued, the

9   Federal Reserve Board made clear that when the loan was a variable rate loan and it had payment caps,

10  that the disclosure required a definitive statement about negative amortization:

11                      12 CFR Part 226

12                  [Regulation Z; Docket No. R-0863]

13                      Monday, April 3, 1995

14          AGENCY: Board of Governors of the Federal Reserve System.

15              ACTION: Final rule; official staff interpretation.

16          "For the program that gives the borrower an option to cap

17          monthly payments, the creditor must fully disclose the rules

18          relating to the payment cap option, including the effects of

19          exercising it (such as **negative amortization occurs** and

20          that the **principal balance will increase**)…" (Found at

21          C.F.R. § 226.19)

22      62.     At all times relevant, statutory and common law in effect make it unlawful for a lender,

23  such as Defendants, to fail to comply the Federal Reserve Board's Official Staff Commentary as well as

24  Regulation Z and TILA.

25      63.     Defendants sold Plaintiffs and the Class members an Option ARM loan which has a

26  variable rate feature with payment caps. Defendants failed to include any reference on the TILA

27  Disclosure Form that there was negative amortization. There is nothing that would indicate to anyone

28  that the loan schedule had negative amortization. The payment schedule makes no reference to negative

-17-

CLASS ACTION COMPLAINT

1    amortization and makes it appear that the payments cover both principal and interest.

2        64.    In fact, the only place where Defendants even inferentially reference negative

3    amortization is in the Note. However, they mention it in such a way as to make a reasonable person

4    believe that negative amortization is only a possibility, rather than a certainty. And, these loans are, in

5    fact, designed in such a manner so as to make negative amortization a certainty.

6        65.    This attempt at a disclosure did not actually serve to alert or inform the borrowers of

7    anything, much less clearly and conspicuously disclose that the the payment schedule provided by

8    Defendants absolutely would not pay both principal and interest, and therefore would guarantee that

9    negative amortization was to occur on these loans. Rather, Defendants made it appear that as long as the

10   payment schedule provided by Defendants was followed, there would be no negative amortization.

11       66.    So, even where any language is found describing negative amortization, the language is

12   misleading and deceptive. In fact, Defendants' Option ARM loan was designed in such a way as to

13   guarantee negative amortization. TILA demands more than a statement that the payment could be less

14   when Defendants were well aware that the payment is less, and would always be less, than the full

15   interest and principal.

16

17   **C.    Defendants' Failure to Clearly and Conspicuously Disclose that the Initial Interest**

18   **Rate is Discounted Violates Truth in Lending Laws**

19       67.    As previously stated, the informed use of credit means being able to make decisions, as

20   well as being able to plan an individual's finances. Every month consumers look at their income and

21   budget where their funds must be paid. The biggest investment in one's life is generally that person's

22   home. In fact, it is often referred to as "the American Dream" to own a home.

23       68.    Variable rate loans are based on a "margin" and an "index." The index is often the Prime

24   Rate or the LIBOR exchange rate. The margin is the amount the lender charges over that rate, basically

25   it is the lender's profit on the loan.

26       69.    TILA and Regulation Z require disclosures to be clear and conspicuous so people

27   understand what their obligations are. In particular, when the payment is not based on that index and

28   margin a separate disclosure is required. Further, the disclosure must inform the borrower that the

-18-

CLASS ACTION COMPLAINT

1  payment they are making is not based on what the index and margin really should be in order to avoid

2  negative amortization. The disclosure must also inform that interest rate and payment may go up and

3  clearly and conspicuously provide the circumstances under which the rate and payment will increase.

4       70.    The Federal Reserve Board established disclosure requirements for variable rate loans.

5  26 C.F.R. § 226.19 requires a lender to disclose the frequency of interest rate and payment adjustments

6  to borrowers. If interest rate changes will be imposed more frequently or at different intervals than

7  payment changes, a creditor must disclose the frequency and timing of both types of changes.

8       71.    The disclosures required pursuant to 12 C.F.R. § 226.19 are extremely important because

9  Plaintiffs and other consumers similarly situated need this information in order to budget their money.

10  They need to know if their house payments are going to go up so that they can plan for it. If the change

11  comes as a surprise, they face a much greater possibility of defaulting on their loans and losing their

12  homes.

13       72.    Defendants, and each of them, state only that the interest rate *may* increase in the future.

14  However, an interest rate increase was in fact far more certain than this disclosure lead Plaintiffs and

15  Class members to believe. If Defendants had given the Plaintiffs and the Class members the promised

16  low interest rate for any initial period of time, the interest rate was guaranteed to go up even without any

17  change in the index. Thus, the increase in the interest rate on these loans was not just a possibility; it

18  was an absolute certainty and Defendants failed and omitted this material information in their

19  disclosures to Plaintiffs and the Class members.

20       73.    Defendants disclosure statement provided that, "the interest rate may increase during the

21  term of this transaction if the index increases." This, however, was not the only circumstance that could

22  cause an increase in the interest rate. The Defendants, and each of them, failed to disclose that the initial

23  interest rate is discounted, creating the possibility of an increase even when the index did not rise. Due

24  to the initial discounted interest rate, the annual interest rate would increase if the index remained

25  constant, or even if the index declined. Because Defendants' disclosure failed to provide this extremely

26  important, material information, Defendants disclosure failed to meet the clear and conspicuous standard

27  mandated under TILA.

28  / / /

CLASS ACTION COMPLAINT

1    74.    Defendants failed to disclose to Plaintiffs and the Class members that their rate was, with

2    100% certainty, going to increase, whether or not the index upon which their loans are based changed or

3    not.  As such, Defendants violated TILA and Regulation Z with unclear, deceptive and poorly drafted or

4    intentionally misleading disclosure.

5

6    **D.    Defendants' Failure to Disclose the Composite Interest Rate Violates Truth in**

7    **Lending Laws**

8    75.    Defendants provided Plaintiffs and Class members with multiple, conflicting interest

9    rates when describing the costs of this loan.  On the TILA Disclosure Form Defendants set forth one

10   interest rate, while on the Note, Defendants set forth two other, different interest rates.

11   76.    The official staff commentary to 226 C.F.R. § 17(C)(8) states:

12       *Basis of disclosures in variable-rate transactions.* The disclosures for a

13       variable-rate transaction must be given for the full term of the transaction

14       and must be based on the terms in effect at the time of consummation.

