1  MICHAEL J. AGOGLIA (CA SBN 154810)
   magoglia@mofo.com
2  WENDY M. GARBERS (CA SBN 213208)
   wgarbers@mofo.com
3  NANCY R. THOMAS (CA SBN 236185)
   nthomas@mofo.com
4  MORRISON & FOERSTER LLP
   425 Market Street
5  San Francisco, California  94105-2482
   Telephone: (415) 268-7000
6  Facsimile: (415) 268-7522

7  Attorneys for Defendants
   BANK OF AMERICA CORPORATION;
8  BANK OF AMERICA, NATIONAL ASSOCIATION

9

10                 UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12                      SAN JOSE DIVISION

13

14  BRIAN O'DONNELL, MICHAEL VAN          Case No. C-07-04500 RMW (HRL)
    BELLEGHEM, PATRICIA VAN
15  BELLEGHEM, individually and on behalf of all
    others similarly situated,             **NOTICE OF MOTION AND MOTION
16                Plaintiffs,              TO DISMISS PLAINTIFFS' FIRST
                                           AMENDED COMPLAINT**
17        v.
                                           Date:    February 15, 2008
18                                         Time:    9:00 a.m.
19  BANK OF AMERICA CORPORATION;           Crtrm:   6
    BANK OF AMERICA, NATIONAL
20  ASSOCIATION a.k.a. BANK OF AMERICA,    Honorable Ronald M. Whyte
    N.A., and DOES 1 through 10 inclusive,
21                Defendants.              Complaint filed:    August 30, 2007

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

NOTICE OF MOTION AND MOTION ...................................................................... iv

STATEMENT OF ISSUES TO BE DECIDED ............................................................ v

MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 1

BACKGROUND ......................................................................................................... 2

    A.    Plaintiffs' Option ARM Loans ................................................... 2

    B.    Plaintiffs' Allegations ................................................................ 4

    C.    TILA .............................................................................................. 4

ARGUMENT ............................................................................................................... 5

I.      PLAINTIFFS FAIL TO STATE A CLAIM UNDER TILA. ........................... 5

    A.    Plaintiffs' Claims for Damages Under TILA Are Barred by the Statute of Limitations. ............................................................... 6

    B.    Plaintiffs' Notes Clearly Disclose the Contractual Interest Rate and as Required by TILA. ............................................................ 6

    C.    The Loan Documents Fully Informed Plaintiffs About Negative Amortization. ......................................................................... 10

    D.    The Disclosures Concerning the Discounting of the Initial Interest Rate Complied with TILA. .................................................. 12

    E.    The TILA Disclosure Statements Complied with TILA. .................... 12

II.    PLAINTIFFS FAIL TO STATE AN "UNLAWFUL" UCL CLAIM PREDICATED ON A VIOLATION OF TILA. ............................................. 13

III.   PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF CONTRACT. ................................................................................................ 14

IV.   PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT. ........................................................................... 16

V.    PLAINTIFFS FAIL TO STATE AN "UNLAWFUL" UCL CLAIM PREDICATED ON A VIOLATION OF SECTION 22303 OF THE FINANCIAL CODE. .............................................................................. 17

CONCLUSION ........................................................................................................ 18

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

**CASES**

3

*Andrews v. Chevy Chase Bank, FSB,*

4

   240 F.R.D. 612 (E.D. Wis. 2007) ........................................................................................... 9

5

*Barnett v. Fireman's Fund Ins. Co.,*

6

   90 Cal. App. 4th 500 (2001) ................................................................................................ 14

7

*Bionghi v. Metro. Water Dist. of S. Cal.,*

   70 Cal. App. 4th 1358 (1999) .............................................................................................. 17

8

*Branch v. Tunnell,*

9

   14 F.3d 449 (9th Cir. 1994) ................................................................................................... 9

10

*Careau & Co. v. Sec. Pac. Bus. Credit, Inc.,*

   222 Cal. App. 3d 1371 (1990)........................................................................................ 16, 17

11

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,*

12

   20 Cal. 4th 163 (1999) ........................................................................................................ 13

13

*Fecht v. Price Co.,*

14

   70 F.3d 1078 (9th Cir. 1995)................................................................................................. 9

15

*Ford Motor Credit Co. v. Milhollin,*

   444 U.S. 555 (1980)............................................................................................................... 5

16

*Fundin v. Chicago Pneumatic Tool Co.,*

17

   152 Cal. App. 3d 951 (1984)............................................................................................... 14

18

*Grimes v. New Century Mortgage Corp.,*

19

   340 F.3d 1007 (9th Cir. 2003)............................................................................................... 5

20

*Guz v. Bechtel Nat'l Inc.,*

   24 Cal. 4th 317 (2000) .................................................................................................... 16, 17

21

*Household Credit Servs. v. Pfennig,*

22

   541 U.S. 232 (2004) .............................................................................................................. 5

23

*In re Late Fee & Over-Limit Fee Litig.,*

   No. C 07-0634 SBA, 2007 U.S. Dist. LEXIS 86408 (N.D. Cal. Nov. 16, 2007) ................... 13

24

25

*In re Stac Elecs. Sec. Litig.,*

   89 F.3d 1399 (9th Cir. 1996)................................................................................................. 9

26

*Parrino v. FHP, Inc.,*

27

   146 F.3d 699 (9th Cir. 1988)................................................................................................. 3

28

*Smith v. State Farm Mut. Auto. Ins. Co.*,
    93 Cal. App. 4th 700 (2001) ................................................................................ 13, 18

*Szumny v. Am. Gen. Fin., Inc.*,
    246 F.3d 1065 (7th Cir. 2001) .............................................................................. 5, 9

**STATUTES**

12 U.S.C.
    §§ 21 *et seq.* ........................................................................................................ 2, 18

15 U.S.C.
    §§ 1601 *et seq* .................................................................................................. *passim*
    § 1601(a) ................................................................................................................. 5
    § 1604(a) ................................................................................................................. 5
    § 1640 ..................................................................................................................... 6

12 C.F.R.
    pt. 226, App. J ........................................................................................................ 8
    pt. 226, Supp. I, § 226.23(a)(3) cmt. 2 .................................................................. 6
    §§ 226.1 *et seq.* ..................................................................................................... 5
    § 226.4 .................................................................................................................... 8
    §§ 226.6, 226.22 ................................................................................................... 13
    § 226.17 ............................................................................................................... 6, 7
    §§ 226.17-24 .......................................................................................................... 7
    § 226.19 ..................................................................................................... 6, 10, 12
    § 226.19(b)(1) ........................................................................................................ 3
    § 226.19(b)(2) ...................................................................................................... 12
    § 226.22 .................................................................................................................. 8
    § 226.23(a)(3) ........................................................................................................ 6
    § 226.23(a)(3) n.48 ................................................................................................ 6
    § 226.30 .................................................................................................................. 7

