1   Jonathan Shub (SBN 237708)
    jshub@seegerweiss.com
2   **SEEGER WEISS LLP**
    1515 Market Street, Suite 1380
3   Philadelphia, PA 19107
    Phone: (215) 564-2300; Fax (215) 851-8029
4
    Paul R. Kiesel, Esq. (SBN 119854)
5   kiesel@kbla.com
    Patrick DeBlase, Esq. (SBN 167138)
6   deblase@kbla.com
    Michael C. Eyerly, Esq. (SBN 178693)
7   eyerly@kbla.com
    **KIESEL BOUCHER LARSON LLP**
8   8648 Wilshire Boulevard
    Beverly Hills, California 90211
9   Phone:  (310) 854-4444
    Fax:  (310) 854-0812

    David M. Arbogast (SBN 167571)
    David@SpiroMoss.com
    Ira Spiro (SBN 67641)
    Ira@SpiroMoss.com
    **SPIRO MOSS BARNESS LLP**
    11377 W. Olympic Boulevard, Fifth Floor
    Los Angeles, CA 90064-1683
    Phone: (310) 235-2468; Fax: (310) 235-2456

    Jeffrey K. Berns, Esq. (SBN 131351)
    jberns@jeffbernslaw.com
    **LAW OFFICES OF JEFFREY K. BERNS**
    19510 Ventura Boulevard, Suite 200
    Tarzana, California 91356
    Phone: (818) 961-2000; Fax: (818) 867-4820

12  Attorneys for Plaintiffs and all others Similarly Situated

13              **UNITED STATES DISTRICT COURT**

14      **NORTHER DISTRICT OF CALIFORNIA - SAN JOSE DIVISION**

| | |
|---|---|
| BRIAN O'DONNELL, MICHAEL VAN BELLEGHEM, and PATRICIA VAN BELLEGHEM, individually, and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BANK OF AMERICA, NATIONAL ASSOCIATION a.k.a. BANK OF AMERICA, N.A., and DOES 1 through 10 inclusive, <br><br> Defendants. | **CASE NO. C-07-04500 RMW** <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT FOR:** <br><br> **(1)  Violations of the Truth in Lending Act, 15 U.S.C. §1601, *et seq*;** <br><br> **(2)  Fraudulent Omissions;** <br><br> **(3)  Violation of Bus. & Prof. Code §17200, *et seq*. – "Unfair" and "Fraudulent" Business Practices;** <br><br> **(4)  Breach of Contract; and** <br><br> **(5)  Tortious Breach of the Covenant of Good Faith and Fair Dealing.** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

Plaintiffs, BRIAN O'DONNELL, MICHAEL VAN BELLEGHEM, PATRICIA VAN

BELLEGHEM ("Plaintiffs"), individually and on behalf of all others similarly situated allege as

follows:

## I.

## **INTRODUCTION**

1.      This is an action pursuant to the Truth in Lending Act ("TILA"), 15 U.S.C. §1601, *et seq.,* California's Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200, *et seq.,* and other statutory and common law in effect.  Plaintiffs BRIAN O'DONNELL,  MICHAEL VAN BELLEGHEM, and PATRICIA VAN  BELLEGHEM ("Plaintiffs"), individually, and on behalf of all others similarly situated, bring this action against BANK OF AMERICA, N.A., and DOES 1-10 (collectively "Defendants"), based, in part, on Defendants' failure to clearly and conspicuously disclose to Plaintiffs and the Class Members, in Defendants Option Adjustable Rate Mortgage ("ARM") loan documents, and in the required disclosure statements, accompanying the loans, (i) the actual interest rate on the note(s) (12 C.F.R. § 226.17); (ii) that payments on the notes at the teaser rate will result in negative amortization and that the principal balance will increase (12 C.F.R. § 226.19); and (iii) that the initial interest rate provided was discounted and does not reflect the actual interest that Plaintiffs and Class members would be paying on the Note(s).

## II.

## **THE PARTIES**

2.      Plaintiff, BRIAN O'DONNELL ("O'DONNELL") is, and at all times relevant to this Complaint, was an individual residing in San Jose, California.  On or about June 8, 2005, Plaintiff refinanced his existing home loan and entered into an Option ARM loan agreement with Defendants. The Option ARM loan was secured by Plaintiff's primary residence.  Attached hereto as <u>Exhibit 1</u> is a true and correct copy of the Note and Truth and Lending Disclosure Form pertinent to this action.

3.      Plaintiffs, MICHAEL VAN BELLEGHEM and PATRICIA VAN BELLEGHEM ("BELLEGHEM") are, and at all times relevant to this Complaint were, individuals residing in Arroyo

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04500 RMW

Grande, California. On or about May 25, 2006, Plaintiffs refinanced their existing home loan and entered into an Option ARM loan agreement with Defendants. The Option ARM loan was secured by Plaintiffs' primary residence. Attached hereto as <u>Exhibit 2</u> is a true and correct copy of the Note and Truth and Lending Disclosure Form pertinent to this action.

4.     Defendant, BANK OF AMERICA, NATIONAL ASSOCIATION a.k.a. BANK OF AMERICA, N.A. ("BANK OF AMERICA, N.A."), is a United States corporation licensed to do, and is doing business in California.   At all relevant times hereto BANK OF AMERICA, N.A was and is engaged in the business of promoting, marketing, distributing and selling the Option Arm loans that are the subject of this Complaint.   BANK OF AMERICA, N.A. transacts business in Santa Clara County, California and at all relevant times promoted, marketed, distributed, and sold Option Arm loans throughout the United States, including Santa Clara County, California.  BANK OF AMERICA, N.A. has significant contacts with Santa Clara County, California, and the activities complained of herein occurred, in whole or in part, in Santa Clara County, California.

5.     Defendants, BANK OF AMERICA, N.A., and DOES 1 through 10, shall hereinafter be referred to collectively as "Defendants."

6.     At all times mentioned herein, Defendants, and each of them, were engaged in the business of promoting, marketing, distributing, and selling the Option Arm loans that are the subject of this Complaint, throughout the United States, including Santa Clara County, California.

7.     Plaintiffs are informed, believe, and thereon allege, that each and all of the aforementioned Defendants are responsible in some manner, either by act or omission, strict liability, fraud, deceit, fraudulent concealment, negligence, respondeat superior, breach of contract or otherwise, for the occurrences herein alleged, and that Plaintiff's injuries, as herein alleged, were proximately caused by the conduct of Defendants.

8.     Plaintiffs are informed, believe, and thereon allege, that at all times material hereto and mentioned herein, each of the Defendants (both named and DOE defendants) sued herein were the agent, servant, employer, joint venturer, partner, division, owner, subsidiary, alias, assignee and/or alter-ego of each of the remaining Defendants and were at all times acting within the purpose and scope of such agency, servitude, joint venture, division, ownership, subsidiary, alias, assignment, alter-ego,

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04500 RMW

1  partnership or employment and with the authority, consent, approval and ratification of each remaining

2  Defendant.

3       9.    At all times herein mentioned, each Defendant was the co-conspirator, agent, servant,

4  employee, assignee and/or joint venturer of each of the other Defendants and was acting within the

5  course and scope of said conspiracy, agency, employment, assignment and/or joint venture and with the

6  permission and consent of each of the other Defendants.

7       10.   Plaintiffs are informed, believe, and thereon allege that each and all of the

8  aforementioned Defendants are responsible in some manner, either by act or omission, strict liability,

9  fraud, deceit, fraudulent concealment, negligence, respondeat superior, breach of contract or otherwise,

10 for the occurrences herein alleged, and that Plaintiffs' injuries, as herein alleged, were proximately

11 caused by the conduct of Defendants.

12      11.   Plaintiffs are informed, believe, and thereon allege, that at all times material hereto and

13 mentioned herein, each of the Defendants (both named and DOE defendants) sued herein were the

14 agent, servant, employer, joint venturer, partner, division, owner, subsidiary, alias, assignee and/or alter-

15 ego of each of the remaining Defendants and were at all times acting within the purpose and scope of

16 such agency, servitude, joint venture, division, ownership, subsidiary, alias, assignment, alter-ego,

17 partnership or employment and with the authority, consent, approval and ratification of each remaining

18 Defendant.

19      12.   At all times herein mentioned, each Defendant was the co-conspirator, agent, servant,

20 employee, assignee and/or joint venturer of each of the other Defendants and was acting within the

21 course and scope of said conspiracy, agency, employment, assignment and/or joint venture and with the

22 permission and consent of each of the other Defendants.

23      13.   Plaintiffs are informed, believe, and thereon allege, that Defendants, BANK OF

24 AMERICA and DOES 1-10, and each of them, are, and at all material times relevant to this Complaint,

25 performed the acts alleged herein and/or otherwise conducted business in California.  Defendants, and

26 each of them, are corporations or other business entities, form unknown, have, and are doing business in

27 this judicial district.

28 / / /

14. Plaintiffs are informed, believe, and thereon allege, that DOES 1 through 10, inclusive, are securitized trusts, equity funds, collateralized debt obligations (CDO), CDO underwriters, CDO trustees, hedge funds or other entities that acted as additional lenders, loan originators and/or are assignees to the loans which are the subject of this action. Plaintiffs will seek leave of Court to replace the fictitious names of these entities with their true names when they are discovered by Plaintiffs herein.

15. The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 10, inclusive, and each of them, are unknown to Plaintiffs at this time, and Plaintiffs therefore sue said Defendants by such fictitious names. Plaintiffs allege, on information and belief, that each Doe defendant is responsible for the actions herein alleged. Plaintiffs will seek leave of Court to amend this Complaint when the names of said Doe defendants have been ascertained.

16. Plaintiffs are informed, believe, and thereon allege, that at all times mentioned herein, Defendants, and each of them, including without limitation those Defendants herein sued as DOES, were acting in concert or participation with each other, or were joint participants and collaborators in the acts complained of, and were the agents or employees of the others in doing the acts complained of herein, each and all of them acting within the course and scope of said agency and/or employment by the others, each and all of them acting in concert one with the other and all together.

## III.
## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to 15 U.S.C § 1601 *et seq.* and 28 U.S.C. § 1331.

18. This Court has personal jurisdiction over the parties in this action by the fact that Defendants are either individuals who reside in this District within California or are corporations duly licenced to do business in California.

19. Venue is proper within this District and Division pursuant to 28 U.S.C. §1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in this district, and because there is personal jurisdiction in this district over the named Defendant because it regularly conducts business in this judicial district.

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04500 RMW

**IV.**

**FACTS COMMON TO ALL CAUSES OF ACTION**

20.     BANK OF AMERICA is one of the world's largest financial institutions, serving individual consumers, small and middle market businesses and large corporations with a full range of banking, investing, asset management and other financial and risk-management products and services.

21.     The instant action arises out of residential mortgage loan transactions in which Defendants failed to disclose pertinent information in a clear and conspicuous manner to Plaintiffs and the Class members, in writing, as required by law.

22.     Defendants sold a variety of home loans.   The OPTION ARM or adjustable rate mortgages are the loans that are the subject of this Complaint.

23.     The instant action arises out of residential mortgage loan transactions in which Defendants failed to disclose pertinent information in a clear and conspicuous manner to Plaintiffs and the Class members, in writing, as required by law.

24.     This action also concerns Defendants' fraudulent and unfair business acts or practices. Defendants engaged in a campaign of deceptive conduct and concealment aimed at maximizing the number of consumers who would accept this type of loan in order to maximize Defendants' profits, even as Defendants knew their conduct would cause many of these consumers to lose their homes through foreclosure.

25.     Plaintiffs, along with thousands of other similarly situated consumers, were sold an Option ARM home loan by Defendant.  The Option ARM loans sold to Plaintiffs and the Class is a deceptively devised financial product.  The loan has a variable rate feature with payment caps.  The product was sold based on the promise of a low fixed payment based on a low listed interest rate, when in fact Plaintiffs and the Class were charged a different, much greater interest rate than promised. Further, Defendants failed to disclose, and by omission, failed to inform Plaintiffs of the fact that Defendants' Option ARM loan was designed to, and did, cause negative amortization to occur.  And, on information and belief, for a substantial number of the loans sold to the Class members, once lured into these loans, these consumers cannot easily extricate themselves from these loans because Defendants included in these loans a stiff and onerous prepayment penalty making it extremely difficult, if not

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04500 RMW

1    impossible, for borrowers to extricate themselves from these loans.

2        26.    The Option ARM loan Defendants sold to Plaintiffs and the Class violates the Truth In

3    Lending Act (TILA).  TILA is supposed to protect consumers; it mandates certain disclosures be made

4    by lenders to borrowers concerning the terms and conditions of their home loans.  Defendants failed to

5    make these disclosures in connection with the Option ARM loans sold to Plaintiffs and the Class.

6        27.    At all times relevant, Defendants sold their Option ARM loan product to consumers,

7    including Plaintiffs, in a false or deceptive manner.  Defendants' loan documents indicated that the loan

8    would have a very low payment for the first three (3) to five (5) years and there is no indication of

9    negative amortization.  In furtherance of their scheme, Defendants listed a low "teaser" rate in the

10   Note(s) and a low corresponding payment schedule in the TILA Disclosure Statement (hereafter

11   "TILDS") to lure Plaintiffs and the Class members into purchasing Defendants' Option ARM loan

12   product.  However, the low "teaser" rate was illusory, a false promise.  Plaintiffs and others similarly

13   situated did not receive the benefit of the low rate promised to them.  Once signed on to Defendants'

14   loan, the interest rate applied to Plaintiffs' and Class members' loans was immediately and significantly

15   increased.

