1   MICHAEL J. AGOGLIA (CA SBN 154810)
    magoglia@mofo.com
2   WENDY M. GARBERS (CA SBN 213208)
    wgarbers@mofo.com
3   NANCY R. THOMAS (CA SBN 236185)
    nthomas@mofo.com
4   MORRISON & FOERSTER LLP
    425 Market Street
5   San Francisco, California  94105-2482
    Telephone: (415) 268-7000
6   Facsimile: (415) 268-7522

7   Attorneys for Defendant
    BANK OF AMERICA, NATIONAL ASSOCIATION
8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                        SAN JOSE DIVISION

12

| | |
|---|---|
| 13  BRIAN O'DONNELL, MICHAEL VAN BELLEGHEM, and PATRICIA VAN 14  BELLEGHEM, individually, and on behalf of all others similarly situated, 15                    Plaintiffs, 16      v. 17  BANK OF AMERICA, NATIONAL 18  ASSOCIATION a.k.a. BANK OF AMERICA, N.A., and DOES 1 through 10 inclusive, 19                    Defendants. 20 | Case No.    C-07-04500 RMW (HRL) **NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES** Date:      April 25, 2008 Time:      9:00 a.m. Ctrm:      6 Honorable Ronald M. Whyte Complaint filed:  August 30, 2007 |

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
CASE NO. C-07-04500 RMW (HRL)
sf-2471413

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on April 25, 2008, at 9:00 a.m., or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable Ronald M. Whyte, United States District Court, Northern District of California, San Jose Division, Courtroom 6, 4th floor, located at 280 South 1st Street, San Jose, California, defendant Bank of America, National Association ("Bank of America") will and hereby does move the Court for an order dismissing the Second Amended Complaint with prejudice pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.  This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities in support hereof, the Declaration of Pamela Sullivan in Support of Motion to Dismiss Plaintiffs' First Amended Complaint, filed on December 21, 2007, the pleadings and other files herein, and such other written and oral argument as may be presented to the Court.

By this Motion, Bank of America seeks an order from the Court that plaintiffs fail to state a claim against it for:  (1) Violations of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.*; (2) Fraudulent Omissions; (3) Violation of California's Unfair Competition Law ("UCL"), Business and Professions Code section 17200 *et seq.*, for "Unfair" and "Fraudulent" Business Practices predicated on an alleged "bait and switch" scheme; (4) Breach of Contract; and (5) Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing.

**STATEMENT OF ISSUES TO BE DECIDED**

Pursuant to Civil Local Rule 7-4(a)(3), Bank of America sets forth the following statement of issues to be decided:

1.      Whether plaintiffs' first cause of action for violations of TILA should be dismissed for failure to state a claim where Bank of America's disclosures concerning the Option ARM loans at issue complied with TILA and Regulation Z.

2.      Whether plaintiffs' second cause of action for fraudulent omissions should be dismissed for failure to state a claim where Bank of America did not have a duty to disclose.

3.      Whether plaintiffs' third cause of action for violation of California's UCL should be dismissed where they failed to state a claim with particularity as required by Rule 9(b).

4.      Whether plaintiffs' fourth cause of action for breach of contract should be dismissed for failure to state a claim where the contractual promises that plaintiffs allege were breached do not exist.

5.      Whether plaintiffs' fifth cause of action for tortious breach of the implied covenant of good faith and fair dealing should be dismissed for failure to state a claim where, as a matter of law, there is no "special relationship" to justify tort recovery and plaintiffs otherwise fail to allege any such relationship.

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION..............................................................................i

STATEMENT OF ISSUES TO BE DECIDED .................................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES...................................................... 1

BACKGROUND .............................................................................................................. 2

    A.    Plaintiffs' Option ARM Loans .................................................... 2

    B.    Plaintiffs' Allegations................................................................ 4

    C.    TILA ........................................................................................... 5

ARGUMENT .................................................................................................................... 6

I.    PLAINTIFFS CANNOT STATE ANY CLAIM UNDER TILA. .................... 6

    A.    Plaintiffs Fail to Fix the Four Original Theories of Liability Because These TILA Claims Cannot Be Cured. .................. 7

        1.    The Notes Clearly Disclose the Contractual Interest Rate as Required by TILA (Theory C). ............................. 7

        2.    The Loan Documents Fully Informed Plaintiffs About Negative Amortization (Theory D). ..................... 10

        3.    The Disclosures on the Discounting of the Initial Interest Rate Complied with TILA (Theory E). ................ 12

        4.    The TILA Disclosure Statements Complied with TILA (Theory F)........................................................... 13

    B.    Plaintiffs' Three New Theories of TILA Liability Also Fail to State a Claim. ................................................ 13

        1.    The Payment Schedule Complied with TILA (Theory A). .................. 13

        2.    The Disclosures Concerning the Terms of Plaintiffs' Legal Obligation Conformed with TILA (Theory B).................... 14

        3.    The Effect of the Payment Cap Was Reflected in the TILA Disclosure Statements (Theory G). ..................... 15

II.    PLAINTIFFS' FRAUD-BASED CAUSES OF ACTION FAIL TO STATE A CLAIM. ...................................................................... 16

    A.    Plaintiffs Fail to State a Claim for Fraudulent Omissions.............................. 16

        1.    There Is No Duty to Disclose Because TILA Does Not Require the Disclosures Plaintiffs Allege............................ 17

2.    Bank of America Did Not Make Partial Representations. ....................18

B.    Plaintiffs Have Not Pled the UCL Cause of Action with the Required Particularity....................................................................................19

III.    PLAINTIFFS' CONTRACT-BASED CAUSES OF ACTION FAIL TO STATE ANY CLAIM. .....................................................................................20

A.    Because the Notes Expressly Contradict Plaintiffs' Allegations, Their Breach of Contract Claims Cannot Survive......................................................................................................20

B.    Plaintiffs Cannot State a Claim for Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing. ..........................23

CONCLUSION .....................................................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Andrews v. Chevy Chase Bank, FSB*,
240 F.R.D. 612 (E.D. Wis. 2007) ............................................................................................. 9

*Barnett v. Fireman's Fund Ins. Co.*,
90 Cal. App. 4th 500 (2001) .................................................................................................... 21

*Bionghi v. Metro. Water Dist.*,
70 Cal. App. 4th 1358 (1999) .................................................................................................. 23

*Branch v. Tunnell*,
14 F.3d 449 (9th Cir. 1994) ...................................................................................................... 9

*Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*,
222 Cal. App. 3d 1371 (1990) ................................................................................................. 24

*Cooper v. Pickett*,
137 F.3d 616 (9th Cir. 1997) ................................................................................................... 20

*Copesky v. Super. Ct.*,
229 Cal. App. 3d 678 (1991) ................................................................................................... 24

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) .................................................................................................... 9

*Ford Motor Credit Co. v. Milhollin*,
444 U.S. 555 (1980) .................................................................................................................. 5

*Fundin v. Chicago Pneumatic Tool Co.*,
152 Cal. App. 3d 951 (1984) ................................................................................................... 21

*Grimes v. New Century Mortgage Corp.*,
340 F.3d 1007 (9th Cir. 2003) .................................................................................................. 5

*Household Credit Servs. v. Pfennig*,
541 U.S. 232 (2004) .................................................................................................................. 5

*In re Stac Elecs. Sec. Litig.*,
89 F.3d 1399 (9th Cir. 1996) .................................................................................................... 9

*LiMandri v. Judkins*,
52 Cal. App. 4th 326 (1997) .................................................................................................... 18

*Linear Tech. Corp. v. Applied Materials, Inc.*,
152 Cal. App. 4th 115 (2007) ................................................................................................. 17

v

*Lovejoy v. AT&T Corp.*,
    119 Cal. App. 4th 151 (2004) ............................................................................... 17

*Mitsui Mfrs. Bank v. Super. Ct.*,
    212 Cal. App. 3d 726 (1989) ............................................................................... 23

*Mktg. W., Inc. v. Sanyo Fisher (USA) Corp.*,
    6 Cal. App. 4th 603 (1992) ............................................................................... 17

*Parrino v. FHP, Inc.*,
    146 F.3d 699 (9th Cir. 1998) ............................................................................... 3

*Price v. Wells Fargo Bank*,
    213 Cal. App. 3d 465 (1989) ............................................................................... 23

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) ............................................................................... 18, 23

*Szumny v. Am. Gen. Fin., Inc.*,
    246 F.3d 1065 (7th Cir. 2001) ............................................................................... 5, 10

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) ............................................................................... 19, 20

