Exhibit 1

12 C.F.R. Pt. 226, Supp. I

**Effective: January 14, 2008**

Code of Federal Regulations Currentness
  Title 12. Banks and Banking
    Chapter II. Federal Reserve System
      Subchapter A. Board of Governors of the Federal Reserve System
        Part 226. Truth in Lending (Regulation Z) (Refs & Annos)

→**SUPPLEMENT I TO PART 226-- OFFICIAL STAFF INTERPRETATIONS**

<For compliance date(s) of amendment(s) to supplement, see 72 FR 63462.>

Introduction

1. Official status. This commentary is the vehicle by which the staff of the Division of Consumer and Community Affairs of the Federal Reserve Board issues official staff interpretations of Regulation Z, as revised effective April 1, 1981. Good faith compliance with this commentary affords protection from liability under 130(f) of the Truth in Lending Act. Section 130(f) (15 U.S.C. 1640) protects creditors from civil liability for any act done or omitted in good faith in conformity with any interpretation issued by a duly authorized official or employee of the Federal Reserve System.

2. Procedure for requesting interpretations. Under appendix C of the regulation, anyone may request an official staff interpretation. Interpretations that are adopted will be incorporated in this commentary following publication in the Federal Register. No official staff interpretations are expected to be issued other than by means of this commentary.

3. Status of previous interpretations. All statements and opinions issued by the Federal Reserve Board and its staff interpreting previous Regulation Z remain effective until October 1, 1982, only insofar as they interpret that regulation. When compliance with revised Regulation Z becomes mandatory on October 1, 1982, the Board and staff interpretations of the previous regulation will be entirely superseded by the revised regulation and this commentary except with regard to liability under the previous regulation.

4. Rules of construction. (a) Lists that appear in the commentary may be exhaustive or illustrative; the appropriate construction should be clear from the context. In most cases, illustrative lists are introduced by phrases such as "including, but not limited to," "among other things," "for example," or "such as."

(b) Throughout the commentary and regulation, reference to the regulation should be construed to refer to revised Regulation Z, unless the context indicates that a reference to previous Regulation Z is also intended.

(c) Throughout the commentary, reference to "this section" or "this paragraph" means the section or paragraph in the regulation that is the subject of the comment.

5. Comment designations. Each comment in the commentary is identified by a number and the regulatory section or paragraph which it interprets. The comments are designated with as much specificity as possible according to the particular regulatory provision addressed. For example, some of the comments to § 226.18(b) are further divided by paragraph, such as Comment 18(b)(1)-1 and Comment 18(b)(2)-1. In other cases, comments have more general application and are designated, for example, as Comment 18-1 or Comment 18(b)-1. This introduction may be cited as Comments I-1 through I-7. Comments to the appendices may be cited, for example, as Comment app. A-1.

6. Cross-references. The following cross-references to related material appear at the end of each section of the commentary:

(a) "Statute"--those sections of the Truth in Lending Act on which the regulatory provision is based (and any other relevant statutes);

(b) "Other sections"--other provisions in the regulation necessary to understand that section;

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

consumer credit to residents (including resident aliens) of any state as defined in § 226.2. If an account is located in the United States and credit is extended to a U.S. resident, the transaction is subject to the regulation. This will be the case whether or not a particular advance or purchase on the account takes place in the United States and whether or not the extender of credit is chartered or based in the United States or a foreign country. Thus, a U.S. resident's use in Europe of a credit card issued by a bank in the consumer's home town is covered by the regulation. The regulation does not apply to a foreign branch of a U.S. bank when the foreign branch extends credit to a U.S. citizen residing or visiting abroad or to a foreign national abroad.

References

Statute: Section 102.

Other sections: None.

Previous regulation: § 226.1.

1981 changes: A discussion of coverage has been added to § 226.1 so that the reader will understand from the start what is subject to the regulation. Language has also been added to explain the reorganization of the regulation into subparts that group together the provisions relating to general matters, open-end credit, closed-end credit, and miscellaneous rules. The provisions on consumer leasing have been issued by the Board as a separate regulation, Regulation M (12 CFR part 213).

Section 226.2--Definitions and Rules of Construction

2(a) Definitions.

2(a)(2) Advertisement.

1. Coverage. Only commercial messages that promote consumer credit transactions requiring disclosures are advertisements. Messages inviting, offering, or otherwise announcing generally to prospective customers the availability of credit transactions, whether in visual, oral, or print media, are covered by Regulation Z (12 CFR part 226).

i. Examples include:

A. Messages in a newspaper, magazine, leaflet, promotional flyer, or catalog.

B. Announcements on radio, television, or public address system.

C. On-line messages, such as on the Internet.

D. Direct mail literature or other printed material on any exterior or interior sign.

E. Point-of-sale displays.

F. Telephone solicitations.

G. Price tags that contain credit information.

H. Letters sent to customers as part of an organized solicitation of business.

I. Messages on checking account statements offering auto loans at a stated annual percentage rate.

J. Communications promoting a new open-end plan or closed-end transaction.

ii. The term does not include:

A. Direct personal contacts, such as follow-up letters, cost estimates for individual consumers, or oral or written communication relating to the negotiation of a specific transaction.

B. Informational material, for example, interest rate and loan term memos, distributed only to business entities.

C. Notices required by federal or state law, if the law mandates that specific information be displayed and only the information so mandated is included in the notice.

D. News articles the use of which is controlled by the news medium.

E. Market research or educational materials that do not solicit business.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Case 5:07-cv-04500-RMW   Document 34-2   Filed 03/28/2008   Page 4 of 16

Page 4

12 C.F.R. Pt. 226, Supp. I

F. Communications about an existing credit account (for example, a promotion encouraging additional or different uses of an existing credit card account).