15       Creditors should base the disclosures only on the initial rate and should

16       not assume that this rate will increase. For example, in a loan with an

17       initial rate of 10 percent and a 5 percentage points rate cap, creditors

18       should base the disclosures on the initial rate and should not assume that

19       this rate will increase 5 percentage points. **However, in a variable-rate**

20       **transaction with a** seller buydown that is reflected in the credit contract, a

21       consumer buydown, or **a discounted or premium rate, disclosures**

22       **should not be based solely on the initial terms. In those transactions,**

23       **the disclosed annual percentage rate should be a composite rate based**

24       **on the rate in effect during the initial period and the rate that is the**

25       **basis of the variable-rate feature for the remainder of the term.** (See

26       the commentary to section 226.17(c) for a discussion of buydown,

27       discounted, and premium transactions and the commentary to section

28       226.19(a)(2) for a discussion of the redisclosure in certain residential

CLASS ACTION COMPLAINT

1    mortgage transactions with a variable-rate feature.)

2    77.    The reason for this requirement is clear. Consumers cannot make informed decisions

3    when they cannot compare the cost of credit to other proposals. It is therefore incumbent upon

4    Defendants to show the composite interest rate in effect so that the borrowers can understand exactly

5    what they are paying for the loan.

6    78.    A lender violates TILA, Reg. Z and the OTS guidelines by failing to list the composite

7    rate in variable rate loans that had a discounted initial rate. The loan sold to Plaintiffs and Class

8    members by Defendants is a discounted variable-rate loan. Because Defendants failed to properly,

9    clearly and conspicuously, disclose a composite annual percentage rate on these loans Defendants

10   violated TILA and Regulation Z.

11   79.    As a direct and proximate result of Defendants' conduct in violation of TILA, Plaintiffs

12   and Class members have suffered injury an amount to be determined at time of trial. If Defendants had

13   not violated TILA and had instead properly disclosed the material terms of Defendants' Option ARM

14   loan product, as alleged herein, Plaintiffs and Class members would not have entered into the home loan

15   agreements which are the subject of this action. Because Defendants failed to make proper disclosures

16   in violation of TILA, Plaintiffs and Class members now seek redress in an amount and/or type as proven

17   at time of trial.

18

19                                         **VII.**

20                          **SECOND CAUSE OF ACTION**

21   **Violation of California's Unfair Competition Law, Bus. & Prof. Code § 17200 *et. seq.* -**

22        **"Unlawful" Business Acts or Practices Predicated on Violations of TILA**

23                              **(Against All Defendants)**

24

25   80.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

26   81.    California's Unfair Competition Law ("UCL"), Business and Professions Code, §17200,

27   *et seq.*, prohibits acts of "unfair competition," including any unlawful, unfair, fraudulent or deceptive

28   business act or practice as well as "unfair, deceptive, untrue or misleading advertising."

CLASS ACTION COMPLAINT

82.    A business act or practice is "unlawful" if it violates any other law, code or statute.

83.    Defendants, and each of them, engaged in unfair competition within the meaning of §17200 by violating the TILA as detailed in Plaintiffs' First Cause of Action. Defendants failed to comply with the disclosure requirements mandated by TILA, Regulation Z and Official Staff Commentary issued by the Federal Reserve Board. Defendants failed in a number of ways to clearly or accurately disclose the terms of the Option ARM loan to Plaintiffs as Defendants were required to do under TILA.

84.    Plaintiffs and Class members are direct victims of the Defendants' unlawful conduct, as herein alleged, and each has suffered injury in fact, and have lost money or property as a result of Defendants' unfair competition.

## VIII.

## THIRD CAUSE OF ACTION

**(Violation of California's Unfair Competition Law, Bus. & Prof. Code §17200 *et seq.*,**

**"Unfair" and "Fraudulent" Business Acts or Practices,**

**(Against All Defendants)**

85.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

86.    The instant claim is predicated on the generally applicable duty of any contracting party to not misrepresent material facts, and on the duty to refrain from unfair and deceptive business practices. The Plaintiffs and Class members hereby seek to enforce a general proscription of unfair business practices and the requirement to refrain from deceptive conduct. The instant claim is predicated on duties that govern anyone engaged in any business and anyone contracting with anyone else.

87.    California Business and Professions Code, §17200, *et seq.*, also known as the California Unfair Competition Law ("UCL"), prohibits acts of "unfair competition," including any unlawful, unfair, fraudulent or deceptive business act or practice as well as "unfair, deceptive, untrue or misleading advertising."

///

CLASS ACTION COMPLAINT

88.     A business practice is "unfair" if is violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits.

89.     A business practice is "fraudulent" if it is one which is likely to deceive the public.

90.     Defendants engaged in a pattern of deceptive conduct and concealment aimed at maximizing the number of borrowers who would accept their Option ARM loan. Defendants, and each of them, marketed and sold Plaintiffs and Class members a deceptively devised financial product. Defendants marketed and sold their Option ARM loan product to consumers, including Plaintiffs, in a false or deceptive manner. Defendants marketed and advertised to the general public through brochures, flyers and other substantially identical marketing material, a loan which appeared to have a very low, fixed interest rate for a period of three (3) to five (5) years and no negative amortization. Further, Defendants disguised from Plaintiffs and the Class members the fact that Defendants' Option ARM loan was designed to, and did, cause negative amortization to occur.

91.     Defendants lured Plaintiffs and the Class members into the Option ARM loan with promises of low fixed interest. Once Plaintiffs and the Class members entered into these loans, Defendants switched the interest rate charged on the loans to a much higher rate than the one they advertised and promised to Plaintiffs and the Class members. After entering these loans, Plaintiffs and the Class members could not escape because Defendants purposefully placed into these loans an extremely onerous prepayment penalty that made it prohibitively expensive for consumers to extricate themselves from these loans. Thus, once on the hook, Plaintiffs and the Class members could not escape from Defendants loans.

92.     Plaintiffs and Class members were consumers who applied for a mortgage loan through Defendants. During the loan application process, in each case, Defendants uniformly promoted, advertised, and informed Plaintiffs and Class members that in accepting these loan terms, Plaintiffs and Class members would be able to lower their mortgage payment and save money.