Cal. Bus. & Prof. Code
    §§ 17200 *et seq.* ............................................................................................ *passim*

Cal. Fin. Code
    § 22050 ................................................................................................................. 18
    § 22302(b) ............................................................................................................ 18

46 Fed. Reg. 50288 (Oct. 9, 1981) .............................................................................. 6

**OTHER AUTHORITIES**

Federal Reserve Board's "Consumer Handbook on Adjustable-Rate Mortgages" .................... 2, 3

1

## NOTICE OF MOTION AND MOTION

2

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

3      PLEASE TAKE NOTICE that on February 15, 2008, at 9:00 a.m., or as soon thereafter as

4   the matter may be heard, in the Courtroom of the Honorable Ronald M. Whyte, United States

5   District Court, Northern District of California, San Jose Division, Courtroom 6, 4th floor, located

6   at 280 South 1st Street, San Jose, California, defendants Bank of America Corporation and Bank

7   of America, National Association ("Bank of America")[1] will and hereby do move the Court for an

8   order dismissing the first, second, fourth, fifth, and sixth causes of action in the First Amended

9   Complaint ("FAC") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  This

10   Motion is based on this Notice of Motion and Motion, the Memorandum of Points and

11   Authorities in support hereof, the Request for Judicial Notice and Declaration in support hereof,

12   the pleadings and other files herein, and such other written and oral argument as may be presented

13   to the Court.

14      By this Motion, Bank of America seeks an order from the Court that plaintiffs fail to state

15   a claim against Bank of America for (1) Violations of the Truth in Lending Act, 15 U.S.C.

16   §§ 1601 *et seq*.; (2) Violation of California Business and Professions Code section 17200 *et seq*.,

17   for "Unlawful" Business Practices predicated on violations of the Truth in Lending Act;

18   (3) Breach of Contract; (4) Breach of the Covenant of Good Faith and Fair Dealing; and

19   (5) Violation of California Business and Professions Code section 17200 *et seq*., for "Unlawful"

20   Business Practices predicated on violations of California Financial Code section 22302.

21

22

23

24

25

26   [1] The loans at issue were made by Bank of America, National Association.  Bank of America Corporation, which is a holding company, was not involved in any way with plaintiffs' loans.  Plaintiffs have agreed to dismiss Bank of America Corporation from the litigation, without prejudice.  Subject to that dismissal, Bank of America Corporation joins the present motion.

27

28

NOTICE OF MOTION AND MOTION TO DISMISS          iv
PLAINTIFFS' FIRST AMENDED COMPLAINT
CASE NO. C-07-04500 RMW (HRL)

# STATEMENT OF ISSUES TO BE DECIDED

Pursuant to Civil Local Rule 7-4(a)(3), Bank of America sets forth the following statement of issues to be decided:

1.    Whether plaintiffs' first cause of action for violations of the Truth in Lending Act ("TILA") should be dismissed for failure to state a claim where Bank of America's disclosures concerning the Option ARM loans at issue complied with TILA and Regulation Z.

2.    Whether plaintiffs' claims for damages under TILA are barred by the statute of limitations where plaintiffs filed this action more than one year after the closing of the loans at issue.

3.    Whether plaintiffs' second cause of action for violation of California's UCL should be dismissed for failure to state a claim where no violation of TILA exists.

4.    Whether plaintiffs' fourth cause of action for breach of contract should be dismissed for failure to state a claim where the contractual promises plaintiffs allege were breached do not exist.

5.    Whether plaintiffs' fifth cause of action for breach of the covenant of good faith and fair dealing should be dismissed for failure to state a claim where it is either redundant of the breach of contract claim or seeks to impose extra-contractual obligations on Bank of America.

6.    Whether plaintiffs' sixth cause of action for violation of California's UCL should be dismissed for failure to state a claim where no violation of section 22302 of California's Financial Code can exist because banks, such as Bank of America, National Association, are expressly exempted from that provision of the Financial Code.

1          **MEMORANDUM OF POINTS AND AUTHORITIES**

2              This lawsuit challenges a particular type of home-loan product, known as a payment

3     option adjustable rate mortgage ("Option ARM").  It is one of many initiated by a common group

4     of lawyers in a transparent attempt to seize upon the current mortgage market crisis.  But that

5     impulse searches in vain for a viable legal theory.  Plaintiffs' theories routinely misapply the

6     governing law and ignore their actual loan documents in the most elementary ways.  Indeed, they

7     even amended the complaint once already to add numerous allegations about how the Option

8     ARM loans were especially nefarious because they locked borrowers into upwardly adjusting

9     interest rate payments through harsh prepayment penalty provisions.  They did so despite the fact

10    (revealed in the Notes they attached to the complaint) that their loans contained ***no prepayment***

11    ***penalties at all***.

12             Having applied for, obtained, and already used the proceeds of the Option ARM loans at

13    issue, plaintiffs now primarily contend that Bank of America failed adequately to disclose the

14    terms of their loans, especially the applicable interest rates and the loans' potential for negative

15    amortization.  Both assertions, though, are plainly contradicted by plaintiffs' loan documents,

16    which disclosed the applicable interest rates, and both warned plaintiffs that negative amortization

17    was a possibility and advised them on how to avoid it.

18             Plaintiffs' initial claim is that Bank of America's violated the Truth and Lending Act,

19    15 U.S.C. §§ 1601 *et seq* ("TILA").  But all of their different TILA theories are fatally flawed.

20    Almost all are time barred, and they repeatedly reflect a fundamental misunderstanding of TILA's

21    most basic disclosure obligations.  For instance, plaintiffs misunderstand the difference between

22    the contract interest rate, which is set forth in the Note, and the very different TILA-prescribed

23    "Annual Percentage Rate" or "APR," which is calculated by including other loan costs, in

24    addition to the contractual interest rate.

25             Because plaintiffs have no TILA claim against Bank of America, their claim under

26    California's Unfair Competition Law, California Business and Professions Code section 17200 *et*

27    *seq.* ("UCL"), predicated on a TILA violation fails as well.  Nor can they premise an "unlawful"

28    UCL claim against Bank of America on a supposed violation of section 22302 of California's

1  Financial Code, as banks are expressly exempted from that provision of the Financial Code.

2  Similarly, plaintiffs' breach of contract claims fail because the contractual provisions that

3  plaintiffs allege were breached simply do not exist.  Their implied covenant of good faith and fair

4  dealing claim is independently flawed, as it is either redundant of the contract claim or seeks to

5  impose extra-contractual obligations.