16       28.    Plaintiffs and others similarly situated were consumers who applied for a mortgage loan

17   through Defendants.  During the loan application process, in each case, Defendants intended Plaintiffs

18   and the Class members to believe that in entering these loan contracts that they would be able to have

19   low mortgage payments.  Defendants initiated this scheme in order to maximize the amount of the loans

20   it sold to consumers and to maximize it's profits.

21       29.    Based on the Defendants' representations in the loan documents, and the misconduct

22   alleged herein, Plaintiffs and the Class members agreed to finance their primary residence through

23   Defendants' Option ARM loan.  Plaintiffs and the Class members were sold a home loan with a low

24   interest rate of between 1% and 3.0% interest rate (the "teaser" rate), and a corresponding payment

25   schedule based on that interest rate for the first three (3) to five (5) years of the loan.  Defendants also

26   represented to Plaintiffs, and Plaintiffs reasonably believed, that if they made payments based on the

27   promised low interest rate, which were the payments reflected in the written payment schedule provided

28   to them by Defendants, that the loans would be no negative amortization home loans and that Plaintiffs'

-7-

1  payments would be applied to both principal and interest.

2     30.    After, the purported three (3) - five (5) year fixed interest period, Plaintiffs and the Class

3  members reasonably believed, based on the representations contained in the documents Defendants

4  provided to Plaintiffs and the Class members, that they would be able to refinance their loan and get a

5  new loan before their scheduled payments increased.  However, the payment schedule provided by

6  Defendants failed to disclose, and by omission, failed to inform these consumers that due to the negative

7  amortization that was purposefully built into these loans, Plaintiffs and the Class members would be

8  unable to refinance their homes as there would be little or no equity left to refinance.

9     31.    Plaintiffs believed these facts to be true because that is what the Defendants intended

10  consumers to believe.  Defendants aggressively marketed their product as a fixed, low interest home

11  loan.  Defendants knew that if marketed and sole in such a manner, their Option ARM loan product

12  would be a hugely popular and profitable product for them.  Defendants also knew, however, that they

13  were selling their product in a false and deceptive manner.  While Defendants trumpeted their low rate

14  loans to the public, Defendants knew their promise of a low interest was a mirage.

15     32.    In fact, Defendants' Option ARM loan possessed a low, fixed *payment* but not a low,

16  fixed interest rate.  Unbeknownst to Plaintiffs and the Class members, the actual interest rate they were

17  charged on their loans was not fixed, was not the low teaser interest rate stated in the loan

18  documentation and was in fact considerably higher than going market rates.  And, after purchasing

19  Defendants' Option ARM loan product, Plaintiffs and the Class members did not actually receive the

20  benefit of the low teaser rate at all or in some cases, at best, received that teaser rate for only a single

21  month.  Immediately, thereafter, Defendants in every instance and for every loan, secretly increased the

22  interest rate they charged consumers.  The now-increased interest charges incurred by Plaintiffs and the

23  Class members, over and above the fixed interest payment rate, were added to the principal balance on

24  their home loans in ever increasing increments, substantially reducing the equity in these borrowers'

25  homes.

26     33.    In stark contrast to this reality, Defendants, through the standardized loan documents they

27  created and supplied to Plaintiffs, stated that negative amortization was only a mere possibility.

28  Defendants concealed and failed to disclose the fact that the loan, as presented and designed, in fact,

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04500 RMW

1  guaranteed negative amortization.  Defendants failed to disclose and omitted the objectively material

2  fact that negative amortization was absolutely certain to occur if consumers followed the payment

3  schedule listed by Defendants in the TILDS.  This information was objectively material and necessary

4  for consumers to make an informed decision because this would have revealed that the loan's principal

5  balance would increase if the payment schedule was followed, thereby rendering it impossible to

6  refinance the loan at or around the time the prepayment penalty expired and/or by the time the interest

7  and payment rates re-set.   In this respect, Defendants utterly failed to place any warning on the Truth

8  and Lending Disclosure Form about negative amortization.

9       34.    Plaintiffs are informed, believe, and thereon allege, that for a substantial number of loans,

10  once these Class members accepted Defendant's Option ARM loan contract, they had no viable option

11  by which to extricate themselves because these Option ARM loan agreements included a draconian pre-

12  payment penalty for a period of up to three years.

13       35.    The Option ARM loans sold by Defendants all have the following uniform

14  characteristics:

15       (a)    There is an initial low interest rate or "teaser" rate that was used to entice the

16  Plaintiffs into entering into the loan.  The rate offered was typically 1%-3%;

17       (b)    The loan has with it a corresponding low payment schedule.  The documentation

18  provided intended to misleadingly portray to consumers that the low payments for the first three (3) to

19  five (5) years were a direct result of the low interest rate being offered;

20       (c)    The initial payments in the required disclosures were equal to the low interest rate

21  being offered.  The purpose was to assure that if someone were to calculate what the payment would be

22  at the low offered interest rate, it corresponded to the payment schedule.  This portrayal was intended to

23  further mislead consumers into believing that the payments were enough to cover all principal and

24  interest;

25       (d)    The payment has a capped annual increase on the payment amount; and

26       (e)    The loan includes a prepayment penalty preventing consumers from securing a

27  new loan for a period of up to three (3) years.

28  / / /

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04500 RMW

36.     Defendants uniformly failed to disclose, and by omission, failed inform consumers, including Plaintiffs and the Class members, in a clear and conspicuous manner that the fixed "teaser" rate offered by Defendants was actually never applied to their loans, or, at best, was only applied for thirty (30) days.  Thereafter, the true interest charged on the loans was significantly higher than the promised rate.

37.     Defendants uniformly failed to disclose and by omission failed to inform consumers, including Plaintiffs and the Class members, that the payments set forth in Defendants' schedule of payments were insufficient to cover the actual amount they were being charged for the loan, and that these were, in fact, loans that would cause Plaintiffs and the Class members to lose the equity they have in their homes.

38.     Defendants uniformly failed to disclose and by omission failed to inform consumers, including Plaintiffs and the Class members, that when the principal balance increased to a certain level, they would no longer have the option of making the fixed interest payment amount.

39.     Disclosing whether a payment will result in negative amortization is of critical importance to consumers.  If the disclosed payment rate is insufficient to pay both principal and interest, one of the consequences of negative amortization is a loss of equity.  Defendants are and at all times relevant hereto have been aware that clear and conspicuous disclosure of the actual interest rate and a payment rate sufficient to avoid negative amortization and the concomitant loss of equity is extremely important material information.

40.     At all times relevant, Defendants, and each of them, knew or should have known, or were reckless in not knowing, that: (i) the payment rate provided to Plaintiffs and the Class members were insufficient to pay both interest and principal; (ii) that negative amortization was certain to occur if Plaintiffs and the Class members made payments according to the payment schedule provided by Defendants; and (iii) that loss of equity and/or loss of Plaintiffs' and the Class members' residence was substantially certain to occur if Plaintiffs and the Class members made payments according to the payment schedule provided by Defendants.

41.     In spite of its knowledge, Defendants sold its Option ARM loans as product that would provide Plaintiffs and the Class members with a low payment and interest rate for the first three (3) to

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04500 RMW

five (5) years of the loan, and at all times relevant, failed to disclose and/or concealed by making partial representations of material facts when Defendants had exclusive knowledge of material facts that negative amortization was certain to occur.  This concealed and omitted information was not known to Plaintiffs and the Class members and which, at all times relevant, Defendants failed to disclose and/or actively concealed by making such statements and partial misleading representations to Plaintiffs and all others similarly situated.  Because the Option ARM loans did not provide a low interest rate for the first three (3) to five (5) years of the Note and the payment disclosed by Defendants was insufficient to pay both principal and interest, negative amortization occurred.

42.    The true facts about Defendants' Option ARM loans is that they do not provide the low interest rate promised, and are certain to result in negative amortization.

43.    Disclosure of a payment rate that is sufficient to pay both principal and interest on the loans is of critical importance consumers.  If the disclosed payment rate is insufficient to pay both principal and interest, one of the consequences is that negative amortization or loss of equity will occur. Defendants are and at all times relevant hereto have been aware that the ability of the disclosed payment amount to pay both principal and interest so as to avoid negative amortization is one of the most important terms of a loan.

44.    To this day, Defendants continue to conceal material information from consumers, and the public, that: (i) the payment schedules provided to Plaintiffs and the Class members are and were insufficient to pay both principal and interest; (ii) if the disclosed payment schedules are followed, Plaintiffs and the Class members will suffer negative amortization; and (iii) loss of equity and/or possession of the property is substantially certain to occur if the disclosed payment schedule is followed. Nevertheless, Defendants have refused to clearly and conspicuously disclose to Plaintiffs and the Class members the existence of this important material information and the injury caused thereby, including but not limited to the loss of equity.

45.    In the end, the harm caused by Defendants' failures to disclose and omissions, as alleged herein, grossly outweighs any benefit that could be attributed to them.

46.    Knowing the truth and motivated by profit and market share, Defendants have knowingly and willfully engaged in the acts and/or omissions to mislead and/or deceive Plaintiffs and others

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04500 RMW

1   similarly situated.

2       47.    The Option ARM loans have resulted and will continue to result in significant loss and

3   damage to the Class Members, including but not limited to the loss of equity these consumers have or

4   had in their homes.

5       48.    The facts which Defendants misrepresented and concealed, as alleged in the preceding

6   paragraphs, were material to the decisions about whether to purchase the Option ARM loans in that

7   Plaintiffs and others similarly situated would not have purchased these loans but for Defendants'

8   unlawful, unfair, fraudulent and/or deceptive acts and/or practices as alleged herein.

9       49.    Defendants engaged in the unlawful, unfair, fraudulent, untrue and/or deceptive

10  marketing scheme to induce consumers to purchase their ARM loans.

11      50.    Defendants' unlawful, unfair, fraudulent, untrue and/or deceptive acts and/or practices

12  were committed with willful and wanton disregard for whether or not Plaintiffs or others similarly

13  situated would receive a home loan that would actually provide the low interest and payment rate for the

14  first three (3) to five (5) years of the loan sufficient to pay both principal and interest.

15      51.    Upon information and belief, and at all times relevant during the liability period,

16  Defendants possessed full knowledge and information concerning the above facts about the ARM loans,

17  and otherwise sold these ARM loans throughout the United States, including the State of California.

18

19                                        **V.**

20                      **CLASS ACTION ALLEGATIONS**

21      52.    Plaintiffs bring this action on behalf of themselves, and on behalf of all others similarly

22  situated (the "Class") pursuant to Federal Rule of Civil Procedure, Rules 23(a), and 23(b), and the case

23  law thereunder.  The classes Plaintiffs seek to represent are defined as follows:

24              **The California Class**:  All individuals who, within the four year period
                preceding the filing of Plaintiffs' Complaint through the date notice is
25              mailed to the Class, received an Option ARM loan through Defendants on
                their primary residence located in the State of California.  Excluded from
26              the California Class are Defendants' employees, officers, directors, agents,
                representatives, and their family members; and
27

28  / / /

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04500 RMW

**The National Class**:  All individuals in the United States of America who, within the four year period preceding the filing of Plaintiffs' complaint through the date notice is mailed to the Class, received an Option ARM loan through Defendants on their primary residence located in the United States of America.  Excluded from the National Class are Defendant's employees, officers, directors, agents, representatives, and their family members.

An appropriate sub-Class exists for the following Class Members:

All individuals in the United States of America who, within the three year period preceding the filing of Plaintiffs' complaint through the date notice is mailed to the Class, received an Option ARM loan through Defendantson their primary residence located in the United States of America.  Excluded from the National sub-Class are Defendant's employees, officers, directors, agents, representatives, and their family members.

Plaintiffs reserve the right to amend or otherwise alter the Class definitions presented to the Court at the appropriate time, or propose or eliminate sub-Classes, in response to facts learned through discovery, legal arguments advanced by Defendants or otherwise.

53.    Numerosity:  The Class is so numerous that the individual joinder of all members is impracticable under the circumstances of this case.  While the exact number of Class members is unknown at this time, Plaintiffs are informed and believe that the entire Class or Classes consist of approximately tens of thousands of members.

54.    Commonality:  Common questions of law or fact are shared by the Class members.  This action is suitable for class treatment because these common questions of fact and law predominate over any individual issues.  Such common questions include, but are not limited to, the following:

(1)    Whether Defendants' acts and practices violate the Truth in Lending Act, 15 U.S.C. §1601, et seq;

(2)    Whether Defendants' conduct violated 12 C.F.R. § 226.17;

(3)    Whether Defendants' conduct violated 12 C.F.R. § 226.19;

(4)    Whether Defendants engaged in unfair business practices aimed at deceiving Plaintiffs and the Class members before and during the loan application process;

(5)    Whether Defendants, by and through their officers, employees, and agents failed to disclose that the interest rate actually charged on these loans was higher than the rate represented and promised to Plaintiffs and the Class members;

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04500 RMW

(6)     Whether Defendants, by and through their officers, employees and agents concealed, omitted and/or otherwise failed to disclose information they were mandated to disclose under TILA;

(7)     Whether Defendants failed to disclose the true variable nature of interest rates on adjustable rate mortgage loans and adjustable rate home equity loans;

(8)     Whether Defendants failed to properly disclose the process by which negative amortization occurs, ultimately resulting in the recasting of the payment structure over the remaining lifetime of the loans;

(9)     Whether Defendants' failure to apply Plaintiffs' and the Class members' payments to principal as promised in the form Notes constitutes a breach of contract, including a breach of the covenant of good faith and fair dealing;

(10)    Whether Defendants' conduct in immediately raising the interest rate on consumers' loans so that no payments were applied to the principal balance constitutes breach of the covenant of good faith and fair dealing;

(11)    Whether Defendants' marketing plan and scheme misleadingly portrayed or implied that these loans were fixed rate loans, when Defendants knew that only the periodic payments were fixed (for a time) but that interest rates were not, in fact, "fixed;"

(12)    Whether the terms and conditions of Defendants' Option ARM home loan are unconscionable;

(13)    Whether Plaintiffs and the Class are entitled to damages;

(14)    Whether Plaintiffs and the Class members are entitled to punitive damages; and

(15)    Whether Plaintiffs and the Class members are entitled to rescission.