*Wallis v. Super. Ct.*,
    160 Cal. App. 3d 1109 (1984) ............................................................................... 24


**STATUTES**

12 U.S.C. §§ 21 *et seq.* ............................................................................... 2

15 U.S.C.
    § 1601(a) ............................................................................... 5
    § 1604(a) ............................................................................... 5
    § 1640 ............................................................................... 6

12 C.F.R.
    §§ 226.1 *et seq.* ............................................................................... 5
    § 226.4 ............................................................................... 9
    §§ 226.6, ............................................................................... 13
    §§ 226.17 ............................................................................... 7, 13
    § 226.17(a)(1) ............................................................................... 13
    § 226.18(g) ............................................................................... 14
    § 226.19 ............................................................................... 10, 12
    § 226.19(b)(2) ............................................................................... 12

12 C.F.R. (cont'd)
  § 226.22 ................................................................................................................. 8
  § 226.22 and .......................................................................................................... 9
  § 226.23(a)(3) ........................................................................................................ 6
  § 226.30 ................................................................................................................. 7
  pt. 226, Supp. I, cmt. 17(a)(1)-5 ......................................................................... 13
  pt. 226, Supp. I, cmt. 19(b)(2)(vii)-2 .................................................................. 17
  pt. 226, Supp. I, cmt. 23(a)(3)-2 ........................................................................... 6
  pt. 226, Supp. I, cmts. 17(c)(1)-1, 8, & 10 ........................................................ 14
  pt. 226., App. J. ...................................................................................................... 9

46 Fed. Reg. 50288 (Oct. 9, 1981) ............................................................................ 6

Fed. R. Civ. P.
  9(b) ............................................................................................................. 2, 18, 19, 20

Cal. Civ. Code
  § 1641 ................................................................................................................... 22

## OTHER AUTHORITIES

5 Bernard E. Witkin, *Summary of California Law, Torts* § 794 (10th ed. 2005) .......................... 16

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2      This lawsuit challenges a particular type of home-loan product, known as a payment

3  option adjustable-rate mortgage ("Option ARM").  It is one of many lawsuits initiated by a

4  common group of lawyers in a transparent attempt to seize upon the current mortgage market

5  crisis.  But that impulse searches in vain for a viable legal theory.  Plaintiffs' theories routinely

6  misapply the governing law and ignore their actual loan documents in the most elementary ways.

7      Indeed, plaintiffs have already amended their complaint, not once, but twice.  The first

8  time, they added numerous allegations about how the Option ARM loans were especially

9  nefarious, complaining the loans locked borrowers into upwardly adjusting interest rate payments

10  through harsh prepayment penalty provisions.  Plaintiffs did so despite the fact (revealed in the

11  Notes they attached to the complaint) that their loans contained ***no prepayment penalties at all***.

12      In response to this and many other defects, defendant Bank of America moved to dismiss

13  all but one of the causes of action in the First Amended Complaint ("FAC").  One day before the

14  opposition's deadline, plaintiffs sought Bank of America's consent to file a Second Amended

15  Complaint ("SAC"), which was ultimately filed on February 21, 2008.

16      Although the SAC adds new theories and reshuffles plaintiffs' state-law causes of action,

17  not much has changed.  Plaintiffs still cannot state a claim.  Instead of curing the FAC's defects,

18  plaintiffs carried them over into the SAC.  Irrespective of how many times plaintiffs attempt to

19  refashion their theories, they simply cannot change what the loan documents say.

20      Plaintiffs' first cause of action is that Bank of America violated TILA.  They primarily

21  contend that Bank of America failed to adequately disclose the terms of their loans, especially the

22  applicable interest rates and the loans' potential for negative amortization.  Both assertions,

23  though, are plainly contradicted by plaintiffs' loan documents.  These documents disclosed the

24  applicable interest rates, and both warned plaintiffs that negative amortization was a possibility

25  and advised them on how to avoid it.

26      All of plaintiffs' other TILA theories are fatally flawed.  Most are time-barred, and the

27  theories repeatedly reflect a fundamental misunderstanding of TILA's most basic disclosure

28  obligations.  For instance, plaintiffs misunderstand the difference between the contract interest

1   rate, which is set forth in the promissory note, and the very different TILA-prescribed "Annual

2   Percentage Rate" or "APR," which is calculated by including other loan costs, in addition to the

3   contractual interest rate.

4        Plaintiffs' fraud-based claims fail as well.  The second cause of action for fraudulent

5   omissions cannot survive.  Bank of America does not have a duty to make the additional

6   disclosures plaintiffs seek.  The third cause of action under California's UCL must be dismissed

7   under Federal Rule of Civil Procedure 9(b).  It challenges Bank of America's alleged

8   misrepresentations, but is devoid of the required particularity regarding "who, what, where, when,

9   and how."

10        Plaintiffs' contract-based claims fare no better.  The fourth cause of action for breach of

11   contract fails because the contractual provisions that they allege were breached simply do not

12   exist.  The fifth cause of action for tortious breach of the implied covenant of good faith and fair

13   dealing is independently flawed.  As a matter of law, the "special relationship" needed to justify

14   tort remedies does not exist in ordinary bank-borrower relationships, such as those here.

15   Plaintiffs apparently appreciate this.  They make no attempt whatsoever to allege the existence of

16   any special relationship.

17        Accordingly, Bank of America respectfully requests that the Court dismiss the SAC with

18   prejudice.[1]

19                                **BACKGROUND**

20   **A.    Plaintiffs' Option ARM Loans**

21        Plaintiffs Brian O'Donnell and Michael and Patricia Van Belleghem obtained Option

22   ARM loans from Bank of America to refinance their homes.  Mr. O'Donnell's loan closed in

23   June of 2005, and the Van Belleghems' loan closed in May of 2006.  (SAC ¶¶ 2-3.)  Their

24   allegations center on (1) their Adjustable Rate Notes ("Notes"), which were signed by each

25   ───────────────

26        [1] The second, third, and fifth causes of action are also preempted by federal law,
     specifically the National Bank Act, 12 U.S.C. §§ 21 *et seq.*, and its implementing regulations
     promulgated by the Office of the Comptroller of the Currency.  To avoid presenting potentially
27   unnecessary arguments, Bank of America reserves the preemption issues for later, to the extent
     they may be necessary.

28

1    plaintiff and are the contracts applicable to their loans with Bank of America; and (2) the Federal

2    Truth in Lending Disclosure Statements ("TILA Disclosure Statements"), which were provided to

3    each plaintiff as required by TILA (collectively, the "Loan Documents").  They attach copies of

4    each of the Loan Documents as an exhibit to the SAC.  (SAC Exs. 1 and 2.)

5         Option ARMs are adjustable-rate mortgages that allow the borrower to select from a

6    number of different payment options each month.  As the Federal Reserve Board has explained,

7    in its "Consumer Handbook on Adjustable-Rate Mortgages" ("Handbook"), a borrower with an

8    Option ARM loan has the option of making:

9              (i) a "traditional payment of principal and interest";

10              (ii) an "interest-only" payment; or

11              (iii) a "minimum (or limited) payment," which "may be less than
                 the amount of interest due that month" and may not reduce the
12              amount the buyer owes on his or her mortgage.

13    (Handbook at 16-17, 33.)[2]  The "**Payment Options**" section in plaintiffs' Notes informed

14    plaintiffs about the availability of these three payment options.  (SAC Exs. 1 and 2, at Section

15    4(H).)  The Notes' explanations were amplified by an additional disclosure, called the 1-Month

16    ManyOptions™ ARM Product disclosure ("Program Disclosure"), which was provided by Bank

17    of America to borrowers in transactions such as plaintiffs'.[3]

18         Option ARM loans can be attractive to consumers because they allow them to finance

19    properties without making traditional payments of principal and interest in the early years of the

20    loan.  Electing to make less than the full payment of principal and interest due results in "negative

21    amortization."  Negative amortization, by definition, occurs whenever the monthly mortgage

22    _____

23         [2] A copy of the Handbook can be found on the Federal Reserve Board's website at
     http://www.federalreserve.gov/pubs/arms/arms_english.htm.

24         [3] Although plaintiffs neglected to attach their Program Disclosures to the SAC, the Court
     may properly consider plaintiffs' Program Disclosures in connection with this motion to dismiss.
25    *See Parrino v. FHP, Inc*., 146 F.3d 699, 705-06 (9th Cir. 1988).  The Program Disclosure
     applicable to plaintiffs' Option ARM is attached as Exhibit A to the Declaration of Pamela
26    Sullivan in Support of Motion to Dismiss Plaintiffs' First Amended Complaint ("Sullivan Decl."),
     filed on December 21, 2007 (Docket Document 14).  Because the Sullivan declaration is on
27    record, Bank of America incorporates it here by reference to the Motion to Dismiss Plaintiffs'
     Second Amended Complaint.