2. Persons covered. All persons must comply with the advertising provisions in §§ 226.16 and 226.24, not just those that meet the definition of creditor in § 226.2(a)(17). Thus, home builders, merchants, and others who are not themselves creditors must comply with the advertising provisions of the regulation if they advertise consumer credit transactions. However, under section 145 of the act, the owner and the personnel of the medium, in which an advertisement appears, or through which it is disseminated, are not subject to civil liability for violations.

2(a)(3) [Reserved]

2(a)(4) Billing cycle or cycle.

1. Intervals. In open-end credit plans, the billing cycle determines the intervals for which periodic disclosure statements are required; these intervals are also used as measuring points for other duties of the creditor. Typically, billing cycles are monthly, but they may be more frequent or less frequent (but not less frequent than quarterly).

2. Creditors that do not bill. The term cycle is interchangeable with billing cycle for definitional purposes, since some creditors' cycles do not involve the sending of bills in the traditional sense but only statements of account activity. This is commonly the case with financial institutions when periodic payments are made through payroll deduction or through automatic debit of the consumer's asset account.

3. Equal cycles. Although cycles must be equal, there is a permissible variance to account for weekends, holidays, and differences in the number of days in months. If the actual date of each statement does not vary by more than 4 days from a fixed day (for example, the third Thursday of each month) or date (for example, the 15th of each month) that the creditor regularly uses, the intervals between statements are considered equal. The requirement that cycles be equal applies even if the creditor applies a daily periodic rate to determine the finance charge. The requirement that intervals be equal does not apply to the transitional billing cycle that can occur when the creditor occasionally changes its billing cycles so as to establish a new statement day or date. (See the commentary to § 226.9(c).)

4. Payment reminder. The sending of a regular payment reminder (rather than a late payment notice) establishes a cycle for which the creditor must send periodic statements.

2(a)(6) Business day.

1. Business function test. Activities that indicate that the creditor is open for substantially all of its business functions include the availability of personnel to make loan disbursements, to open new accounts, and to handle credit transaction inquiries. Activities that indicate that the creditor is not open for substantially all of its business functions include a retailer merely accepting credit cards for purchases or a bank having its customer-service windows open only for limited purposes such as deposits and withdrawals, bill paying, and related services.

2. Rescission rule. A more precise rule for what is a business day (all calendar days except Sundays and the federal legal holidays listed in 5 U.S.C. 6103(a)) applies when the right of rescission or mortgages subject to § 226.32 are involved. (See also comment 31(c)(1)-1.) Four federal legal holidays are identified in 5 U.S.C. 6103(a) by a specific date: New Year's Day, January 1; Independence Day, July 4; Veterans Day, November 11; and Christmas Day, December 25. When one of these holidays (July 4, for example) falls on a Saturday, federal offices and other entities might observe the holiday on the preceding Friday (July 3). The observed holiday (in the example, July 3) is a business day for purposes of rescission or the delivery of disclosures for certain high-cost mortgages covered by § 226.32.

2(a)(7) Card issuer.

1. Agent. An agent of a card issuer is considered a card issuer. Because agency relationships are traditionally defined by contract and by state or other applicable law, the regulation does not define agent. Merely providing services relating to the production of credit cards or data processing for others, however,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

does not make one the agent of the card issuer. In contrast, a financial institution may become the agent of the card issuer if an agreement between the institution and the card issuer provides that the cardholder may use a line of credit with the financial institution to pay obligations incurred by use of the credit card.

2(a)(8) Cardholder.

1. General rule. A cardholder is a natural person at whose request a card is issued for consumer credit purposes or who is a co-obligor or guarantor for such a card issued to another. The second category does not include an employee who is a co-obligor or guarantor on a card issued to the employer for business purposes, nor does it include a person who is merely the authorized user of a card issued to another.

2. Limited application of regulation. For the limited purposes of the rules on issuance of credit cards and liability for unauthorized use, a cardholder includes any person, including an organization, to whom a card is issued for any purpose--including a business, agricultural, or commercial purpose.

3. Issuance. See the commentary to § 226.12(a).

4. Dual-purpose cards and dual-card systems. Some card issuers offer dual-purpose cards that are for business as well as consumer purposes. If a card is issued to an individual for consumer purposes, the fact that an organization has guaranteed to pay the debt does not make it business credit. On the other hand, if a card is issued for business purposes, the fact that an individual sometimes uses it for consumer purchases does not subject the card issuer to the provisions on periodic statements, billing error resolution, and other protections afforded to consumer credit. Some card issuers offer dual-card systems--that is, they issue two cards to the same individual, one intended for business use, the other for consumer or personal use. With such a system, the same person may be a cardholder for general purposes when using the card issued for consumer use, and a cardholder only for the limited purposes of the restrictions on issuance and liability when using the card issued for business purposes.

2(a)(9) Cash price.

1. Components. This amount is a starting point in computing the amount financed and the total sale price under § 226.18 for credit sales. Any charges imposed equally in cash and credit transactions may be included in the cash price, or they may be treated as other amounts financed under § 226.18(b)(2).

2. Service contracts. Service contracts include contracts for the repair or the servicing of goods, such as mechanical breakdown coverage, even if such a contract is characterized as insurance under state law.

3. Rebates. The creditor has complete flexibility in the way it treats rebates for purposes of disclosure and calculation. See the commentary to § 226.18(b).

2(a)(10) Closed-end credit.

1. General. The coverage of this term is defined by exclusion. That is, it includes any credit arrangement that does not fall within the definition of open-end credit. Subpart C contains the disclosure rules for closed-end credit when the obligation is subject to a finance charge or is payable by written agreement in more than 4 installments.

2(a)(11) Consumer.

1. Scope. Guarantors, endorsers, and sureties are not generally consumers for purposes of the regulation, but they may be entitled to rescind under certain circumstances and they may have certain rights if they are obligated on credit card plans.