93.     Defendants promoted their Option ARM loan as having a low fixed interest rate, i.e., typically between 1% and 3%. However, Defendants did not disclose that this was just a "teaser" rate, the purpose of which was to get consumers to enter into loan agreements with Defendants. Defendants did not disclose to Plaintiffs and the Class members that the "teaser" rate was not the fixed rate that

CLASS ACTION COMPLAINT

1  Defendants would actually charge Plaintiffs and the Class members on their outstanding loan balances.

2      94.    Based on the Defendants' representations and conduct, Plaintiffs and the Class members

3  agreed to finance their primary residence through Defendants' Option ARM loan. Plaintiffs and the

4  Class members were told they were being sold a home loan with a low interest rate, fixed for the first

5  three (3) to five (5) years of the loan. Plaintiffs and the Class members were also lead to believe that if

6  they made payments based on this advertised interest rate, and the payment schedule provided to them

7  by Defendants, the loan was a no negative amortization home loan. After, the fixed interest period,

8  Plaintiffs and the Class members were told their rate "may" change. And, Plaintiffs believed they would

9  then be able to re-finance to another home loan. Plaintiffs and the Class members believed these facts to

10  be true because that is what the Defendants wanted consumers to believe, that is what Defendants lead

11  consumers to believe.

12      95.    Defendants aggressively sold their product as a fixed low interest home loan. Defendants

13  knew that if marketed in such a manner, their Option ARM loan product would be a hugely popular and

14  profitable product for them. Defendants also knew, however, that they were marketing their product in a

15  false and deceptive manner. While Defendants trumpeted their low, fixed rate loans to the public,

16  Defendants knew, however, that this was not entirely true.

17      96.    In fact, Defendants' Option ARM loan possessed a low, fixed *payment* but not a low,

18  fixed interest rate. Unbeknownst to Plaintiffs and Class members, the actual interest rate they were

19  charged on their loans was not fixed. After purchasing Defendants' Option ARM loan product,

20  Plaintiffs and class members never actually received the benefit of the low advertised interest rate, or, in

21  some cases, consumers received the low rate for just a single month. Immediately, thereafter,

22  Defendants in every instance and for every loan increased the interest rate they charged Plaintiffs and the

23  Class members. Once Plaintiffs and Class members accepted Defendants' Option ARM loan, they had

24  no viable option to extricate themselves because of these loan agreements included a draconian pre-

25  payment penalty.

26      97.    Defendants perpetrated a bait and switch scheme on Plaintiffs and Class members.

27  Defendants' conduct and failure to disclose the whole truth about the loan's interest rate and to describe

28  the loan as having a fixed interest rate was deceptive and unfair. Defendants initiated this scheme in

CLASS ACTION COMPLAINT

1  order to maximize the amount of the loans issued to consumers and to maximize Defendants' profits.

2      98.    Plaintiffs and Class members are direct victims of the Defendants' unlawful conduct, as

3  herein alleged, and each has suffered injury in fact, and have lost money or property as a result of

4  Defendants' unfair competition.

5

6  IX.

7  **FOURTH CAUSE OF ACTION**

8  **Breach of Contract**

9  **(Against All Defendants)**

10      99.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

11      100.    Plaintiffs and Class members entered into a written home loan agreement – the Note –

12  with Defendants. The Note was drafted by Defendants and could not be modified by Plaintiffs or Class

13  members. The Note describes terms and respective obligations applicable to the parties herein.

14      101.    The Note describes Plaintiffs' and Class members' interest rate on the loan as a low

15  interest rate, typically between 1% and 3%. In addition, as required by federal law, the Defendants

16  provided a Truth In Lending Disclosure concerning the home loan agreement that shows a payment

17  schedule based on that low 1% to 3% interest rate. For the first three (3) to five (5) years the payment

18  schedule shows that Plaintiffs' and Class members' monthly payment obligations to Defendants are the

19  exact payments necessary to pay off all principal and interest during the terms of the loans if, indeed, the

20  interest rate actually charged by Defendants on the loans was the low interest rate promised.

21      102.    Defendants expressly and/or through their conduct and actions indicate that Plaintiffs'

22  and Class members' monthly payment obligations *will* be applied to payment of both principal and

23  interest owed on the loans. Defendants breached this agreement and never applied any of Plaintiffs' and

24  Class members' payments to principal.

25      103.    The written payment schedules prepared by Defendants, and applicable to Plaintiffs' and

26  Class members' loans, show that the payment amounts owed by Plaintiffs and Class members to

27  Defendants in year one are exactly equal to the amount required to pay off the loan if, indeed, the interest

28  actually charged on the loan was the low interest rate promised. If the Defendants did as promised, the

CLASS ACTION COMPLAINT

1  payments would have been sufficient to pay both principal and interest amounts.

2      104.    Instead, Defendants immediately raised Plaintiffs' and Class members' interest rates and

3  applied *no part* of Plaintiffs' and Class members' payments to the principal balances on their loans.  In

4  fact, because Defendants charged more interest than was agreed to, the total payment was insufficient to

5  cover the interest charge and the principal balance increased (which is the negative amortization built

6  into the loan).

7      105.    Defendants breached the written contractual agreement by failing to apply any portion of

8  Plaintiffs' and the Class members' monthly payments towards their principal loan balances.

9      106.    Plaintiffs and the Class members, on the other hand, did all of those things the contract

10  required of them.  Plaintiffs and the Class members made monthly payments in the amount required by

11  the terms of the Note and reflected in the payment schedule prepared by Defendants.

12      107.    As a result of Defendants' breach of the agreement, Plaintiffs and the Class members

13  have suffered harm.  Plaintiffs and Class members have incurred additional charges to their principal

14  loan balance.  Plaintiffs and Class members have incurred and will continue to incur additional interest

15  charges on the principal loan balance and surplus interest added to Plaintiffs' and Class members'

16  principal loan balance.  Furthermore, Defendants' breach has placed Plaintiffs and Class members in

17  danger of losing their homes through foreclosure, as Defendants have caused Plaintiffs' and Class

18  members' principal loan balances to increase and limited these consumers' ability to make their future

19  house payments or obtain alternative home loan financing.

20

21                              X.

22                    **FIFTH CAUSE OF ACTION**

23        **Breach of Implied Covenant of Good Faith and Fair Dealing**

24                      **(Against All Defendants)**

25      108.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

26      109.    Defendants entered into written agreements with Plaintiffs and Class members based on

27  representations Defendants made indirectly and directly to Plaintiffs and the Class members about the

28  terms of their loans.

CLASS ACTION COMPLAINT

110.    Defendants impliedly and expressly represented to Plaintiffs and Class members that it would provide loans secured by Plaintiffs' and Class members' homes, and that the loans would have a fixed interest rate at promised low interest rate for a period of three (3) to five (5) years.

111.    Defendants also represented that if Plaintiffs and Class members made the monthly payments in the amount prescribed by Defendants no negative amortization would occur. The Note expressly states and/or implies that Plaintiffs' and Class members' monthly payment obligation will be applied to pay both principal and interest owed on the loan. The Note further makes clear that for each monthly payment Plaintiffs and Class members make, "interest shall be paid before principal."