6       Accordingly, Bank of America respectfully requests that the Court dismiss the first,

7  second, fourth, fifth, and sixth causes of action in plaintiffs' first amended complaint ("FAC")

8  with prejudice.[2]

9                                    **BACKGROUND**

10      **A.    Plaintiffs' Option ARM Loans**

11      Plaintiffs Brian O'Donnell, and Michael and Patricia Van Belleghem obtained Option

12  ARM loans from Bank of America.  Mr. O'Donnell's loan closed in June of 2005, and the Van

13  Belleghems' loan closed in May of 2006.  (FAC ¶¶ 2-3.)  Their allegations center around (1) their

14  Adjustable Rate Notes ("Notes"), which were signed by each plaintiff and are the contracts

15  applicable to their loans with Bank of America; and (2) the "Federal Truth in Lending Disclosure

16  Statements" ("TILA Disclosure Statements"), which were provided to each plaintiff as required

17  by TILA (collectively, the "Loan Documents").  They attach copies of each of the Loan

18  Documents as an exhibit to the complaint.  (FAC Exs. 1 and 2).

19      Option ARMs are adjustable-rate mortgages that allow the borrower to select from a

20  number of different payment options each month.  As the Federal Reserve Board's "Consumer

21  Handbook on Adjustable-Rate Mortgages" ("Handbook") discussing these loans explains, a

22  borrower with a Option ARM loan has the option of making:

23           (i) a "traditional payment of principal and interest";

24  _____

25      [2]  While this motion to dismiss does not challenge the sufficiency of third cause of action, that claim, along with the second, fifth, and sixth causes of action, are also preempted by federal law, specifically the National Bank Act, 12 U.S.C. §§ 21 *et seq.*, and the Office of the Comptroller of Currency's regulations thereunder.  In order to avoid presenting potentially unnecessary arguments to the Court, Bank of America will reserve the preemption issues for later, to the extent they may be necessary.

26

27

28

1    (ii) an "interest-only" payment; or

2    (iii) a "minimum (or limited) payment," which "may be less than
     the amount of interest due that month" and may not reduce the
3    amount the buyer owes on his or her mortgage.

4    (Handbook at 16-17, 33.)[3]  These explanations were amplified by an additional disclosure, called

5    the 1-Month ManyOptions™ ARM Product disclosure ("Program Disclosure"), which was

6    provided by Bank of America to borrowers in transactions such as plaintiffs'.[4]

7          Option ARM loans can be attractive to consumers because they allow them to finance

8    properties without making traditional payments of principal and interest in the early years of the

9    loan.  As the Handbook explains, electing to make less than the full payment of principal and

10   interest due results in "negative amortization."  Negative amortization, by definition, occurs

11   whenever the monthly mortgage payments do not cover all the monthly interest owed on the

12   mortgage.  Because the interest shortfall is folded into the amount owed by the borrower, with

13   additional interest accruing on the shortfall, it results in the borrower owing more than originally

14   borrowed.  (*Id*. at 22, 33.)

15         Plaintiffs' Option ARM loans carried low, initial rates that were in effect for

16   approximately one month.  Mr. O'Donnell's initial rate was 1%.  (FAC Ex. 1 at Section 2.)  The

17   Van Belleghems' was 1.125%.  (FAC Ex. 2 at Section 2.)  As described in their Notes, the

18   interest rates applicable to plaintiffs' loans thereafter fluctuated monthly based on a disclosed

19   index.  (FAC Exs. 1 and 2, at Section 4.)

20

21   _____

22         [3] A copy of the Handbook can be found on the Federal Reserve Board's website at
     http://www.federalreserve.gov/pubs/arms/arms_english.htm.  Regulation Z requires adjustable-
23   rate mortgage applicants to be given a copy of this Handbook in connection with their loan
     applications.  12 C.F.R. § 226.19(b)(1).  Tellingly, the FAC contains no allegation that Bank of
24   America failed to provide plaintiffs with a copy of the Handbook.

25         [4] Although plaintiffs neglected to attach their Program Disclosures to the FAC, the Court
     may properly consider plaintiffs' Program Disclosures in connection with this motion to dismiss.
26   *See Parrino v. FHP, Inc*., 146 F.3d 699, 705-06 (9th Cir. 1988).  The Program Disclosure
     applicable to plaintiffs' Option ARM is attached as Exhibit A to the accompanying Declaration of
27   Pamela Sullivan in Support of Motion to Dismiss Plaintiffs' First Amended Complaint ("Sullivan
     Decl.").

28

1    Although the interest rates on plaintiffs' loans had the potential to change monthly, the

2    payment-option feature of the loans capped the minimum payments that plaintiffs were required

3    to make each month by limiting how much they could increase.  (FAC Exs. 1 and 2, at

4    Section 4(E).)  Because interest accrued on the loans at a rate tied to an index, choosing to make

5    the minimum monthly payment was not necessarily sufficient to cover all the interest that

6    accumulated during that period.  Plaintiffs had the option of avoiding negative amortization by

7    making "interest only" or "fully amortizing" payments.  (FAC Exs. 1 and 2, at Section 4(H).)

8    Contrary to plaintiffs allegations, they were also entitled to prepay all or part of their loans at any

9    time *without* incurring a prepayment penalty.  (FAC Exs. 1 and 2 at Section 5.)

10   ### B.    Plaintiffs' Allegations

11   Plaintiffs purport to represent a nationwide class of consumers who received Option ARM

12   loans through Bank of America.  (FAC ¶ 49.)  Plaintiffs allege conclusorily that, in the course of

13   their loan transactions, Bank of America "failed to disclose pertinent information in a clear and

14   conspicuous manner" as required by law (FAC ¶ 20), and "engaged in a campaign of deceptive

15   conduct and concealment," disguising from plaintiffs the fact that, although the Loan Documents

16   purported to offer a low initial interest rate, that rate was "illusory" and was instead "designed" to

17   cause negative amortization to occur.  (FAC ¶¶ 21-22, 24-26.)

18   Despite having received extensive disclosures to the contrary, as discussed in more detail

19   below, plaintiffs claim that the Loan Documents failed to inform them adequately that the

20   required minimum payment might not be sufficient to pay the interest accruing on their loan.