55.     Typicality:  Plaintiffs' claims are typical of the claims of the Class members.  Plaintiffs and the other Class members were subjected to the same kind of unlawful conduct and the claims of Plaintiffs and the other Class members are based on the same legal theories.

56.     Adequacy:  Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other members of the Class Plaintiffs seek to represent.  Plaintiffs

-14-

1   have retained counsel competent and experienced in complex class action litigation and Plaintiffs intend

2   on prosecuting this action vigorously.   The interests of members of the Class will be fairly and

3   adequately protected by Plaintiffs and their counsel.

4       57.   <u>Ascertainable Class</u>:  The proposed Classes are ascertainable in that the members can be

5   identified and located using information contained in Defendants' mortgage lending records.

6       58.   This case is brought and can be maintained as a class action under Rule 23(b)(1),

7   23(b)(2), and 23(b)(3):

8       (a)   <u>Risk of Inconsistent Judgments</u>: The unlawful acts and practices of Defendants, as

9            alleged herein, constitute a course of conduct common to Plaintiffs and each Class

10           member.  Prosecution of separate actions by individual Class members would create a

11           risk of inconsistent or varying adjudications which would establish incompatible

12           standards of conduct for Defendants and/or substantially impair or impede the ability of

13           individual Class members to protect their interests;

14      (b)   <u>Injunctive and/or Declaratory Relief to the Class is Appropriate</u>:  Defendants, and each of

15           them, have acted or refused to act on grounds generally applicable to the Class, thereby

16           making final injunctive relief or corresponding declaratory relief with respect to the Class

17           as a whole appropriate; and

18      (c)   <u>Predominant Questions of Law or Fact</u>:  Questions of law or fact common to the Class

19           members, including those identified above, predominate over questions affecting only

20           individual Class members (if any), and a class action is superior to other available

21           methods for the fair and efficient adjudication of the controversy.  Class action treatment

22           will allow a large number of similarly situated consumers to prosecute their common

23           claims in a single forum, simultaneously, efficiently, and without the unnecessary

24           duplication of effort and expense that numerous individual actions would require.

25           Further, an important public interest will be served by addressing the matter as a class

26           action.  The cost to the court system of adjudicating each such individual lawsuit would

27           be substantial.

28

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04500 RMW

# VI.

## FIRST CAUSE OF ACTION

### (Violations of Truth in Lending Laws, 15 U.S.C. §1601, *et seq.*,

### (Against All Defendants)

59.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

60.    15 U.S.C. §1601, *et seq*., is the Federal Truth in Lending Act ('TILA'). The Federal Reserve Board of Governors implements the Federal Truth in Lending Act through Regulation Z (12 C.F.R. §226 ) and its Official Staff Commentary. Compliance by lenders with Regulation Z became mandatory October 1, 1982. Likewise, Official Staff Commentary issued by the Federal Reserve Board is also binding on all lenders.

61.    The purpose of TILA is to protect consumers. This is stated in 12 C.F.R. § 226.1, which reads:

> **§226.1 Authority, purpose, coverage, organization, enforcement and liability. . .**
>
> (b)    Purpose. The purpose of this regulation is to promote the informed use of consumer credit by requiring disclosures about its terms and costs. The regulation also gives consumers the right to cancel certain credit transactions that involve a lien on a consumer's principal dwelling . . .

62.    Reg. Z also mandates very specific disclosure requirements regarding home loans with which lenders, including Defendant, must comply:

> **§ 226.17. General disclosure requirements.**
>
> (a) Form of disclosures. (1) The creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep. The disclosures shall be grouped together, shall be segregated from everything else, and shall not contain any information not directly related to the disclosures required under § 226.18.

/ / /

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04500 RMW

63.     The purpose of the TILA is to assure a meaningful disclosure of credit terms so that the borrowers will be able to compare more readily the various credit terms available to them and avoid the uninformed use of credit and to protect the consumer against inaccurate and unfair credit billing practices.

64.     Defendants' Option ARM loan violates TILA because Defendants failed to comply with the disclosure requirements mandated by Regulation Z and Official Staff Commentary issued by the Federal Reserve Board.  Defendants failed in a number of ways to clearly, conspicuously and/or accurately disclose the terms of the Option ARM loan to Plaintiffs as Defendants were required to do under TILA.  These violations are apparent on the face of the TILA Disclosure Forms.

65.     The TILA violations committed by Defendants are more specifically detailed as follows:

**A.**    **Defendants' Failure to Clearly and Conspicuously Disclose That the Payment Schedules Are Not Based on the Actual Interest Rate Violates TILA**

66.     12 C.F.R. § 226.17 and 12 C.F.R. § 226.19 require the lender to make disclosures concerning the interest rate and payments in a clear and conspicuous manner.  Further, a misleading disclosure is as much a violation of TILA as a failure to disclose at all.

67.     As for Plaintiffs and the Class members Option ARM loans, Defendants violated 12 C.F.R. § 226.17 and 12 C.F.R. § 226.19 in that it failed to clearly and conspicuously disclose the interest rate upon which the payments listed in the TILDS are based.

68.     The scheduled payment amounts and interest rate listed in the TILDS for each of the subject loans are unclear and inconspicuous.  In fact, the payment amounts are not based on the interest rate listed but instead, were based upon an interest rate which was neither disclosed nor made conspicuous as required under TILA.

69.     At all times relevant, Defendants knowingly and intentionally included in each of the TILDS a schedule of payments which was not based upon the interest rate listed in these same document.  Defendant's failure to clearly and conspicuously disclose the interest rate upon which the payment amounts were based was, and is, deceptive.

70.     Further, in addition to Defendants' failure to disclose in the TILDS that the payments listed were not based upon the interest rate listed, Defendants knowingly and intentionally represented

in the loan documents that the payments would be applied to both principal and interest. However, in truth, if Plaintiffs followed the payment schedule provided by Defendants, the payments were guaranteed to be insufficient to pay the principal and interest on the loan.

71.     At all times relevant, Defendants failed to clearly and conspicuously disclose to Plaintiffs and the Class members that if they made payments according to the payment schedule set forth in the TILDS, that negative amortization was not just a mere possibility, it was an absolute certainty.

72.     At all times relevant, Defendants purposefully and intentionally failed to disclose to Plaintiffs, and all others similarly situated, the interest rate upon which the payment schedule was based in order to mislead and deceive Plaintiffs and Class members into believing that they would be getting a loan with a low fixed payment rate that would be sufficient to pay both interest and principal.

73.     At all times relevant, the payment amount provided by Defendants was intended to and did deceive consumers into falsely believing they would, in fact, receive the low interest rate upon which the payment schedule is based. While the Note states the amount of Plaintiffs' initial monthly payment, however, the initial monthly payment amounts stated in the Note and TILDS are not, in anyway related to the interest rate listed in the Note(s) and TILDS.

74.     Defendants employed the aforementioned bait-and-switch tactics in a common and uniform class-wide basis. In particular, had Defendants clearly and conspicuously disclosed a payment amount sufficient to cover both principle and interest, the payment amounts would have to have been almost double the payment amounts listed.

75.     The TILDS are also deceptive for much the same reason. The TILDS list a schedule of payments, yet for up to the five years the listed payment amounts have no relation to, and are also not based on the interest rate listed in the TILDS.

76.     At all times relevant, Defendants failed to clearly, conspicuously, and accurately disclose a payment amount that corresponds to the actual interest rate being charged on the loan sufficient to pay the true costs of the loan. Plaintiffs and the Class members reasonably believed that if they made the payments according to Defendants' payment schedule, the payments would, in fact, be paying off the loan. However, the true fact is that the payment amounts stated in Defendants' payment schedule did not include any principal on the loans at all and only covered a portion of the interest Defendants were

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04500 RMW

1    charging on these loans.

2         77.    Official Staff Commentary to 12 C.F.R. § 226.17(a)(1) states that "this standard requires

3    that disclosures be in a reasonably understandable form.  For example, while the regulation requires no

4    mathematical progression or format, the disclosures must be presented in a way that does not obscure

5    the relationship of the terms to each other…"

6         78.    At all times relevant, Defendants' Option ARM loans violated 12 C.F.R. § 226.17(a)(1)

7    in that the relationship between the payments, for up to the first five years of the loans, bear no

8    relationship to the interest rate listed in the TILDS.  Therefore, as a direct and proximate result, the form

9    of disclosure used by Defendants obscured the relationship between the interest rate listed in the Note(s)

10   and TILDS and the payment schedule provided.

11        **B.    Defendants' Failure to Clearly and Conspicuously Disclose The Legal**

12             **Obligation Violates Truth in Lending Laws**

13        79.    12 C.F.R. § 226.17(c)(1) requires that "[t]he disclosures shall reflect the terms of the

14   legal obligation between the parties."

15        80.    Official binding staff commentary on 12 C.F.R. § 226.17(c)(1) requires that: "[t]he

16   disclosures shall reflect the credit terms to which the parties are legally bound as of the outset of the

17   transaction.  In the case of disclosures required under  § 226.20(c), the disclosures shall reflect the credit

18   terms to which the parties are legally bound when the disclosures are provided."

19        81.    The Official binding staff commentary further states, at 12 C.F.R. § 226.17(c)(1)(2), that

20   "[t]he legal obligation normally is presumed to be contained in the note or contract that evidences the

21   agreement."

22        82.    Official Staff Commentary to 12 C.F.R. § 226.17(c)(1) states that "[i]f a loan contains a

23   rate or payment cap that would prevent the initial rate or payment, at the time of the first adjustment,

24   from changing to the rate determined by the index or formula at consummation, the effect of that rate or

25   payment cap should be reflected in the disclosures."

26        83.    At all times relevant during the liability period, Defendant's Option ARM loans violated

27   12 C.F.R. § 226.17(c) in that the Note(s) and TILDS did not disclose, and by omission, failed to disclose

28   what Plaintiff's and the Class members' were legally obligated to pay.  In particular, the Note(s) charged

1  these borrowers a much higher monthly amount than what Defendants disclosed. Defendants

2  accomplished this deception by only listing a partial payment in the TILDS, rather than a payment

3  amount that was sufficient to pay what these borrowers were being charged for their loans, and were

4  legally obligated to pay.

5      84.    As a direct and proximate result of Defendant's omissions and failures to clearly and

6  conspicuously disclose Plaintiff's and the Class members' legal obligations under the loans, Defendants

7  took the partial payments and secretly added the deficit, each month, to principal, thereby causing

8  negative amortization to occur.

9      **C.     Defendants' Failure to Clearly and Conspicuously Disclose The Actual Interest**

10          **Rate Violates Truth in Lending Laws**

11      85.    12 C.F.R. § 226.17 and 12 C.F.R. § 226.19 require the lender to make disclosures

12 concerning the interest rate in a clear and conspicuous manner. Further, a misleading disclosure is as

13 much a violation of TILA as a failure to disclose at all. Defendants failed to meet the disclosure

14 mandates required of them concerning the interest rate Defendants actually applied to Plaintiffs' and

15 Class members' loans, as well as the interest Defendants actually charged Plaintiff and the Class

16 members.

17      86.    Defendants' disclosure in the Promissory Note concerning the interest rate is, at best,

18 unclear and inconspicuous. At worst, it is intentionally deceptive. In either instance, it is certainly

19 different than the interest rate set forth by Defendants in the TILD. The interest rate information set

20 forth by Defendants in the Note conflicts with the interest rate information set forth by Defendants in the

21 TILDS.

22      87.    The interest rate set forth in the Note is the teaser rate that Defendant, in fact, applied to

23 the loan for a single month. However, at all times relevant during the liability period, Defendants did

24 not make it clear in the Note(s) or TILDS that this low promised rate (the same rate upon which

25 Defendants base the written payment schedule provided to Plaintiffs) is only offered for the first thirty

26 (30) days of the loan. In furtherance of their scheme, Defendants employed the most convoluted,

27 confusing and circuitous methodology in describing the interest rate. In particular, Defendants used

28 terms like "may" when discussing potential interest rate increases, when in fact it was an absolute

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04500 RMW

1  certainty the interest rate listed would only be provided for the first thirty days of the loan, and would be

2  raised when the first payment was due. In one part of the Note, Defendants state that the promised low

3  interest rate is the rate until the "change date." A description of the change date is found in another part

4  of the Note. The convoluted and disjointed method employed by Defendants to provide this information

5  to consumers makes it extremely difficult, if not impossible, for anyone to determine that, in fact, that

6  the change date corresponds to the very first monthly payment Plaintiffs and the Class members made

7  on their loans.

8          88.     The convoluted language used by Defendants to disclose the interest rate on Plaintiffs'

9  and the Class members' loans is not clear and conspicuous. Rather, the disclosures used by Defendants

10 were purposefully unclear and meant to mislead and deceive Plaintiffs and the Class members. In

11 particular, it is virtually impossible to discern when Plaintiffs and the Class members would receive the

12 low interest rate they were promised, if, in fact, it can be determined at all. And, the truth is that

13 Plaintiffs and the Class members never received the low interest rate, or in some cases received it for

14 only thirty days. Defendants' promise of a low interest rate is and was wholly illusory and the

15 deception, as alleged herein, was uniformly practiced on Plaintiffs and all Class members by Defendants

16 to facilitate sales of their loans to consumers.