28

1   payments do not cover all the monthly interest owed on the mortgage. Because the interest

2   shortfall is folded into the amount owed by the borrower, with additional interest accruing on the

3   shortfall, it may result in the borrower "ow[ing] more at the end of the mortgage term than the

4   original principal balance." (Program Disclosure at 2.)

5         Plaintiffs' Option ARM loans carried low initial rates that were in effect for

6   approximately one month. Mr. O'Donnell's initial rate was 1%. (SAC Ex. 1 at Section 2.) The

7   Van Belleghems' was 1.125%. (SAC Ex. 2 at Section 2.) As described in their Notes, the

8   interest rates applicable to plaintiffs' loans thereafter fluctuated monthly based on a disclosed

9   index. (SAC Exs. 1 and 2, at Section 4.)

10        Although the interest rates on plaintiffs' loans had the potential to change monthly, the

11  payment-option feature of the loans capped the minimum payments that plaintiffs were required

12  to make each month by limiting how much they could increase. (SAC Exs. 1 and 2, at

13  Section 4(E).) Because interest accrued on the loans at a rate tied to an index, choosing to make

14  the minimum monthly payment was not necessarily sufficient to cover all the interest that

15  accumulated during that period. Plaintiffs had the option of avoiding negative amortization by

16  making "interest only" or "fully amortizing" payments. (SAC Exs. 1 and 2, at Section 4(H).)

17  Contrary to plaintiffs' allegations, they were also entitled to prepay all or part of their loans at any

18  time *without* incurring a prepayment penalty. (SAC Exs. 1 and 2, at Section 5.)

19        **B.    Plaintiffs' Allegations**

20        Plaintiffs purport to represent a nationwide class of consumers who received Option ARM

21  loans through Bank of America. (SAC ¶ 52.) Plaintiffs allege that, in the course of their loan

22  transactions, Bank of America "failed to disclose pertinent information in a clear and conspicuous

23  manner" as required by law (SAC ¶ 21), and "engaged in a campaign of deceptive conduct and

24  concealment," disguising from plaintiffs the fact that, although the Loan Documents purported to

25  offer a low initial interest rate, that rate was "illusory" and was instead "designed" to cause

26  negative amortization to occur. (SAC ¶¶ 24-25, 27-29.)

27        Despite having received extensive disclosures to the contrary, as discussed below,

28  plaintiffs claim that the Loan Documents failed to inform them adequately that the required

1   minimum payment might not be sufficient to pay the interest accruing on their loans.  Based on

2   these allegations, the SAC asserts five causes of action: (1) violations of TILA; (2) fraudulent

3   omissions; (3) violation of the UCL based on "unfair" and "fraudulent" business practices;

4   (4) breach of contract; and (5) tortious breach of the implied covenant of good faith and fair

5   dealing.[4]

6       **C.     TILA**

7       Congress enacted TILA to promote the informed use of credit.  It requires creditors to

8   make specified disclosures so that consumers can more accurately compare the cost of credit.  *See*

9   15 U.S.C. § 1601(a).  TILA "focuses on disclosure and does not serve as an umbrella statute for

10  consumer protection in real estate transactions."  *Grimes v. New Century Mortgage Corp.*,

11  340 F.3d 1007, 1011 (9th Cir. 2003) (MeKeown, J., dissenting); *see also Szumny v. Am. Gen.*

12  *Fin., Inc.*, 246 F.3d 1065, 1070 (7th Cir. 2001) (TILA "is a disclosure statute; it does not regulate

13  substantively consumer credit but rather requires disclosure of certain terms and conditions of

14  credit before consummation of a consumer credit transaction.").  TILA was designed to balance

15  the competing considerations of complete disclosure and the need to avoid informational

16  overload.  As the Supreme Court has explained, TILA's purpose is to require "meaningful

17  disclosure," not "more disclosure."  *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568

18  (1980).

19      To implement TILA, Congress delegated "expansive authority" to the Federal Reserve

20  Board "to enact appropriate regulations to advance this purpose."  *Household Credit Servs. v.*

21  *Pfennig*, 541 U.S. 232, 235 (2004); *Milhollin*, 444 U.S. at 559; 15 U.S.C. § 1604(a).  Pursuant to

22  this authority, the Federal Reserve Board has issued a set of comprehensive and highly detailed

23  regulations, known as Regulation Z.  *See* 12 C.F.R. §§ 226.1 *et seq.*  These regulations, along

24  with the Federal Reserve Board's official staff commentary thereto, are entitled to judicial

---

[4] In amending the FAC to the SAC, plaintiffs dropped two causes of action:  (1) violation of the UCL based on alleged violations of TILA; and (2) violation of the UCL based on alleged violation of section 22302 of California's Financial Code.  They also added a new cause of action for fraudulent omissions and modified an existing claim to seek tort recovery for breach of the implied covenant of good faith and fair dealing.

1   deference.  *Milhollin*, 444 U.S. at 565-66.  Regulation Z does much more than establish a set of

2   standards for creditors to consider in making their disclosures.  Instead, Regulation Z sets forth a

3   series of very specific instructions regarding when, where, and how the TILA disclosures are to

4   be made.

5                                         **ARGUMENT**

6   **I.     PLAINTIFFS CANNOT STATE ANY CLAIM UNDER TILA.**

7           The first cause of action asserts that the Loan Documents violated TILA.  Plaintiffs

8   advance seven theories of liability, four old and three new.  The SAC, like the FAC, alleges that

9   the Loan Documents failed to clearly and conspicuously disclose:  (1) the applicable rate of

10  interest in plaintiffs' Notes; (2) the possibility of negative amortization; (3) the fact that the initial

11  interest rate was discounted; and (4) the correct APR.  (FAC ¶¶ 63-92; SAC ¶¶ 85-115.)  In the

12  SAC, unlike the FAC, plaintiffs now assert that the same documents also failed to clearly and

13  conspicuously disclose:  (5) the payment schedules are not based on the actual interest rate;

14  (6) the terms of plaintiffs' legal obligation; and (7) the effect of the payment cap.  (SAC ¶¶ 66-84,

15  116-19.)

16          In response to Bank of America's first motion to dismiss, plaintiffs appear to have

17  conceded that all claims for damages under TILA are time-barred.  (*Compare* FAC ¶ 92 *with*

18  SAC ¶ 120.) [5]  Nevertheless, Bank of America addresses the deeper defects affecting their TILA

19  theories.  All of them otherwise fail on the merits.

20

21          [5] Under TILA, any claim for actual or statutory damages must be brought within one year
22  of the date the disputed disclosures were provided.  15 U.S.C. § 1640.  The disclosures at issue in
    Mr. O'Donnell's loan were given on or before June 8, 2005.  (SAC ¶ 2, Ex. 1.)  The disclosures at
23  issue in the Van Belleghems' loan were given on or before May 25, 2006.  (SAC ¶ 3, Ex. 2.)  This
    action was filed on August 30, 2007, more than one year later.

24          At this point, the only TILA remedy even theoretically available to plaintiffs would be the
    right to rescind the loan transactions.  But, the three-year right to rescind applies only if "material
25  disclosures" were not delivered.  12 C.F.R. § 226.23(a)(3).  Even if otherwise legally and
    factually correct, none of plaintiffs' TILA claims about the disclosure of (1) the applicable rate of
26  interest in their Notes, (2) the possibility of negative amortization, or (3) the fact that the initial
    interest rate was discounted would entitle them to rescind their loans.  12 C.F.R.
27  § 226.23(a)(3) n.48 (listing the "material" disclosures that would trigger a right to rescind);
    12 C.F.R. pt. 226, Supp. I, cmt. 23(a)(3)-2; 46 Fed. Reg. 50288, 50319 (Oct. 9, 1981).

28

1    Plaintiffs fundamentally misapply TILA's provisions.  Their TILA claims rest on selective

2    attention to the provisions of their Loan Documents and other disclosures.  A review of the

3    governing law and the actual documents reveals that Bank of America properly and repeatedly

4    disclosed what was required under TILA.  Accordingly, plaintiffs fail to state any TILA claim.