2. Rescission rules. For purposes of rescission under §§ 226.15 and 226.23, a consumer includes any natural person whose ownership interest in his or her principal dwelling is subject to the risk of loss. Thus, if a security interest is taken in A's ownership interest in a house and that house is A's principal dwelling, A is a consumer for purposes of rescission, even if A is not liable, either primarily or secondarily, on the underlying consumer credit transaction. An ownership interest does not include, for example, leaseholds or inchoate rights, such as dower.

3. Land trusts. Credit extended to land trusts, as described in the commentary to § 226.3(a), is

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

considered to be extended to a natural person for purposes of the definition of consumer.

2(a)(12) Consumer credit.

1. Primary purpose. There is no precise test for what constitutes credit offered or extended for personal, family, or household purposes, nor for what constitutes the primary purpose. See, however, the discussion of business purposes in the commentary to § 226.3(a).

2(a)(13) Consummation.

1. State law governs. When a contractual obligation on the consumer's part is created is a matter to be determined under applicable law; Regulation Z does not make this determination. A contractual commitment agreement, for example, that under applicable law binds the consumer to the credit terms would be consummation. Consummation, however, does not occur merely because the consumer has made some financial investment in the transaction (for example, by paying a nonrefundable fee) unless, of course, applicable law holds otherwise.

2. Credit v. sale. Consummation does not occur when the consumer becomes contractually committed to a sale transaction, unless the consumer also becomes legally obligated to accept a particular credit arrangement. For example, when a consumer pays a nonrefundable deposit to purchase an automobile, a purchase contact may be created, but consummation for purposes of the regulation does not occur unless the consumer also contracts for financing at that time.

2(a)(14) Credit.

1. Exclusions. The following situations are not considered credit for purposes of the regulation:

. Layaway plans, unless the consumer is contractually obligated to continue making payments. Whether the consumer is so obligated is a matter to be determined under applicable law. The fact that the consumer is not entitled to a refund of any amounts paid towards the cash price of the merchandise does not bring layaways within the definition of credit.

. Tax liens, tax assessments, court judgments, and court approvals of reaffirmation of debts in bankruptcy. However, third-party financing of such obligations (for example, a bank loan obtained to pay off a tax lien) is credit for purposes of the regulation.

. Insurance premium plans that involve payment in installments with each installment representing the payment for insurance coverage for a certain future period of time, unless the consumer is contractually obligated to continue making payments.

. Home improvement transactions that involve progress payments, if the consumer pays, as the work progresses, only for work completed and has no contractual obligation to continue making payments.

. Borrowing against the accrued cash value of an insurance policy or a pension account, if there is no independent obligation to repay.

. Letters of credit.

. The execution of option contracts. However, there may be an extension of credit when the option is exercised, if there is an agreement at that time to defer payment of a debt.

. Investment plans in which the party extending capital to the consumer risks the loss of the capital advanced. This includes, for example, an arrangement with a home purchaser in which the investor pays a portion of the downpayment and of the periodic mortgage payments in return for an ownership interest in the property, and shares in any gain or loss of property value.

. Mortgage assistance plans administered by a government agency in which a portion of the consumer's monthly payment amount is paid by the agency. No finance charge is imposed on the subsidy amount and that amount is due in a lump-sum payment on a set date or upon the occurrence of certain events. (If payment is not made when due, a new note imposing a finance charge may be written, which may then be subject to the regulation.)

2. Payday loans; deferred presentment. Credit includes a transaction in which a cash advance is made to a consumer in exchange for the consumer's personal check, or in exchange for the consumer's

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

authorization to debit the consumer's deposit account, and where the parties agree either that the check will not be cashed or deposited, or that the consumer's deposit account will not be debited, until a designated future date. This type of transaction is often referred to as a "payday loan" or "payday advance" or "deferred presentment loan." A fee charged in connection with such a transaction may be a finance charge for purposes of § 226.4, regardless of how the fee is characterized under state law. Where the fee charged constitutes a finance charge under § 226.4 and the person advancing funds regularly extends consumer credit, that person is a creditor and is required to provide disclosures consistent with the requirements of Regulation Z. See § 226.2(a)(17).

2(a)(15) Credit card.

1. Usable from time to time. A credit card must be usable from time to time. Since this involves the possibility of repeated use of a single device, checks and similar instruments that can be used only once to obtain a single credit extension are not credit cards.

2. Examples.

i. Examples of credit cards include:

A. A card that guarantees checks or similar instruments, if the asset account is also tied to an overdraft line or if the instrument directly accesses a line of credit.

B. A card that accesses both a credit and an asset account (that is, a debit-credit card).

C. An identification card that permits the consumer to defer payment on a purchase.

D. An identification card indicating loan approval that is presented to a merchant or to a lender, whether or not the consumer signs a separate promissory note for each credit extension.

E. A card or device that can be activated upon receipt to access credit, even if the card has a substantive use other than credit, such as a purchase-price discount card. Such a card or device is a credit card notwithstanding the fact that the recipient must first contact the card issuer to access or activate the credit feature.

ii. In contrast, a credit card does not include, for example:

A. A check-guarantee or debit card with no credit feature or agreement, even if the creditor occasionally honors an inadvertent overdraft.

B. Any card, key, plate, or other device that is used in order to obtain petroleum products for business purposes from a wholesale distribution facility or to gain access to that facility, and that is required to be used without regard to payment terms.

3. Charge card. Generally, charge cards are cards used in connection with an account on which outstanding balances cannot be carried from one billing cycle to another and are payable when a periodic statement is received. Under the regulation, a reference to credit cards generally includes charge cards. The term charge card is, however, distinguished from credit card in §§ 226.5a, 226.9(e), 226.9(f), and 226.28(d), and appendices G-10 through G-13. When the term credit card is used in those provisions, it refers to credit cards other than charge cards.