112.    The written payment schedules prepared by Defendants, and applicable to Plaintiffs' and Class members' loans, show that the payment amounts owed by Plaintiffs and Class members to Defendants in year one are exactly equal to the amount required to pay off the loan if, indeed, the interest actually charged on the loan was the low interest rate promised. If the Defendants acted as it promised, the payments would have been sufficient to pay both principal and interest.

113.    Instead, Defendants immediately raised Plaintiffs' and Class members' interest rate and applied *no part* of Plaintiffs' and Class members' payment to principal. In fact, because Defendants charged more interest than was disclosed and agreed to in the loans, Plaintiffs and the Class members' payments were insufficient to cover the interest that Defendants charged resulting in an increase in the amount of principal Plaintiffs and the Class members owed on their homes.

114.    Defendants unfairly interfered with Plaintiffs' and Class members' rights to receive the benefits of the contract. These loans will cost Plaintiffs and Class members thousands of dollars more than represented by Defendants. Plaintiffs and Class members did not receive the fixed low interest rate home loan promised them by Defendants. Defendants have caused Plaintiffs and Class members to lose equity in their homes and therefore have denied Plaintiffs and Class members the enjoyment, security of one of their most important investments.

115.    Plaintiffs and Class members, on the other hand, did all of those things the contract required of them. Plaintiffs and Class members made monthly payments in the amount required by the terms of the Note and reflected in the payment schedule prepared by Defendants.

/ / /

-27-

CLASS ACTION COMPLAINT

116.    As a result of Defendants' breach of the agreement, Plaintiffs and Class members have suffered harm. Plaintiffs and Class members have incurred additional charges to their principal loan balance. Plaintiffs and Class members have incurred and will continue to incur additional interest charges on the principal loan balance and surplus interest added to Plaintiffs' and Class members' principal loan balance. Furthermore, Defendants' breach has placed Plaintiffs and Class members in danger of losing their homes through foreclosure, as Defendants have caused Plaintiffs' and Class members' principal loan balances to increase and limited these consumers' ability to make their future house payments or obtain alternative home loan financing.

## XI.

### SIXTH CAUSE OF ACTION

**Violation of California's Unfair Competition Law, Bus. & Prof. Code §17200, *et seq.*, –**

**"Unlawful" Business Acts or Practices Predicated on Violations of Cal. Financial Code § 22302**

**(Against All Defendants)**

117.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

118.    California Business and Professions Code, §17200, *et seq.*, also known as the California Unfair Competition Law ("UCL"), prohibits acts of "unfair competition," including any unlawful, unfair, fraudulent or deceptive business act or practice as well as "unfair, deceptive, untrue or misleading advertising."

119.    A business act or practice is "unlawful" if it violates any other law, code or statute.

120.    Defendants, and each of them, engaged in unfair competition within the meaning of §17200 by violating California Financial Code § 22302.

121.    California Financial Code § 22302 applies to consumer loan contracts. It states that a loan found to be unconscionable pursuant to Section 1670.5 of the California Civil Code shall be deemed to be a violation of Financial Code § 22302.

122.    The loan contracts prepared by Defendants and entered into between Plaintiffs and Class members and Defendants were, and are, unconscionable pursuant to Section 1670.5 of the Civil Code.

123.    The relative bargaining power between Plaintiffs and Class members and Defendants was

CLASS ACTION COMPLAINT

1   unequal. Plaintiffs and Class members could not negotiate or change any of the particular terms related

2   to the loan and drafted by Defendants. To secure the loan Plaintiffs and Class members were given no

3   choice but to make payments as described in the payment schedule and to accept and sign all the

4   associating documents numbering over a hundred pages.

5       124.   The period of time where Defendants offered Plaintiffs and Class members a low interest

6   rate, often was for only one month. Because Defendant Lender packaged the documents in such a

7   manner as to lead Plaintiff and Class members to believe that they had a low interest rate and therefore

8   low payments for three to five years, Plaintiffs and Class members would end up owing significantly

9   more than before they started and with a significant chance of losing their homes through foreclosure.

10      125.   Defendants drafted these loan documents for use on tens of thousands of individuals. The

11  loan process was such that individual terms could not be modified. The documents evidencing the loan

12  were delivered to Plaintiffs and Class members at the time of signature. The loan process offered by

13  Defendants did not permit for any meaningful negotiation of terms or even review of the loan documents

14  at the time of execution.

15      126.   Defendants further inserted into the loan documents a prepayment penalty that has as it

16  sole purpose to cause Plaintiffs and Class members to continue under the terms of this loans or lose

17  thousands of dollars if Plaintiffs try to refinance the loans.

18      127.   The loans as drafted by Defendants were so "one-sided" that they could only lead

19  Plaintiffs and Class members to one result, which was a significant loss of money. As a result of

20  Defendants' unconscionable behavior, Plaintiffs and the Class members have suffered direct and actual

21  injury.

22      128.   Because Defendants' Option ARM loan contract is unconscionable pursuant to Section

23  1670.5 of the Civil Code, Defendants' Option ARM loan violates Financial Code § 22302 and

24  constitutes a violation of the UCL.

25      129.   Plaintiffs and Class members are direct victims of the Defendants' unlawful conduct, as

26  herein alleged, and each has suffered injury in fact, and have lost money or property as a result of

27  Defendants' unfair competition.

28

CLASS ACTION COMPLAINT

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and all Class members pray for judgment against each Defendant, jointly and severally, as follows:

A.    An order certifying this case as a class action and appointing Plaintiffs and their counsel to represent the Class;

B.    For actual damages according to proof;

C.    For compensatory damages as permitted by law;

D.    For consequential damages as permitted by law;

E.    For statutory damages as permitted by law;

F.    For punitive damages as permitted by law;

G.    For rescission;

H.    For equitable relief, including restitution;

I.    For an order requiring Defendants to disgorge all profits obtained as a result of their unfair competition;

J.    For interest as permitted by law;

K.    For Declaratory Relief;

L.    For a mandatory injunction requiring Defendants to permanently include in every Option ARM loan and disclosure statement: (i) comply with 12 C.F.R. § 226.17 by clearly and conspicuously disclosing the actual interest rate on the Note(s) and disclosure statement(s); (ii) comply with 12 C.F.R. § 226.19 by clearly and conspicuously disclosing in the Note(s) and the disclosure statement(s) that payments on the variable interest rate loan during the initial period at the teaser rate will result in negative amortization and that the principal balance will increase; and (iii) clearly and conspicuously disclose that the initial interest rate provided is discounted and does not reflect the actual interest that Plaintiffs and Class members would be paying on the Note(s).