21   Based on these allegations, plaintiffs assert six causes of action: (1) violations of  TILA;

22   (2) violation of the UCL based on the alleged TILA violations; (3) violation of the UCL based on

23   "unfair" and "fraudulent" business practices; (4) breach of contract; (5) breach of the covenant of

24   good faith and fair dealing; and (6) violation of the UCL based on an alleged violation of section

25   22302 of California's Financial Code.

26   ### C.    TILA

27   Congress enacted TILA to promote the informed use of credit by requiring creditors to

28   make specified disclosures so that consumers could more accurately compare the cost of credit.

1  *See* 15 U.S.C. § 1601(a).  TILA "focuses on disclosure and does not serve as an umbrella statute

2  for consumer protection in real estate transactions."  *Grimes v. New Century Mortgage Corp*.,

3  340 F.3d 1007, 1011 (9th Cir. 2003) (MeKeown, J., dissenting); *see also Szumny v. Am. Gen.*

4  *Fin., Inc*., 246 F.3d 1065, 1070 (7th Cir. 2001) (TILA "is a disclosure statute; it does not regulate

5  substantively consumer credit but rather requires disclosure of certain terms and conditions of

6  credit before consummation of a consumer credit transaction.").  TILA was designed to balance

7  the competing considerations of complete disclosure and the need to avoid informational

8  overload.  As the Supreme Court has explained, TILA's purpose is to require "meaningful

9  disclosure," not "more disclosure."  *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568

10  (1980).

11          To implement TILA, Congress delegated "expansive authority" to the Federal Reserve

12  Board "to enact appropriate regulations to advance this purpose."  *Household Credit Servs. v.*

13  *Pfennig*, 541 U.S. 232, 235 (2004); *Milhollin*, 444 U.S. at 559; 15 U.S.C. § 1604(a).  Pursuant to

14  this authority, the Federal Reserve Board has issued a set of comprehensive and highly-detailed

15  regulations, known as Regulation Z.  *See* 12 C.F.R. §§ 226.1 *et seq.*  These regulations, along

16  with the Federal Reserve Board's official staff commentary thereto, are entitled to judicial

17  deference.  *Milhollin*, 444 U.S. at 565-66.  Regulation Z does much more than establish a set of

18  standards for creditors to consider in making their disclosures.  Instead, Regulation Z sets forth a

19  series of very specific instructions regarding when, where and how the TILA disclosures are to be

20  made.

21                                      **ARGUMENT**

22  **I.      PLAINTIFFS FAIL TO STATE A CLAIM UNDER TILA.**

23          Plaintiffs' first claim alleges four ways in which their Loan Documents purportedly

24  violated TILA by failing to clearly and conspicuously disclose: (1) the applicable rate of interest

25  in their Notes; (2) the possibility of negative amortization; (3) that the initial interest rate was

26  discounted; and (4) the correct APR.  (FAC ¶¶ 63-92.)  Most of plaintiffs' TILA claims are time

27  barred, and they all rest on a fundamental misapplication of TILA's provisions.  Plaintiffs' TILA

28  claims also rest on selective attention to the provisions of their Loan Documents and other

1    disclosures.  A review of the governing provisions and actual documents reveals that Bank of

2    America properly and repeatedly disclosed the applicable interest rate, the possibility of negative

3    amortization, and the APR in conformity with TILA.  Accordingly, plaintiffs' TILA allegations

4    fail to state a claim and should be dismissed with prejudice.

5

6    **A.    Plaintiffs' Claims for Damages Under TILA Are Barred by the Statute of Limitations.**

7        Plaintiffs' claims for damages under TILA are time-barred.  Any claim for actual or

8    statutory damages under TILA must be brought within one year of the date the allegedly defective

9    disclosures were provided.  15 U.S.C. § 1640.  The disclosures at issue in Mr. O'Donnell's loan

10   transaction were provided on or before the loan closed on June 8, 2005.  (FAC Ex. 1.)  The

11   disclosures at issue in the Van Belleghems' loan transaction were provided on or before the loan

12   closed on May 25, 2006.  (FAC Ex. 2.)  The instant action based on the alleged disclosure

13   violations occurring during those loan transactions was not filed until August 30, 2007, well over

14   a year later.  Plaintiffs' claims for damages under TILA must therefore be dismissed.

15       This defect alone eliminates the first three of plaintiffs' four theories of TILA liability.[5]

16   Bank of America nevertheless addresses the additional infirmities with those claims, and the

17   fourth claim relating to the APR disclosure in the TILA Disclosure Statement, below.

18   **B.    Plaintiffs' Notes Clearly Disclose the Contractual Interest Rate and as Required by TILA.**

19

20       Plaintiffs' assertion that the disclosure of the applicable interest rates in their Notes is

21   "unclear and inconspicuous," in violation of §§ 226.17 and 226.19, is fundamentally misguided.

22   _____

23       [5] The only TILA remedy aside from damages even theoretically available to plaintiffs at this juncture is the right to rescind the loan transactions, and even then only if that right was extended to the maximum three year period after their loans were consummated.  But that three-

24   year right to rescind applies only if "material disclosures" were not delivered.  12 C.F.R. § 226.23(a)(3).  Even if otherwise legally and factually correct, none of plaintiffs' TILA claims

25   about the disclosure of (1) the applicable rate of interest in their Notes, (2) the possibility of negative amortization, or (3) the fact that the initial interest rate was discounted would entitle

26   them to rescind their loan.  12 C.F.R. § 226.23(a)(3) n.48 (listing the "material" disclosures that would trigger a right to rescind); 12 C.F.R. pt. 226, Supp. I, § 226.23(a)(3) cmt. 2, 46 Fed. Reg.

27   50288, 50319 (Oct. 9, 1981).

28

(FAC ¶¶ 63-64.)  These sections of Regulation Z are completely inapplicable to the Notes.[6]  The only section of Regulation Z that pertains to disclosures that must be made in a Note is § 226.30, which provides:

> A creditor shall include in any consumer credit contract secured by a dwelling and subject to the act and this regulation the maximum interest rate that may be imposed during the term of the obligation.

12 C.F.R. § 226.30.  Bank of America clearly did this, and plaintiffs do not contend otherwise. (FAC Ex. 1 at Section 4(d) (informing Mr. O'Donnell that "my interest rate will never be greater than 9.950%"), Ex. 2 at Section 4(d) (informing the Van Belleghems that "my interest rate will never be greater than 10.075%").