17         89.     The Note also sets forth the amount of Plaintiffs' and Class members' initial monthly

18 payments. The "initial monthly payments" amount figure is exactly equal to what the payments would

19 be if the listed low interest rate promised to Plaintiffs by Defendants was true and was, in fact, applied

20 to the principal balance on the loans. This is a further deception committed by Defendants, because the

21 real interest rate charged on the loans by Defendants is much higher than the low interest rate promised

22 to Plaintiff and the Class members. Thus, the "initial monthly payment" amount provided by

23 Defendants was intended to and did deceive consumers into falsely believing that they would, in fact,

24 receive the teaser interest rate promised to them.

25         90.     The TILDS is also unfairly confusing and deceptive for much the same reason. The

26 scheduled payments for the first three (3) to five (5) years of the loan lists payment amounts based on

27 the low "teaser" rate, with the agreed 7.5% annual increase in the payment amount. In truth, however,

28 this payment schedule has no real relation to the interest rate Defendants actually charged Plaintiffs and

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04500 RMW

1    the Class members on their loans.

2        91.    At all times relevant during the liability period, Defendants failed to clearly,

3    conspicuously and accurately disclose the actual interest rate applied to Plaintiffs' and Class members'

4    loans.  Defendants also failed to disclose, and by omission, failed to inform Plaintiffs and the Class

5    members that the payment amounts listed in the payment schedule did not include any amount towards

6    the principle on the loan and were, in fact, insufficient to pay all of the interest accruing.  Based on the

7    payment schedule listed in the Note and TILDS, Plaintiffs and the Class members reasonably believed

8    that the payments would be sufficient to meet the loan obligations in the Note(s).  However, the true fact

9    is that the payment schedule provided by Defendants did not pay any principal on the loan at all and

10   only included a partial payment towards the interest Defendants charged Plaintiffs and the Class

11   members for these loans.

12       92.    At all times relevant during the liability period, Defendants failed to clearly,

13   conspicuously and accurately disclose in the Note and TILDS a payment amount that was sufficient to

14   pay both principle and interest.  Plaintiffs reasonably believed that if they made the payments according

15   to Defendants' payment schedule, the payments would, in fact, be paying off both principal and interest.

16   However, the true fact is that the payment amounts stated in Defendants' payment schedule did not

17   include any principal on the loans at all and were only a partial payment of the interest Defendants were

18   charging on these loans.

19       93.    At all times relevant during the liability period, Defendants failed to disclose, and by

20   omission, failed to inform consumers that if they followed the payment schedule provided by

21   Defendants, their payments will not be applied to principle at all and were not sufficient enough to cover

22   all of the interest Defendantscharged on the loan(s).

23       **D.**    **Defendant's Failure to Clearly and Conspicuously Disclose Negative Amortization**

24                **Violates the Truth in Lending Laws**

25       94.    12 C.F.R. § 226.19 sets forth additional specific disclosure requirements for residential

26   home loans:

27            § 226.19.  Certain residential mortgage and variable-rate transactions. . . .

28            (b) Certain variable-rate transactions. If the annual percentage rate may

-22-

1
2
3
4
5
6
7
8

increase after consummation in a transaction secured by the consumer's

principal dwelling with a term greater than one year, the following

disclosures must be provided at the time an application form is provided

or before the consumer pays a non-refundable fee, whichever is earlier. . .

(vii) Any rules relating to changes in the index, interest rate, payment

amount, and outstanding loan balance including, for example, an

explanation of interest rate or payment limitations, negative amortization,

and interest rate carryover. (Emphasis added.)

9       95.     The negative amortization disclosure is required and must be made clearly and

10   conspicuously, and done in a manner that does not obscure its significance.  The disclosure must state

11   whether the loan and payments established under the terms dictated by the lender is a negative

12   amortizing loan.

13       96.     In 1995, and continuing each time new Official Staff Commentary was issued, the

14   Federal Reserve Board made clear that when the loan was a variable rate loan with payment caps, such

15   as those that are the subject of this lawsuit, that the disclosure requires a definitive statement about

16   negative amortization:

17                           12 CFR Part 226

18                     [Regulation Z; Docket No. R-0863]

19                         Monday, April 3, 1995

20           AGENCY: Board of Governors of the Federal Reserve System.

21               ACTION: Final rule; official staff interpretation.

22           "For the program that gives the borrower an option to cap monthly

23           payments, the creditor must fully disclose the rules relating to the payment

24           cap option, including the effects of exercising it (such as ***negative***

25           ***amortization occurs*** and that ***the principal balance will increase***)…"

26   (See C.F.R. § 226.19) (emphasis added).

27       97.     At all times relevant, statutory and common law in effect make it unlawful for a lender,

28   such as Defendant, to fail to comply with the Federal Reserve Board's Official Staff Commentary as

well as Regulation Z and TILA.

98.    Defendants sold Plaintiff and the Class members Option ARM loans which have a variable rate feature with payment caps.  Defendants failed to include any reference in the TILDS or in the Note(s) that negative amortization would occur if Plaintiff  and the Class members followed the payment schedule provided by Defendant.

99.    In fact, the only place in the Note where Defendants even inferentially references negative amortization caused Plaintiff and all other similarly situated reasonable persons to believe that negative amortization was only a mere possibility, rather than an absolute certainty.  In fact, these loans were designed in such a way so as to make negative amortization an absolute certainty.  And, even when a separate explanation was provided, Defendants omitted the important material fact that these loans and payment schedules would, in fact, guarantee negative amortization.

100.    Defendant's statement in the Note(s) that "[i]f my monthly payment is less than the amount necessary to pay the full amount of interest for that month, the portion of interest that is unpaid will be added to the principal balance of my loan..." was an artfully contrived half-truth and did not alert or inform Plaintiff  that the payment schedule provided by Defendants would absolutely guarantee that negative amortization was going to occur on these loans.  Rather, Defendants made it appear that as long as the payments were made according to the schedule listed in the TILDS, that there would be no negative amortization.

101.    At all times relevant, Defendants' statement in the Note, TILDS, and any other disclosures they provided, described negative amortization as only a mere possibility, and therefore was misleading and deceptive.  In fact, Defendants' Option ARM loan was designed in such a way as to guarantee negative amortization.  TILA demands more than a statement that the payment could be less, or "may" be less, when Defendants knew that the payments were less, and would always be less, than the full amount required to pay both principle and interest.

E.    **Defendant's Failure to Clearly and Conspicuously Disclose that the Initial Interest Rate is Discounted Violates Truth in Lending Laws**

102.    As previously stated, the informed use of credit means being able to make decisions, as well as being able to plan an individual's finances.  Every month consumers look at their income and

1  budget where their funds must be paid.  The biggest investment in one's life is generally that person's

2  home.  In fact, it is often referred to as "the American Dream" to own a home.

3          103.    Variable rate loans are based on a "margin" and an "index."  The index is often the Prime

4  Rate or the LIBOR exchange rate.  The margin is the amount the lender charges over that rate, basically

5  it is the lender's profit on the loan.

6          104.    TILA and Regulation Z require disclosures to be clear and conspicuous so people

7  understand what their obligations are.  In particular, when the payment is not based on that index and

8  margin a separate disclosure is required.  The disclosure must also inform that interest rate and payment

9  may go up and clearly and conspicuously provide  the circumstances under which the rate and payment

10  will increase.  Further, the disclosure must inform the borrower what the true cost of the loan is.

11          105.    The Federal Reserve Board established disclosure requirements for variable rate loans.

12  26 C.F.R. § 226.19 requires a lender to disclose the frequency of interest rate and payment adjustments

13  to borrowers.  If interest rate changes will be imposed more frequently or at different intervals than

14  payment changes, a creditor must disclose the frequency and timing of both types of changes.

15          106.    The disclosures required pursuant to 12 C.F.R. § 226.19 are extremely important because

16  Plaintiff and other consumers similarly situated need this information in order to budget their money.

17  They need to know if their house payments are going to go up so that they can plan for it.  If the change

18  comes as a surprise, they face a much greater possibility of defaulting on their loans and losing their

19  homes.

20          107.    Here, Defendants states only that the interest rate may increase in the future.  However,

21  an interest rate increase was in fact far more certain than this disclosure led Plaintiff and the Class

22  members to believe.  If Defendants had given the Plaintiffs and the Class members the promised low

23  interest rate for any initial period of time, the interest rate was guaranteed to go up even without any

24  change in the index.  Thus, the increase in the interest rate on these loans was not just a possibility; it

25  was an absolute certainty and Defendants failed and omitted this material information in their

26  disclosures to Plaintiff and the Class members.

27          108.    Defendants' loan documents state that the interest rate may increase during the term of

28  this transaction if the index increases.  This, however, was not the only circumstance that could cause an

1  increase in the interest rate because the disclosed interest rate was discounted.

2  109.  At all times relevant during the liability period, Defendants failed to disclose, and by

3  omission, failed to inform Plaintiffs and the Class members that the initial interest rate was discounted,

4  creating the possibility of an increase even when the index did not rise.  Due to the initial discounted

5  interest rate being listed at 1% to 3%, the interest rate would increase because the index and margin

6  were between 5% and 8% higher.  Even when Defendants did provide a disclosure that stated the initial

7  payment was not based on the index, it did so in a manner that was not clear and conspicuous.  Because

8  the loan documents failed to provide this extremely important material information in a clear and

9  conspicuous manner that did not obscure its importance, Defendant's disclosure failed to meet the

10  standards mandated under TILA.

11  110.  Defendants failed to disclose to Plaintiffs and the Class members that their interest rate

12  was, with 100% certainty, going to increase, regardless of whether or not the index upon which their

13  loans are based changed.  As such, Defendants violated TILA and Regulation Z by providing Plaintiffs

14  and the Class members with unclear, deceptive and poorly drafted or intentionally misleading

15  disclosures.

16  **F.**     **Defendant's Failure to Disclose the Composite Interest Rate Violates Truth in**

17     **Lending Laws**

18  111.  Defendants provided Plaintiffs and the Class members with multiple, conflicting interest

19  rates when describing the costs of this loan.  On the TILDS, Defendants set forth one interest rate, while

20  on the Note, Defendants set forth one or two other, different interest rates.

21  112.  The official staff commentary to 226 C.F.R. § 17(C)(8) states:

22     Basis of disclosures in variable-rate transactions. The disclosures for a

23     variable-rate transaction must be given for the full term of the transaction

24     and must be based on the terms in effect at the time of consummation.

25     Creditors should base the disclosures only on the initial rate and should

26     not assume that this rate will increase. For example, in a loan with an

27     initial rate of 10 percent and a 5 percentage points rate cap, creditors

28     should base the disclosures on the initial rate and should not assume that

-26-

this rate will increase 5 percentage points. However, in a variable-rate transaction with a seller buydown that is reflected in the credit contract, a consumer buydown, or a discounted or premium rate, disclosures should not be based solely on the initial terms. ***In those transactions, the disclosed annual percentage rate should be a composite rate based on the rate in effect during the initial period and the rate that is the basis of the variable-rate feature for the remainder of the term***. (See the commentary to section 226.17(c) for a discussion of buydown, discounted, and premium transactions and the commentary to section 226.19(a)(2) for a discussion of the redisclosure in certain residential mortgage transactions with a variable-rate feature.)

113.    The reason for this requirement is clear.  Consumers cannot make an informed decision when they cannot compare the cost of credit to other proposals.  It is therefore incumbent upon Defendants to show the composite interest rate in effect so that the borrowers can understand exactly what they will be paying for the loan.

114.    A lender violates TILA, Reg. Z and the OTS guidelines by failing to list the composite rate in variable rate loans that have a discounted initial rate.  The loan sold to Plaintiffs and Class members by Defendants is a variable-rate loan.  At all times relevant during the liability period, Defendants listed an interest rate in the Note(s) that, in truth, would only be provided for the first thirty (30) days of the thirty year loan, and would, with one hundred percent certainty, be increased after that first month.  Because Defendants failed to clearly and conspicuously disclose the composite annual percentage rate on these loans, and instead listed different interest rates in different places in the documents provided to consumers, Defendants violated TILA and Regulation Z, and failed to provide disclosures that did not obscure relevant information.

115.    As a direct and proximate result of Defendants' violations of TILA, as alleged herein, Plaintiffs and the Class members have suffered injury in an amount to be determined at time of trial.  If Defendants had not violated TILA and had instead clearly and conspicuously disclosed the material terms of Defendants' Option ARM loan, as alleged herein, Plaintiffs and the Class members would not

1   have entered into the home loan contracts which are the subject of this action.  Because Defendants

2   failed to make the proper disclosures required under TILA, Plaintiffs and the Class members now seek

3   redress in an amount and/or type as proven at time of trial.

4

5       **G.    Defendant's Failure to Clearly and Conspicuously Disclose the Effect of the**

6           **Payment Cap on the True Cost of the Loan Violates Truth in Lending Laws**

7       116.    The Option ARM loans at issue each contained a variable rate feature with an initial

8   teaser rate with payment caps.  The payment cap is a limit on how much the payment may be increased

9   annually.  Its purpose is to provide borrowers with a limit on how much their payment can increase from

10  year to year.  The loans issued by Defendants had a 7.5% payment cap, which means that a borrower

11  would only see their payment rise each year by a maximum of 7.5%.  (i.e. a $1,000 monthly payment in

12  year one, could go to a $1,075 payment in year two.)