5    The first cause of action should be dismissed with prejudice.

6    **A.    Plaintiffs Fail to Fix the Four Original Theories of Liability Because These**
         **TILA Claims Cannot Be Cured.**
7

8    **1.    The Notes Clearly Disclose the Contractual Interest Rate as Required**
            **by TILA (Theory C).**

9    Plaintiffs' assertion that the disclosure of the applicable interest rates in their Notes is

10   "unclear and inconspicuous," in violation of §§ 226.17 and 226.19, is fundamentally misguided.

11   (SAC ¶¶ 85-86.)  These sections of Regulation Z are completely inapplicable to the Notes.[6]  The

12   only section of Regulation Z that pertains to disclosures that must be made in a note is § 226.30,

13   which states:

14              A creditor shall include in any consumer credit contract secured by
               a dwelling and subject to the act and this regulation the maximum
15              interest rate that may be imposed during the term of the obligation.

16   12 C.F.R. § 226.30.  Bank of America clearly did this, and plaintiffs do not contend otherwise.

17   (SAC Ex. 1 at Section 4(D) (informing Mr. O'Donnell that "my interest rate will never be greater

18   than 9.950%"), Ex. 2 at Section 4(D) (informing the Van Belleghems that "my interest rate will

19   never be greater than 10.075%").

20   Moreover, plaintiffs' Notes clearly set forth the applicable contractual rates of interest and

21   specify when those rates can change.  (SAC Exs. 1, 2 at Sections 2, 4(A), 4(E).)  In this regard,

22   both Notes inform plaintiffs of their initial interest rates, 1% and 1.125% respectively.  (SAC

23   Exs. 1, 2 at Section 2.)  Both Notes also inform plaintiffs that "[t]he interest rate I will pay will

24

25

26   _____
         [6] Section 226.17 applies only to disclosures required by "this Subpart," i.e., Subpart C,
     12 C.F.R. §§ 226.17-24.  Subpart C does not address disclosures that must be made in a note,
27   such as the interest rate.  Thus, section 226.17's "clearly and conspicuously" language, upon
     which plaintiffs seek to ground their case, does not even apply to interest rate disclosures.
28

change in accordance with Section 4 of this Note."  Section 4(A) of the Notes goes on to specify

when the interest rate may change:

> The interest rate I will pay **may change on the first day of August, 2005** [in the Van Belleghems' case, July 2006], and on the first day of every month thereafter.  Each date on which my interest rate could change is called a "Rate Change Date."

(SAC Exs. 1, 2 at Section 4(A) (emphasis added).)  Sections 4(B) and (C) specify how the new

interest rates will be computed:

> **(B) Index**
> Beginning with the first Change Date, my adjustable rate will be based on an Index.  The "Index" is equal to the LIBOR Annual Monthly Average ("LAMA") of the 1-month London Inter-Bank Offered Rate ("LIBOR"), as made available by the Fannie Mae on their website, through electronic transmission or by telephone.  The most recent LIBOR Annual Monthly Average ("LAMA") figure available as of a date 15 days before each Change Date is called the "Current Index."
>
> * * *
>
> **(C) Calculations of Interest Rate Changes**
> Before each Rate Change Date, the Note Holder will calculate my new interest rate by adding TWO AND ONE-EIGHTH percentage points (2.125%) [in the Van Belleghems' case, 2.250%] to the Current Index.  The Note Holder will then round the result of this addition to the NEXT HIGHEST one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D) below, [which establishes a maximum interest rate], this rounded amount will be my new interest rate until the next Rate Change Date.

(SAC Exs. 1, 2 at Sections 4(B) and (C).)

The Program Disclosures also emphasized the short-term nature of plaintiffs' initial

interest rates:

> The maximum period of time before the first interest rate change date is 1 month.
>
> Your interest rate can change every month after the first change date.

(Sullivan Decl. Ex. A at 1.)

Plaintiffs' contention that the initial interest rates disclosed in their Notes were

"deceptive," because they were different from the APRs set forth in the TILA Disclosure

Statements, reflects an even more elementary misunderstanding of TILA.  (SAC ¶ 86.)  The APR

8

1    is by no means synonymous with the contractual interest rate.  Instead, the APR is disclosed on

2    the TILA Disclosure Statement, and its purpose is to permit borrowers to compare on an apples-

3    to-apples basis the true costs of credit when shopping for loans.  12 C.F.R. § 226.22.  As those

4    costs involve more than the contractual interest rate, the APR calculation includes not only that

5    rate, but also points, broker fees, and certain other credit charges, amortized over the term of the

6    loan.  *See* 12 C.F.R. § 226.4.  Regulation Z sets forth, over numerous pages of the Federal

7    Register, exactly how the APR must be calculated.  12 C.F.R. § 226.22 and 12 C.F.R. pt. 226,

8    App. J.[7]

9             Plaintiffs' confusion over the difference between the APR set forth in the TILA

10   Disclosure Statements and the contractual interest rate in their Notes is disingenuous.  Although

11   plaintiffs attached to the SAC only the first page of the Van Belleghems' two-page TILA

12   Disclosure Statement, the second page of Mr. O'Donnell's TILA Disclosure Statement is entitled

13   "Definition of Truth-in-Lending Terms."  (SAC Exs. 1-2.)[8]  That disclosure makes it clear that

14   the APR is different from the contractual rate of interest:

15                              ANNUAL PERCENTAGE RATE

16                This is not the Note rate for which the borrower applied.  The
                  Annual Percentage Rate (APR) is the cost of the loan in percentage
17                terms taking into account various loan charges of which interest is
                  only one such charge.  Other charges which are used in calculation
18                of the Annual Percentage Rate are Private Mortgage Insurance or
                  FHA Mortgage Insurance Premium (when applicable) and Prepaid
19                Finance Charges (loan discount, origination fees, prepaid interest
                  and other credit costs).  The APR is calculated by spreading these
20                charges over the life of the loan which results in a rate higher than
                  the interest rate showing on your Mortgage Deed of Trust Note.  If

21   _____

22          [7] Bank of America respectfully contends that a federal district court in Wisconsin erred
     when it concluded, albeit on different facts than presented here, that the disclosure of different
23   figures for the interest rate and the APR amounted to a TILA violation.  *Andrews v. Chevy Chase
     Bank, FSB*, 240 F.R.D. 612, 617-19 (E.D. Wis. 2007).  As discussed above, Regulation Z requires
24   lenders to include various non-interest charges in the calculation of the APR, which invariably
     means that it will not match the contractual rate of interest.

25          [8] (*See* Sullivan Decl. Exs. B and C.)  The Court may properly consider the complete
     versions of the TILA Disclosure Statements in connection with this motion to dismiss.  *See In re
26   Stac Elecs. Sec. Litig*., 89 F.3d 1399, 1405 n.4 (9th Cir. 1996) (complete copies of documents
     whose contents are alleged in the complaint may be considered by the court in connection with a
27   12(b)(b) motion) (citing *Fecht v. Price Co*., 70 F.3d 1078, 1080 (9th Cir. 1995); *Branch v.
     Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994)).

28

1     interest was the only Finance Charge, then the interest rate and the
Annual Percentage Rate would be the same.

2

3   *Id.*

4        Plaintiffs' flawed disclosure theories about the interest rate are often accompanied by

5   rhetorical flourishes attacking (after the fact) that plaintiffs' loans had low initial "teaser" interest

6   rates.  (SAC ¶ 87.)  But, nothing about that feature of their loans was illegal.  In any event, TILA

7   only regulates disclosures, not loan terms.  *See Szumny*, 246 F.3d at 1070 (TILA "is a disclosure

8   statute; it does not regulate substantively consumer credit.").  There is no provision of TILA that

9   a low initial interest rate violates.[9]

10

11
        **2.     The Loan Documents Fully Informed Plaintiffs About Negative
              Amortization (Theory D).**

12       Like the rest of their TILA claims, plaintiffs' attack on the negative amortization

13   disclosures rests on a basic misunderstanding of Regulation Z.  Plaintiffs base this claim on

14   12 C.F.R. § 226.19, and allege that the TILA Disclosure Statements failed to comply with its

15   requirements.  (SAC ¶¶ 94-95.)  While § 226.19 is the only provision of Regulation Z that

16   addresses negative amortization, it only applies to the Program Disclosures, not the TILA

17   Disclosure Statements or the Notes.  12 C.F.R. § 226.19 (the "negative amortization" disclosure,

18   cited by plaintiffs, must be made in a "loan program disclosure for each variable-rate program in

19   which the consumer expresses an interest").