2(a)(16) Credit sale.

1. Special disclosure. If the seller is a creditor in the transaction, the transaction is a credit sale and the special credit sale disclosures (that is, the disclosures under § 226.18(j)) must be given. This applies even if there is more than one creditor in the transaction and the creditor making the disclosures is not the seller. See the commentary to § 226.17(d).

2. Sellers who arrange credit. If the seller of the property or services involved arranged for financing but is not a creditor as to that sale, the transaction is not a credit sale. Thus, if a seller assists the consumer in obtaining a direct loan from a financial institution and the consumer's note is payable to the financial institution, the transaction is a loan and only the financial institution is a creditor.

3. Refinancings. Generally, when a credit sale is refinanced within the meaning of § 226.20(a), loan disclosures should be made. However, if a new sale

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Case 5:07-cv-04500-RMW  Document 34-2  Filed 03/28/2008  Page 8 of 16

Page 8

12 C.F.R. Pt. 226, Supp. I

of goods or services is also involved, the transaction is a credit sale.

4. Incidental sales. Some lenders sell a product or service--such as credit, property, or health insurance--as part of a loan transaction. Section 226.4 contains the rules on whether the cost of credit life, disability or property insurance is part of the finance charge. If the insurance is financed, it may be disclosed as a separate credit sale transaction or disclosed as part of the primary transaction; if the latter approach is taken, either loan or credit sale disclosures may be made. See the commentary to § 226.17(c)(1) for further discussion of this point.

5. Credit extensions for educational purposes. A credit extension for educational purposes in which an educational institution is the creditor may be treated as either a credit sale or a loan, regardless of whether the funds are given directly to the student, credited to the student's account, or disbursed to other persons on the student's behalf. The disclosure of the total sale price need not be given if the transaction is treated as a loan.

2(a)(17) Creditor.

1. General. The definition contains four independent tests. If any one of the tests is met, the person is a creditor for purposes of that particular test.

Paragraph 2(a)(17)(i).

1. Prerequisites. This test is composed of 2 requirements, both of which must be met in order for a particular credit extension to be subject to the regulation and for the credit extension to count towards satisfaction of the numerical tests mentioned in footnote 3 to § 226.2(a)(17). First, there must be either or both of the following:

. A written (rather than oral) agreement to pay in more than 4 installments. A letter that merely confirms an oral agreement does not constitute a written agreement for purposes of the definition.

. A finance charge imposed for the credit. The obligation to pay the finance charge need not be in writing.

Second, the obligation must be payable to the person in order for that person to be considered a creditor. If an obligation is made payable to bearer, the creditor is the one who initially accepts the obligation.

2. Assignees. If an obligation is initially payable to one person, that person is the creditor even if the obligation by its terms is simultaneously assigned to another person. For example:

. An auto dealer and a bank have a business relationship in which the bank supplies the dealer with credit sale contracts that are initially made payable to the dealer and provide for the immediate assignment of the obligation to the bank. The dealer and purchaser execute the contract only after the bank approves the creditworthiness of the purchaser. Because the obligation is initially payable on its face to the dealer, the dealer is the only creditor in the transaction.

3. Numerical tests. The examples below illustrate how the numerical tests of footnote 3 are applied. The examples assume that consumer credit with a finance charge or written agreement for more than 4 installments was extended in the years in question and that the person did not extend such credit in 1982.

4. Counting transactions. For purposes of closed-end credit, the creditor counts each credit transaction. For open-end credit, transactions means accounts, so that outstanding accounts are counted instead of individual credit extensions. Normally the number of transactions is measured by the preceding calendar year; if the requisite number is met, then the person is a creditor for all transactions in the current year. However, if the person did not meet the test in the preceding year, the number of transactions is measured by the current calendar year. For example, if the person extends consumer credit 26 times in 1983, it is a creditor for purposes of the regulation for the last extension of credit in 1983 and for all extensions of consumer credit in 1984. On the other hand, if a business begins in 1983 and extends consumer credit 20 times, it is not a creditor for purposes of the regulation in 1983. If it extends consumer credit 75 times in 1984, however, it becomes a creditor for purposes of the regulation (and must begin making disclosures) after the 25th extension of credit in that year and is a creditor for all

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

extensions of consumer credit in 1985.

5. Relationship between consumer credit in general and credit secured by a dwelling. Extensions of credit secured by a dwelling are counted towards the 25-extensions test. For example, if in 1983 a person extends unsecured consumer credit 23 times and consumer credit secured by a dwelling twice, it becomes a creditor for the succeeding extensions of credit, whether or not they are secured by a dwelling. On the other hand, extensions of consumer credit not secured by a dwelling are not counted towards the number of credit extensions secured by a dwelling. For example, if in 1983 a person extends credit not secured by a dwelling 8 times and credit secured by a dwelling 3 times, it is not a creditor.

6. Effect of satisfying one test. Once one of the numerical tests is satisfied, the person is also a creditor for the other type of credit. For example, in 1983 a person extends consumer credit secured by a dwelling 5 times. That person is a creditor for all succeeding credit extensions, whether they involve credit secured by a dwelling or not.

7. Trusts. In the case of credit extended by trusts, each individual trust is considered a separate entity for purposes of applying the criteria. For example:

. A bank is the trustee for 3 trusts: Trust A makes 15 extensions of consumer credit annually; Trust B makes 10 extensions of consumer credit annually; and Trust C makes 30 extensions of consumer credit annually. Only Trust C is a creditor for purposes of the regulation.