M.    For reasonable attorneys' fees and costs; and

/ / /

/ / /

CLASS ACTION COMPLAINT

1    N.    For such other relief as is just and proper.

2

3   DATED: August 24, 2007                    **SPIRO MOSS BARNESS LLP**

4

5                                              By: _____

6                                                 David M. Arbogast, Esq.
                                                  11377 W. Olympic Boulevard, Fifth Floor
7                                                 Los Angeles, CA 90064-1683
                                                  Phone: (310) 235-2468; Fax: (310) 235-2456

8                                                 Paul R. Kiesel, Esq.
                                                  Patrick Deblase, Esq.
9                                                 Michael C. Eyerly, Esq.
                                                  **KIESEL BOUCHER LARSON LLP**
10                                                8648 Wilshire Boulevard
                                                  Beverly Hills, California 90210
11                                                Phone: (310) 854-4444; Fax: (310) 854-0812

12                                                Jeffrey K. Berns, Esq.
                                                  **LAW OFFICES OF JEFFREY K. BERNS**
13                                                19510 Ventura Blvd, Suite 200
                                                  Tarzana, California 91356
14                                                Phone: (818) 961-2000; Fax: (818) 867-4820

15                                                Attorneys for Plaintiffs and all others Similarly
                                                  Situated
16

17                                **DEMAND FOR JURY TRIAL**

18        Plaintiffs hereby demand a trial by jury to the full extent permitted by law.

19

20   DATED: August 29 2007                     **SPIRO MOSS BARNESS LLP**

21

22                                              By: _____

23                                                 David M. Arbogast, Esq.
                                                   11377 W. Olympic Boulevard, Fifth Floor
24                                                 Los Angeles, CA 90064-1683
                                                   Phone: (310) 235-2468; Fax: (310) 235-2456

25                                                 Paul R. Kiesel, Esq.
                                                   Patrick Deblase, Esq.
26                                                 Michael C. Eyerly, Esq.
                                                   **KIESEL BOUCHER LARSON LLP**
27                                                 8648 Wilshire Boulevard
                                                   Beverly Hills, California 90210
28                                                 Phone: (310) 854-4444; Fax: (310) 854-0812

-31-

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jeffrey K. Berns, Esq.
**LAW OFFICES OF JEFFREY K. BERNS**
19510 Ventura Blvd, Suite 200
Tarzana, California 91356
Phone: (818) 961-2000; Fax: (818) 867-4820

Attorneys for Plaintiffs and all others Similarly
Situated

CLASS ACTION COMPLAINT

**Exhibit No. 1**

LOAN # 6900091171

# ADJUSTABLE RATE NOTE

LIBOR Annual Monthly Average (LAMA) of 1-Month LIBOR Index

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY PAYMENT CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

JUNE 08, 2005              SAN JOSE                          CA
[Date]                        [City]                    [State]
1271 TERILYN AVENUE, SAN JOSE, CA 95122

[Property Address]

### 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $      468,000.00      (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is  BANK OF AMERICA, N.A.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    1.000      %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3.  PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the first day of each month beginning on  AUGUST 01, 2005       .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied first to current interest, then to prior unpaid interest, and the remainder to Principal. If, on JULY 01, 2035      , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  BANK OF AMERICA, N.A., P.O. BOX 17404, BALTIMORE, MD 21297-1404
or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $      1,505.28      . This amount may change.

**(C) Monthly Payment Changes**

The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

### 4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Interest Rate Change Dates**

The interest rate I will pay may change on the first day of  AUGUST, 2005      , and on the first day of every month thereafter. Each date on which my interest rate could change is called a "Rate Change Date."

MULTISTATE ADJUSTABLE RATE NOTE – Single Family

BA477N (0504)
W77N 06/08/05  2:04 PM 6900091171

VMP Mortgage Solutions, Inc. (800)521-7291



**(B) The Index**

Beginning with the first Change Date, my adjustable rate will be based on an Index. The "Index" is equal to the LIBOR Annual Monthly Average ("LAMA") of the 1-month London Inter-Bank Offered Rate ("LIBOR"), as made available by Fannie Mae on their website, through electronic transmission or by telephone. The most recent LIBOR Annual Monthly Average ("LAMA") figure available as of the date 15 days before each Change Date is called the "Current Index".

If the Index is no longer available or is no longer posted either through electronic transmission or by telephone, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculations of Interest Rate Changes**

Before each Rate Change Date, the Note Holder will calculate my new interest rate by adding TWO AND ONE-EIGHTH                              percentage points (    2.125          %) to the Current Index. The Note Holder will then round the result of this addition to the NEXT HIGHEST one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Rate Change Date.

**(D) Interest Rate Limit**

My interest rate will never be greater than    9.950        %.

**(E) Payment Changes**

My monthly payment will be adjusted on      AUGUST 01, 2006          and on the same date each year thereafter. Each date on which my payment could change is called a "Payment Change Date". My monthly payment will not increase or decrease by more than 7.5% from the payment in effect just prior to the change ("Annual Payment Cap"), except as described in Section 4(G) below. Unless limited by the Annual Payment Cap, my new monthly payment will equal the amount necessary to amortize (pay off) my loan in substantially equal installments over its remaining term based on the interest rate that became effective on the Rate Change Date prior to the Payment Change Date.

**(F) Principal Balance Adjustments - Deferred Interest (Negative Amortization)**

If my monthly payment is less than the amount necessary to pay the full amount of interest for that month, the portion of interest that is unpaid will be added to the principal balance of my loan as of the due date for such payment and will accrue interest at the rate in effect from time to time in accordance with this Note.

**(G) Full Reamortization**

The Payment Change Dates occurring immediately following every fifth year (on the due dates for my 61st, 121st, 181st, 241st and 301st payments) are instead called "Reamortization Dates." In addition, if as of a due date for any payment, the principal balance on this loan would increase to an amount that equals or exceeds    115          % of the original principal balance, that due date will also be a "Reamortization Date."

Effective with the payment due on a Reamortization Date, the Note Holder will adjust my monthly payment in the same manner as provided in Section 4(E) above, except that the Note Holder will not apply the Annual Payment Cap. I will continue making payments at the new level until the next Payment Change Date or Reamortization Date.