Moreover, plaintiffs' Notes clearly set forth the applicable contractual rates of interest and specify when those rates would change.  (FAC Exs. 1, 2 at Sections 2, 4(A),4(E).)  In this regard, both Notes inform plaintiffs of their initial interest rates, 1% and 1.125% respectively.  (FAC Exs. 1, 2 at Section 2.)  Both Notes also inform plaintiffs that "[t]he interest rate I will pay will change in accordance with Section 4 of this Note."  Section 4(a) of the Notes goes on to specify when the interest rate may change:

> The interest rate I will pay **may change on the first day of August, 2005** [in the Van Belleghems' case, July 2006], and on the first day of every month thereafter.  Each date on which my interest rate could change is called a "Rate Change Date."

(FAC Exs. 1, 2 at Section 4(a) (emphasis added).)  Sections 4(b) and (c) specify how the new interest rates will be computed:

> **(b) Index**
> Beginning with the first Change Date, my adjustable rate will be based on an Index.  The "Index" is equal to the LIBOR Annual Monthly Average ("LAMA") of the 1-month London Inter-Bank Offered Rate ("LIBOR"), as made available by the Fannie Mae on their website, through electronic transmission or by telephone.  The most recent LIBOR Annual Monthly Average ("LAMA") figure

---

[6] Section 226.17 applies only to disclosures required by "this Subpart," i.e., Subpart C, 12 C.F.R. §§ 226.17-24.  Subpart C does not address disclosures that must be made in a note, such as the interest rate.  Thus, section 226.17's "clearly and conspicuously" language, upon which plaintiffs seek to ground their case, does not even apply to interest rate disclosures.

available as of a date 15 days before each Change Date is called the "Current Index."

* * *

**(c) Calculations of Interest Rate Changes**
Before each Rate Change Date, the Note Holder will calculate my new interest rate by adding TWO AND ONE-EIGHTH percentage points (2.125%) [in the Van Belleghems' case, 2.250%] to the Current Index.  The Note Holder will then round the result of this addition to the NEXT HIGHEST one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(d) below, [which establishes a maximum interest rate], this rounded amount will be my new interest rate until the next Rate Change Date.

(FAC Exs. 1, 2 at Sections 4(b) and (C).)

The Program Disclosures also emphasized the short-term nature of plaintiffs' initial interest rates:

The maximum period of time before the first interest rate change date is 1 month

Your interest rate can change every month after the first change date.

(Sullivan Decl. Ex. A at 1.)

Plaintiffs' contention that the initial interest rates disclosed in their Notes was "deceptive," because they were different than the APRs set forth in the TILA Disclosure Statements, reflects an even more elementary misunderstanding of mortgage financing and TILA.  (FAC ¶ 64.)  The APR is by no means synonymous with the contractual interest rate.  Instead, the APR is disclosed on the TILA Disclosure Statement, and its purpose is to permit borrowers to compare on an apples-to-apples basis the true costs of credit when shopping for loans.  12 C.F.R. § 226.22.  As those costs involve more than the contract interest rate, the APR calculation includes not only that rate, but also points, broker fees, and certain other credit charges, amortized over the term of the loan. *See* 12 C.F.R. § 226.4.  Regulation Z sets forth, over numerous pages of the Federal Register, exactly how the APR must be calculated.  12 C.F.R. § 226.22 and 12 C.F.R. pt. 226, App. J.[7]

---

[7] Bank of America respectfully contends that a federal district court in Wisconsin erred

*(Footnote continues on following page)*

1      Plaintiffs' confusion over the difference between the APR set forth in the TILA

2  Disclosure Statements and the contractual interest rate in their Notes is disingenuous.  Although

3  plaintiffs attached to the FAC only the first page of their two-page TILA Disclosure Statements

4  (FAC Exs. 1-2), the second page is entitled "Definition of Truth-in-Lending Terms."[8]  That

5  disclosure makes it clear that the APR is different than the contractual rate of interest:

6                          <u>ANNUAL PERCENTAGE RATE</u>

7               This is not the Note rate for which the borrower applied.  The
               Annual Percentage Rate (APR) is the cost of the loan in percentage
8               terms taking into account various loan charges of which interest is
               only one such charge.  Other charges which are used in calculation
9               of the Annual Percentage Rate are Private Mortgage Insurance or
               FHA Mortgage Insurance Premium (when applicable) and Prepaid
10              Finance Charges (loan discount, origination fees, prepaid interest
               and other credit costs).  The APR is calculated by spreading these
11              charges over the life of the loan which results in a rate higher than
               the interest rate showing on your Mortgage Deed of Trust Note.  If
12              interest was the only Finance Charge, then the interest rate and the
               Annual Percentage Rate would be the same.
13

14     Plaintiffs' flawed disclosure theories about the interest rate are often accompanied by

15  rhetorical flourishes attacking (after the fact) the fact that plaintiffs' loans had low initial "teaser"

16  interest rates.  (FAC ¶ 65.)  But, nothing about that feature of their loans was illegal.  In any

17  event, TILA only regulates disclosures, not loan terms.  *See Szumny*, 246 F.3d at 1070 (TILA "is

18  a disclosure statute; it does not regulate substantively consumer credit.").  There is no provision

19  of TILA that a low, initial interest rate violates.[9]

20  ────────────────────

*(Footnote continued from previous page)*

21  when it concluded, albeit on different facts than presented here, that the disclosure of different
   figures for the interest rate and the APR amounted to a TILA violation.  *Andrews v. Chevy Chase*
22  *Bank, FSB*, 240 F.R.D. 612, 617-19 (E.D. Wis. 2007).  As discussed above, Regulation Z requires
   lenders to include various non-interest charges in the calculation of the APR, which invariably
23  means that it will not match the contractual rate of interest.

24      [8]  *See* Sullivan Decl. Exs. B and C.  The Court may properly consider the complete
   versions of the TILA Disclosure Statements in connection with this motion to dismiss.  *See In re*
25  *Stac Elecs. Sec. Litig*., 89 F.3d 1399, 1405 n.4 (9th Cir. 1996) (complete copies of documents
   whose contents are alleged in the complaint may be considered by the court in connection with a
26  12(b)(6) motion) (citing *Fecht v. Price Co*., 70 F.3d 1078, 1080 (9th Cir. 1995); *Branch v.*
   *Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994)).