13      117.    The Official Staff Commentary to 12 C.F.R. § 226.17(c)(1)(10)(iii)  states that "[i]f a

14  loan contains a rate or payment cap that would prevent the initial rate or payment, at the time of the first

15  adjustment, from changing to the rate determined by the index or formula at consummation, the effect of

16  that rate or payment cap should be reflected in the disclosures."  Thus, at all times relevant during the

17  liability period, Defendants had a duty to Plaintiffs and the Class members to disclose the effect the

18  payment caps would have on the loans in the TILD.

19      118.    At all times relevant during the liability period, Defendants failed to disclose, and by

20  omission, failed to inform Plaintiffs and the Class members that the payment cap would cause hundreds,

21  if not thousands of dollars, each month, to be secretly added to principle.

22      119.    As a direct and proximate result, Defendants failed to disclose, and by omission, failed to

23  inform Plaintiffs and the Class members of the effect of the payment cap in violation of 12 C.F.R. §

24  226.17.

25      120.    WHEREFORE, Plaintiffs and the Class members are entitled to an order declaring that

26  Defendants violated TILA, 15 U.S.C. §1601, et seq., that Plaintiff  and the Class have the right to

27  rescind pursuant to 15 U.S.C. § 1635 and 12 C.F.R. § 226.23, attorneys fees, litigation costs and

28  expenses and costs of suit, and for an order rescinding Plaintiff ' individual mortgage and those of any

1  class member desirous of such relief, and for an order awarding other relief as the Court deems just and

2  proper.

### IX.

### SECOND CAUSE OF ACTION

### FRAUDULENT OMISSIONS

### (Against All Defendants)

121.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

122.    As alleged herein, pursuant to TILA, 15 U.S.C. §1601, *et seq*.,  Regulation Z (12 C.F.R. §226 ) and the Federal Reserve Board's Official Staff Commentary, Defendants had a duty to disclose to Plaintiffs, and each Class member, (i) the actual interest rate being charged on the Note(s), (ii) that negative amortization would occur and that the "principal balance *will* increase"; and (iii) that the initial interest rate on the note was discounted.

123.    Defendants further had a duty to disclose to Plaintiffs, and each Class member (i) the actual interest rate being charged on the Note(s), (ii) that negative amortization would occur and that the "principal balance *will* increase"; and (iii) that the initial interest rate on the note was discounted, based upon Defendants partial representations of material facts when Defendants had exclusive knowledge of material facts that negative amortization was certain to occur.

124.    The Note(s) state at ¶ 3 (A): "I will pay principal and interest by making a payment each month."   However, the true facts are that the payment rate provided by Defendants was insufficient to pay both interest and principal.  In fact, the payment rate was not even sufficient to pay enough interest to avoid negative amortization which, under the terms of the Note(s) was certain to occur.

125.    The Note(s) further state, at ¶ 3(F), "[i]f my monthly payment is less than the amount necessary to pay the full amount of interest for that month, the portion of interest that is unpaid will be added to the principal balance of my loan as of the due date for such payment and will accrue interest at the rate in effect from time to time in accordance with this Note."   However, the payment schedule provided by Defendants in the TILD were absolutely incapable of covering the amount of interest due and therefore this statement was false in that it omitted this material fact.

126.    The Note(s) state an interest rate and an initial payment amount based on that interest rate.  The TILDS Defendants gave to Plaintiffs and the Class members include the schedule of payments (including that initial payment rate) but yet disclose a different interest rate.  The payment schedule, however, is wholly unrelated to the true interest rate being charged on the loan and, at all times relevant during the liability period, Defendants failed to disclose, and by omission, failed to inform Plaintiffs and the Class members of this important material information.

127.    The aforementioned omitted information was not known to Plaintiffs and the Class members and which, at all times relevant, Defendants failed to disclose and/or actively concealed by making such statements and partial, misleading representations to Plaintiffs and all others similarly situated.  Because the Option ARM loans did not provide a low interest rate for the first three (3) to five (5) years of the Note, and the payment rate disclosed by Defendants were insufficient to pay both principal and interest, negative amortization occurred.

128.    Defendants, and each of them, failed to disclose, and by omission failed to inform Plaintiffs and each Class member that (i) the payment rate provided to Plaintiffs and the Class members on the TILD was insufficient to pay both principal and interest; (ii) that negative amortization was absolutely certain to occur if Plaintiffs and the Class members made payments according to the payment schedule provided by Defendants; and (iii) that loss of equity and/or loss of Plaintiffs' and the Class members residence was substantially certain to occur if Plaintiffs and the Class members made payments according to the payment schedule provided by Defendants.

129.    As alleged herein, Defendants had a duty to disclose to Plaintiffs, and each Class member and at all times relevant, failed to disclose and/or concealed material facts by making partial representations of some material facts when Defendants had exclusive knowledge of material facts, including but not limited to, (i) the disclosed interest was not the actual interest rate charged on the Note(s), (ii) that negative amortization was certain to occur, and (iii) that the initial rate was discounted. The concealed and omitted information was not known to Plaintiffs and the Class members and which, at all times relevant, Defendants failed to disclose and/or actively concealed by making such statements and partial, misleading representations to Plaintiffs  and all others similarly situated.  Because the Option ARM loans did not provide a low interest rate for the first three (3) to five (5) years of the Note,

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04500 RMW

1    and the payment rate disclosed by Defendants was insufficient to pay both principal and interest,

2    negative amortization occurred.

3        130.    From the inception of Option ARM loan scheme, until the present, Defendants have

4    engaged in a purposeful and fraudulent scheme to omit material facts known solely to them, and not

5    reasonably discoverable by Plaintiffs and the Class members, regarding the true facts concerning the

6    actual interest rate charged on the loans, the negative amortization that was certain to occur, and that the

7    initial interest rate, in fact, was discounted, all of which Defendants were duty bound to clearly and

8    conspicuously disclose to Plaintiffs and the Class members in the TILDS.

9        131.    Defendants have known from the inception of their Option ARM loan scheme that these

10   loans, (i) do not provide the promised initial interest rate for the first three (3) to five (5) years of the

11   Note, (ii) that negative amortization would occur and that Plaintiffs' and the Class members' principal

12   balances would increase, and (iii) that the initial interest rate was discounted and did not accurately

13   reflect the interest that consumers were being charged on the loans.

14       132.    Defendants purposefully and intentionally devised this Option ARM loan scheme to

15   defraud and/or mislead consumers into believing that these loans would provide a low-interest rate loan,

16   for the first three to five years of the note and that if they made their payments according to the payment

17   schedule provided by Defendants that it would be sufficient to pay both principal and interest.

18       133.    The omitted information, as alleged herein, was material to Plaintiffs and each Class

19   member in that had the information be disclosed, Plaintiffs and each Class member would not have

20   entered into the loans.

21       134.    As a direct and proximate result of Defendants failures to disclose and omission of

22   material facts, as alleged herein, Plaintiffs and each Class member have suffered damages, which

23   include, but are not limited to the loss of equity Plaintiffs and each Class member had in their homes

24   prior to entering these loans.

25       135.    The wrongful conduct of Defendants, as alleged herein, was willful, oppressive, immoral,

26   unethical, unscrupulous, substantially injurious, malicious and in conscious disregard for the well being

27   of Plaintiffs , and others similarly situated.  Accordingly, Plaintiffs, and the others similarly situated

28   seek punitive damages against Defendants in an amount to deter Defendants from similar conduct in the

1    future.

2        136.    WHEREFORE, Plaintiffs and members of the Class are entitled to all legal and equitable

3    remedies provided by law, including but not limited to actual damages, exemplary damages,

4    prejudgment interest and costs.

5

6                                            **VII.**

7                                **THIRD CAUSE OF ACTION**

8    **(Violation of California's Unfair Competition Law, Bus. & Prof. Code §17200 *et seq*., "Unfair"**

9                              **and "Fraudulent" Business Acts or Practices,**

10                                   **(Against All Defendants)**

11       137.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

12       138.    Plaintiffs bring this cause of action on behalf of themselves, on behalf of the Class, and in

13   their capacity as private attorney generals against all Defendants for their unfair, fraudulent and/or

14   deceptive business acts and/or practices pursuant to California Business and Professions Code Sections

15   17200 et seq., which prohibits all unfair and/or fraudulent business acts and/or practices.

16       139.    Plaintiffs assert these claims as they are representatives of an aggrieved group and as

17   private attorney generals on behalf of the general public and other persons who have expended funds

18   that the Defendants should be required to pay or reimburse under the equitable and restitutionary

19   remedies provided by California Business and Professions Code Sections 17200 et seq.

20       140.    The instant claim is predicated on the generally applicable duty of any contracting party

21   to not misrepresent material facts, and on the duty to refrain from unfair and deceptive business

22   practices.  Plaintiffs and the Class members hereby seek to enforce a general proscription of unfair

23   business practices and the requirement to refrain from deceptive conduct.  The instant claim is

24   predicated on duties that govern anyone engaged in any business and anyone contracting with anyone

25   else.

26       141.    At all times relevant during the liability period, Defendants engaged in a pattern of

27   deceptive conduct and concealment aimed at maximizing the number of borrowers who would accept

28   their Option ARM loans.  Defendants, and each of them, sold to Plaintiffs and the Class members a

                                           -32-

deceptively devised financial product. As alleged herein, Defendants sold their Option ARM loan product to consumers, including Plaintiffs, in a false or deceptive manner. As alleged herein, Defendants sold a loan which appeared to have a very low, fixed payment and interest rate for a period of three (3) to five (5) years and no negative amortization. However, at all times relevant during the liability period, Defendants failed to disclose, and by omission, failed to inform Plaintiffs and the Class members the true fact that Defendants' Option ARM loans were designed to, and did, cause negative amortization to occur.

142.    Defendants lured Plaintiffs and the Class members into the Option ARM loan with promises of low payment and low interest. Once Plaintiffs and the Class members entered into these loans, Defendants switched the interest rate charged on the loans to a much higher rate than the one they promised to Plaintiffs and the Class members. And, for a substantial number of the loans, after entering these loans, the Class members could not escape because Defendants purposefully placed into these loans an extremely onerous prepayment penalty that made it prohibitively expensive for consumers to extricate themselves from these loans. Thus, once on the hook, these Class members could not escape from Defendants loans.

143.    Plaintiffs and the Class members were consumers who applied for a mortgage loan through Defendants. During the loan application process, in each case, Defendants uniformly promoted, advertised, and informed Plaintiffs and the Class members that in accepting these loan terms, Plaintiffs and the Class members would be able to lower their mortgage payment and save money.

144.    At all times relevant during the liability period, Defendants sold their Option ARM loan product as having a low payment and interest rate, i.e., typically between 1% and 3%. However, Defendants did not disclose that this was just a "teaser" rate, the purpose of which was to get consumers to enter into loan agreements with Defendants. Defendants did not disclose to Plaintiffs and the Class members that the "teaser" rate was not the fixed rate that Defendants would actually charge Plaintiffs and the Class members on their outstanding loan balances after the first thirty days. Nor did Defendants disclose that the corresponding payment schedule was not the true payment required, but was rather only a partial payment of the interest accruing on the loans.

/ / /

1    145.    Based on Defendants' representations and misconduct as alleged herein, Plaintiffs and

2    the Class members agreed to finance their primary residence through Defendants' Option ARM loan

3    product. Plaintiffs and the Class members were told they were being sold a home loan with a low

4    payment and interest rate. Plaintiffs and the Class members were also led to believe that if they made

5    payments based on this interest rate, and the payment schedule provided to them by Defendants, the loan

6    would be a no negative amortization home loan. After, the fixed interest period, the loan documents

7    stated that the interest rate "may" change. Plaintiffs and the Class members believed these facts to be

8    true because that is what the Defendants wanted consumers to believe.

9    146.    Defendants aggressively sold their product as a fixed low interest home loan. Defendants

10   knew that if they sold these loans in such a manner, their Option ARM loan product would be a hugely

11   popular and profitable product for them. Defendants also knew, however, that they were selling their

12   product in a false and deceptive manner.

13   147.    In fact, Defendants' Option ARM loan possessed a low, fixed *payment* but not a low

14   interest rate. Unbeknownst to Plaintiffs and the Class members, the actual interest rate they were

15   charged on their loans was not fixed. After purchasing Defendants' Option ARM loan product,

16   Plaintiffs and class members never actually received the benefit of the promised low interest rate, or, in

17   some cases, consumers received the low rate for just a single month. Immediately, thereafter,

18   Defendants in every instance and for every loan increased the interest rate they charged Plaintiffs and

19   the Class members. And, for a substantial number of the Class, once these Class members accepted

20   Defendants' Option ARM loan, they had no viable option to extricate themselves because as substantial

21   number of the loan contracts included a draconian pre-payment penalty.

22   148.    Defendants perpetrated this bait and switch scheme on Plaintiffs and the Class members

23   in a common and uniform manner. Defendants' misconduct and failures to disclose the truth about the

24   actual interest rate charged on the loans and describing the loans as having a low payment that

25   corresponded to a listed "teaser" rate was, at all times relevant, deceptive and unfair. Defendants

26   initiated this scheme in order to maximize the amount of the loans issued to consumers and to maximize

27   Defendants' profits.

28   / / /

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04500 RMW

1    149.    The acts, misrepresentations, omissions, and practices of Defendants alleged above

2    constitute unfair, and/or fraudulent business acts and/or practices within the meaning of California

3    Business and Professions Code Sections 17200 et seq.

4    150.    By engaging in the above-described acts and practices, Defendants have committed one

5    or more acts of unfair competition within the meaning of Business and Professions Code Sections

6    17200, et seq.

7    151.    Defendants' conduct, as alleged herein, was likely to deceive members of the consuming

8    public, and at all times relevant during the liability period, Defendants' failures to disclose and omission

9    of material facts have been and continue to be unfair, fraudulent, untrue and/or deceptive.