20       Plaintiffs make no allegations that the Program Disclosure failed to meet the requirements

21   of § 226.19, and for good reason.  The Program Disclosure clearly disclosed the fact that negative

22   amortization was a possibility, specified the circumstances in which it would occur, and advised

23   borrowers how to avoid it.  More specifically, the Program Disclosure highlighted the fact that

24   negative amortization would result if plaintiffs selected the minimum payment option.  On its first

25   page it disclosed, in italics, that "[*t*]*his loan has the potential for deferred interest, also known as*

26

27
        [9] Plaintiffs' allegations about the disclosure of an initial monthly payment amount suffer
the exact same infirmities.  (SAC ¶ 89.)  There is no provision of TILA cited by plaintiffs
regulating the disclosure of the initial payment in their Notes.  (*Id.*)  And no such provision exists.

28

*negative amortization.*" (Sullivan Decl. Ex. A at 1.)  The Program Disclosure went on to explain

what the monthly payment options were, and how to use them to avoid negative amortization:

- **Minimum Payment**.  This is the minimum amount you must pay.
. . . This amount will appear on all your monthly billing
statements.  *If interest on your loan for a month is more than the
minimum payment, your loan will have deferred interest, also
known as negative amortization.*  This option may cost you more,
as the monthly unpaid interest will begin accruing interest the
following month.  Please refer to the Deferred Interest Section
below.  This option may require a substantially higher payment at
the next Special Payment Adjustment and on the Maturity Date.

- **Interest Only Payment.**  This is the amount sufficient to pay all of
the monthly interest, but not principal.  This amount will appear on
your monthly billing statement only if it is more than the Minimum
Payment amount.  ***This option eliminates deferred interest, also
known as negative amortization***, but may require a substantially
higher payment at the next Special Payment Adjustment and on the
Maturity Date.

- **Principal and Interest Payment.**  This is the monthly payment
amount sufficient to fully amortize your loan over its remaining
term in substantially equal payments.  This amount will appear on
your monthly billing statement only if it is more than the Minimum
Payment Amount.  By making this payment every month, your
original loan balance will be paid off at the end of the scheduled
loan term.

(Sullivan Decl. Ex. A at 2 (emphasis added).)  The Program Disclosure twice admonishes, in bold

letters, how a borrower can avoid negative amortization:

> **You may avoid deferred interest, also known as negative
> amortization, by payment of either the Interest Only Payment
> or the Principal and Interest Payment.**

(*Id.*)

Plaintiffs' claim to have been unaware of the possibility of negative amortization of their

loans is belied by the Notes themselves.  The Notes clearly discuss how negative amortization

would occur:

> **(F) Principal Balance Adjustments—Deferred Interest
> (*Negative Amortization*)**
> If my monthly payment is less than the amount necessary to pay the
> full amount of interest for the month, the portion of interest that is
> unpaid will be added to the principal balance of my loan as of the
> due date for such payment and will accrue interest at the rate in
> effect from time to time in accordance with this Note.

1    (SAC Exs. 1, 2 at Section 4(F) (emphasis added).)  The Notes also specifically inform plaintiffs

2    that, if they selected the minimum payment option and made only the "Required Payment,"

3    negative amortization could result.  The Notes also provide a number of alternative payment

4    options to avoid negative amortization:

5    **(H) Payment Options**
     I will have up to three monthly payment options for my loan.  I may

6    always make the monthly payment required under Sections 3(B),
     4(E) or 4(G), as applicable (the "Required Payment").  ***If the***

7    ***Required Payment is insufficient to fully amortize my loan as a***
     ***result of the application of the Annual Payment Cap or principal***

8    ***balance adjustments, I will have the option to make a fully***
     ***amortizing payment***, which is an amount sufficient to pay off my

9    loan in substantially equal payments over its remaining term at its
     then interest rate.  If the Required Payment is not sufficient to pay

10   off all of the interest owed for that month, which would result in
     ***negative amortization***, I also will have the option to make an

11   interest only payment, which will be sufficient to pay the monthly
     interest and avoid ***negative amortization***, but will not reduce the

12   principal balance.

13   (SAC Exs. 1 and 2 at Section 4(H) (emphasis added).)  And contrary to plaintiffs' claim, negative

14   amortization was not an "absolute certainty."  (SAC ¶¶ 95, 99-101.)  As the above section of the

15   Note makes clear, plaintiffs always had the right to elect either "fully amortizing" or "interest

16   only" payments.  In both such instances, no negative amortization would occur.

17

18                   **3.      The Disclosures on the Discounting of the Initial Interest Rate**
                             **Complied with TILA (Theory E).**

19           Plaintiffs claim that Bank of America failed to disclose in the Loan Documents that the

20   initial rate was discounted.  (SAC ¶¶ 109-10.)  This theory fails, as the Regulation Z provision

21   plaintiffs rely on does not apply to the Notes or the TILA Disclosure Statements.  The TILA

22   disclosure requirement plaintiffs rely upon is found in 12 C.F.R. § 226.19.  (*Id.*)  As set forth

23   above, the disclosures required under § 226.19, including the disclosure about any discounting of

24   the initial interest rate, are to be made in a "loan program disclosure," not in the Note or the TILA

25   Disclosure Statement.  12 C.F.R. § 226.19(b)(2).  Plaintiffs make no claim that Bank of

26   America's program disclosure was non-compliant.

27

28

**4.      The TILA Disclosure Statements Complied with TILA (Theory F).**

In what ranks as a particularly confusing set of allegations, plaintiffs assert in almost entirely conclusory language that the TILA Disclosure Statements failed to disclose the correct interest rate. (SAC ¶¶ 111-15.) But the only specific allegation is, once again, that "[o]n the TILDS [TILA Disclosure Statements] Defendants set forth one interest rate, while on the Note, Defendants set forth one or two other, different interest rates." (SAC ¶ 111.) As described more fully above when the same allegation was employed to attack the Notes (section I.A.1, *supra*), this allegation rests on the most basic misunderstanding of TILA. The APR under TILA is not a contractual rate of interest. 12 C.F.R. §§ 226.6, 226.22. The fact that the contractual interest rate and the APR are different is precisely what the statute and Regulation Z contemplate. Plaintiffs allege no facts indicating that the APR calculation in their respective TILA Disclosure Statements was not in conformity with TILA. Accordingly, plaintiffs' claim that Bank of America failed to base its disclosures on the composite interest rate, as mandated by TILA, is without any factual foundation.

**B.      Plaintiffs' Three New Theories of TILA Liability Also Fail to State a Claim.**

**1.      The Payment Schedule Complied with TILA (Theory A).**

Plaintiffs allege that Bank of America violated TILA by failing to clearly and conspicuously "disclose the interest rate upon which the payments listed in the TILDS [TILA Disclosure Statements] are based." (SAC ¶ 67 (citing 12 C.F.R. §§ 226.17, 226.19).) Plaintiffs further claim that "the payment amounts are not based on the interest rate listed but instead, were based upon an interest rate which was neither disclosed nor made conspicuous as required under TILA." (SAC ¶ 68.)

Plaintiffs miscomprehend what TILA mandates. Nothing in Regulation Z, or within §§ 226.17 and 226.18 specifically, requires Bank of America to make a disclosure regarding the "actual interest rate" used to calculate the payment schedule listed in the TILA Disclosure Statement. In fact, § 226.17 prohibits a creditor from including any information not "directly related to" the required disclosures, 12 C.F.R. § 226.17(a)(1), and the disclosure of "the interest rate upon which the payments listed" are based is not such a disclosure, 12 C.F.R. pt. 226,

1    Supp. I, cmt. 17(a)(1)-5.  Thus, Bank of America was not required to make a contractual interest

2    rate disclosure on the TILA Disclosure Statements.  On the contrary, TILA affirmatively

3    prohibited it from doing so.  Because §§ 226.17 and 226.18 do not require what plaintiffs allege,

4    plaintiffs fail to state a claim under this theory.

5         Plaintiffs misunderstand what is to be disclosed on the TILA Disclosure Statements.

6    Contrary to their allegations, the Statements are not supposed to disclose an "interest rate."  (SAC

7    ¶¶ 69, 73, 75-76, 78.)  The rate listed is the APR.  (SAC Exs. 1, 2.)  As explained, the APR is by

8    no means synonymous with the contractual interest rate.  (*See* Section I.A.1, *supra*.)  Moreover,

9    the calculation of the payment schedule set forth in the TILA Disclosure Statements is governed

10   by 12 C.F.R. § 226.18(g), which requires the lender to make a number of TILA-mandated

11   assumptions in calculating the scheduled payments.  *See* 12 C.F.R. pt. 226, Supp. I, cmts.