8. Loans from employee savings plan. Some employee savings plans permit participants to borrow money up to a certain percentage of their account balances, and use a trust to administer the receipt and disbursement of funds. Unless each participant's account is an individual plan and trust, the creditor should apply the numerical tests to the plan as a whole rather than to the individual account, even if the loan amount is determined by reference to the balance in the individual account and the repayments are credited to the individual account. The person to whom the obligation is originally made payable (whether the plan, the trust, or the trustee) is the creditor for purposes of the act and regulation.

Paragraph 2(a)(17)(ii). [Reserved]

Paragraph 2(a)(17)(iii).

1. Card issuers subject to Subpart B. Section 226.2(a)(17)(iii) makes certain card issuers creditors for purposes of the open-end credit provisions of the regulation. This includes, for example, the issuers of so-called travel and entertainment cards that expect repayment at the first billing and do not impose a finance charge. Since all disclosures are to be made only as applicable, such card issuers would omit finance charge disclosures. Other provisions of the regulation regarding such areas as scope, definitions, determination of which charges are finance charges, Spanish language disclosures, record retention, and use of model forms, also apply to such card issuers.

Paragraph 2(a)(17)(iv).

1. Card issuers subject to Subparts B and C. Section 226.2(a)(17)(iv) includes as creditors card issuers extending closed-end credit in which there is a finance charge or an agreement to pay in more than 4 installments. These card issuers are subject to the appropriate provisions of Subparts B and C, as well as to the general provisions.

2(a)(18) Downpayment.

1. Allocation. If a consumer makes a lump-sum payment, partially to reduce the cash price and partially to pay prepaid finance charges, only the portion attributable to reducing the cash price is part of the downpayment. (See the commentary to § 226.2(a)(23).)

2. Pick-up payments. Creditors may treat the deferred portion of the down-payment, often referred to as pick-up payments, in a number of ways. If the pick-up payment is treated as part of the downpayment:

. It is subtracted in arriving at the amount financed under § 226.18(b).

. It may, but need not, be reflected in the payment schedule under § 226.18(g).

If the pick-up payment does not meet the definition (for example, if it is payable after the second

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

regularly scheduled payment) or if the creditor chooses not to treat it as part of the downpayment:

. It must be included in the amount financed.

. It must be shown in the payment schedule.

Whichever way the pick-up payment is treated, the total of payments under § 226.18(h) must equal the sum of the payments disclosed under § 226.18(g).

3. Effect of existing liens.

i. No cash payment. In a credit sale, the "downpayment" may only be used to reduce the cash price. For example, when a trade-in is used as the downpayment and the existing lien on an automobile to be traded in exceeds the value of the automobile, creditors must disclose a zero on the downpayment line rather than a negative number. To illustrate, assume a consumer owes $10,000 on an existing automobile loan and that the trade-in value of the automobile is only $8,000, leaving a $2,000 deficit. The creditor should disclose a downpayment of $0, not -$2,000.

ii. Cash payment. If the consumer makes a cash payment, creditors may, at their option, disclose the entire cash payment as the downpayment, or apply the cash payment first to any excess lien amount and disclose any remaining cash as the downpayment. In the above example:

A. If the downpayment disclosed is equal to the cash payment, the $2,000 deficit must be reflected as an additional amount financed under § 226.18(b)(2).

B. If the consumer provides $1,500 in cash (which does not extinguish the $2,000 deficit), the creditor may disclose a downpayment of $1,500 or of $0.

C. If the consumer provides $3,000 in cash, the creditor may disclose a downpayment of $3,000 or of $1,000.

2(a)(19) Dwelling.

1. Scope. A dwelling need not be the consumer's principal residence to fit the definition and thus a vacation or second home could be a dwelling. However, for purposes of the definition of residential mortgage transaction and the right to rescind, a dwelling must be the principal residence of the consumer. See the commentary to §§ 226.2(a)(24), 226.15, and 226.23.

2. Use as a residence. Mobile homes, boats, and trailers are dwellings if they are in fact used as residences, just as are condominium and cooperative units. Recreational vehicles, campers, and the like not used as residences are not dwellings.

3. Relation to exemptions. Any transaction involving a security interest in a consumer's principal dwelling (as well as in any real property) remains subject to the regulation despite the general exemption in § 226.3(b) for credit extensions over $25,000.

2(a)(20) Open-end credit.

1. General. This definition describes the characteristics of open-end credit (for which the applicable disclosure and other rules are contained in Subpart B), as distinct from closed-end credit. Open-end credit is consumer credit that is extended under a plan and meets all 3 criteria set forth in the definition.

2. Existence of a plan. The definition requires that there be a plan, which connotes a contractual arrangement between the creditor and the consumer. Some creditors offer programs containing a number of different credit features. The consumer has a single account with the institution that can be accessed repeatedly via a number of sub-accounts established for the different program features and rate structures. Some features of the program might be used repeatedly (for example, an overdraft line) while others might be used infrequently (such as the part of the credit line available for secured credit). If the program as a whole is subject to prescribed terms and otherwise meets the definition of open-end credit, such a program would be considered a single, multi-featured plan.

3. Repeated transactions. Under this criterion, the creditor must reasonably contemplate repeated transactions. This means that the credit plan must be usable from time to time and the creditor must legitimately expect that there will be repeat business rather than a one-time credit extension. The creditor must expect repeated dealings with consumers under

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

the credit plan as a whole and need not believe a consumer will reuse a particular feature of the plan. The determination of whether a creditor can reasonably contemplate repeated transactions requires an objective analysis. Information that much of the creditor's customer base with accounts under the plan make repeated transactions over some period of time is relevant to the determination, particularly when the plan is opened primarily for the financing of infrequently purchased products or services. A standard based on reasonable belief by a creditor necessarily includes some margin for judgmental error. The fact that particular consumers do not return for further credit extensions does not prevent a plan from having been properly characterized as open-end. For example, if much of the customer base of a clothing store makes repeat purchases, the fact that some consumers use the plan only once would not affect the characterization of the store's plan as open-end credit. The criterion regarding repeated transactions is a question of fact to be decided in the context of the creditor's type of business and the creditor's relationship with its customers. For example:

i. It would be more reasonable for a thrift institution chartered for the benefit of its members to contemplate repeated transactions with a member than for a seller of aluminum siding to make the same assumption about its customers.

ii. It would be more reasonable for a financial institution to make advances from a line of credit for the purchase of an automobile than for an automobile dealer to sell a car under an open-end plan.