I understand that changes in the interest rate that occur during the final five years of my loan term may make my monthly payments insufficient to pay off my loan over the remaining term in equal installments unless I elect to make fully amortizing payments during that period, as provided in Section 4(H) below. As agreed in Section 3(A) above, I will pay off all amounts still owing under this Note on or before the Maturity Date even if this requires a substantially higher payment on the Maturity Date than the immediately preceding payment amounts. Lender is under no obligation to refinance the loan at that time. I will, therefore, be required to make payment out of other assets that I may own, or I will have to find a lender, which may be the lender I have this loan with, willing to lend me the money. If I refinance this loan at maturity, I may have to pay some or all of the closing costs normally associated with a new loan even if I obtain refinancing from the same lender.

**(H) Payment Options**

I will have up to three monthly payment options for my loan. I may always make the monthly payment required under Sections 3(B), 4(E) or 4(G), as applicable (the "Required Payment"). If the Required Payment is insufficient to fully amortize my loan as a result of the application of the Annual Payment Cap or principal balance adjustments, I will have the option to make a fully amortizing payment, which is an amount sufficient to pay off my loan in substantially

equal payments over its remaining term at its then interest rate. If the Required Payment is not sufficient to pay all of the interest owed for that month, which would result in negative amortization, I also will have the option to make an interest-only payment, which will be sufficient to pay the monthly interest and avoid negative amortization, but will not reduce the principal balance. Even if these options are available, I may still elect to make only the Required Payment.

(I) Effective Date of Interest Rate Changes
My new interest rate will become effective on each Rate Change Date. I will pay the amount of my new monthly payment beginning on the Payment Change Date or the Reamortization Date, as applicable, until the amount of my monthly payment changes again.

(J) Notice of Changes
The Note Holder will deliver or mail to me an annual notice of any changes that have occurred to my adjustable interest rate in the preceding year. The Note Holder will also deliver or mail to me a notice of the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5.   BORROWER'S RIGHT TO PREPAY

I HAVE THE RIGHT TO MAKE PAYMENTS OF PRINCIPAL AT ANY TIME BEFORE THEY ARE DUE. A PAYMENT OF PRINCIPAL ONLY IS KNOWN AS A "PREPAYMENT." WHEN I MAKE A PREPAYMENT, I WILL TELL THE NOTE HOLDER IN WRITING THAT I AM DOING SO. I MAY NOT DESIGNATE A PAYMENT AS A PREPAYMENT IF I HAVE NOT MADE ALL THE MONTHLY PAYMENTS DUE UNDER THIS NOTE.

I MAY MAKE A FULL PREPAYMENT OR PARTIAL PREPAYMENT WITHOUT PAYING ANY PREPAYMENT CHARGE. AFTER PAYING ANY LATE FEES OR OUTSTANDING FEES THAT I OWE, THE NOTE HOLDER WILL USE MY PREPAYMENTS TO REDUCE THE AMOUNT OF PRINCIPAL THAT I OWE UNDER THIS NOTE. HOWEVER, THE NOTE HOLDER MAY APPLY MY PREPAYMENT TO THE ACCRUED AND UNPAID INTEREST ON THE PREPAYMENT AMOUNT BEFORE APPLYING MY PREPAYMENT TO REDUCE THE PRINCIPAL AMOUNT OF THIS NOTE. IF I MAKE A PARTIAL PREPAYMENT, THERE WILL BE NO CHANGES IN THE DUE DATE OR IN THE AMOUNT OF MY MONTHLY PAYMENT UNLESS THE NOTE HOLDER AGREES IN WRITING TO THOSE CHANGES. MY PARTIAL PREPAYMENT MAY REDUCE THE AMOUNT OF MY MONTHLY PAYMENTS AFTER THE FIRST RATE CHANGE DATE FOLLOWING MY PARTIAL PREPAYMENT. HOWEVER, ANY REDUCTION DUE TO MY PARTIAL PREPAYMENT MAY BE OFFSET BY AN INTEREST RATE INCREASE.

## 6.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7.   BORROWER'S FAILURE TO PAY AS REQUIRED
(A) Late Charges for Overdue Payments
If the Note Holder has not received the full amount of any Required Payment by the end of          15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.0       % of my overdue Required Payment. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each Required Payment or any other amounts due under this Note on the date the payment or other amount is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10.   WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11.   UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ {Seal}
BRIAN D. O'DONNELL                                                -Borrower

_____ {Seal}
                                                                  -Borrower

_____ {Seal}
                                                                  -Borrower

_____ {Seal}
                                                                  -Borrower

_____ {Seal}
                                                                  -Borrower

_____ {Seal}
                                                                  -Borrower

_____ {Seal}
                                                                  -Borrower

_____ {Seal}
                                                                  -Borrower

**FEDERAL TRUTH IN LENDING
DISCLOSURE STATEMENT
Real Estate Loans**

Loan Center ___CONCORD LOAN CENTER___     No. _2527_  Loan No. ____6900091171____

Principal Amount of Proposed Loan ____468,000.00____     Expected Funding Date ____06/10/05____

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 9.945 % | $ 1,158,815.30 | $ 462,083.18 | $ 1,620,878.48 |

1.  Payment Schedule.
    Your payment schedule will be:

| Number of Payments | Payments Are Due MONTHLY Beginning | Amount of Payments ** | Number of Payments | Payments Are Due MONTHLY Beginning | Amount of Payments ** |
|---|---|---|---|---|---|
| 12 | 08/01/05 | 1505.28 | | | |
| 12 | 08/01/06 | 1618.17 | | | |
| 4 | 08/01/07 | 1739.54 | | | |
| 332 | 12/01/07 | 4748.31 | | | |

2.  Security and Property Insurance.
    You are giving a security interest in real estate at:
    1271 TERILYN AVENUE, SAN JOSE, CA 95122
    You may obtain property insurance from anyone you want who is acceptable to the Lender.

3.  Late Payment.
    If a payment is not received by the Lender by its first banking day which is at least ___15___ days after the payment due date, you will be charged ____5.0____ % of the payment.

4.  Prepayment.
    If you pay off early, you [X] will not [ ] may have to pay a prepayment penalty.
    [ ] If you prepay your loan on other than the regular installment date, you may be assessed interest charges until the end of the month.
    [ ] You may be entitled to a refund of the mortgage insurance premium from HUD.
    You [X] will not [ ] may be entitled to a refund of part of the finance charge.

[X] 5.  Assumption Policy.
    [ ] Someone buying your home cannot assume the remainder of your loan on its original terms.
    [X] Someone buying your home may be allowed to assume the remainder of your loan on its original terms, subject to certain conditions stated in your loan documents.

[X] 6.  Variable Rate.
    Your loan contains a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

[ ] 7.  Required Deposit.
    The annual percentage rate does not take into account your required deposit.