27      [9]  Plaintiffs allegations about a the disclosure of an initial monthly payment amount suffers

28                                                              *(Footnote continues on following page)*

1

### C.    The Loan Documents Fully Informed Plaintiffs About Negative Amortization.

2

3    Like the rest of their TILA claims, plaintiffs' attack on the negative amortization

4    disclosures rests on a basic misunderstanding of Regulation Z.  Plaintiffs base this claim on

5    12 C.F.R. § 226.19, and allege that the TILA Disclosure Statements failed to comply with its

6    requirements.  (FAC ¶¶ 71-72.)  While § 226.19 is the only provision of Regulation Z that

7    addresses negative amortization, it only applies to the Program Disclosures, not the TILA

8    Disclosure Statements or the Notes.  12 C.F.R. § 226.19 (the "negative amortization" disclosure,

9    cited by plaintiffs, must be made in a "loan program disclosure for each variable-rate program in

10    which the consumer expresses an interest").

11    Plaintiffs make no allegations that the Program Disclosure failed to meet the requirements

12    of § 226.19, and for good reason.  The Program Disclosure clearly disclosed the fact that negative

13    amortization was a possibility, specified the circumstances in which it would occur, and advised

14    borrowers how to avoid it.  More specifically, the Program Disclosure highlighted the fact that

15    negative amortization would result if plaintiffs selected the minimum payment option.  On its first

16    page it disclosed, in italics, that "*This loan has the potential for deferred interest, also known as*

17    *negative amortization*."  (Sullivan Decl. Ex. A at 1.)  The Program Disclosure went on to explain

18    what the monthly payment options were, and how to use them to avoid negative amortization:

19    • **Minimum Payment**.  This is the minimum amount you must pay.
     . . . This amount will appear on all your monthly billing

20    statements.  ***If interest on your loan for a month is more than the***
     ***minimum payment, your loan will have deferred interest, also***

21    ***known as negative amortization***.  This option may cost you more,
     as the monthly unpaid interest will begin accruing interest the

22    following month.  Please refer to the Deferred Interest Section
     below.  This option may require a substantially higher payment at

23    the next Special Payment Adjustment and on the Maturity Date.

24    • **Interest Only Payment.**  This is the amount sufficient to pay all of
     the monthly interest, but not principal.  This amount will appear on

25

26    *(Footnote continued from previous page)*

27    the exact same infirmities.  (FAC ¶ 67.)  There is no provision of TILA cited by plaintiff
     regulating the disclosure of the initial payment in their Notes.  (*Id.*)  And no such provision exists.

28

your monthly billing statement only if it is more than the Minimum Payment amount. ***This option eliminates deferred interest, also known as negative amortization***, but may require a substantially higher payment at the next Special Payment Adjustment and on the Maturity Date.

- **Principal and Interest Payment.** This is the monthly payment amount sufficient to fully amortize your loan over its remaining term in substantially equal payments. This amount will appear on your monthly billing statement only if it is more than the Minimum Payment Amount. By making this payment every month, your original loan balance will be paid off at the end of the scheduled loan term.

(Sullivan Decl. Ex. A at 2 (emphasis added).)  The Program Disclosure twice admonishes, in bold letters, how a borrower can avoid negative amortization:

> **You may avoid deferred interest, also known as negative amortization, by payment of either the Interest Only Payment or the Principal and Interest Payment.**

(*Id.*)

Plaintiffs' claim to have been unaware of the possibility of negative amortization of their loans is belied by the Notes themselves.  The Notes clearly discuss how negative amortization would occur:

> **(f) Principal Balance Adjustments—Deferred Interest (*Negative Amortization*)**
> If my monthly payment is less than the amount necessary to pay the full amount of interest for the month, the portion of interest that is unpaid will be added to the principal balance of my loan as of the due date for such payment and will accrue interest at the rate in effect from time to time in accordance with this Note.

(FAC Exs. 1, 2 at Section 4(f) (emphasis added).)  The Notes also specifically inform plaintiffs that, if they selected the minimum payment option and made only the "Required Payment," negative amortization could result.  They also provide a number of alternative payment options to avoid negative amortization:

> **(H) Payment Options**
> I will have up to three monthly payment options for my loan.  I may always make the monthly payment required under Sections 3(B), 4(e) or 4(G), as applicable (the "Required Payment").  ***If the Required Payment is insufficient to fully amortize my loan as a result of the application of the Annual Payment Cap or principal balance adjustments, I will have the option to make a fully amortizing payment***, which is an amount sufficient to pay off my loan in substantially equal payments over its remaining term at its

1

2

3

4

> then interest rate.  If the Required Payment is not sufficient to pay off all of the interest owed for that month, which would result in ***negative amortization***, I also will have the option to make an interest only payment, which will be sufficient to pay the monthly interest and avoid ***negative amortization***, but will not reduce the principal balance.

5    (FAC Exs. 1 and 2 at Section 4(H) (emphasis added).)  And contrary to plaintiffs' claim, negative

6    amortization was not an "absolute certainty."  (FAC ¶¶ 72, 76-78.)  As the above section of the

7    Note makes clear, plaintiffs always had the right to elect either "fully amortizing" or "interest-

8    only" payments.  In both such instances, no negative amortization would occur.

9        Accordingly, aside from being time barred, plaintiffs' TILA claim for failure to disclose

10   negative amortization should be dismissed for these additional reasons.

11

12   **D.      The Disclosures Concerning the Discounting of the Initial Interest Rate Complied with TILA.**

13       Plaintiffs' claim that Bank of America failed to disclose in the Loan Documents that the

14   initial rate was discounted.  (FAC ¶¶ 82-83.)  While time barred as well, this theory fails for the

15   additional reason that the Regulation Z provision plaintiffs rely on does not apply to the Note or

16   the TILA Disclosure Statement.  The TILA disclosure requirement complained of is found in

17   12 C.F.R. § 226.19.  (*Id.*)  As set forth above, the disclosures required under § 226.19, including

18   the disclosure about any discounting of the initial interest rate, are to be made in a "loan program

19   disclosure," not the Note or the TILA Disclosure Statement.  12 C.F.R. § 226.19(b)(2).  Plaintiffs

20   make no claim that Bank of America's program disclosure was non-compliant.

21   **E.      The TILA Disclosure Statements Complied with TILA.**

22       In what ranks as a particularly confusing set of allegations, plaintiffs assert in almost

23   entirely conclusory language that the TILA Disclosure Statements failed to disclose the correct

24   interest rate.  (FAC ¶¶ 87-92.)  But the only specific allegation is, once again, that "[o]n the TILA

25   Disclosure Form Defendants set forth one interest rate, while on the Note, Defendants set forth

26   two other, different interest rates."  (FAC ¶ 87.)  As described more fully above when the same

27   allegation was employed to attack the Notes (section I.B, *supra*), this allegation rests on the most

28   basic misunderstanding of TILA.  The APR under TILA is not a contractual rate of interest.