10    152.    Defendants' misconduct as alleged herein gave Defendants an unfair competitive

11    advantage over their competitors.

12    153.    As a direct and proximate result of the aforementioned acts, Defendants, and each of

13    them, received monies and continues to hold the monies expended by Plaintiffs and others similarly

14    situated who purchased the Option ARM loans as described herein.

15    154.    In addition to the relief requested in the Prayer below, Plaintiffs seek the imposition of a

16    constructive trust over, and restitution of, the monies collected and realized by Defendants.

17    155.    The harm to Plaintiffs, members of the general public and others similarly situated

18    outweighs the utility of Defendants' policies, acts and/or practices and, consequently Defendants'

19    conduct herein constitutes an unlawful business act or practice within the meaning of California

20    Business & Professions Code Sections 17200 et seq.

21    156.    The unfair, deceptive and/or fraudulent business practices of Defendants, as alleged

22    herein, presents a continuing threat to members of the public to be mislead and/or deceived by

23    Defendants' Option ARM loans as described herein.  Plaintiffs and other members of the general public

24    have no other remedy of law that will prevent Defendants misconduct as alleged herein from occurring

25    and/or reoccurring in the future.

26    157.    As a direct and proximate result of Defendants' unfair and/or fraudulent conduct alleged

27    herein, Plaintiffs and Class Members have lost thousands if not millions of dollars of equity in their

28    homes.  Plaintiffs and the Class members are direct victims of the Defendants' unlawful conduct, and

1    each has suffered injury in fact, and have lost money or property as a result of Defendants' unfair

2    competition.

3        158.    WHEREFORE, Plaintiffs and members of the Classes are entitled to equitable relief,

4    including restitution, restitutionary disgorgement of all profits accruing to Defendants because of their

5    unfair, fraudulent, and deceptive acts and/or practices, attorneys fees and costs, declaratory relief, and a

6    permanent injunction enjoining Defendants from their unfair, fraudulent and deceitful activity.

7

8    **X.**

9    **FOURTH CAUSE OF ACTION**

10    **Breach of Contract**

11    **(Against All Defendants)**

12        159.    Plaintiffs  incorporate all preceding paragraphs as though fully set forth herein.

13        160.    Plaintiffs and the Class members entered into a written home loan agreement – the

14    contract or Note – with Defendants.  The Note(s) were drafted by Defendants and could not be modified

15    by Plaintiffs or the Class members.  The Note(s) describe the terms and respective obligations applicable

16    to the parties herein.

17        161.    The Note(s) state the interest rate on the loan at 1% to 3% and indicate that it "may"

18    change.  The payment schedule in the TILDS, for the first three (3) to five (5) years of the Note, are

19    based on that low 1% to 3% "teaser" interest rate.

20        162.    Defendants drafted the Note(s) and did not allow Plaintiffs or the Class members any

21    opportunity to make changes to the Note(s) and due to Defendants' superior bargaining position, the

22    Note(s) were offered on a take it or leave it basis.  As such, the Note(s) at issue are contracts of

23    adhesion.

24        163.    Defendants' Note(s) state, at ¶ 3 (A): "I will pay principal and interest by making a

25    payment each month."

26        164.    Defendants expressly and/or through their conduct and actions agreed that Plaintiffs' and

27    the Class members' monthly payment obligations would be sufficient to pay both the principal and

28    interest owed on the loans.

1    165.    At all times relevant during the liability period, Defendants breached this agreement and

2    never applied any of Plaintiffs' and the Class members' payments to principal.

3    166.    The written payment schedules prepared by Defendants, and applicable to Plaintiffs' and

4    Class members' loans, show that the payment amounts owed by Plaintiffs and Class members to

5    Defendants in year one are exactly equal to the amount required to pay off the loan if, indeed, the

6    interest actually charged on the loan was the low interest rate promised.  If the Defendants did as

7    promised, the payments would have been sufficient to pay both principal and interest amounts.

8    167.    Instead, Defendants immediately raised Plaintiffs' and the Class members' interest rates

9    and applied *no part* of Plaintiffs' and the Class members' payments were applied to the principal

10   balances on their loans.  In fact, because Defendants charged more interest than was agreed to and

11   payments, as disclosed by Defendants, were, at all times relevant, insufficient to cover the interest

12   charge and thus principal balances increased (which is the negative amortization built into the loan).

13   168.    Defendants breached the written contractual agreement by failing to apply any portion of

14   Plaintiffs' and the Class members' monthly payments towards their principal loan balances.

15   169.    Plaintiffs and the Class members, on the other hand, did all of those things the contract

16   required of them.  Plaintiffs and the Class members made monthly payments in the amount required by

17   the terms of the Note and reflected in the payment schedule prepared by Defendants.

18   170.    As a result of Defendants' breach of the agreement, Plaintiffs and the Class members

19   have suffered harm.  Plaintiffs  and Class members have incurred additional charges to their principal

20   loan balance.  Plaintiffs  and Class members have incurred and will continue to incur additional interest

21   charges on the principal loan balance and surplus interest added to Plaintiffs' and Class members'

22   principal loan balance.  Furthermore, Defendants' breach has placed Plaintiffs and the Class members in

23   danger of losing their homes through foreclosure as Defendants have caused Plaintiffs' and the Class

24   members' principal loan balances to increase and limited these consumers' ability to make their future

25   house payments or obtain alternative home loan financing.

26   171.    At all times relevant, there existed a gross inequality of bargaining power between the

27   parties to the ARM loan contracts.  At all times relevant, Defendants unreasonably and unconscionably

28   exploited their superior bargaining position and foisted upon Plaintiffs and the Class members extremely

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04500 RMW

1  harsh, one-sided provisions in the loan contract, which Plaintiffs and Class members were not made

2  aware of and did not comprehend (*e.g.*, Defendants fraud and failures to clearly and conspicuously

3  disclose as alleged herein), and which attempt to severely limit Defendants' obligations under these loan

4  contracts at the expense of Plaintiffs and the Class members, as alleged herein.  As a direct and

5  proximate result of these extremely harsh, one-sided provisions, including but not limited to the

6  provisions which seek to limit the "teaser" interest rate for one month or less, these provisions are

7  unconscionable and therefore unenforceable.

8       172.    WHEREFORE, Plaintiffs and members of the Class are entitled to declaratory relief,

9  compensatory damages proximately caused by Defendants breach of contract as alleged herein, pre-

10 judgment interest, costs of suit and other relief as the Court deems just and proper.

11

12                                          **XI.**

13                            **FIFTH CAUSE OF ACTION**

14          **Tortiuous Breach of Implied Covenant of Good Faith and Fair Dealing**

15                            **(Against All Defendants)**

16       173.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

17       174.    Defendants entered into written contracts with Plaintiffs and the Class members based on

18 representations Defendants made directly and indirectly to Plaintiffs and the Class members about the

19 terms of their loans.

20       175.    Defendants expressly and impliedly represented to Plaintiffs and the Class members that

21 they would provide loans secured by Plaintiffs' and the Class members' homes, and that the loans would

22 have a fixed interest rate at promised low interest rate for a period of three (3) to five (5) years.

23       176.    As alleged herein, Defendants loan documents also represented to Plaintiffs and the Class

24 members that if they made the monthly payments in the amount prescribed by Defendants that no

25 negative amortization would occur.  The Note(s) expressly state and/or imply that Plaintiffs' and the

26 Class members' monthly payment obligation *will* be applied to pay both principal and interest owed on

27 the loan.  The Note(s) further state that for each monthly payment Plaintiffs and the Class members

28 interest shall be paid before principal.

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04500 RMW

177.    The written payment schedules prepared by Defendants, and applicable to Plaintiffs' and the Class members' loans, show that the payment amounts owed by Plaintiffs and the Class members to Defendants in year one are exactly equal to the amount required to pay off the loan if, indeed, the interest actually charged on the loans was the low interest rate promised.  Thus, if Defendants had acted as promised, the payments would have been sufficient to pay both principal and interest.

178.    Instead, Defendants immediately raised Plaintiffs' and the Class members' interest rate and applied ***no part*** of Plaintiffs' and the Class members' payments to principal.  In fact, because Defendants charged more interest than was disclosed, and agreed to, in the loan contracts, Plaintiffs and the Class members' payments were insufficient to cover the interest that Defendants charged resulting in an increase in the amount of principal Plaintiffs and the Class members owed on their homes.

179.    At all times relevant during the liability period, Defendants fraudulently and unfairly interfered with Plaintiffs' and Class members' rights to receive the benefits of the contract.  These loans will cost Plaintiffs and the Class members thousands of dollars more than represented by Defendants. Plaintiffs and the Class members did not receive the fixed low interest rate home loan promised them by Defendants.  Defendants have caused Plaintiffs and the Class members to lose equity in their homes and therefore have denied Plaintiffs and the Class members the enjoyment, security of one of their most important investments.

180.    Plaintiffs and the Class members, on the other hand, did all of those things the contract required of them.  Plaintiffs and the Class members made monthly payments in the amount required by the terms of the Note and reflected in the payment schedule prepared and provided by Defendants.

181.    At all times relevant, Defendants unreasonably denied Plaintiffs and members of the Class the benefits promised to them under the terms of the Note(s), including but not limited to: (i) the promised low interest rate for the first three (3) to five (5) years of the loan as reflected in the payment schedule(s), (ii) payments to both principal and interest during the first three (3) to five (5) years of the loan; and (iii) secretly adding negative amortization to the principal balance(s), and charged interest on that unpaid interest.

182.    Knowing the truth and motivated by profit and market share, Defendants have knowingly, willfully, and fraudulently breached the implied covenant of good faith and fair dealing by

engaging in the acts and/or omissions to mislead and/or deceive Plaintiffs and others similarly situated as alleged herein.

183.    Defendants' toritiuous breaches, as alleged herein, were committed with malice and willful and wanton disregard for whether or not Plaintiffs or others similarly situated would actually receive a home loan that would provide the promised low interest and payment rate for the first three (3) to five (5) years of the loan sufficient to pay both principal and interest.

184.    Upon information and belief, and at all times relevant during the liability period, Defendants possessed full knowledge and information concerning the above facts about the Option ARM loans, and otherwise sold these loans throughout the United States, including the State of California.

185.    Defendants' placing of their corporate and/or individual profits over the rights of others is particularly vile, base, contemptible, and wretched and said acts and/or omissions were performed on the part of officers, directors, and/or managing agents of each corporate Defendants and/or taken with the advance knowledge of the officers, directors, and/or managing agents who authorized and/or ratified said acts and/or omissions. Defendants thereby acted with malice and complete indifference to and/or conscious disregard for the rights and safety of others, including Plaintiffs and the General Public.

186.    At all times relevant during the liability period, Defendants' conduct, as alleged herein, was malicious, oppressive, and/or fraudulent.

187.    As a direct and proximate result of Defendants' toritiuous misconduct, as alleged herein, Plaintiffs and the Class members have suffered harm. Plaintiffs and the Class members have incurred additional charges to their principal loan balances. Plaintiffs and the Class members have incurred and will continue to incur additional interest charges on their principal loan balances which Defendants has secretly added to their principal loan balances. Furthermore, Defendants' breach has caused and/or otherwise placed Plaintiffs and the Class members in danger of losing their homes through foreclosure and, as a direct and proximate result of said misconduct, caused Plaintiffs' and the Class members' principal loan balances to increase limiting these consumers' ability to make their future house payments or obtain alternative home loan financing.

/ / /

1    188.    WHEREFORE, Plaintiffs and members of the Class are entitled to declaratory relief, all

2  damages proximately caused by Defendants breach of the implied covenant of good faith and fair

3  dealing as alleged herein, punitive damages, pre-judgment interest, costs of suit and other relief as the

4  Court deems just and proper.

5

6                                    **PRAYER FOR RELIEF**

7          WHEREFORE, Plaintiffs  and all Class members pray for judgment against each Defendants,

8  jointly and severally, as follows:

9          A.      An order certifying this case as a class action and appointing Plaintiffs  and their counsel

10                 to represent the Class;

11         B.      For actual damages according to proof;

12         C.      For compensatory damages as permitted by law;

13         D.      For consequential damages as permitted by law;

14         E.      For punitive damages as permitted by law;

15         F.      For rescission;

16         G.      For equitable relief, including restitution;

17         H.      For restitutionary disgorgement of all profits Defendants obtained as a result of their

18                 unfair competition;

19         I.      For interest as permitted by law;

20         J.      For Declaratory Relief;

21         K.      For reasonable attorneys' fees and costs; and

22         L.      For such other relief as is just and proper.

23  DATED: February 8, 2008                    **SEEGER WEISS LLP**

24

25                                  By: _____/s/_____
                                        Jonathan Shub, Esq.
26                                      1515 Market Street, Suite 1380
                                        Philadelphia, PA 19107
27                                      Phone: (215) 564-2300
                                        Fax (215) 851-8029
28  / / /

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04500 RMW

1

David M. Arbogast, Esq.
**SPIRO MOSS BARNESS LLP**

2

11377 W. Olympic Boulevard, Fifth Floor
Los Angeles, CA 90064-1683

3

Phone: (310) 235-2468
Fax:  (310) 235-2456

4

5

Paul R. Kiesel, Esq.
Patrick Deblase, Esq.