12   17(c)(1)-1, 8, & 10.  Nothing in Regulation Z requires, or even allows, the TILA Disclosure

13   Statements to explain the rules for identifying the interest rate that will be used to calculate the

14   payment schedule or discuss the assumptions that are used to calculate the monthly payments.

15   This is because the TILA Disclosure Statement is designed to be a "short and sweet" disclosure

16   document.  Tellingly, plaintiffs do not allege that the payment schedule was not prepared in the

17   manner specified by 12 C.F.R. § 226.18(g).

18        Accordingly, plaintiffs' theory fails to state a claim.  TILA does not require the TILA

19   Disclosure Statements to state the "interest rate" underlying the payment schedules.

20

21        **2.    The Disclosures Concerning the Terms of Plaintiffs' Legal Obligation
             Conformed with TILA (Theory B).**

22        Plaintiffs allege that the Loan Documents violated § 226.17(c)(1), because these

23   documents failed to disclose what plaintiffs were legally obligated to pay.  (SAC ¶¶ 79, 83.)

24   Specifically, plaintiffs claim that, while the Notes charged a much higher monthly amount for the

25   loans, the TILA Disclosure Statements obscured this "by only listing a partial payment" that "was

26   insufficient to pay what these borrowers were being charged for their loans, and were legally

27   obligated to pay."  (SAC ¶ 83.)

28

1   Aside from the rhetoric surrounding plaintiffs' dissatisfaction with the Option ARM

2   product, plaintiffs identify nothing in the TILA Disclosure Statements that was inconsistent with

3   the parties' obligations, as specified in the Notes.  While § 226.17(c)(1) does require that "[t]he

4   disclosures shall reflect the terms of the legal obligation between the parties," one of the features

5   of the Option ARM product was that it capped the amount by which plaintiffs' Minimum

6   Payments could increase in certain years, a feature that was fully set forth in the Notes.  (SAC

7   Exs. 1 and 2 at Section 4(E).)  Consistent with this term of the parties' agreements, Bank of

8   America prepared TILA Disclosure Statements that took into account the payment caps in effect

9   in the early years of the loans, and did not require substantial payment increases until month 29,

10  in Mr. O'Donnell's case, when the loan reached 115% of its original principal balance, and month

11  61, in the Van Belleghems' case, when the loan reached its five-year Reamortization Date, both

12  such events triggering reamortization and subsequent Minimum Payment adjustments pursuant to

13  Section 4(G) of the Notes.  Accordingly, notwithstanding plaintiffs' accusations to the contrary,

14  the TILA Disclosure Statements were prepared in a manner that was entirely consistent with the

15  parties' obligations.

16

17  **3.      The Effect of the Payment Cap Was Reflected in the TILA Disclosure Statements (Theory G).**

18  Plaintiffs' final TILA theory is that Bank of America failed to comply with Paragraph

19  226.17(c)(1)-10.iii of the Commentary (mistakenly cited as § 226.17(c)(1)(10)(iii) of Regulation

20  Z) by failing to disclose "the effect [of] the payment caps."  (SAC ¶ 117.)  Specifically, plaintiffs

21  allege that Bank of America "failed to inform Plaintiffs and the Class members that the payment

22  cap would cause hundreds, if not thousands of dollars, each month, to be secretly added to

23  princip[al]."  (SAC ¶ 118.)

24  Plaintiffs misunderstand the requirements of the regulation and Commentary.  This

25  Comment simply requires that the *effect* of the 7.5% payment cap in plaintiffs' Notes "be

26  reflected in the disclosures" that are otherwise mandated by Regulation Z.  (SAC Exs. 1 and 2 at

27  Section 4(E).)

28

1    The TILA Disclosure Statements did, in fact, reflect the *effect* of these payment caps. For

2    example, on Mr. O'Donnell's loan, the scheduled payments increased each year for two years,

3    with a significant jump four months after the second year. The increases at the beginning of years

4    two and three were the result of the 7.5% payment cap in the Note. The Note provides that the

5    monthly payment will change every year. (SAC Ex. 1 at 4(E).) However, the Note further states

6    that notwithstanding the foregoing, a new monthly payment will be calculated if the unpaid

7    principal would otherwise exceed 115% of the original principal amount borrowed, and that no

8    payment cap will be applied in such circumstance. (SAC Ex. 1 at 4(G).) Based on the

9    assumption that Mr. O'Donnell would make the minimum payment each month, the unpaid

10   principal balance would exceed 115% of the original balance at month 28, resulting in a

11   recalculation of the minimum payment amount and lifting of the payment cap. Consequently, the

12   TILA Disclosure Statement discloses substantially larger scheduled payments in months 29

13   and on.

14       Plaintiffs try to stretch the requirements of Paragraph 226.17(c)(1)-10.iii of the

15   Commentary by arguing that Bank of America should have also provided an *explanation of the*

16   *ramifications* of the payment cap—i.e., that the payment cap would result in negative

17   amortization. Nothing in Regulation Z of the Commentary requires this.

18

19   ## II.    PLAINTIFFS' FRAUD-BASED CAUSES OF ACTION FAIL TO STATE A CLAIM.

20       ### A.    Plaintiffs Fail to State a Claim for Fraudulent Omissions.

21       Plaintiffs' second cause of action alleges a convoluted set of accusations that do not equal

22   a claim for fraudulent omissions. At heart, plaintiffs' claim seems grounded in the view that

23   Bank of America had a duty to be their financial advisor, explaining in detail the reasons why

24   they may or may not want an Option ARM loan. *See* 5 Bernard E. Witkin, *Summary of*

25   *California Law, Torts* § 794, at 1149 (10th ed. 2005) (For a tort of failure to disclose to be

26   actionable, the defendant must be in a "fiduciary or other confidential relationship that imposes a

27   duty of disclosure."). Banks, however, are not in fiduciary relationships with their borrowers.

28   (*See* Section III.B, *infra*.)

1    Unable to allege that Bank of America is their fiduciary, plaintiffs predicate the second

2    cause of action on an alleged duty to disclose derived from TILA and the allegation that Bank of

3    America made partial representations in the Loan Documents.  Still, plaintiffs' fraudulent

4    omissions claim fails.  They have not adequately alleged duty to disclose.[10]  This defect is fatal.

5

6            **1.    There Is No Duty to Disclose Because TILA Does Not Require the
                      Disclosures Plaintiffs Allege.**

7            Broadly citing TILA and Regulation Z, plaintiffs allege that Bank of America had a duty

8    to disclose the material fact of:  (1) actual interest rate being charged on the Notes; (2) negative

9    amortization would occur and that the "principal balance *will* increase"; and (3) the initial interest

10   rate on the note was discounted.  (SAC ¶ 122.)

11           TILA, however, does not mandate the *additional* disclosures plaintiffs seek.  As to the

12   Notes, Bank of America was only required to state the maximum interest rate.  (*See* Section I.A.1,

13   *supra*.)  Bank of America did this.  (SAC Exs. 1 and 2 at Section 4(D).)  TILA does not mandate

14   any other interest rate disclosures in the Notes.  The Notes nevertheless set forth exactly how the

15   interest rate would be determined.  (SAC Exs. 1 and 2 at Sections 2 and 4(A)-(C).)  Likewise,

16   Bank of America had no duty under TILA to disclose that negative amortization was certain to

17   occur.  TILA only requires that the Program Disclosure, not the Note or the TILA Disclosure

18   Statement, disclose "the *possibility* of negative amortization."  12 C.F.R. pt. 226, Supp. I, cmt.

19   19(b)(2)(vii)-2 (emphasis added).  Where plaintiffs rely on a statute to impose a duty to disclose

20   but the statute does not impose the duty plaintiffs seek, the statute cannot provide a duty for

21   purposes of fraudulent concealment.  *Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal.

22   App. 4th 115, 132-33 n.7 (2007) (holding that there was no duty to disclose for fraudulent

23   concealment purposes where the "statute does not provide a basis for requiring disclosure").

24
     _____

25           [10] The elements for fraud based on concealment are: "(1) the defendant must have
     concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose
     the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact
26   with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and
     would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a
27   result of the concealment or suppression of the fact, the plaintiff must have sustained damage."
     *Mktg. W., Inc. v. Sanyo Fisher (USA) Corp.*, 6 Cal. App. 4th 603, 612, 613 (1992).

28

Moreover, because Bank of America "made full disclosure consistent with the duty of disclosure" imposed by TILA, "there was no concealment or suppression of a material fact as a matter of law." *Lovejoy v. AT&T Corp.*, 119 Cal. App. 4th 151, 160 (2004).