4. Finance charge on an outstanding balance. The requirement that a finance charge may be computed and imposed from time to time on the outstanding balance means that there is no specific amount financed for the plan for which the finance charge, total of payments, and payment schedule can be calculated. A plan may meet the definition of open-end credit even though a finance charge is not normally imposed, provided the creditor has the right, under the plan, to impose a finance charge from time to time on the outstanding balance. For example, in some plans, such as certain china club plans, a finance charge is not imposed if the consumer pays all or a specified portion of the outstanding balance within a given time period. Such a plan could meet the finance charge criterion, if the creditor has the right to impose a finance charge, even though the consumer actually pays no finance charges during the existence of the plan because the consumer takes advantage of the option to pay the balance (either in full or in installments) within the time necessary to avoid finance charges.

5. Reusable line. The total amount of credit that may be extended during the existence of an open-end plan is unlimited because available credit is generally replenished as earlier advances are repaid. A line of credit is self-replenishing even though the plan itself has a fixed expiration date, as long as during the plan's existence the consumer may use the line, repay, and reuse the credit. The creditor may verify credit information such as the consumer's continued income and employment status or information for security purposes. This criterion of unlimited credit distinguishes open-end credit from a series of advances made pursuant to a close-end credit loan commitment. For example:

. Under a closed-end commitment, the creditor might agree to lend a total of $10,000 in a series of advances as needed by the consumer. When a consumer has borrowed the full $10,000, no more is advanced under that particular agreement, even if there has been repayment of a portion of the debt.

This criterion does not mean that the creditor must establish a specific credit limit for the line of credit or that the line of credit must always be replenished to its original amount. The creditor may reduce a credit limit or refuse to extend new credit in a particular case due to changes in the economy, the creditor's financial condition, or the consumer's creditworthiness. (The rules in § 226.5b(f), however, limit the ability of a creditor to suspend credit advances for home equity plans.) While consumers should have a reasonable expectation of obtaining credit as long as they remain current and within any preset credit limits, further extensions of credit need not be an absolute right in order for the plan to meet the self-replenishing criterion.

6. Open-end real estate mortgages. Some credit plans call for negotiated advances under so-called open-end real estate mortgages. Each such plan must be independently measured against the definition of open-end credit, regardless of the terminology used

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

in the industry to describe the plan. The fact that a particular plan is called an open-end real estate mortgage, for example, does not, by itself, mean that it is open-end credit under the regulation.

2(a)(21) Periodic rate.

1. Basis. The periodic rate may be stated as a percentage (for example, 1 1/2 % per month) or as a decimal equivalent (for example, .015 monthly). It may be based on any portion of a year the creditor chooses. Some creditors use 1/360 of an annual rate as their periodic rate. These creditors:

. May disclose a 1/360 rate as a daily periodic rate, without further explanation, if it is in fact only applied 360 days per year. But if the creditor applies that rate for 365 days, the creditor must note that fact and, of course, disclose the true annual percentage rate.

. Would have to apply the rate to the balance to disclose the annual percentage rate with the degree of accuracy required in the regulation (that is, within 1/8 of 1 percentage point of the rate based on the actual 365 days in the year).

2. Transaction charges. Periodic rate does not include initial one-time transaction charges, even if the charge is computed as a percentage of the transaction amount.

2(a)(22) Person.

1. Joint ventures. A joint venture is an organization and is therefore a person.

2. Attorneys. An attorney and his or her client are considered to be the same person for purposes of this regulation when the attorney is acting within the scope of the attorney-client relationship with regard to a particular transaction.

3. Trusts. A trust and its trustee are considered to be the same person for purposes of this regulation.

2(a)(23) Prepaid finance charge.

1. General. Prepaid finance charges must be taken into account under § 226.18(b) in computing the disclosed amount financed, and must be disclosed if the creditor provides an itemization of the amount financed under § 226.18(c).

2. Examples. Common examples of prepaid finance charges include:

. Buyer's points.

. Service fees.

. Loan fees.

. Finder's fees.

. Loan guarantee insurance.

. Credit investigation fees.

However, in order for these or any other finance charges to be considered prepaid, they must be either paid separately in cash or check or withheld from the proceeds. Prepaid finance charges include any portion of the finance charge paid prior to or at closing or settlement.

3. Exclusions. Add-on and discount finance charges are not prepaid finance charges for purposes of this regulation. Finance charges are not prepaid merely because they are precomputed, whether or not a portion of the charge will be rebated to the consumer upon prepayment. See the commentary to § 226.18(b).

4. Allocation of lump-sum payments. In a credit sale transaction involving a lump-sum payment by the consumer and a discount or other item that is a finance charge under § 226.4, the discount or other item is a prepaid finance charge to the extent the lump-sum payment is not applied to the cash price. For example, a seller sells property to a consumer for $10,000, requires the consumer to pay $3,000 at the time of the purchase, and finances the remainder as a closed-end credit transaction. The cash price of the property is $9,000. The seller is the creditor in the transaction and therefore the $1,000 difference between the credit and cash prices (the discount) is a finance charge. (See the commentary to §§ 226.4(b)(9) and 226.4(c)(5).) If the creditor applies the entire $3,000 to the cash price and adds the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

$1,000 finance charge to the interest on the $6,000 to arrive at the total finance charge, all of the $3,000 lump-sum payment is a downpayment and the discount is not a prepaid finance charge. However, if the creditor only applies $2,000 of the lump-sum payment to the cash price, then $2,000 of the $3,000 is a downpayment and the $1,000 discount is a prepaid finance charge.