8.  See your loan documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment refunds and penalties.

9.  Certain Security Interest Charges. PLEASE SEE THE GOOD FAITH ESTIMATE AND HUD-1 FOR THESE FEES.
    Recording/filing                        $ _____    $ _____
    Lien release recording/filing           $ _____    $ _____

10. The loan applied for will not be secured by any contractual lien except that resulting from the mortgage or deed of trust covering the security described in the Security and Property Insurance Section.
    * THE CURRENT INDEX USED AT THE TIME OF CLOSING WAS 2.280X .

**The payment amount does not include ♦ tax and insurance reserve.

BANK OF AMERICA, N.A. ("LENDER")  X _[signature]_  6/8/05

BA222 (0409)               VMP Mortgage Solutions, Inc. (800)521-7291

TLD1 06/08/05 2:04 PM 6900091171

PAGE 1 OF 2

**Exhibit No. 2**

Aug 01 07 09:54p    Michael Van Belleghem                805 481 7156                         p.2

LOAN # 6997911521

# ADJUSTABLE RATE NOTE

### LIBOR Annual Monthly Average (LAMA) of 1-Month LIBOR Index

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY PAYMENT CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

MAY 25, 2006                          ARROYO GRANDE                                CA
[Date]                                    [City]                                  [State]
751 SOUTH ELM, ARROYO GRANDE, CA 93420

[Property Address]

### 1.    BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $     300,000.00     (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is BANK OF AMERICA, N.A.

I will make all payments under this Note in the form of cash, check or money order.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2.    INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of     1.125     %. The interest rate I will pay will change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3.    PAYMENTS

**(A) Time and Place of Payments**
I will pay principal and interest by making a payment every month.
I will make my monthly payment on the first day of each month beginning on JULY 01, 2006
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied first to current interest, then to prior unpaid interest, and the remainder to Principal. If, on JUNE 01, 2036                               , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at BANK OF AMERICA, N.A., P.O. BOX 17404, BALTIMORE, MD 21297-1404
or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**
Each of my initial monthly payments will be in the amount of U.S. $     982.25     . This amount may change.

**(C) Monthly Payment Changes**
The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

### 4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Interest Rate Change Dates**
The interest rate I may change on the first day of JULY, 2006                               , and on the first day of every month thereafter. Each date on which my interest rate could change is called a "Rate Change Date."

MULTISTATE ADJUSTABLE RATE NOTE – Single Family

BA477N  (05/04)                                                          Page 1 of 5
477N 05/25/06  2:10 PM 6997911521            VMP Mortgage Solutions, Inc. (800)521-7291

**(B) The Index**

Beginning with the first Change Date, my adjustable rate will be based on an Index. The "Index" is equal to the LIBOR Annual Monthly Average ("LAMA") of the 1-month London Inter-Bank Offered Rate ("LIBOR"), as made available by Fannie Mae on their website, through electronic transmission or by telephone. The most recent LIBOR Annual Monthly Average ("LAMA") figure available as of the date 15 days before each Change Date is called the "Current Index."

If the Index is no longer available or is no longer posted either through electronic transmission or by telephone, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculations of Interest Rate Changes**

Before each Rate Change Date, the Note Holder will calculate my new interest rate by adding  TWO AND ONE-QUARTER                                          percentage points (    2.250          %) to the Current Index. The Note Holder will then round the result of this addition to the  NEXT HIGHEST  one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Rate Change Date.

**(D) Interest Rate Limit**

My interest rate will never be greater than     10.075          %.

**(E) Payment Changes**

My monthly payment will be adjusted on       JULY 01, 2007                   and on the same date each year thereafter. Each date on which my payment could change is called a "Payment Change Date." My monthly payment will not increase or decrease by more than 7.5% from the payment in effect just prior to the change ("Annual Payment Cap"), except as described in Section 4(G) below. Unless limited by the Annual Payment Cap, my new monthly payment will equal the amount necessary to amortize (pay off) my loan in substantially equal installments over its remaining term based on the interest rate that became effective on the Rate Change Date prior to the Payment Change Date.

**(F) Principal Balance Adjustments - Deferred Interest (Negative Amortization)**

If my monthly payment is less than the amount necessary to pay the full amount of interest for that month, the portion of interest that is unpaid will be added to the principal balance of my loan as of the due date for such payment and will accrue interest at the rate in effect from time to time in accordance with this Note.

**(G) Full Reamortization**

The Payment Change Dates occurring immediately following every fifth year (on the due dates for my 61st, 121st, 181st, 241st and 301st payments) are instead called "Reamortization Dates." In addition, if as of a due date for any payment, the principal balance on this loan would increase to an amount that equals or exceeds     115          % of the original principal balance, that due date will also be a "Reamortization Date."

Effective with the payment due on a Reamortization Date, the Note Holder will adjust my monthly payment in the same manner as provided in Section 4(E) above, except that the Note Holder will not apply the Annual Payment Cap. I will continue making payments at the new level until the next Payment Change Date or Reamortization Date.

I understand that changes in the interest rate that occur during the final five years of my loan term may make my monthly payments insufficient to pay off my loan over the remaining term in equal installments unless I elect to make fully amortizing payments during that period, as provided in Section 4(H) below. As agreed in Section 3(A) above, I will pay off all amounts still owing under this Note on or before the Maturity Date even if this requires a substantially higher payment on the Maturity Date than the immediately preceding payment amounts. Lender is under no obligation to refinance the loan at that time. I will, therefore, be required to make payment out of other assets that I may own, or I will have to find a lender, which may be the lender I have this loan with, willing to lend me the money. If I refinance this loan at maturity, I may have to pay some or all of the closing costs normally associated with a new loan even if I obtain refinancing from the same lender.

**(H) Payment Options**

I will have up to three monthly payment options for my loan. I may always make the monthly payment required under Sections 3(B), 4(E) or 4(G), as applicable (the "Required Payment"). If the Required Payment is insufficient to fully amortize my loan as a result of the application of the Annual Payment Cap or principal balance adjustments, I will have the option to make a fully amortizing payment, which is an amount sufficient to pay off my loan in substantially

Jg 01 07 09:54p    Michael Van Belleghem                605 481 7158                 p.4

equal payments over its remaining term at its then interest rate. If the Required Payment is not sufficient to pay all of the interest owed for that month, which would result in negative amortization, I also will have the option to make an interest only payment, which will be sufficient to pay the monthly interest and avoid negative amortization, but will not reduce the principal balance. Even if these options are available, I may still elect to make only the Required Payment.