1    12 C.F.R. §§ 226.6, 226.22.  The fact that the contractual interest rate and the APR are different is

2    precisely what the statute and Regulation Z contemplate.  Plaintiff alleges no facts indicating that

3    the APR calculation in their respective TILA Disclosure Statements was not in conformity with

4    TILA.  Accordingly, plaintiffs' claim that Bank of America failed to base its disclosures on the

5    composite interest rate, as mandated by TILA, is without any factual foundation.

6
7    **II.    PLAINTIFFS FAIL TO STATE AN "UNLAWFUL" UCL CLAIM
             PREDICATED ON A VIOLATION OF TILA.**

8          Plaintiffs' second cause of action purports to state an "unlawful" claim under the UCL,

9    predicated on the foregoing TILA violations.  (FAC ¶ 98.)  Because plaintiffs' TILA claims fail,

10   the "unlawful" UCL claim based upon the supposed TILA violations fails as well.

11         An "unlawful" business practice under the UCL is a practice that violates any other law.

12   *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) ("By proscribing

13   'any unlawful' business practice, section 17200 'borrows' violations of *other* laws and treats

14   them as unlawful practices that the unfair competition law makes independently actionable.")

15   (internal quotation marks omitted; emphasis added).  However, if the plaintiff's claim would fail

16   under the "borrowed" law, the UCL claim fails too.  *See, e.g.*, *Smith v. State Farm Mut. Auto. Ins.*

17   *Co.*, 93 Cal. App. 4th 700, 718 (2001).

18         As set forth above, plaintiffs' TILA claim fails.  Moreover, TILA is the sole predicate

19   alleged for plaintiffs' "unlawful" UCL claim in the second cause of action.  (FAC ¶¶ 93-104.)  As

20   Bank of America did not violate TILA, plaintiffs' UCL claim predicated on this supposed

21   violation fail and must be dismissed.  *See In re Late Fee & Over-Limit Fee Litig.*, No. C 07-0634

22   SBA, 2007 U.S. Dist. LEXIS 86408, at *34 (N.D. Cal. Nov. 16, 2007) (finding that the defendant

23   banks "could not properly be deemed to have engaged in unfair or deceptive practices under the

24   [UCL] by acting consistently with all existing legal interpretations of the NBA and with the

25   express disclosures of their contracts concerning late and over-limit fees").

26
27
28

III.    **PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF CONTRACT.**

Plaintiffs' fourth cause of action purports to state a claim for breach of contract.  A review of the written agreements entered into between plaintiffs and Bank of America reveals that plaintiffs have manufactured out of whole cloth the provisions they claim were breached. Plaintiffs allege that Bank of America breached the parties' agreements by:

> (1) promising a "low interest rate" "between 1% and 3%" that would be fixed for "three (3) to five (5) years" and, instead, "immediately rais[ing] Plaintiffs' and Class members' interest rates;" and

> (2) promising "that Plaintiffs' and the Class members' monthly payment obligations would be sufficient to pay both the principal and interest owed" and, instead, allowing "negative amortization" to occur.

(FAC ¶¶ 129-134.)  Bank of America's contracts made no such promises.

Plaintiffs' mischaracterizations must yield to the actual contractual language.  *See Fundin v. Chicago Pneumatic Tool Co.*, 152 Cal. App. 3d 951, 955 (1984) ("[I]if there are inconsistencies between the complaint and the written instrument, the written instrument controls."); *Barnett v. Fireman's Fund Ins. Co.*, 90 Cal. App. 4th 500, 505 (2001) ("[T]o the extent the factual allegations conflict with the content of the exhibits to the complaint, we rely on and accept as true the contents of the exhibits and treat as surplusage the pleader's allegations as to the legal effect of the exhibits.").

Contrary to plaintiffs' allegations, the parties' agreements plainly provide that the interest rate will not be fixed, but will vary according to an index.  Consider, for example, Mr. O'Donnell's Adjustable Rate Note, which was executed on June 8, 2005.  It is evident from the title of the Note that the interest rate on the loan would not be fixed.  Section 2 of the Note confirms this fact.  (FAC Ex. 1 at 1 ("The interest rate I will pay will change in accordance with Section 4 of this Note.").)  Section 4(a) goes on to provide that "[t]he interest rate I will pay may change on the first day of August, 2005, and on the first day of every month thereafter."  Such days are defined as "Rate Change Date[s]."  (FAC Ex. 1 at 1.)  Section 4(b) of the Note specifies that the interest rate will be tied to an index, specifically the LIBOR Annual Monthly Average of

1    the 1-month London Inter-Bank Offered Rate.  And, Section 4(c) of the Note sets forth exactly

2    how this will work:

> Before each Rate Change Date, the Note Holder will calculate my
> new interest rate by adding TWO AND ONE-EIGHTH percentage
> points (2.125%) to the Current Index.  The Note Holder will then
> round the result of this addition to the NEXT HIGHEST one-eighth
> of one percentage point (0.125%).  Subject to the limits stated in
> Section 4(d) below, this rounded amount will be my new interest
> rate until the next Rate Change Date.

7    (FAC Ex. 1 at 2.) [10]  The adjustable nature of the interest rates on plaintiffs' loans is further

8    confirmed by the Adjustable Rate Riders to plaintiffs' Deeds of Trusts.[11]  The Adjustable Rate

9    Riders state, in capitalized, bold letters that:

> **THE NOTE CONTAINS PROVISIONS ALLOWING FOR
> CHANGES IN THE INTEREST RATE AND THE
> MONTHLY PAYMENT.**

12   (Sullivan Decl. Exs. D and E at 1.)  Far from promising that plaintiffs' interest rates will be fixed,

13   the contracts at issue clearly provide that the interest rates may change.

14          Similarly, nothing in the parties' agreements provides that plaintiffs' "payment obligations

15   would be sufficient to pay both the principal and interest owed on the loans." (FAC ¶ 131.)  On

16   the contrary, in Section 4(F), the Notes explicitly state that negative amortization is a possibility:

> **(f) Principal Balance Adjustments—Deferred Interest (Negative
> Amortization)**  If my monthly payment is less than the amount
> necessary to pay the full amount of interest for that month, the
> portion of interest that is unpaid will be added to the principal
> balance of my loan as of the due date for such payment and will
> accrue interest at the rate in effect from time to time in accordance
> with this Note.