6

Michael C. Eyerly, Esq.
**KIESEL BOUCHER LARSON LLP**
8648 Wilshire Boulevard

7

Beverly Hills, California 90210
Phone:  (310) 854-4444

8

Fax:  (310) 854-0812

9

Jeffrey K. Berns, Esq.
**LAW OFFICES OF JEFFREY K. BERNS**

10

19510 Ventura Blvd, Suite 200
Tarzana, California 91356

11

Phone: (818) 961-2000
Fax:  (818) 867-4820

12

13

Attorneys for Plaintiffs, BRIAN O'DONNELL,
MICHAEL VAN BELLEGHEM, and PATRICIA
VAN BELLEGHEM, and all others Similarly Situated

14

15

**<u>DEMAND FOR JURY TRIAL</u>**

16

Plaintiffs  hereby demands a trial by jury to the full extent permitted by law.

17

DATED: February 8, 2008                **SEEGER WEISS LLP**

18

19

By:  _____*/s/*_____
Jonathan Shub, Esq.
1515 Market Street, Suite 1380

20

Philadelphia, PA 19107
Phone: (215) 564-2300

21

Fax (215) 851-8029

22

David M. Arbogast, Esq.
**SPIRO MOSS BARNESS LLP**

23

11377 W. Olympic Boulevard, Fifth Floor
Los Angeles, CA 90064-1683

24

Phone: (310) 235-2468
Fax:  (310) 235-2456

25

26

/ / /

27

/ / /

28

/ / /

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04500 RMW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Paul R. Kiesel, Esq.
Patrick Deblase, Esq.
Michael C. Eyerly, Esq.
**KIESEL BOUCHER LARSON LLP**
8648 Wilshire Boulevard
Beverly Hills, California 90210
Phone:  (310) 854-4444
Fax:  (310) 854-0812

Jeffrey K. Berns, Esq.
**LAW OFFICES OF JEFFREY K. BERNS**
19510 Ventura Blvd, Suite 200
Tarzana, California 91356
Phone: (818) 961-2000
Fax:  (818) 867-4820

Attorneys for Plaintiffs, BRIAN O'DONNELL,
MICHAEL VAN BELLEGHEM, and PATRICIA
VAN BELLEGHEM, and all others Similarly Situated

SECOND AMENDED CLASS ACTION COMPLAINT - C-07-04500 RMW

**Exhibit No. 1**

LOAN # 6900091171

# ADJUSTABLE RATE NOTE

LIBOR Annual Monthly Average (LAMA) of 1-Month LIBOR Index

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY PAYMENT CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| JUNE 08, 2005 | SAN JOSE | CA |
|---|---|---|
| [Date] | [City] | [State] |

1271 TERILYN AVENUE, SAN JOSE, CA 95122

[Property Address]

### 1.   BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $   468,000.00   (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is BANK OF AMERICA, N.A.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2.   INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   1.000   %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3.   PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the first day of each month beginning on   AUGUST 01, 2005   . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied first to current interest, then to prior unpaid interest, and the remainder to Principal. If, on JULY 01, 2035   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   BANK OF AMERICA, N.A., P.O. BOX 17404, BALTIMORE, MD 21297-1404   or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $   1,505.28   . This amount may change.

**(C) Monthly Payment Changes**

The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

### 4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Interest Rate Change Dates**

The interest rate I will pay may change on the first day of   AUGUST, 2005   , and on the first day of every month thereafter. Each date on which my interest rate could change is called a "Rate Change Date."

**MULTISTATE ADJUSTABLE RATE NOTE** – Single Family

Page 1 of 5

BA477N (0504)    VMP Mortgage Solutions, Inc. (800)521-7291

M77N 06/08/05  2:04 PM 6900091171



**(B) The Index**

Beginning with the first Change Date, my adjustable rate will be based on an Index. The "Index" is equal to the LIBOR Annual Monthly Average ("LAMA") of the 1-month London Inter-Bank Offered Rate ("LIBOR"), as made available by Fannie Mae on their website, through electronic transmission or by telephone. The most recent LIBOR Annual Monthly Average ("LAMA") figure available as of the date 15 days before each Change Date is called the "Current Index".

If the Index is no longer available or is no longer posted either through electronic transmission or by telephone, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculations of Interest Rate Changes**

Before each Rate Change Date, the Note Holder will calculate my new interest rate by adding  TWO AND ONE-EIGHTH                        percentage points (    2.125        %) to the Current Index. The Note Holder will then round the result of this addition to the  NEXT HIGHEST  one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Rate Change Date.

**(D) Interest Rate Limit**

My interest rate will never be greater than     9.950      %.

**(E) Payment Changes**

My monthly payment will be adjusted on      AUGUST 01, 2006        and on the same date each year thereafter. Each date on which my payment could change is called a "Payment Change Date." My monthly payment will not increase or decrease by more than 7.5% from the payment in effect just prior to the change ("Annual Payment Cap"), except as described in Section 4(G) below. Unless limited by the Annual Payment Cap, my new monthly payment will equal the amount necessary to amortize (pay off) my loan in substantially equal installments over its remaining term based on the interest rate that became effective on the Rate Change Date prior to the Payment Change Date.

**(F) Principal Balance Adjustments - Deferred Interest (Negative Amortization)**

If my monthly payment is less than the amount necessary to pay the full amount of interest for that month, the portion of interest that is unpaid will be added to the principal balance of my loan as of the due date for such payment and will accrue interest at the rate in effect from time to time in accordance with this Note.

**(G) Full Reamortization**

The Payment Change Dates occurring immediately following every fifth year (on the due dates for my 61st, 121st, 181st, 241st and 301st payments) are instead called "Reamortization Dates." In addition, if as of a due date for any payment, the principal balance on this loan would increase to an amount that equals or exceeds    115        % of the original principal balance, that due date will also be a "Reamortization Date."

Effective with the payment due on a Reamortization Date, the Note Holder will adjust my monthly payment in the same manner as provided in Section 4(E) above, except that the Note Holder will not apply the Annual Payment Cap. I will continue making payments at the new level until the next Payment Change Date or Reamortization Date.

I understand that changes in the interest rate that occur during the final five years of my loan term may make my monthly payments insufficient to pay off my loan over the remaining term in equal installments unless I elect to make fully amortizing payments during that period, as provided in Section 4(H) below. As agreed in Section 3(A) above, I will pay off all amounts still owing under this Note on or before the Maturity Date even if this requires a substantially higher payment on the Maturity Date than the immediately preceding payment amounts. Lender is under no obligation to refinance the loan at that time. I will, therefore, be required to make payment out of other assets that I may own, or I will have to find a lender, which may be the lender I have this loan with, willing to lend me the money. If I refinance this loan at maturity, I may have to pay some or all of the closing costs normally associated with a new loan even if I obtain refinancing from the same lender.

**(H) Payment Options**

I will have up to three monthly payment options for my loan. I may always make the monthly payment required under Sections 3(B), 4(E) or 4(G), as applicable (the "Required Payment"). If the Required Payment is insufficient to fully amortize my loan as a result of the application of the Annual Payment Cap or principal balance adjustments, I will have the option to make a fully amortizing payment, which is an amount sufficient to pay off my loan in substantially

equal payments over its remaining term at its then interest rate. If the Required Payment is not sufficient to pay all of the interest owed for that month, which would result in negative amortization, I also will have the option to make an interest-only payment, which will be sufficient to pay the monthly interest and avoid negative amortization, but will not reduce the principal balance. Even if these options are available, I may still elect to make only the Required Payment.

### (I) Effective Date of Interest Rate Changes
My new interest rate will become effective on each Rate Change Date. I will pay the amount of my new monthly payment beginning on the Payment Change Date or the Reamortization Date, as applicable, until the amount of my monthly payment changes again.

### (J) Notice of Changes
The Note Holder will deliver or mail to me an annual notice of any changes that have occurred to my adjustable interest rate in the preceding year. The Note Holder will also deliver or mail to me a notice of the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

### 5. BORROWER'S RIGHT TO PREPAY
I HAVE THE RIGHT TO MAKE PAYMENTS OF PRINCIPAL AT ANY TIME BEFORE THEY ARE DUE. A PAYMENT OF PRINCIPAL ONLY IS KNOWN AS A "PREPAYMENT." WHEN I MAKE A PREPAYMENT, I WILL TELL THE NOTE HOLDER IN WRITING THAT I AM DOING SO. I MAY NOT DESIGNATE A PAYMENT AS A PREPAYMENT IF I HAVE NOT MADE ALL THE MONTHLY PAYMENTS DUE UNDER THIS NOTE.

I MAY MAKE A FULL PREPAYMENT OR PARTIAL PREPAYMENT WITHOUT PAYING ANY PREPAYMENT CHARGE. AFTER PAYING ANY LATE FEES OR OUTSTANDING FEES THAT I OWE, THE NOTE HOLDER WILL USE MY PREPAYMENTS TO REDUCE THE AMOUNT OF PRINCIPAL THAT I OWE UNDER THIS NOTE. HOWEVER, THE NOTE HOLDER MAY APPLY MY PREPAYMENT TO THE ACCRUED AND UNPAID INTEREST ON THE PREPAYMENT AMOUNT BEFORE APPLYING MY PREPAYMENT TO REDUCE THE PRINCIPAL AMOUNT OF THIS NOTE. IF I MAKE A PARTIAL PREPAYMENT, THERE WILL BE NO CHANGES IN THE DUE DATE OR IN THE AMOUNT OF MY MONTHLY PAYMENT UNLESS THE NOTE HOLDER AGREES IN WRITING TO THOSE CHANGES. MY PARTIAL PREPAYMENT MAY REDUCE THE AMOUNT OF MY MONTHLY PAYMENTS AFTER THE FIRST RATE CHANGE DATE FOLLOWING MY PARTIAL PREPAYMENT. HOWEVER, ANY REDUCTION DUE TO MY PARTIAL PREPAYMENT MAY BE OFFSET BY AN INTEREST RATE INCREASE.

### 6. LOAN CHARGES
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 7. BORROWER'S FAILURE TO PAY AS REQUIRED
#### (A) Late Charges for Overdue Payments
If the Note Holder has not received the full amount of any Required Payment by the end of        15
calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.0        % of my overdue Required Payment. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each Required Payment or any other amounts due under this Note on the date the payment or other amount is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

8.    GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10.    WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11.    UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

00004

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____  (Seal)
BRIAN D O'DONNELL                                  -Borrower

_____  (Seal)
                                                   -Borrower

_____  (Seal)
                                                   -Borrower

_____  (Seal)
                                                   -Borrower

_____  (Seal)
                                                   -Borrower

_____  (Seal)
                                                   -Borrower

_____  (Seal)
                                                   -Borrower

_____  (Seal)
                                                   -Borrower

**BA477N** (0504)
M77N 06/08/05  2:04 PM 6900091171              Page 5 of 5

00005

**FEDERAL TRUTH IN LENDING
DISCLOSURE STATEMENT
Real Estate Loans**

Loan Center  **CONCORD LOAN CENTER**          No.  **2627**   Loan No.          **6900091171**

Principal Amount of Proposed Loan          **468,000.00**          Expected Funding Date          **06/10/05**

| ANNUAL PERCENTAGE RATE<br><br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br><br>The dollar amount the credit will cost you. | Amount Financed<br><br>The amount of credit provided to you or on your behalf. | Total of Payments<br><br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| **9.945** % | $ **1,158,815.30** | $ **462,063.18** | $ **1,620,878.48** |

1. **Payment Schedule.**
   Your payment schedule will be:

| Number of Payments | Payments Are Due MONTHLY Beginning | Amount of Payments ** | Number of Payments | Payments Are Due MONTHLY Beginning | Amount of Payments ** |
|---|---|---|---|---|---|
| 12 | 08/01/05 | 1505.28 | | | |
| 12 | 08/01/06 | 1618.17 | | | |
| 4 | 08/01/07 | 1739.54 | | | |
| 332 | 12/01/07 | 4748.31 | | | |

2. **Security and Property Insurance.**
   You are giving a security interest in real estate at:
   **1271 TERILYN AVENUE, SAN JOSE, CA 95122**
   You may obtain property insurance from anyone you want who is acceptable to the Lender.

3. **Late Payment.**
   If a payment is not received by the Lender by its first banking day which is at least **15** days after the payment due date, you will be charged **5.0** % of the payment.

4. **Prepayment.**
   If you pay off early, you [X] will not [ ] may have to pay a prepayment penalty.
   [ ] If you prepay your loan on other than the regular installment date, you may be assessed interest charges until the end of the month.
   [ ] You may be entitled to a refund of the mortgage insurance premium from HUD.
   You [X] will not [ ] may be entitled to a refund of part of the finance charge.

[X] 5. **Assumption Policy.**
   [ ] Someone buying your home cannot assume the remainder of your loan on its original terms.
   [X] Someone buying you home may be allowed to assume the remainder of your loan on its original terms, subject to certain conditions stated in your loan documents.

[X] 6. **Variable Rate.**
   Your loan contains a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

[ ] 7. **Required Deposit.**
   The annual percentage rate does not take into account your required deposit.

8. See your loan documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment refunds and penalties.

9. **Certain Security Interest Charges.** PLEASE SEE THE GOOD FAITH ESTIMATE AND HUD-1 FOR THESE FEES.
   Recording/filing          $ _____    _____    $ _____
   Lien release recording/filing   $ _____    _____    $ _____

10. The loan applied for will not be secured by any contractual lien except that resulting from the mortgage or deed of trust covering the security described in the Security and Property Insurance Section.
    ~ THE CURRENT INDEX USED AT THE TIME OF CLOSING WAS 2.280% .