### 2.    Bank of America Did Not Make Partial Representations.

Plaintiffs also allege that Bank of America had a duty to disclose due to supposedly "partial representations" it made in the Notes.  In making this allegation, plaintiffs rely on the following two provisions in the Notes:

> "I will pay principal and interest by making a payment each [sic, every] month."
>
> * * *
>
> "If my monthly payment is less than the amount necessary to pay the full amount of interest for that month, the portion of interest that is unpaid will be added to the principal balance of my loan as of the due date for such payment and will accrue interest at the rate in effect from time to time in accordance with this Note."

(SAC ¶¶ 124-25, Exs. 1 and 2 at Sections 3(A), 4(F).)[11]  Apparently, plaintiffs believe that these two representations trigger a duty to disclose "that negative amortization was certain to occur.'" (SAC ¶ 123.)

The Notes, however, belie plaintiffs' claim.  Read as a whole, and contrary to plaintiffs' allegations, each Note accurately communicates that negative amortization was not certain to occur.  *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (allegations should be disregarded if contradicted by exhibits attached to complaint).  The Notes expressly gave plaintiffs multiple alternative payment options to avoid negative amortization.  (*See* Section I.A.2, *supra*.)  There can be no fraudulent concealment due to partial representations where the alleged material fact was not suppressed, but rather, was actually disclosed in the Notes.  *See LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997) (noting that nondisclosure may constitute

---

[11] The remainder of plaintiffs' allegations on partial representations are not pled with the particularity required under Rule 9(b).  (*See* Section II.B, *infra*.)  One cannot identify what the alleged partial representations are.  (SAC ¶¶ 126-27, 129.)

1    fraud where "the defendant makes partial representations but also suppresses some material fact")

2    (citation and quotations omitted).

3

4    **B.    Plaintiffs Have Not Pled the UCL Cause of Action with the Required Particularity.**

5    Plaintiffs' third cause of action under the UCL for "unfair" and "fraudulent" business

6    practices must be dismissed.  It does not satisfy the requirements of Rule 9(b).

7    Under Rule 9(b), "all averments of fraud . . . shall be stated with particularity."  Fed. R.

8    Civ. P. 9(b).  "It is established law" that "Rule 9(b)'s particularity requirement applies to state-

9    law causes of action" where the action is being litigated in federal court.  *Vess v. Ciba-Geigy*

10   *Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003).  Even if "fraud is not an essential element of the

11   claim," where a plaintiff alleges "a unified course of fraudulent conduct and rel[ies] entirely on

12   that course of conduct as the basis of a claim," the claim is thus "grounded in fraud," and "the

13   pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)."  *Id.* at

14   1103-04 (applying Rule 9(b) to claims under California Business and Professions Code sections

15   17200 and 17500 where allegations "sound[ed] in fraud").

16   Stretching far beyond the Loan Documents, plaintiffs' UCL claim is based on an alleged

17   unified course of fraudulent conduct.  Plaintiffs claim that Bank of America engaged in a "bait

18   and switch scheme" involving a wide-ranging "pattern of deceptive conduct and concealment."

19   (SAC ¶¶ 141, 148.)  But, the UCL claim is devoid of specific allegations regarding the fraudulent

20   conduct.  For example, plaintiffs allege (emphasis added):

21       *Defendants lured plaintiffs and the Class members* into the Option
         ARM Loan with promises of low payment and low interest
22       (SAC ¶ 142);

23       *During the loan application process, in each case, Defendants
         uniformly promoted, advertised, and informed Plaintiffs and the
24       Class Members* that in accepting these loan terms, Plaintiffs and the
         Class members would be able to lower their mortgage payment and
25       save money (SAC ¶ 143);

26       *Plaintiffs and the Class members were told* they were being sold a
         home loan with a low payment and interest rate (SAC ¶ 145);
27

28

1

2

> *At all times relevant during the liability period, Defendants sold* their Option ARM loan product as having a low payment and interest rate, i.e. typically between 1% and 3% (SAC ¶ 144);

3

4

5

> *Defendants expressly and impliedly represented to Plaintiffs and the Class* that they would provide loans secured by Plaintiffs' and the Class members' homes, and that the loans would have a fixed interest rate at promised low interest rate for a period of three (3) to five (5) years (SAC ¶ 175).

6   However, neither the SAC nor these broad and conclusory allegations provide the requisite "who,

7   what, where, and how" of the supposed misrepresentations. *Cooper v. Pickett*, 137 F.3d 616, 627

8   (9th Cir. 1997). [12]  At a minimum, plaintiffs must specifically plead the alleged

9   misrepresentations surrounding their respective loan transactions.  They have not done so, other

10   than admitting that they closed a home refinance loan by a date and received the Loan

11   Documents.  (SAC ¶¶ 2, 3.)  This is not enough to carry their UCL claim over the pleading bar set

12   by Rule 9(b).  It must be dismissed.  *Vess*, 317 F.3d at 1106-08 (affirming dismissal of UCL

13   claims with prejudice because plaintiffs' allegations constituted a "unified fraudulent course of

14   conduct" but lacked the particularity required under Rule 9(b)).

15   **III.    PLAINTIFFS' CONTRACT-BASED CAUSES OF ACTION FAIL TO STATE ANY CLAIM.**

16

17   **A.    Because the Notes Expressly Contradict Plaintiffs' Allegations, Their Breach of Contract Claims Cannot Survive.**

18        Plaintiffs' fourth cause of action asserts a claim for breach of contract.  A review of the

19   written agreements between plaintiffs and Bank of America reveals that plaintiffs have

20   manufactured out of whole cloth the provisions they allege were breached.  Plaintiffs allege that

21   Bank of America breached the Notes by:

22

23

> (1) promising a "low interest rate" "at 1% to 3%" for "the first three (3) to five (5) years" and, instead, "immediately rais[ing] Plaintiffs' and the Class members' interest rates"; and

24

> (2) promising "Plaintiffs' and the Class members' monthly payment

25

26

27

---

[12] The difference between paragraphs 175 and 176 confirms that plaintiffs' UCL claim attacks alleged misrepresentations beyond the Loan Documents.  (*Compare* "Defendants expressly and impliedly represented to Plaintiffs" *with* "Defendants loan documents **also** represented to Plaintiffs."  (SAC ¶¶ 175-76 (emphasis added).))

28

1

obligations would be sufficient to pay both the principal and
interest owed" and, instead, causing negative amortization to occur.

2

3    (SAC ¶¶ 159-68.)  Bank of America's contracts made no such promises.  Plaintiffs'

4    mischaracterizations must yield to the actual contractual language.[13]

5          The parties' agreements plainly state that the interest rate will not be fixed, but will vary

6    according to an index.  Consider Mr. O'Donnell's "Adjustable Rate Note," executed on June 8,

7    2005.  Its title announces its nature:  the interest rate is adjustable.  Section 2 of the Note confirms

8    this fact.  (SAC Ex. 1 at 1 ("I will pay interest at a yearly rate of 1.000%.  The interest rate I will

9    pay *will* change in accordance with Section 4 of this Note.") (emphasis added).)  Section

10   4(A) goes on to provide that "[t]he interest rate I will pay may change on the first day of August,

11   2005, and on the first day of every month thereafter."  Such days are defined as "Rate Change

12   Date[s]."  (SAC Ex. 1 at 1.)  Section 4(B) of the Note specifies that the interest rate will be tied to

13   an index, specifically the LIBOR Annual Monthly Average of the 1-month London Inter-Bank

14   Offered Rate.  And, Section 4(C) of the Note sets forth exactly how this will work:

15
16
17
18

          Before each Rate Change Date, the Note Holder will calculate my
          new interest rate by adding TWO AND ONE-EIGHTH percentage
          points (2.125%) to the Current Index.  The Note Holder will then
          round the result of this addition to the NEXT HIGHEST one-eighth
          of one percentage point (0.125%).  Subject to the limits stated in
          Section 4(D) below, this rounded amount will be my new interest
          rate until the next Rate Change Date.

19   (SAC Ex. 1 at 2.)[14]  The adjustable nature of the interest rates on plaintiffs' loans is further

20   confirmed by the Adjustable Rate Riders to plaintiffs' Deeds of Trust.[15]  The Adjustable Rate

21   Riders state in capitalized, bold letters:

22   [13] *See Fundin v. Chicago Pneumatic Tool Co.*, 152 Cal. App. 3d 951, 955 (1984) ("[I]f
     there are inconsistencies between the complaint and the written instrument, the written instrument
23   controls."); *Barnett v. Fireman's Fund Ins. Co.*, 90 Cal. App. 4th 500, 505 (2001) ("[T]o the
     extent the factual allegations conflict with the content of the exhibits to the complaint, we rely on
24   and accept as true the contents of the exhibits and treat as surplusage the pleader's allegations as
     to the legal effect of the exhibits.").