2(a)(24) Residential mortgage transaction.

1. Relation to other sections. This term is important in six provisions in the regulation:

. Section 226.4(c)(7)--exclusions from the finance charge.

. Section 226.15(f)--exemption from the right of rescission.

. Section 226.18(q)--whether or not the obligation is assumable.

. Section 226.19--special timing rules.

. Section 226.20(b)--disclosure requirements for assumptions.

. Section 226.23(f)--exemption from the right of rescission.

2. Lien status. The definition is not limited to first lien transactions. For example, a consumer might assume a paid-down first mortgage (or borrow part of the purchase price) and borrow the balance of the purchase price from a creditor who takes a second mortgage. The second mortgage transaction is a residential mortgage transaction if the dwelling purchased is the consumer's principal residence.

3. Principal dwelling. A consumer can only have one principal dwelling at a time. Thus, a vacation or other second home would not be a principal dwelling. However, if a consumer buys or builds a new dwelling that will become the consumer's principal dwelling within a year or upon the completion of construction, the new dwelling is considered the principal dwelling for purposes of applying this definition to a particular transaction. See the commentary to §§ 226.15(a) and 226.23(a).

4. Construction financing. If a transaction meets the definition of a residential mortgage transaction and the creditor chooses to disclose it as several transactions under § 226.17(c)(6), each one is considered to be a residential mortgage transaction, even if different creditors are involved. For example:

. The creditor makes a construction loan to finance the initial construction of the consumer's principal dwelling, and the loan will be disbursed in 5 advances. The creditor gives 6 sets of disclosures (5 for the construction phase and 1 for the permanent phase). Each one is a residential mortgage transaction.

. One creditor finances the initial construction of the consumer's principal dwelling and another creditor makes a loan to satisfy the construction loan and provide permanent financing. Both transactions are residential mortgage transactions.

5. Acquisition. i. A residential mortgage transaction finances the acquisition of a consumer's principal dwelling. The term does not include a transaction involving a consumer's principal dwelling if the consumer had previously purchased and acquired some interest to the dwelling, even though the consumer had not acquired full legal title.

ii. Examples of new transactions involving a previously acquired dwelling include the financing of a balloon payment due under a land sale contract and an extension of credit made to a joint owner of property to buy out the other joint owner's interest. In these instances, disclosures are not required under § 226.18(q) or § 226.19(a) (assumability policies and early disclosures for residential mortgage transactions). However, the rescission rules of §§ 226.15 and 226.23 do apply to these new transactions.

iii. In other cases, the disclosure and rescission rules do not apply. For example, where a buyer enters into a written agreement with the creditor holding the seller's mortgage, allowing the buyer to assume the mortgage, if the buyer had previously purchased the property and agreed with the seller to make the mortgage payments, § 226.20(b) does not apply (assumptions involving residential mortgages).

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

6. Multiple purpose transactions. A transaction meets the definition of this section if any part of the loan proceeds will be used to finance the acquisition or initial construction of the consumer's principal dwelling. For example, a transaction to finance the initial construction of the consumer's principal dwelling is a residential mortgage transaction even if a portion of the funds will be disbursed directly to the consumer or used to satisfy a loan for the purchase of the land on which the dwelling will be built.

7. Construction on previously acquired vacant land. A residential mortgage transaction includes a loan to finance the construction of a consumer's principal dwelling on a vacant lot previously acquired by the consumer.

2(a)(25) Security interest.

1. Threshold test. The threshold test is whether a particular interest in property is recognized as a security interest under applicable law. The regulation does not determine whether a particular interest is a security interest under applicable law. If the creditor is unsure whether a particular interest is a security interest under applicable law (for example, if statutes and case law are either silent or inconclusive on the issue), the creditor may at its option consider such interests as security interests for Truth in Lending purposes. However, the regulation and the commentary do exclude specific interests, such as after-acquired property and accessories, from the scope of the definition regardless of their categorization under applicable law, and these named exclusions may not be disclosed as security interests under the regulation. (But see the discussion of exclusions elsewhere in the commentary to § 226.2(a)(25).)

2. Exclusions. The general definition of security interest excludes three groups of interests: Incidental interests, interests in after-acquired property, and interests that arise solely by operation of law. These interests may not be disclosed with the disclosures required under § 226.18, but the creditor is not precluded from preserving these rights elsewhere in the contract documents, or invoking and enforcing such rights, if it is otherwise lawful to do so. If the creditor is unsure whether a particular interest is one of the excluded interests, the creditor may, at its option, consider such interests as security interests for Truth in Lending purposes.

3. Incidental interests. Incidental interests in property that are not security interests include, among other things:

. Assignment of rents.

. Right to condemnation proceeds.

. Interests in accessories and replacements.

. Interests in escrow accounts, such as for taxes and insurance.

. Waiver of homestead or personal property rights.

The notion of an incidental interest does not encompass an explicit security interest in an insurance policy if that policy is the primary collateral for the transaction--for example, in an insurance premium financing transaction.

4. Operation of law. Interests that arise solely by operation of law are excluded from the general definition. Also excluded are interests arising by operation of law that are merely repeated or referred to in the contract. However, if the creditor has an interest that arises by operation of law, such as a vendor's lien, and takes an independent security interest in the same property, such as a UCC security interest, the latter interest is a disclosable security interest unless otherwise provided.

5. Rescission rules. Security interests that arise solely by operation of law are security interests for purposes of rescission. Examples of such interests are mechanics' and materialmen's liens.