**(I) Effective Date of Interest Rate Changes**
My new interest rate will become effective on each Rate Change Date. I will pay the amount of my new monthly payment beginning on the Payment Change Date or the Reamortization Date, as applicable, until the amount of my monthly payment changes again.

**(J) Notice of Changes**
The Note Holder will deliver or mail to me an annual notice of any changes that have occurred to my adjustable interest rate in the preceding year. The Note Holder will also deliver or mail to me a notice of the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

5.   **BORROWER'S RIGHT TO PREPAY**
I HAVE THE RIGHT TO MAKE PAYMENTS OF PRINCIPAL AT ANY TIME BEFORE THEY ARE DUE. A PAYMENT OF PRINCIPAL ONLY IS KNOWN AS A "PREPAYMENT." WHEN I MAKE A PREPAYMENT, I WILL TELL THE NOTE HOLDER IN WRITING THAT I AM DOING SO. I MAY NOT DESIGNATE A PAYMENT AS A PREPAYMENT IF I HAVE NOT MADE ALL THE MONTHLY PAYMENTS DUE UNDER THIS NOTE.
I MAY MAKE A FULL PREPAYMENT OR PARTIAL PREPAYMENT WITHOUT PAYING ANY PREPAYMENT CHARGE. AFTER PAYING ANY LATE FEES OR OUTSTANDING FEES THAT I OWE, THE NOTE HOLDER WILL USE MY PREPAYMENTS TO REDUCE THE AMOUNT OF PRINCIPAL THAT I OWE UNDER THIS NOTE. HOWEVER, THE NOTE HOLDER MAY APPLY MY PREPAYMENT TO THE ACCRUED AND UNPAID INTEREST ON THE PREPAYMENT AMOUNT BEFORE APPLYING MY PREPAYMENT TO REDUCE THE PRINCIPAL AMOUNT OF THIS NOTE. IF I MAKE A PARTIAL PREPAYMENT, THERE WILL BE NO CHANGES IN THE DUE DATE OR IN THE AMOUNT OF MY MONTHLY PAYMENT UNLESS THE NOTE HOLDER AGREES IN WRITING TO THOSE CHANGES. MY PARTIAL PREPAYMENT MAY REDUCE THE AMOUNT OF MY MONTHLY PAYMENTS AFTER THE FIRST RATE CHANGE DATE FOLLOWING MY PARTIAL PREPAYMENT. HOWEVER, ANY REDUCTION DUE TO MY PARTIAL PREPAYMENT MAY BE OFFSET BY AN INTEREST RATE INCREASE.

6.   **LOAN CHARGES**
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

7.   **BORROWER'S FAILURE TO PAY AS REQUIRED**
(A) Late Charges for Overdue Payments
If the Note Holder has not received the full amount of any Required Payment by the end of         15
calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be
5.0        % of my overdue Required Payment. I will pay this late charge promptly but only once on each
late payment.

**(B) Default**

If I do not pay the full amount of each Required Payment or any other amounts due under this Note on the date the payment or other amount is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.   WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.   UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
MICHAEL VAN BELLEGHEM                                    -Borrower

_____ (Seal)
PATRICIA VAN BELLEGHEM                                   -Borrower

_____ (Seal)
                                                        -Borrower

_____ (Seal)
                                                        -Borrower

_____ (Seal)
                                                        -Borrower

_____ (Seal)
                                                        -Borrower

_____ (Seal)
                                                        -Borrower

_____ (Seal)
                                                        -Borrower

BA477N (0904)                              Page 6 of 6
            M77N 05/25/06  2:10 PM 6997911921

Aug 01 07 09:55p    Michael Van Belleynem                605 481 7158                        p.7

## FEDERAL TRUTH IN LENDING
### DISCLOSURE STATEMENT
#### Real Estate Loan

| Loan Center | BREA RETAIL LOAN CENTER | No. | 2629 | Loan No. | 6697911521 |
|---|---|---|---|---|---|

Principal Amount of Proposed Loan _____ 300,000.00 _____    Expected Funding Date _____ 06/01/06

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 5.378 % | $ 432,277.24 | $ 298,595.00 | $ 730,872.24 |

**1. Payment Schedule.**
Your payment schedule will be:

| Number of Payments | Payments Are Due MONTHLY Beginning | Amount of Payments ** | Number of Payments | Payments Are Due MONTHLY Beginning | Amount of Payments ** |
|---|---|---|---|---|---|
| 12 | 07/01/06 | 982.25 | | | |
| 12 | 07/01/07 | 1055.91 | | | |
| 12 | 07/01/08 | 1135.11 | | | |
| 12 | 07/01/09 | 1220.24 | | | |
| 12 | 07/01/10 | 1311.78 | | | |
| 300 | 07/01/11 | 2208.03 | | | |

**2. Security and Property Insurance.**
You are giving a security interest in real estate at:
761 SOUTH ELM, ARROYO GRANDE, CA 93420
You may obtain property insurance from anyone you want who is acceptable to the Lender.

**3. Late Payment.**
If a payment is not received by the Lender by its first banking day which is at least __15__ days after the payment due date, you will be charged ___6.0___ % of the payment.

**4. Prepayment.**
If you pay off early, you [X] will not [ ] may have to pay a prepayment penalty.
[ ] If you prepay your loan on other than the regular installment date, you may be assessed interest charges until the end of the month.
You may be entitled to a refund of the mortgage insurance premium from HUD.
You [X] will not [ ] may be entitled to a refund of part of the finance charge.

[X] **5. Assumption Policy.**
[ ] Someone buying your home cannot assume the remainder of your loan on its original terms.
[X] Someone buying your home may be allowed to assume the remainder of your loan on its original terms, subject to certain conditions stated in your loan documents.

[X] **6. Variable Rate.**
Your loan contains a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

[ ] **7. Required Deposit.**
The annual percentage rate does not take into account your required deposit.

**8.** See your loan documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment refunds and penalties.

**9. Certain Security Interest Charges.** PLEASE SEE THE GOOD FAITH ESTIMATE AND HUD-1 FOR THESE FEES.
Recording/filing                                 $                                 $
Lien release recording/filing                 $                                 $

**10.** This loan applied for will not be secured by any contractual lien except that resulting from the mortgage or deed of trust covering the security described in the Security and Property Insurance Section.
* THE CURRENT INDEX USED AT THE TIME OF CLOSING WAS 4.111% .

**The payment amount does not include a tax and insurance reserve.

BANK OF AMERICA, N.A. ("LENDER")

BA222 (0811)
        TLD1 05/25/06 2:10 PM 6697911521            VMP Mortgage Solutions, Inc. (800)521-7291

                                PAGE 1 OF 2