21   (FAC Ex. 1 at 2; Ex. 2 at 2.)  Section 4(H) underscores the possibility of negative amortization in

22   the event that the borrower selects the minimum payment option:

> **(H) Payment Options**  I will have up to three monthly payment

---

24

25   [10] The language in the Van Belleghems' Note is identical in all material respects.  (FAC Ex. 2 at 1-2.)

26   [11] The Adjustable Rate Riders to the Deeds of Trusts are also contractual documents,
27   which specify the terms of Bank of America's security interest in the underlying property, and are thus properly considered by the Court.

28

options for my loan.  I may always make the monthly payment required under Sections 3(B), 4(e) or 4(G), as applicable (the "Required Payment").  If the Required Payment is insufficient to fully amortize my loan as a result of the application of the Annual Payment Cap or principal balance adjustments, I will have the option to make a fully amortizing payment, which is an amount sufficient to pay off my loan in substantially equal payments over its remaining term at its then interest rate.  If the Required Payment is not sufficient to pay all of the interest owed for that month, ***which would result in negative amortization***, I will also have the option to make an interest-only payment, which will be sufficient to pay the monthly interest and ***avoid negative amortization***, but will not reduce the principal balance.  Even if these options are available, I may still elect to make only the Required Payment.

(FAC Ex. 1 at 2-3; Ex. 2 at 2-3 (emphasis added).)

In sum, plaintiffs' claim that Bank of America promised them fixed interest rates "between 1% and 3%" is belied by a review of the parties' written agreement; so is plaintiffs' claim that Bank of America promised them that their "monthly payment obligations would be sufficient to pay both the principal and interest owed on the loans."  The Notes both provide that the interest rate is adjustable and that negative amortization may occur.  The supposed contractual commitments that plaintiffs claim Bank of America breached simply do not exist.  Accordingly, plaintiffs' fourth cause of action should be dismissed.

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT

In their fifth cause of action, plaintiffs claim that Bank of America breached the implied-covenant of good faith and fair dealing by "denying [them] the benefits promised to them under the terms of the Note."  (FAC ¶ 146.)  As set forth above, plaintiffs' Notes do not contain the promises plaintiffs assert they do.  In any event, "[i]f the allegations [set forth in a claim for breach of the implied-covenant of good faith and fair dealing] do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated."  *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990) (affirming trial court's sustaining of demurrer to implied-covenant claim); *see also Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 352 (2000)

1    (explaining, "[t]o the extent the implied covenant claim seeks simply to invoke terms to which the

2    parties *did* agree, it is superfluous"); *Bionghi v. Metro. Water Dist. of S. Cal.*, 70 Cal. App. 4th

3    1358, 1370 (1999) (affirming trial court's grant of summary adjudication of implied-covenant

4    claim).

5             Here, the conduct claimed by plaintiffs to constitute a breach of the implied covenant —

6    failure to provide a low, fixed interest rate and failure to prevent negative amortization

7    (FAC ¶ 146) — is nothing more than the supposed breaches of contract.  (*Compare* FAC ¶¶ 140-

8    146 *with* ¶¶ 129, 131-135.)  As such, plaintiffs' implied-covenant claim is superfluous and should

9    be dismissed.

10            To the extent plaintiffs intend the implied covenant claim to impose extra-contractual

11   duties, it is independently subject to dismissal.  The California Supreme Court has made it clear

12   that one cannot use the implied covenant of good faith and fair dealing to enforce "promises" that

13   one wishes were part of one's contractual agreement, but are not actually there.  As the Court

14   noted:  "[t]he covenant . . . cannot be endowed with an existence independent of its contractual

15   underpinnings.  It cannot impose substantive duties or limits on the contracting parties beyond

16   those incorporated in the specific terms of their agreement."  *Guz*, 24 Cal. 4th at 349-50 (2000)

17   (internal citations and quotations omitted).

18            Plaintiffs' implied-covenant claim either is redundant of the breach of contract claim, and

19   subject to dismissal for that reason, *see Careau*, 222 Cal. App. 3d at 1395, or attempts to impose

20   substantive duties on Bank of America that are beyond the terms of the parties' agreement, *see*

21   *Guz*, 24 Cal. 4th at 349-50.  Either way, the implied-covenant claim fails and should be

22   dismissed.

23   **V.      PLAINTIFFS FAIL TO STATE AN "UNLAWFUL" UCL CLAIM**
             **PREDICATED ON A VIOLATION OF SECTION 22303 OF THE**
24           **FINANCIAL CODE.**

25            Plaintiffs' sixth cause of action, which purports to state an "unlawful" UCL claim

26   predicated on a supposed violation of section 22302 of California's Financial Code, also fails.

27   Banks, like Bank of America, National Association, are not subject to section 22302.

28   (FAC ¶ 160.)

1      Section 22302 of California's Financial Code provides:

2          A loan found to be unconscionable pursuant to Section 1670.5 of
the Civil Code shall be deemed to be in violation of this division
3          and subject to the remedies specified in this division.

4  Cal. Fin. Code § 22302(b).  Plaintiffs cannot ground any claim against Bank of America in this

5  provision, however, as *it does not even purport to apply to banks*.  *See* Cal. Fin. Code § 22050

6  ("This division does not apply to any person doing business under any law of any state or of the

7  United States relating to banks[.]").[12]  Because plaintiffs' claim under section 22303 fails, their

8  "unlawful" UCL claim predicated on this section fails as well.  *See, e.g.*, *Smith*, 93 Cal. App. 4th

9  at 718.  Accordingly, the sixth cause of action in plaintiffs' FAC should also be dismissed.

10                             **CONCLUSION**

11      For the foregoing reasons, the Court should dismiss the first, second, fourth, fifth, and

12  sixth causes of action in plaintiffs' FAC.

13  Dated:  December 21, 2007        MORRISON & FOERSTER LLP

14

15                     By:     /s/
                                  Michael J. Agoglia

16                       Attorneys for Defendants
               BANK OF AMERICA CORPORATION; BANK OF
17                 AMERICA, NATIONAL ASSOCIATION

18

19

20

21

22

23

24

25

26         [12] There is no genuine dispute that Bank of America, N.A., the entity that made the loans
and is identified in the Note, is a national banking association that is organized and operating
under the National Bank Act, 12 U.S.C. §§ 21 *et seq*.  (*See also* Request for Judicial Notice in
27  Support of Motion to Dismiss Plaintiffs' First Amended Complaint, Exs. A, B, and C.)

28