**The payment amount does not include a tax and insurance reserve.

BANK OF AMERICA, N.A. ("LENDER")   X _Ri DSnell_   6/8/05

BA222 (0408)                    VMP Mortgage Solutions, Inc. (800)521-7291

TLD1 06/08/05 2:04 PM 6900091171

PAGE 1 OF 2

## DEFINITION OF TRUTH-IN-LENDING TERMS

### ANNUAL PERCENTAGE RATE

This is not the Note rate for which the borrower applied. The Annual Percentage Rate (APR) is the cost of the loan in percentage terms taking into account various loan charges of which interest is only one such charge. Other charges which are used in calculation of the Annual Percentage Rate are Private Mortgage Insurance or FHA Mortgage Insurance Premium (when applicable) and Prepaid Finance Charges (loan discount, origination fees, prepaid interest and other credit costs). The APR is calculated by spreading these charges over the life of the loan which results in a rate higher than the interest rate shown on your Mortgage/Deed of Trust Note. If interest was the only Finance Charge, then the interest rate and the Annual Percentage Rate would be the same.

### PREPAID FINANCE CHARGES

Prepaid Finance Charges are certain charges made in connection with the loan and which must be paid upon the close of the loan. These charges are defined by the Federal Reserve Board in Regulation Z and the charges must be paid by the borrower. Non-Inclusive examples of such charges are: Loan origination fee, "Points" or Discount, Private Mortgage Insurance or FHA Mortgage Insurance, Tax Service Fee. Some loan charges are specifically excluded from the Prepaid Finance Charge such as appraisal fees and credit report fees.

Prepaid Finance Charges are totaled and then subtracted from the Loan Amount (the face amount of the Deed of Trust/Mortgage Note). The net figure is the Amount Financed as explained below.

### FINANCE CHARGE

The amount of interest, prepaid finance charge and certain insurance premiums (if any) which the borrower will be expected to pay over the life of the loan.

### AMOUNT FINANCED

The Amount Financed is the loan amount applied for less the prepaid finance charges. Prepaid finance charges can be found on the Good Faith Estimate/Settlement Statement (HUD-1 or IA). For example if the borrower's note is for $100,000 and the Prepaid Finance Charges total $5,000, the Amount Financed would be $95,000. The Amount Financed is the figure on which the Annual Percentage Rate is based.

### TOTAL OF PAYMENTS

This figure represents the total of all payments made toward principal, interest and mortgage insurance (if applicable) over the life of the loan.

### PAYMENT SCHEDULE

The dollar figures in the Payment Schedule represent principal, interest, plus Private Mortgage Insurance (if applicable) over the life of the loan. These figures will not reflect taxes and insurance escrows or any temporary buydown payments contributed by the seller.

00007



**Exhibit No. 2**

LOAN # 6997911521

# ADJUSTABLE RATE NOTE

## LIBOR Annual Monthly Average (LAMA) of 1-Month LIBOR Index

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY PAYMENT CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

MAY 25, 2006                 ARROYO GRANDE                    CA
[Date]                        [City]                          [State]
751 SOUTH ELM, ARROYO GRANDE, CA 93420

[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $    300,000.00    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is BANK OF AMERICA, N.A.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   1.125   %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the first day of each month beginning on  JULY 01, 2006                .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied first to current interest, then to prior unpaid interest, and the remainder to Principal. If, on JUNE 01, 2036              , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  BANK OF AMERICA, N.A., P.O. BOX 17404, BALTIMORE, MD 21297-1404
or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $    982.25    . This amount may change.

**(C) Monthly Payment Changes**

The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

### 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Interest Rate Change Dates**

The interest rate I will pay may change on the first day of   JULY, 2006              , and on the first day of every month thereafter. Each date on which my interest rate could change is called a "Rate Change Date."

MULTISTATE ADJUSTABLE RATE NOTE – Single Family

Page 1 of 5

BA477N (0504)                VMP Mortgage Solutions, Inc. (800)521-7291
M77N 05/25/06  2:10 PM 6997911521



00001

**(B) The Index**

Beginning with the first Change Date, my adjustable rate will be based on an Index. The "Index" is equal to the LIBOR Annual Monthly Average ("LAMA") of the 1-month London Inter-Bank Offered Rate ("LIBOR"), as made available by Fannie Mae on their website, through electronic transmission or by telephone. The most recent LIBOR Annual Monthly Average ("LAMA") figure available as of the date 15 days before each Change Date is called the "Current Index".

If the Index is no longer available or is no longer posted either through electronic transmission or by telephone, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculations of Interest Rate Changes**

Before each Rate Change Date, the Note Holder will calculate my new interest rate by adding TWO AND ONE-QUARTER              percentage points (    2.250        %) to the Current Index. The Note Holder will then round the result of this addition to the NEXT HIGHEST one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Rate Change Date.

**(D) Interest Rate Limit**

My interest rate will never be greater than    10.075        %.

**(E) Payment Changes**

My monthly payment will be adjusted on      JULY 01, 2007                    and on the same date each year thereafter. Each date on which my payment could change is called a "Payment Change Date." My monthly payment will not increase or decrease by more than 7.5% from the payment in effect just prior to the change ("Annual Payment Cap"), except as described in Section 4(G) below. Unless limited by the Annual Payment Cap, my new monthly payment will equal the amount necessary to amortize (pay off) my loan in substantially equal installments over its remaining term based on the interest rate that became effective on the Rate Change Date prior to the Payment Change Date.

**(F) Principal Balance Adjustments - Deferred Interest (Negative Amortization)**

If my monthly payment is less than the amount necessary to pay the full amount of interest for that month, the portion of interest that is unpaid will be added to the principal balance of my loan as of the due date for such payment and will accrue interest at the rate in effect from time to time in accordance with this Note.

**(G) Full Reamortization**

The Payment Change Dates occurring immediately following every fifth year (on the due dates for my 61st, 121st, 181st, 241st and 301st payments) are instead called "Reamortization Dates." In addition, if as of a due date for any payment, the principal balance on this loan would increase to an amount that equals or exceeds    115        % of the original principal balance, that due date will also be a "Reamortization Date."

Effective with the payment due on a Reamortization Date, the Note Holder will adjust my monthly payment in the same manner as provided in Section 4(E) above, except that the Note Holder will not apply the Annual Payment Cap. I will continue making payments at the new level until the next Payment Change Date or Reamortization Date.

I understand that changes in the interest rate that occur during the final five years of my loan term may make my monthly payments insufficient to pay off my loan over the remaining term in equal installments unless I elect to make fully amortizing payments during that period, as provided in Section 4(H) below. As agreed in Section 3(A) above, I will pay off all amounts still owing under this Note on or before the Maturity Date even if this requires a substantially higher payment on the Maturity Date than the immediately preceding payment amounts. Lender is under no obligation to refinance the loan at that time. I will, therefore, be required to make payment out of other assets that I may own, or I will have to find a lender, which may be the lender I have this loan with, willing to lend me the money. If I refinance this loan at maturity, I may have to pay some or all of the closing costs normally associated with a new loan even if I obtain refinancing from the same lender.

**(H) Payment Options**

I will have up to three monthly payment options for my loan. I may always make the monthly payment required under Sections 3(B), 4(E) or 4(G), as applicable (the "Required Payment"). If the Required Payment is insufficient to fully amortize my loan as a result of the application of the Annual Payment Cap or principal balance adjustments, I will have the option to make a fully amortizing payment, which is an amount sufficient to pay off my loan in substantially

00002

equal payments over its remaining term at its then interest rate. If the Required Payment is not sufficient to pay all of the interest owed for that month, which would result in negative amortization, I also will have the option to make an interest-only payment, which will be sufficient to pay the monthly interest and avoid negative amortization, but will not reduce the principal balance. Even if these options are available, I may still elect to make only the Required Payment.

### (I) Effective Date of Interest Rate Changes

My new interest rate will become effective on each Rate Change Date. I will pay the amount of my new monthly payment beginning on the Payment Change Date or the Reamortization Date, as applicable, until the amount of my monthly payment changes again.

### (J) Notice of Changes

The Note Holder will deliver or mail to me an annual notice of any changes that have occurred to my adjustable interest rate in the preceding year. The Note Holder will also deliver or mail to me a notice of the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5.  BORROWER'S RIGHT TO PREPAY

I HAVE THE RIGHT TO MAKE PAYMENTS OF PRINCIPAL AT ANY TIME BEFORE THEY ARE DUE. A PAYMENT OF PRINCIPAL ONLY IS KNOWN AS A "PREPAYMENT." WHEN I MAKE A PREPAYMENT, I WILL TELL THE NOTE HOLDER IN WRITING THAT I AM DOING SO. I MAY NOT DESIGNATE A PAYMENT AS A PREPAYMENT IF I HAVE NOT MADE ALL THE MONTHLY PAYMENTS DUE UNDER THIS NOTE.

I MAY MAKE A FULL PREPAYMENT OR PARTIAL PREPAYMENT WITHOUT PAYING ANY PREPAYMENT CHARGE. AFTER PAYING ANY LATE FEES OR OUTSTANDING FEES THAT I OWE, THE NOTE HOLDER WILL USE MY PREPAYMENTS TO REDUCE THE AMOUNT OF PRINCIPAL THAT I OWE UNDER THIS NOTE. HOWEVER, THE NOTE HOLDER MAY APPLY MY PREPAYMENT TO THE ACCRUED AND UNPAID INTEREST ON THE PREPAYMENT AMOUNT BEFORE APPLYING MY PREPAYMENT TO REDUCE THE PRINCIPAL AMOUNT OF THIS NOTE. IF I MAKE A PARTIAL PREPAYMENT, THERE WILL BE NO CHANGES IN THE DUE DATE OR IN THE AMOUNT OF MY MONTHLY PAYMENT UNLESS THE NOTE HOLDER AGREES IN WRITING TO THOSE CHANGES. MY PARTIAL PREPAYMENT MAY REDUCE THE AMOUNT OF MY MONTHLY PAYMENTS AFTER THE FIRST RATE CHANGE DATE FOLLOWING MY PARTIAL PREPAYMENT. HOWEVER, ANY REDUCTION DUE TO MY PARTIAL PREPAYMENT MAY BE OFFSET BY AN INTEREST RATE INCREASE.

## 6.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7.  BORROWER'S FAILURE TO PAY AS REQUIRED
### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any Required Payment by the end of          15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be          5.0          % of my overdue Required Payment. I will pay this late charge promptly but only once on each late payment.

BA477N (0904)
U77N 05/25/06 2:10 PM 6997911521          Page 3 of 5

(B) Default

If I do not pay the full amount of each Required Payment or any other amounts due under this Note on the date the payment or other amount is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

00004

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
MICHAEL VAN BELLEGHEM                                    -Borrower

_____ (Seal)
PATRICIA VAN BELLEGHEM                                   -Borrower

_____ (Seal)
                                                        -Borrower

_____ (Seal)
                                                        -Borrower

_____ (Seal)
                                                        -Borrower

_____ (Seal)
                                                        -Borrower

_____ (Seal)
                                                        -Borrower

_____ (Seal)
                                                        -Borrower

BA477N (0504)
M77N 05/25/06  2:10 PM 6997911521          Page 5 of 5

## FEDERAL TRUTH IN LENDING
### DISCLOSURE STATEMENT
### Real Estate Loans

Loan Center ___BREA RETAIL LOAN CENTER___   No. __2629__   Loan No. _____6997911521_____

Principal Amount of Proposed Loan _____300,000.00_____   Expected Funding Date ____06/01/06____

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 6.378 % | $ 432,277.24 | $ 298,695.00 | $ 730,872.24 |

1. **Payment Schedule.**
   Your payment schedule will be:

| Number of Payments | Payments Are Due MONTHLY Beginning | Amount of Payments ** | Number of Payments | Payments Are Due MONTHLY Beginning | Amount of Payments ** |
|---|---|---|---|---|---|
| 12 | 07/01/06 | 982.25 | | | |
| 12 | 07/01/07 | 1055.91 | | | |
| 12 | 07/01/08 | 1135.11 | | | |
| 12 | 07/01/09 | 1220.24 | | | |
| 12 | 07/01/10 | 1311.76 | | | |
| 300 | 07/01/11 | 2208.03 | | | |

2. **Security and Property Insurance.**
   You are giving a security interest in real estate at:
   751 SOUTH ELM, ARROYO GRANDE, CA 93420
   You may obtain property insurance from anyone you want who is acceptable to the Lender.

3. **Late Payment.**
   If a payment is not received by the Lender by its first banking day which is at least _15_ days after the payment due date, you will be charged _____5.0_____ % of the payment.

4. **Prepayment.**
   If you pay off early, you [X] will not [ ] may have to pay a prepayment penalty.
   [ ] If you prepay your loan on other than the regular installment date, you may be assessed interest charges until the end of the month.
   [ ] You may be entitled to a refund of the mortgage insurance premium from HUD.
   You [X] will not [ ] may be entitled to a refund of part of the finance charge.

[X] 5. **Assumption Policy.**
   [ ] Someone buying your home cannot assume the remainder of your loan on its original terms.
   [X] Someone buying your home may be allowed to assume the remainder of your loan on its original terms, subject to certain conditions stated in your loan documents.

[X] 6. **Variable Rate.**
   Your loan contains a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

[ ] 7. **Required Deposit.**
   The annual percentage rate does not take into account your required deposit.

8. See your loan documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment refunds and penalties.

9. **Certain Security Interest Charges.** PLEASE SEE THE GOOD FAITH ESTIMATE AND HUD-1 FOR THESE FEES.
   Recording/filing $_____   $_____
   Lien release recording/filing $_____   $_____

10. The loan applied for will not be secured by any contractual lien except that resulting from the mortgage or deed of trust covering the security described in the Security and Property Insurance Section.
    - THE CURRENT INDEX USED AT THE TIME OF CLOSING WAS 4.111% .

**The payment amount does not include a tax and insurance reserve.

BANK OF AMERICA, N.A. ("LENDER")

00006