25   [14] The language in the Van Belleghems' Note is identical in all material respects.  (SAC
26   Ex. 2 at 1-2.)

27   [15] The Adjustable Rate Riders to the Deeds of Trust are also contractual documents, which
     specify the terms of Bank of America's security interest in the underlying property, and are thus
     properly considered by the Court.

28

1

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT.**

2

3   (Sullivan Decl. Exs. D and E at 1.)  Far from promising that plaintiffs' interest rates will be fixed,

4   the contracts expressly state that the interest rates will change.

5          Similarly, Bank of America's Notes did not promise plaintiffs that their monthly payment

6   would pay both principal and interest.  (SAC ¶ 164.)  Nonetheless, plaintiffs allege this, relying

7   on the Notes' Section 3(A):  "I will pay principal and interest by making a payment each [sic,

8   every] month."  (SAC ¶ 163, Exs. 1, 2.)  This provision does not impose an obligation on Bank of

9   America.  Rather, it imposes an obligation on plaintiffs—to pay off the loan by making monthly

10  payments.  Plaintiffs' distorted view of this single sentence cannot be credited.  This is especially

11  true when the Note is viewed in its entirety.  Cal. Civ. Code § 1641 ("The whole of a contract is

12  to be taken together, so as to give effect to every part, if reasonably practicable, each clause

13  helping to interpret the other.").  In Section 4(F), the Notes explicitly state that negative

14  amortization may occur:

15
**(F) Principal Balance Adjustments—Deferred Interest (Negative Amortization)**  If my monthly payment is less than the

16
amount necessary to pay the full amount of interest for that month, the portion of interest that is unpaid will be added to the principal

17
balance of my loan as of the due date for such payment and will accrue interest at the rate in effect from time to time in accordance

18
with this Note.

19  (SAC Ex. 1 at 2; Ex. 2 at 2.)  Section 4(H) underscores negative amortization in the event that the

20  borrower selects the minimum payment option:

21
**(H) Payment Options**  I will have up to three monthly payment options for my loan.  I may always make the monthly payment

22
required under Sections 3(B), 4(E) or 4(G), as applicable (the "Required Payment").  If the Required Payment is insufficient to

23
fully amortize my loan as a result of the application of the Annual Payment Cap or principal balance adjustments, I will have the

24
option to make a fully amortizing payment, which is an amount sufficient to pay off my loan in substantially equal payments over

25
its remaining term at its then interest rate.  If the Required Payment is not sufficient to pay all of the interest owed for that month,

26
*which would result in negative amortization*, I will also have the option to make an interest-only payment, which will be sufficient to

27
pay the monthly interest and *avoid negative amortization*, but will not reduce the principal balance.  Even if these options are

28
available, I may still elect to make only the Required Payment.

22

1    (SAC Ex. 1 at 2-3; Ex. 2 at 2-3 (emphasis added).)

2           In sum, plaintiffs' claim that Bank of America promised them fixed interest rates "at 1%

3    to 3%" is belied by the parties' written agreements; so is the claim that Bank of America

4    promised that plaintiffs' "monthly payment obligations would be sufficient to pay both the

5    principal and interest owed on the loans." The Notes expressly state that the interest rate is

6    adjustable and that negative amortization may occur. The supposed promises that plaintiffs claim

7    Bank of America breached simply do not exist. Plaintiffs' contrary allegations otherwise should

8    be disregarded. *See Sprewell*, 266 F.3d at 988 (allegations should be disregarded if contradicted

9    by exhibits attached to complaint). Accordingly, plaintiffs' fourth cause of action should be

10   dismissed.

11

12          **B.     Plaintiffs Cannot State a Claim for Tortious Breach of the Implied Covenant
                     of Good Faith and Fair Dealing.**

13          Plaintiffs' fifth cause of action for tortious breach of the implied covenant of good faith

14   and fair dealing must be dismissed. As a matter of law, no special relationship exists between

15   plaintiffs and Bank of America to warrant tort recovery. This is dispositive.[16]

16          "[T]ort recovery for breach of the covenant [of good faith and fair dealing] is available

17   only in limited circumstances, generally involving a special relationship between the contracting

18   parties, such as the relationship between an insured and its insurer." *Bionghi v. Metro. Water*

19   *Dist.*, 70 Cal. App. 4th 1358, 1370 (1999).

20          Where, as here, the disputed transactions occurred in a typical commercial context and the

21   contracting parties were in an ordinary bank-customer relationship, tort remedies are precluded.

22   No special relationship exists. This is well settled under California law. *Mitsui Mfrs. Bank v.*

23   *Super. Ct.*, 212 Cal. App. 3d 726, 795 (1989) ("We reject real parties' argument that the tort

24

---

25   [16] Plaintiffs have modified their prior claim for breach of the implied covenant of good faith and
     fair dealing to now seek tort recovery. This is in direct response to Bank of America's first

26   motion to dismiss, which argued that the implied covenant claim is duplicative of the breach of
     contract claim. While the lack of any special relationship is dispositive, Bank of America

27   incorporates its prior arguments on the breach of the implied covenant claim, to the extent
     necessary. (Docket Document 13, Section IV of Motion to Dismiss Plaintiff's First Amended

28   Complaint at 16-17).

1    doctrine which has been extended only to situations where there are unique fiduciary-like

2    relationships between the parties, should encompass normal commercial banking transactions.")

3    (rejecting commercial borrower's claim against bank for tortious breach of implied covenant of

4    good faith and fair dealing); *Price v. Wells Fargo Bank*, 213 Cal. App. 3d 465, 476 (1989) ("'A

5    debt is not a trust and there is not a fiduciary relation between debtor and creditor as such.'  The

6    same principle should apply with even greater clarity to the relationship between a bank and its

7    loan customers.") (rejecting same claim by individual borrowers against bank) (internal citation

8    omitted); *Careau & Co. v. Sec. Pac. Bus. Credit, Inc*., 222 Cal. App. 3d 1371, 1399 (1990)

9    ("[R]ecognition of a tort remedy for breach of the implied covenant in a noninsurance contract

10    has little authoritative support.") (sustaining demurrer on same claim by commercial borrower

11    against bank); *see Copesky v. Super. Ct.*, 229 Cal. App. 3d 678, 694 (1991) ("It is thus our

12    conclusion that banks, in general and in this case, are not fiduciaries for their depositors; and that

13    the bank-depositor relationship is not a 'special relationship' under the *Wallis* test, or any other

14    test, such as to give rise to tort damages when the implied contractual covenant of good faith is

15    broken.").  The same logic applies here.  Apparently appreciating this, plaintiffs make no attempt

16    whatsoever to allege the existence of a special relationship.  (SAC ¶¶ 173-88.) [17]  Accordingly,

17    the claim for tortious breach of the implied covenant of good faith and fair dealing must be

18    dismissed.

19

20

21

22

23

24
_____

25    [17] Factors leading to a determination of special relationship are:  "(1) inherently unequal
     bargaining positions; (2) nonprofit motivation, i.e., objective of securing peace of mind, security;

26    (3) inadequacy of ordinary contract damages; (4) special vulnerability of one party to harm as a
     result of breach of trust of the other; and (5) awareness by the other of this special vulnerability."

27    *Copesky*, 229 Cal. App. 3d at 687 n.7 (citing *Wallis v. Super. Ct.*, 160 Cal. App. 3d 1109, 1118
     (1984)).

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the foregoing reasons, the Court should dismiss the plaintiffs' SAC with prejudice.

Dated:  March 7, 2008                    MORRISON & FOERSTER LLP


By:  _____/s/  Michael J. Agoglia_____
                    Michael J. Agoglia

Attorneys for Defendant
BANK OF AMERICA, NATIONAL
ASSOCIATION


ECF CERTIFICATION

I, Wendy M. Garbers, am the ECF User whose ID and password are being used to file this Notice Of Motion And Motion To Dismiss Plaintiffs' Second Amended Complaint; Memorandum Of Points And Authorities.  In compliance with General Order 45, X.B., I hereby attest that Michael J. Agoglia has concurred in this filing.

Dated:  March 7, 2008

By: /s/ Wendy M. Garbers
                    Wendy M. Garbers