6. Specificity of disclosure. A creditor need not separately disclose multiple security interests that it may hold in the same collateral. The creditor need only disclose that the transaction is secured by the collateral, even when security interests from prior transactions remain of record and a new security interest is taken in connection with the transaction. In disclosing the fact that the transaction is secured by the collateral, the creditor also need not disclose how the security interest arose. For example, in a closed-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

end credit transaction, a rescission notice need not specifically state that a new security interest is "acquired" or an existing security interest is "retained" in the transaction.

The acquisition or retention of a security interest in the consumer's principal dwelling instead may be disclosed in a rescission notice with a general statement such as the following: "Your home is the security for the new transaction."

2(b) Rules of construction.

1. Footnotes. Footnotes are used extensively in the regulation to provide special exceptions and more detailed explanations and examples. Material that appears in a footnote has the same legal weight as material in the body of the regulation.

2. Amount. The numerical amount must be a dollar amount unless otherwise indicated. For example, in a closed-end transaction (Subpart C), the amount financed and the amount of any payment must be expressed as a dollar amount. In some cases, an amount should be expressed as a percentage. For example, in disclosures provided before the first transaction under an open-end plan (Subpart B), creditors are permitted to explain how the amount of any finance charge will be determined; where a cash advance fee (which is a finance charge) is a percentage of each cash advance, the amount of the finance charge for that fee is expressed as a percentage.

References

Statute: Section 103.

Other sections: None.

Other regulations: Regulation E (12 CFR 205.2(d)).

Previous regulation: Sections 226.2, 226.8, and 226.9.

1981 changes: Section 226.2 implements amended section 103 of the act. Separate definitions for comparative index of credit cost, discount, organization, period, real property, real property transaction, regular price, and surcharge have been deleted. The definitions relating specifically to consumer leases are now found in the separate consumer leasing regulation, Regulation M (12 CFR Part 213).

Several terms are now defined elsewhere in the regulation or commentary rather than in § 226.2. For example, finance charge is described and explained in § 226.4, and agricultural purpose is discussed in the commentary to §226.3. Some terms, such as unauthorized use, are now defined as part of the substantive sections to which they apply. Other terms previously defined, such as customer and organization, are merged into new definitions. Section 226.2 contains new definitions for arranger of credit, business day, closed-end credit, consumer, consummation, downpayment, prepaid finance charge, and residential mortgage transaction.

The major changes in the definitions are as follows:

Arranger of credit has a significantly different meaning. It reflects the statutory amendment that limits arrangers to those who regularly arrange credit extensions for persons who are not themselves creditors. This definition was deleted effective October 1, 1982.

Billing cycle largely restates the prior definition, but requires cycles to be regular, and allows the four-day variance to be measured from a regular day as well as date. The definition also incorporates an interpretation that cycles may be no longer than quarterly.

Business day is new in the sense that the term previously appeared only in a footnote to the rescission provision, but it is now of general applicability. The general rule that it is a day when the creditor is open for business is new, but the rule for rescission purposes is the same as in the previous regulation.

Cash price now explicitly permits inclusion of various incidental charges imposed equally in cash and credit transactions.

Consumer has a narrower meaning in that guarantors, sureties, and endorsers are excluded from the general definition.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

Consumer credit reflects the new statutory exemption for agricultural credit.

Consummation is a significant departure from longstanding interpretations of the previous definition. It now focuses only on the time the consumer becomes contractually obligated, rather than the time the consumer pays a nonrefundable fee or suffers an economic penalty for failing to go forward with the credit transaction.

Credit generally parallels the previous definition, but modifies the previous interpretations of the definition by excluding more transactions.

Creditor reflects the statutory amendments to the act that were intended to eliminate the problem of multiple creditors in a transaction. The regularly standard is still used, but it is now defined in terms of the frequency of the credit extensions. The new definition also requires that there be a written agreement to pay in more than 4 installments if no finance charge is imposed. Finally, the obligation must be initially payable to a person for that person to be the creditor.

Dwelling reflects the statutory amendment that expanded the scope of the definition to include any residential structure, whether or not it is real property under state law.

Open-end credit reflects the amended statutory definition requiring that the creditor reasonably contemplate repeated transactions. The new definition no longer requires the consumer to have the privilege of paying either in installments or in full.

Periodic rate combines the previous definitions of period and periodic rate with clarification in the commentary concerning transaction charges and 360-day-year factors.

Security interest is much narrower than the previous definition. Reflecting the legislative history of the simplification amendments, incidental interests are expressly excluded from the definition. Except for purposes of rescission, interests that arise solely by operation of law are also excluded.

Section 226.3--Exempt Transactions

3(a) Business, commercial, agricultural, or organizational credit.

1. Primary purposes. A creditor must determine in each case if the transaction is primarily for an exempt purpose. If some question exists as to the primary purpose for a credit extension, the creditor is, of course, free to make the disclosures, and the fact that disclosures are made under such circumstances is not controlling on the question of whether the transaction was exempt.

2. Factors. In determining whether credit to finance an acquisition--such as securities, antiques, or art--is primarily for business or commercial purposes (as opposed to a consumer purpose), the following factors should be considered:

. The relationship of the borrower's primary occupation to the acquisition. The more closely related, the more likely it is to be business purpose.

. The degree to which the borrower will personally manage the acquisition. The more personal involvement there is, the more likely it is to be business purpose.

. The ratio of income from the acquisition to the total income of the borrower. The higher the ratio, the more likely it is to be business purpose.

. The size of the transaction. The larger the transaction, the more likely it is to be business purpose.

. The borrower's statement of purpose for the loan.

Examples of business-purpose credit include:

. A loan to expand a business, even if it is secured by the borrower's residence or personal property.

. A loan to improve a principal residence by putting in a business office.

. A business account used occasionally for consumer

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.