Exhibit 3

12 C.F.R. Pt. 226, Supp. I

**Effective: January 14, 2008**

Code of Federal Regulations Currentness
    Title 12. Banks and Banking
      Chapter II. Federal Reserve System
        Subchapter A. Board of Governors of the Federal Reserve System
          Part 226. Truth in Lending (Regulation Z) (Refs & Annos)

➡**SUPPLEMENT I TO PART 226-- OFFICIAL STAFF INTERPRETATIONS**

<For compliance date(s) of amendment(s) to supplement, see 72 FR 63462.>

Introduction

1. Official status. This commentary is the vehicle by which the staff of the Division of Consumer and Community Affairs of the Federal Reserve Board issues official staff interpretations of Regulation Z, as revised effective April 1, 1981. Good faith compliance with this commentary affords protection from liability under 130(f) of the Truth in Lending Act. Section 130(f) (15 U.S.C. 1640) protects creditors from civil liability for any act done or omitted in good faith in conformity with any interpretation issued by a duly authorized official or employee of the Federal Reserve System.

2. Procedure for requesting interpretations. Under appendix C of the regulation, anyone may request an official staff interpretation. Interpretations that are adopted will be incorporated in this commentary following publication in the Federal Register. No official staff interpretations are expected to be issued other than by means of this commentary.

3. Status of previous interpretations. All statements and opinions issued by the Federal Reserve Board and its staff interpreting previous Regulation Z remain effective until October 1, 1982, only insofar as they interpret that regulation. When compliance with revised Regulation Z becomes mandatory on October 1, 1982, the Board and staff interpretations of the previous regulation will be entirely superseded by the revised regulation and this commentary except with regard to liability under the previous regulation.

4. Rules of construction. (a) Lists that appear in the commentary may be exhaustive or illustrative; the appropriate construction should be clear from the context. In most cases, illustrative lists are introduced by phrases such as "including, but not limited to," "among other things," "for example," or "such as."

(b) Throughout the commentary and regulation, reference to the regulation should be construed to refer to revised Regulation Z, unless the context indicates that a reference to previous Regulation Z is also intended.

(c) Throughout the commentary, reference to "this section" or "this paragraph" means the section or paragraph in the regulation that is the subject of the comment.

5. Comment designations. Each comment in the commentary is identified by a number and the regulatory section or paragraph which it interprets. The comments are designated with as much specificity as possible according to the particular regulatory provision addressed. For example, some of the comments to § 226.18(b) are further divided by paragraph, such as Comment 18(b)(1)-1 and Comment 18(b)(2)-1. In other cases, comments have more general application and are designated, for example, as Comment 18-1 or Comment 18(b)-1. This introduction may be cited as Comments I-1 through I-7. Comments to the appendices may be cited, for example, as Comment app. A-1.

6. Cross-references. The following cross-references to related material appear at the end of each section of the commentary:

(a) "Statute"--those sections of the Truth in Lending Act on which the regulatory provision is based (and any other relevant statutes);

(b) "Other sections"--other provisions in the regulation necessary to understand that section;

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

advertising rules in § 226.24. Thus, if a creditor states payment information about the repayment phase, this will trigger the duty to provide additional information under § 226.16, but not under § 226.24.

7. Balloon payment. In some programs, a balloon payment will occur if only the minimum payments under the plan are made. If an advertisement for such a program contains any statement about a minimum periodic payment, the advertisement must also state that a balloon payment will result (not merely that a balloon payment "may" result). (See comment 5b(d)(5)(ii)-3 for guidance on items not required to be stated in the advertisement, and on situations in which the balloon payment requirement does not apply.)

References

Statute: Sections 141 and 143.

Previous regulation: Section 226.10(a) through (c) and Interpretation § 226.1002.

Other sections: Sections 226.2 and 226.6.

1981 changes: Section 226.16 reflects the statutory changes to section 143 of the act which reduce both the number of triggering terms and the additional disclosures required by the use of those terms. Membership or participation fees are included among the additional disclosures required when a triggering term is used. The substance of Interpretation § 226.1002, requiring disclosure of representative amounts of credit in catalogs and multiple-page advertisements, has been incorporated in simplified form in paragraph (c).

Subpart C--Closed-End Credit

Section 226.17--General Disclosure Requirements

17(a) Form of disclosures.

Paragraph 17(a)(1).

1. Clear and conspicuous. This standard requires that disclosures be in a reasonably understandable form. For example, while the regulation requires no mathematical progression or format, the disclosures

must be presented in a way that does not obscure the relationship of the terms to each other. In addition, although no minimum type size is mandated, the disclosures must be legible, whether typewritten, handwritten, or printed by computer.

2. Segregation of disclosures. The disclosures may be grouped together and segregated from other information in a variety of ways. For example, the disclosures may appear on a separate sheet of paper or may be set off from other information on the contract or other documents:

. By outlining them in a box

. By bold print dividing lines

. By a different color background

. By a different type style

(The general segregation requirement described in this subparagraph does not apply to the disclosures required under §§ 226.19(b) and 226.20(c) although the disclosures must be clear and conspicuous.)

3. Location. The regulation imposes no specific location requirements on the segregated disclosures. For example:

. They may appear on a disclosure statement separate from all other material.

. They may be placed on the same document with the credit contract or other information, so long as they are segregated from that information.

. They may be shown on the front or back of a document.

. They need not begin at the top of a page.

. They may be continued from one page to another.

4. Content of segregated disclosures. Footnotes 37 and 38 contain exceptions to the requirement that the disclosures under § 226.18 be segregated from material that is not directly related to those disclosures. Footnote 37 lists the items that may be

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

added to the segregated disclosures, even though not directly related to those disclosures. Footnote 38 lists the items required under § 226.18 that may be deleted from the segregated disclosures and appear elsewhere. Any one or more of these additions or deletions may be combined and appear either together with or separate from the segregated disclosures. The itemization of the amount financed under § 226.18(c), however, must be separate from the other segregated disclosures under § 226.18. If a creditor chooses to include the security interest charges required to be itemized under § 226.4(e) and § 226.18(o) in the amount financed itemization, it need not list these charges elsewhere.

5. Directly related. The segregated disclosures may, at the creditor's option, include any information that is directly related to those disclosures. The following is directly related information:

i. A description of a grace period after which a late payment charge will be imposed. For example, the disclosure given under § 226.18(l) may state that a late charge will apply to "any payment received more than 15 days after the due date."

ii. A statement that the transaction is not secured. For example, the creditor may add a category labelled "unsecured" or "not secured" to the security interest disclosures given under § 226.18(m).

iii. The basis for any estimates used in making disclosures. For example, if the maturity date of a loan depends solely on the occurrence of a future event, the creditor may indicate that the disclosures assume that event will occur at a certain time.

iv. The conditions under which a demand feature may be exercised. For example, in a loan subject to demand after five years, the disclosures may state that the loan will become payable on demand in five years.

v. An explanation of the use of pronouns or other references to the parties to the transaction. For example, the disclosures may state, " 'You' refers to the customer and 'we' refers to the creditor."

vi. Instructions to the creditor or its employees on the use of a multiple-purpose form. For example, the disclosures may state, "Check box if applicable."

vii. A statement that the borrower may pay a minimum finance charge upon prepayment in a simple-interest transaction. For example, when state law prohibits penalties, but would allow a minimum finance charge in the event of prepayment, the creditor may make the § 226.18(k)(1) disclosure by stating, "You may be charged a minimum finance charge."

viii. A brief reference to negative amortization in variable-rate transactions. For example, in the variable-rate disclosure, the creditor may include a short statement such as "Unpaid interest will be added to principal." (See the commentary to § 226.18(f)(1)(iii).)

ix. A brief caption identifying the disclosures. For example, the disclosures may bear a general title such as "Federal Truth in Lending Disclosures" or a descriptive title such as "Real Estate Loan Disclosures."

x. A statement that a due-on-sale clause or other conditions on assumption are contained in the loan document. For example, the disclosure given under § 226.18(q) may state, "Someone buying your home may, subject to conditions in the due-on-sale clause contained in the loan document, assume the remainder of the mortgage on the original terms."

xi. If a state or Federal law prohibits prepayment penalties and excludes the charging of interest after prepayment from coverage as a penalty, a statement that the borrower may have to pay interest for some period after prepayment in full. The disclosure given under § 226.18(k) may state, for example, "If you prepay your loan on other than the regular installment date, you may be assessed interest charges until the end of the month."

xii. More than one hypothetical example under § 226.18(f)(1)(iv) in transactions with more than one variable-rate feature. For example, in a variable-rate transaction with an option permitting consumers to convert to a fixed-rate transaction, the disclosures may include an example illustrating the effects on the payment terms of an increase resulting from conversion in addition to the example illustrating an increase resulting from changes in the index.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

xiii. The disclosures set forth under § 226.18(f)(1) for variable-rate transactions subject to § 226.18(f)(2).

xiv. A statement whether or not a subsequent purchaser of the property securing an obligation may be permitted to assume the remaining obligation on its original terms.

xv. A late-payment fee disclosure under § 226.18(l) on a single payment loan.

6. Multiple-purpose forms. The creditor may design a disclosure statement that can be used for more than one type of transaction, so long as the required disclosures for individual transactions are clear and conspicuous. (See the Commentary to appendices G and H for a discussion of the treatment of disclosures that do not apply to specific transactions.) Any disclosure listed in § 226.18 (except the itemization of the amount financed under § 226.18(c)) may be included on a standard disclosure statement even though not all of the creditor's transactions include those features. For example, the statement may include:

. The variable rate disclosure under § 226.18(f).

. The demand feature disclosure under § 226.18(i).

. A reference to the possibility of a security interest arising from a spreader clause, under § 226.18(m).

. The assumption policy disclosure under § 226.18(q).

. The required deposit disclosure under § 226.18(r).

7. Balloon payment financing with leasing characteristics. In certain credit sale or loan transactions, a consumer may reduce the dollar amount of the payments to be made during the course of the transaction by agreeing to make, at the end of the loan term, a large final payment based on the expected residual value of the property. The consumer may have a number of options with respect to the final payment, including, among other things, retaining the property and making the final payment, refinancing the final payment, or transferring the property to the creditor in lieu of the final payment.

Such transactions may have some of the characteristics of lease transactions subject to Regulation M, but are considered credit transactions where the consumer assumes the indicia of ownership, including the risks, burdens and benefits of ownership upon consummation. These transactions are governed by the disclosure requirements of this regulation instead of Regulation M. Creditors should not include in the segregated Truth in Lending disclosures additional information. Thus, disclosures should show the large final payment in the payment schedule and should not, for example, reflect the other options available to the consumer at maturity.

Paragraph 17(a)(2).

1. When disclosures must be more conspicuous. The following rules apply to the requirement that the terms annual percentage rate and finance charge be shown more conspicuously:

. The terms must be more conspicuous only in relation to the other required disclosures under § 226.18. For example, when the disclosures are included on the contract document, those 2 terms need not be more conspicuous as compared to the heading on the contract document or information required by state law.

. The terms need not be more conspicuous except as part of the finance charge and annual percentage rate disclosures under § 226.18(d) and (e), although they may, at the creditor's option, be highlighted wherever used in the required disclosures. For example, the terms may, but need not, be highlighted when used in disclosing a prepayment penalty under § 226.18(k) or a required deposit under § 226.18(r).

. The creditor's identity under § 226.18(a) may, but need not, be more prominently displayed than the finance charge and annual percentage rate.

. The terms need not be more conspicuous than figures (including, for example, numbers, percentages, and dollar signs).

2. Making disclosures more conspicuous. The terms finance charge and annual percentage rate may be made more conspicuous in any way that highlights them in relation to the other required disclosures. For

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

example, they may be:

. Capitalized when other disclosures are printed in capital and lower case.

. Printed in larger type, bold print or different type face.

. Printed in a contrasting color.

. Underlined.

. Set off with asterisks.

17(b) Time of disclosures.

1. Consummation. As a general rule, disclosures must be made before "consummation" of the transaction. The disclosures need not be given by any particular time before consummation, except in certain mortgage transactions and variable-rate transactions secured by the consumer's principal dwelling with a term greater than one year under § 226.19. (See the commentary to § 226.2(a)(13) regarding the definition of consummation.)

2. Converting open-end to closed-end credit. Except for home equity plans subject to § 226.5b in which the agreement provides for a repayment phase, if an open-end credit account is converted to a closed-end transaction under a written agreement with the consumer, the creditor must provide a set of closed-end credit disclosures before consummation of the closed-end transaction. (See the commentary to § 226.19(b) for the timing rules for additional disclosures required upon the conversion to a variable-rate transaction secured by a consumer's principal dwelling with a term greater than one year.) If consummation of the closed-end transaction occurs at the same time as the consumer enters into the open-end agreement, the closed-end credit disclosures may be given at the time of conversion. If disclosures are delayed until conversion and the closed-end transaction has a variable-rate feature, disclosures should be based on the rate in effect at the time of conversion. (See the commentary to § 226.5 regarding conversion of closed-end to open-end credit.)

3. Disclosures provided on credit contracts. Creditors must give the required disclosures to the consumer in writing, in a form that the consumer may keep, before consummation of the transaction. See § 226.17(a)(1) and (b). Sometimes the disclosures are placed on the same document with the credit contract. Creditors are not required to give the consumer two separate copies of the document before consummation, one for the consumer to keep and a second copy for the consumer to execute. The disclosure requirement is satisfied if the creditor gives a copy of the document containing the unexecuted credit contract and disclosures to the consumer to read and sign; and the consumer receives a copy to keep at the time the consumer becomes obligated. It is not sufficient for the creditor merely to show the consumer the document containing the disclosures before the consumer signs and becomes obligated. The consumer must be free to take possession of and review the document in its entirety before signing.

i. Example. To illustrate:

A. A creditor gives a consumer a multiple-copy form containing a credit agreement and TILA disclosures. The consumer reviews and signs the form and returns it to the creditor, who separates the copies and gives one copy to the consumer to keep. The creditor has satisfied the disclosure requirement.

17(c) Basis of disclosures and use of estimates.

Paragraph 17(c)(1).

1. Legal obligation. The disclosures shall reflect the credit terms to which the parties are legally bound as of the outset of the transaction. In the case of disclosures required under § 226.20(c), the disclosures shall reflect the credit terms to which the parties are legally bound when the disclosures are provided. The legal obligation is determined by applicable state law or other law. (Certain transactions are specifically addressed in this commentary. See, for example, the discussion of buydown transactions elsewhere in the commentary to § 226.17(c).)

. The fact that a term or contract may later be deemed unenforceable by a court on the basis of equity or other grounds does not, by itself, mean that disclosures based on that term or contract did not reflect the legal obligation.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

2. Modification of obligation. The legal obligation normally is presumed to be contained in the note or contract that evidences the agreement. But this presumption is rebutted if another agreement between the parties legally modifies that note or contract. If the parties informally agree to a modification of the legal obligation, the modification should not be reflected in the disclosures unless it rises to the level of a change in the terms of the legal obligation. For example:

. If the creditor offers a preferential rate, such as an employee preferred rate, the disclosures should reflect the terms of the legal obligation. (See the commentary to § 226.19(b) for an example of a preferred-rate transaction that is a variable-rate transaction.)

. If the contract provides for a certain monthly payment schedule but payments are made on a voluntary payroll deduction plan or an informal principal-reduction agreement, the disclosures should reflect the schedule in the contract.

. If the contract provides for regular monthly payments but the creditor informally permits the consumer to defer payments from time to time, for instance, to take account of holiday seasons or seasonal employment, the disclosures should reflect the regular monthly payments.

3. Third-party buydowns. In certain transactions, a seller or other third party may pay an amount, either to the creditor or to the consumer, in order to reduce the consumer's payments or buy down the interest rate for all or a portion of the credit term. For example, a consumer and a bank agree to a mortgage with an interest rate of 15% and level payments over 25 years. By a separate agreement, the seller of the property agrees to subsidize the consumer's payments for the first 2 years of the mortgage, giving the consumer an effective rate of 12% for that period.

. If the lower rate is reflected in the credit contract between the consumer and the bank, the disclosures must take the buydown into account. For example, the annual percentage rate must be a composite rate that takes account of both the lower initial rate and the higher subsequent rate, and the payment schedule disclosures must reflect the 2 payment levels.

However, the amount paid by the seller would not be specifically reflected in the disclosures given by the bank, since that amount constitutes seller's points and thus is not part of the finance charge.

. If the lower rate is not reflected in the credit contract between the consumer and the bank and the consumer is legally bound to the 15% rate from the outset, the disclosures given by the bank must not reflect the seller buydown in any way. For example, the annual percentage rate and payment schedule would not take into account the reduction in the interest rate and payment level for the first 2 years resulting from the buydown.

4. Consumer buydowns. In certain transactions, the consumer may pay an amount to the creditor to reduce the payments or obtain a lower interest rate on the transaction. Consumer buydowns must be reflected in the disclosures given for that transaction. To illustrate, in a mortgage transaction, the creditor and consumer agree to a note specifying a 14 percent interest rate. However, in a separate document, the consumer agrees to pay an amount to the creditor at consummation in return for a reduction in the interest rate to 12 percent for a portion of the mortgage term. The amount paid by the consumer may be deposited in an escrow account or may be retained by the creditor. Depending upon the buydown plan, the consumer's prepayment of the obligation may or may not result in a portion of the amount being credited or refunded to the consumer. In the disclosures given for the mortgage, the creditor must reflect the terms of the buydown agreement. For example:

. The amount paid by the consumer is a prepaid finance charge (even if deposited in an escrow account).

. A composite annual percentage rate must be calculated, taking into account both interest rates, as well as the effect of the prepaid finance charge.

. The payment schedule must reflect the multiple payment levels resulting from the buydown.

The rules regarding consumer buydowns do not apply to transactions known as "lender buydowns." In lender buydowns, a creditor pays an amount (either into an account or to the party to whom the obligation is sold) to reduce the consumer's payments or interest

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

rate for all or a portion of the credit term. Typically, these transactions are structured as a buydown of the interest rate during an initial period of the transaction with a higher than usual rate for the remainder of the term. The disclosures for lender buydowns should be based on the terms of the legal obligation between the consumer and the creditor. (See comment 17(c)(1)-3 for the analogous rules concerning third-party buydowns.)

5. Split buydowns. In certain transactions, a third party (such as a seller) and a consumer both pay an amount to the creditor to reduce the interest rate. The creditor must include the portion paid by the consumer in the finance charge and disclose the corresponding multiple payment levels and composite annual percentage rate. The portion paid by the third party and the corresponding reduction in interest rate, however, should not be reflected in the disclosures unless the lower rate is reflected in the credit contract. (See the discussion on third-party and consumer buydown transactions elsewhere in the commentary to § 226.17(c).)

6. Wrap-around financing. Wrap-around transactions, usually loans, involve the creditor's wrapping the outstanding balance on an existing loan and advancing additional funds to the consumer. The pre-existing loan, which is wrapped, may be to the same consumer or to a different consumer. In either case, the consumer makes a single payment to the new creditor, who makes the payments on the pre-existing loan to the original creditor. Wrap-around loans or sales are considered new single-advance transactions, with an amount financed equalling the sum of the new funds advanced by the wrap creditor and the remaining principal owed to the original creditor on the pre-existing loan. In disclosing the itemization of the amount financed, the creditor may use a label such as "the amount that will be paid to creditor X" to describe the remaining principal balance on the pre-existing loan. This approach to Truth in Lending calculations has no effect on calculations required by other statutes, such as state usury laws.

7. Wrap-around financing with balloon payments. For wrap-around transactions involving a large final payment of the new funds before the maturity of the pre-existing loan, the amount financed is the sum of the new funds and the remaining principal on the pre-existing loan. The disclosures should be based on the

shorter term of the wrap loan, with a large final payment of both the new funds and the total remaining principal on the pre-existing loan (although only the wrap loan will actually be paid off at that time).

8. Basis of disclosures in variable-rate transactions. The disclosures for a variable-rate transaction must be given for the full term of the transaction and must be based on the terms in effect at the time of consummation. Creditors should base the disclosures only on the initial rate and should not assume that this rate will increase. For example, in a loan with an initial rate of 10 percent and a 5 percentage points rate cap, creditors should base the disclosures on the initial rate and should not assume that this rate will increase 5 percentage points. However, in a variable-rate transaction with a seller buydown that is reflected in the credit contract, a consumer buydown, or a discounted or premium rate, disclosures should not be based solely on the initial terms. In those transactions, the disclosed annual percentage rate should be a composite rate based on the rate in effect during the initial period and the rate that is the basis of the variable-rate feature for the remainder of the term. (See the commentary to § 226.17(c) for a discussion of buydown, discounted, and premium transactions and the commentary to section 226.19(a)(2) for a discussion of the redisclosure in certain residential mortgage transactions with a variable-rate feature).

9. Use of estimates in variable-rate transactions. The variable-rate feature does not, by itself, make the disclosures estimates.

10. Discounted and premium variable-rate transactions. In some variable-rate transactions, creditors may set an initial interest rate that is not determined by the index or formula used to make later interest rate adjustments. Typically, this initial rate charged to consumers is lower than the rate would be if it were calculated using the index or formula. However, in some cases the initial rate may be higher. In a discounted transaction, for example, a creditor may calculate interest rates according to a formula using the six-month Treasury bill rate plus a 2 percent margin. If the Treasury bill rate at consummation is 10 percent, the creditor may forgo the 2 percent spread and charge only 10 percent for a limited time, instead of setting an initial rate of 12

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

percent.

i. When creditors use an initial interest rate that is not calculated using the index or formula for later rate adjustments, the disclosures should reflect a composite annual percentage rate based on the initial rate for as long as it is charged and, for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation. The rate at consummation need not be used if a contract provides for a delay in the implementation of changes in an index value. For example, if the contract specifies that rate changes are based on the index value in effect 45 days before the change date, creditors may use any index value in effect during the 45 day period before consummation in calculating a composite annual percentage rate.

ii. The effect of the multiple rates must also be reflected in the calculation and disclosure of the finance charge, total of payments, and payment schedule.

iii. If a loan contains a rate or payment cap that would prevent the initial rate or payment, at the time of the first adjustment, from changing to the rate determined by the index or formula at consummation, the effect of that rate or payment cap should be reflected in the disclosures.

iv. Because these transactions involve irregular payment amounts, an annual percentage rate tolerance of 1/4 of 1 percent applies, in accordance with § 226.22(a)(3).

v. Examples of discounted variable-rate transactions include:

A. A 30-year loan for $100,000 with no prepaid finance charges and rates determined by the Treasury bill rate plus 2 percent. Rate and payment adjustments are made annually. Although the Treasury bill rate at the time of consummation is 10 percent, the creditor sets the interest rate for one year at 9 percent, instead of 12 percent according to the formula. The disclosures should reflect a composite annual percentage rate of 11.63 percent based on 9 percent for one year and 12 percent for 29 years. Reflecting those rate levels, the payment schedule should show 12 payments of $804.62 and 348 payments of $1,025.31. The finance charge

should be $266,463.32 and the total of payments $366,463.32.

B. Same loan as above, except with a 2 percent rate cap on periodic adjustments. The disclosures should reflect a composite annual percentage rate of 11.53 percent based on 9 percent for the first year, 11 percent for the second year, and 12 percent for the remaining 28 years. Reflecting those three rate levels, the payment schedule should show 12 payments of $804.62, 12 payments of $950.09, and 336 payments of $1,024.34. The finance charge should be $265,234.76 and the total of payments $365,234.76.

C. Same loan as above, except with a 7 1/2 percent cap on payment adjustments. The disclosures should reflect a composite annual percentage rate of 11.64 percent, based on 9 percent for one year and 12 percent for 29 years. Because of the payment cap, five levels of payments should be reflected. The payment schedule should show 12 payments of $804.62, 12 payments of $864.97, 12 payments of $929.84, 12 payments of $999.58, and 312 payments of $1,070.04. The finance charge should be $277,040.60, and the total of payments $377,040.60.

vi. A loan in which the initial interest rate is set according to the index or formula used for later adjustments but is not set at the value of the index or formula at consummation is not a discounted variable-rate loan. For example, if a creditor commits to an initial rate based on the formula on a date prior to consummation, but the index has moved during the period between that time and consummation, a creditor should base its disclosures on the initial rate.

11. Examples of variable-rate transactions. Variable-rate transactions include:

. Renewable balloon-payment instruments where the creditor is both unconditionally obligated to renew the balloon-payment loan at the consumer's option (or is obligated to renew subject to conditions within the consumer's control) and has the option of increasing the interest rate at the time of renewal. Disclosures must be based on the payment amortization (unless the specified term of the obligation with renewals is shorter) and on the rate in effect at the time of consummation of the transaction. (Examples of conditions within a consumer's control include requirements that a consumer be current in payments

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

or continue to reside in the mortgaged property. In contrast, setting a limit on the rate at which the creditor would be obligated to renew or reserving the right to change the credit standards at the time of renewal are examples of conditions outside a consumer's control.) If, however, a creditor is not obligated to renew as described above, disclosures must be based on the term of the balloon-payment loan. Disclosures also must be based on the term of the balloon-payment loan in balloon-payment instruments in which the legal obligation provides that the loan will be renewed by a "refinancing" of the obligation, as that term is defined by § 226.20(a). If it cannot be determined from the legal obligation that the loan will be renewed by a "refinancing," disclosures must be based either on the term of the balloon-payment loan or on the payment amortization, depending on whether the creditor is unconditionally obligated to renew the loan as described above. (This discussion does not apply to construction loans subject to § 226.17(c)(6).)

. "Shared-equity" or "shared-appreciation" mortgages that have a fixed rate of interest and an appreciation share based on the consumer's equity in the mortgaged property. The appreciation share is payable in a lump sum at a specified time. Disclosures must be based on the fixed interest rate. (As discussed in the commentary to § 226.2, other types of shared-equity arrangements are not considered "credit" and are not subject to Regulation Z.)

. Preferred-rate loans where the terms of the legal obligation provide that the initial underlying rate is fixed but will increase upon the occurrence of some event, such as an employee leaving the employ of the creditor, and the note reflects the preferred rate. The disclosures are to be based on the preferred rate.

. Graduated-payment mortgages and step-rate transactions without a variable-rate feature are not considered variable-rate transactions.

. "Price level adjusted mortgages" or other indexed mortgages that have a fixed rate of interest but provide for periodic adjustments to payments and the loan balance to reflect changes in an index measuring prices or inflation. Disclosures are to be based on the fixed interest rate.

12. Graduated payment adjustable rate mortgages. These mortgages involve both a variable interest rate and scheduled variations in payment amounts during the loan term. For example, under these plans, a series of graduated payments may be scheduled before rate adjustments affect payment amounts, or the initial scheduled payment may remain constant for a set period before rate adjustments affect the payment amount. In any case, the initial payment amount may be insufficient to cover the scheduled interest, causing negative amortization from the outset of the transaction. In these transactions, the disclosures should treat these features as follows:

. The finance charge includes the amount of negative amortization based on the assumption that the rate in effect at consummation remains unchanged.

. The amount financed does not include the amount of negative amortization.

. As in any variable-rate transaction, the annual percentage rate is based on the terms in effect at consummation.

. The schedule of payments discloses the amount of any scheduled initial payments followed by an adjusted level of payments based on the initial interest rate. Since some mortgage plans contain limits on the amount of the payment adjustment, the payment schedule may require several different levels of payments, even with the assumption that the original interest rate does not increase.

13. Growth-equity mortgages. Also referred to as payment-escalated mortgages, these mortgage plans involve scheduled payment increases to prematurely amortize the loan. The initial payment amount is determined as for a long-term loan with a fixed interest rate. Payment increases are scheduled periodically, based on changes in an index. The larger payments result in accelerated amortization of the loan. In disclosing these mortgage plans, creditors may either:

. Estimate the amount of payment increases, based on the best information reasonably available; or

. Disclose by analogy to the variable-rate disclosures in 226.18(f)(1).

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

(This discussion does not apply to growth-equity mortgages in which the amount of payment increases can be accurately determined at the time of disclosure. For these mortgages, as for graduated-payment mortgages, disclosures should reflect the scheduled increases in payments.)

14. Reverse mortgages. Reverse mortgages, also known as reverse annuity or home equity conversion mortgages, typically involve the disbursement of monthly advances to the consumer for a fixed period or until the occurrence of an event such as the consumer's death. Repayment of the loan (generally a single payment of principal and accrued interest) may be required to be made at the end of the disbursements or, for example, upon the death of the consumer. In disclosing these transactions, creditors must apply the following rules, as applicable:

. If the reverse mortgage has a specified period for disbursements but repayment is due only upon the occurrence of a future event such as the death of the consumer, the creditor must assume that disbursements will be made until they are scheduled to end. The creditor must assume repayment will occur when disbursements end (or within a period following the final disbursement which is not longer than the regular interval between disbursements). This assumption should be used even though repayment may occur before or after the disbursements are scheduled to end. In such cases, the creditor may include a statement such as "The disclosures assume that you will repay the loan at the time our payments to you end. As provided in your agreement, your repayment may be required at a different time."

. If the reverse mortgage has neither a specified period for disbursements nor a specified repayment date and these terms will be determined solely by reference to future events including the consumer's death, the creditor may assume that the disbursements will end upon the consumer's death (estimated by using actuarial tables, for example) and that repayment will be required at the same time (or within a period following the date of the final disbursement which is not longer than the regular interval for disbursements). Alternatively, the creditor may base the disclosures upon another future event it estimates will be most likely to occur first. (If

terms will be determined by reference to future events which do not include the consumer's death, the creditor must base the disclosures upon the occurrence of the event estimated to be most likely to occur first.)

. In making the disclosures, the creditor must assume that all disbursements and accrued interest will be paid by the consumer. For example, if the note has a nonrecourse provision providing that the consumer is not obligated for an amount greater than the value of the house, the creditor must nonetheless assume that the full amount to be disbursed will be repaid. In this case, however, the creditor may include a statement such as "The disclosures assume full repayment of the amount advanced plus accrued interest, although the amount you may be required to pay is limited by your agreement."

. Some reverse mortgages provide that some or all of the appreciation in the value of the property will be shared between the consumer and the creditor. Such loans are considered variable-rate mortgages, as described in comment 17(c)(1)-11, and the appreciation feature must be disclosed in accordance with § 226.18(f)(1). If the reverse mortgage has a variable interest rate, is written for a term greater than one year, and is secured by the consumer's principal dwelling, the shared appreciation feature must be described under § 226.19(b)(2)(vii).

15. Morris Plan transactions. When a deposit account is created for the sole purpose of accumulating payments and then is applied to satisfy entirely the consumer's obligation in the transaction, each deposit made into the account is considered the same as a payment on a loan for purposes of making disclosures.

16. Number of transactions. Creditors have flexibility in handling credit extensions that may be viewed as multiple transactions. For example:

. When a creditor finances the credit sale of a radio and a television on the same day, the creditor may disclose the sales as either 1 or 2 credit sale transactions.

. When a creditor finances a loan along with a credit sale of health insurance, the creditor may disclose in one of several ways: a single credit sale transaction, a

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

single loan transaction, or a loan and a credit sale transaction.

. The separate financing of a downpayment in a credit sale transaction may, but need not, be disclosed as 2 transactions (a credit sale and a separate transaction for the financing of the downpayment).

17. Special rules for tax refund anticipation loans. Tax refund loans, also known as refund anticipation loans (RALs), are transactions in which a creditor will lend up to the amount of a consumer's expected tax refund. RAL agreements typically require repayment upon demand, but also may provide that repayment is required when the refund is made. The agreements also typically provide that if the amount of the refund is less than the payment due, the consumer must pay the difference. Repayment often is made by a preauthorized offset to a consumer's account held with the creditor when the refund has been deposited by electronic transfer. Creditors may charge fees for RALs in addition to fees for filing the consumer's tax return electronically. In RAL transactions subject to the regulation the following special rules apply:

. If, under the terms of the legal obligation, repayment of the loan is required when the refund is received by the consumer (such as by deposit into the consumer's account), the disclosures should be based on the creditor's estimate of the time the refund will be delivered even if the loan also contains a demand clause. The practice of a creditor to demand repayment upon delivery of refunds does not determine whether the legal obligation requires that repayment be made at that time; this determination must be made according to applicable state or other law. (See comment 17(c)(5)-1 for the rules regarding disclosures if the loan is payable solely on demand or is payable either on demand or on an alternate maturity date.)

. If the consumer is required to repay more than the amount borrowed, the difference is a finance charge unless excluded under § 226.4. In addition, to the extent that any fees charged in connection with the loan (such as for filing the tax return electronically) exceed those for a comparable cash transaction (that is, filing the tax return electronically without a loan), the difference must be included in the finance charge.

18. Pawn Transactions. When, in connection with an extension of credit, a consumer pledges or sells an item to a pawnbroker creditor in return for a sum of money and retains the right to redeem the item for a greater sum (the redemption price) within a specified period of time, disclosures are required. In addition to other disclosure requirements that may be applicable under § 226.18, for purposes of pawn transactions:

i. The amount financed is the initial sum paid to the consumer. The pawnbroker creditor need not provide a separate itemization of the amount financed if that entire amount is paid directly to the consumer and the disclosed description of the amount financed is "the amount of cash given directly to you" or a similar phrase.

ii. The finance charge is the difference between the initial sum paid to the consumer and the redemption price plus any other finance charges paid in connection with the transaction. (See § 226.4.)

iii. The term of the transaction, for calculating the annual percentage rate, is the period of time agreed to by the pawnbroker creditor and the consumer. The term of the transaction does not include a grace period (including any statutory grace period) after the agreed redemption date.

Paragraph 17(c)(2)(i).

1. Basis for estimates. Disclosures may be estimated when the exact information is unknown at the time disclosures are made. Information is unknown if it is not reasonably available to the creditor at the time the disclosures are made. The "reasonably available" standard requires that the creditor, acting in good faith, exercise due diligence in obtaining information. For example, the creditor must at a minimum utilize generally accepted calculation tools, but need not invest in the most sophisticated computer program to make a particular type of calculation. The creditor normally may rely on the representations of other parties in obtaining information. For example, the creditor might look to the consumer for the time of consummation, to insurance companies for the cost of insurance, or to realtors for taxes and escrow fees. The creditor may utilize estimates in making disclosures even though the creditor knows that more precise information will be available by the point of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

consummation. However, new disclosures may be required under § 226.17(f) or § 226.19.

2. Labelling estimates. Estimates must be designated as such in the segregated disclosures. Even though other disclosures are based on the same assumption on which a specific estimated disclosure was based, the creditor has some flexibility in labelling the estimates. Generally, only the particular disclosure for which the exact information is unknown is labelled as an estimate. However, when several disclosures are affected because of the unknown information, the creditor has the option of labelling either every affected disclosure or only the disclosure primarily affected. For example, when the finance charge is unknown because the date of consummation is unknown, the creditor must label the finance charge as an estimate and may also label as estimates the total of payments and the payment schedule. When many disclosures are estimates, the creditor may use a general statement, such as "all numerical disclosures except the late payment disclosure are estimates," as a method to label those disclosures as estimates.

3. Simple-interest transactions. If consumers do not make timely payments in a simple-interest transaction, some of the amounts calculated for Truth in Lending disclosures will differ from amounts that consumers will actually pay over the term of the transaction. Creditors may label disclosures as estimates in these transactions. For example, because the finance charge and total of payments may be larger than disclosed if consumers make late payments, creditors may label the finance charge and total of payments as estimates. On the other hand, creditors may choose not to label disclosures as estimates and may base all disclosures on the assumption that payments will be made on time, disregarding any possible inaccuracies resulting from consumers' payment patterns.

Paragraph 17(c)(2)(ii).

1. Per-diem interest. This paragraph applies to any numerical amount (such as the finance charge, annual percentage rate, or payment amount) that is affected by the amount of the per-diem interest charge that will be collected at consummation. If the amount of per-diem interest used in preparing the disclosures for consummation is based on the information known to the creditor at the time the disclosure document is prepared, the disclosures are considered accurate under this rule, and affected disclosures are also considered accurate, even if the disclosures are not labeled as estimates. For example, if the amount of per-diem interest used to prepare disclosures is less than the amount of per-diem interest charged at consummation, and as a result the finance charge is understated by $200, the disclosed finance charge is considered accurate even though the understatement is not within the $100 tolerance of § 226.18(d)(1), and the finance charge was not labeled as an estimate. In this example, if in addition to the understatement related to the per-diem interest, a $90 fee is incorrectly omitted from the finance charge, causing it to be understated by a total of $290, the finance charge is considered accurate because the $90 fee is within the tolerance in § 226.18(d)(1).

Paragraph 17(c)(3)

1. Minor variations. Section 226.17(c)(3) allows creditors to disregard certain factors in calculating and making disclosures. For example:

. Creditors may ignore the effects of collecting payments in whole cents. Because payments cannot be collected in fractional cents, it is often difficult to amortize exactly an obligation with equal payments; the amount of the last payment may require adjustment to account for the rounding of the other payments to whole cents.

. Creditors may base their disclosures on calculation tools that assume that all months have an equal number of days, even if their practice is to take account of the variations in months for purposes of collecting interest. For example, a creditor may use a calculation tool based on a 360-day year, when it in fact collects interest by applying a factor of 1/365 of the annual rate to 365 days. This rule does not, however, authorize creditors to ignore, for disclosure purposes, the effects of applying 1/360 of an annual rate to 365 days.

2. Use of special rules. A creditor may utilize the special rules in § 226.17(c)(3) for purposes of calculating and making all disclosures for a transaction or may, at its option, use the special rules for some disclosures and not others.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

Paragraph 17(c)(4).

1. Payment schedule irregularities. When one or more payments in a transaction differ from the others because of a long or short first period, the variations may be ignored in disclosing the payment schedule, finance charge, annual percentage rate, and other terms. For example:

. A 36-month auto loan might be consummated on June 8 with payments due on July 1 and the first of each succeeding month. The creditor may base its calculations on a payment schedule that assumes 36 equal intervals and 36 equal installment payments, even though a precise computation would produce slightly different amounts because of the shorter first period.

. By contrast, in the same example, if the first payment were not scheduled until August 1, the irregular first period would exceed the limits in § 226.17(c)(4); the creditor could not use the special rule and could not ignore the extra days in the first period in calculating its disclosures.

2. Measuring odd periods. In determining whether a transaction may take advantage of the rule in § 226.17(c)(4), the creditor must measure the variation against a regular period. For purposes of that rule:

. The first period is the period from the date on which the finance charge begins to be earned to the date of the first payment.

. The term is the period from the date on which the finance charge begins to be earned to the date of the final payment.

. The regular period is the most common interval between payments in the transaction.

In transactions involving regular periods that are monthly, semimonthly or multiples of a month, the length of the irregular and regular periods may be calculated on the basis of either the actual number of days or an assumed 30- day month. In other transactions, the length of the periods is based on the actual number of days.

3. Use of special rules. A creditor may utilize the special rules in § 226.17(c)(4) for purposes of calculating and making some disclosures but may elect not to do so for all of the disclosures. For example, the variations may be ignored in calculating and disclosing the annual percentage rate but taken into account in calculating and disclosing the finance charge and payment schedule.

4. Relation to prepaid finance charges. Prepaid finance charges, including "odd-days" or "per-diem" interest, paid prior to or at closing may not be treated as the first payment on a loan. Thus, creditors may not disregard an irregularity in disclosing such finance charges.

Paragraph 17(c)(5).

1. Demand disclosures. Disclosures for demand obligations are based on an assumed 1-year term, unless an alternate maturity date is stated in the legal obligation. Whether an alternate maturity date is stated in the legal obligation is determined by applicable law. An alternate maturity date is not inferred from an informal principal reduction agreement or a similar understanding between the parties. However, when the note itself specifies a principal reduction schedule (for example, "payable on demand or $2,000 plus interest quarterly"), an alternate maturity is stated and the disclosures must reflect that date.

2. Future event as maturity date. An obligation whose maturity date is determined solely by a future event, as for example, a loan payable only on the sale of property, is not a demand obligation. Because no demand feature is contained in the obligation, demand disclosures under § 226.18(i) are inapplicable. The disclosures should be based on the creditor's estimate of the time at which the specified event will occur, and may indicate the basis for the creditor's estimate, as noted in the commentary to § 226.17(a).

3. Demand after stated period. Most demand transactions contain a demand feature that may be exercised at any point during the term, but certain transactions convert to demand status only after a fixed period. For example, in States prohibiting due-on-sale clauses, the Federal National Mortgage Association (FNMA) requires mortgages that it purchases to include a call option rider that may be

12 C.F.R. Pt. 226, Supp. I

exercised after 7 years. These mortgages are generally written as long-term obligations, but contain a demand feature that may be exercised only within a 30-day period at 7 years. The disclosures for these transactions should be based upon the legally agreed-upon maturity date. Thus, if a mortgage containing the 7-year FNMA call option is written as a 20- year obligation, the disclosures should be based on the 20-year term, with the demand feature disclosed under § 226.18(i).

4. Balloon mortgages. Balloon payment mortgages, with payments based on a long-term amortization schedule and a large final payment due after a shorter term, are not demand obligations unless a demand feature is specifically contained in the contract. For example, a mortgage with a term of 5 years and a payment schedule based on 20 years would not be treated as a mortgage with a demand feature, in the absence of any contractual demand provisions. In this type of mortgage, disclosures should be based on the 5-year term.

Paragraph 17(c)(6).

1. Series of advances. Section 226.17(c)(6)(i) deals with a series of advances under an agreement to extend credit up to a certain amount. A creditor may treat all of the advances as a single transaction or disclose each advance as a separate transaction. If these advances are treated as 1 transaction and the timing and amounts of advances are unknown, creditors must make disclosures based on estimates, as provided in § 226.17(c)(2). If the advances are disclosed separately, disclosures must be provided before each advance occurs, with the disclosures for the first advance provided by consummation.

2. Construction loans. Section 226.17(c)(6)(ii) provides a flexible rule for disclosure of construction loans that may be permanently financed. These transactions have 2 distinct phases, similar to 2 separate transactions. The construction loan may be for initial construction or subsequent construction, such as rehabilitation or remodeling. The construction period usually involves several disbursements of funds at times and in amounts that are unknown at the beginning of that period, with the consumer paying only accrued interest until construction is completed. Unless the obligation is paid at that time, the loan then converts to permanent

financing in which the loan amount is amortized just as in a standard mortgage transaction. Section 226.17(c)(6)(ii) permits the creditor to give either one combined disclosure for both the construction financing and the permanent financing, or a separate set of disclosures for the 2 phases. This rule is available whether the consumer is initially obligated to accept construction financing only or is obligated to accept both construction and permanent financing from the outset. If the consumer is obligated on both phases and the creditor chooses to give 2 sets of disclosures, both sets must be given to the consumer initially, because both transactions would be consummated at that time. (Appendix D provides a method of calculating the annual percentage rate and other disclosures for construction loans, which may be used, at the creditor's option, in disclosing construction financing.)

3. Multiple-advance construction loans. Section 226.17(c)(6)(i) and (ii) are not mutually exclusive. For example, in a transaction that finances the construction of a dwelling that may be permanently financed by the same creditor, the construction phase may consist of a series of advances under an agreement to extend credit up to a certain amount. In these cases, the creditor may disclose the construction phase as either 1 or more than 1 transaction and also disclose the permanent financing as a separate transaction.

4. Residential mortgage transaction. See the commentary to § 226.2(a)(24) for a discussion of the effect of § 226.17(c)(6) on the definition of a residential mortgage transaction.

5. Allocation of points. When a creditor utilizes the special rule in § 226.17(c)(6) to disclose credit extensions as multiple transactions, buyers points or similar amounts imposed on the consumer must be allocated for purposes of calculating disclosures. While such amounts should not be taken into account more than once in making calculations, they may be allocated between the transactions in any manner the creditor chooses. For example, if a construction-permanent loan is subject to 5 points imposed on the consumer and the creditor chooses to disclose the 2 phases separately, the 5 points may be allocated entirely to the construction loan, entirely to the permanent loan, or divided in any manner between the two. However, the entire 5 points may not be

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

applied twice, that is, to both the construction and the permanent phases.

17(d) Multiple creditors; multiple consumers.

1. Multiple creditors. If a credit transaction involves more than one creditor:

. The creditors must choose which of them will make the disclosures.

. A single, complete set of disclosures must be provided, rather than partial disclosures from several creditors.

. All disclosures for the transaction must be given, even if the disclosing creditor would not otherwise have been obligated to make a particular disclosure. For example, if one of the creditors is the seller, the total sale price disclosure under § 226.18(j) must be made, even though the disclosing creditor is not the seller.

2. Multiple consumers. When two consumers are joint obligors with primary liability on an obligation, the disclosures may be given to either one of them. If one consumer is merely a surety or guarantor, the disclosures must be given to the principal debtor. In rescindable transactions, however, separate disclosures must be given to each consumer who has the right to rescind under § 226.23, although the disclosures required under § 226.19(b) need only be provided to the consumer who expresses an interest in a variable-rate loan program.

17(e) Effect of subsequent events.

1. Events causing inaccuracies. Inaccuracies in disclosures are not violations if attributable to events occurring after the disclosures are made. For example, when the consumer fails to fulfill a prior commitment to keep the collateral insured and the creditor then provides the coverage and charges the consumer for it, such a change does not make the original disclosures inaccurate. The creditor may, however, be required to make new disclosures under § 226.17(f) or § 226.19 if the events occurred between disclosure and consummation or under § 226.20 if the events occurred after consummation.

17(f) Early disclosures.

1. Change in rate or other terms. Redisclosure is required for changes that occur between the time disclosures are made and consummation if the annual percentage rate in the consummated transaction exceeds the limits prescribed in this section, even if the initial disclosures would be considered accurate under the tolerances in § 226.18(d) or 226.22(a). To illustrate:

i. General. A. If disclosures are made in a regular transaction on July 1, the transaction is consummated on July 15, and the actual annual percentage rate varies by more than 1/8 of 1 percentage point from the disclosed annual percentage rate, the creditor must either redisclose the changed terms or furnish a complete set of new disclosures before consummation. Redisclosure is required even if the disclosures made on July 1 are based on estimates and marked as such.

B. In a regular transaction, if early disclosures are marked as estimates and the disclosed annual percentage rate is within 1/8 of 1 percentage point of the rate at consummation, the creditor need not redisclose the changed terms (including the annual percentage rate).

ii. Nonmortgage loan. If disclosures are made on July 1, the transaction is consummated on July 15, and the finance charge increased by $35 but the disclosed annual percentage rate is within the permitted tolerance, the creditor must at least redisclose the changed terms that were not marked as estimates. (See § 226.18(d)(2) of this part.)

iii. Mortgage loan. At the time TILA disclosures are prepared in July, the loan closing is scheduled for July 31 and the creditor does not plan to collect per-diem interest at consummation. Consummation actually occurs on August 5, and per-diem interest for the remainder of August is collected as a prepaid finance charge. Assuming there were no other changes requiring redisclosure, the creditor may rely on the disclosures prepared in July that were accurate when they were prepared. However, if the creditor prepares new disclosures in August that will be provided at consummation, the new disclosures must take into account the amount of the per-diem interest known to the creditor at that time.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

2. Variable rate. The addition of a variable rate feature to the credit terms, after early disclosures are given, requires new disclosures.

3. Content of new disclosures. If redisclosure is required, the creditor has the option of either providing a complete set of new disclosures, or providing disclosures of only the terms that vary from those originally disclosed. (See the commentary to § 226.19(a)(2).)

4. Special rules. In residential mortgage transactions subject to § 226.19, the creditor must redisclose if, between the delivery of the required early disclosures and consummation, the annual percentage rate changes by more than a stated tolerance. When subsequent events occur after consummation, new disclosures are required only if there is a refinancing or an assumption within the meaning of § 226.20.

Paragraph 17(f)(2).

1. Irregular transactions. For purposes of this paragraph, a transaction is deemed to be "irregular" according to the definition in footnote 46 of § 226.22(a)(3).

17(g) Mail or telephone orders--delay in disclosures.

1. Conditions for use. When the creditor receives a mail or telephone request for credit, the creditor may delay making the disclosures until the first payment is due if the following conditions are met:

. The credit request is initiated without face-to-face or direct telephone solicitation. (Creditors may, however, use the special rule when credit requests are solicited by mail.)

. The creditor has supplied the specified credit information about its credit terms either to the individual consumer or to the public generally. That information may be distributed through advertisements, catalogs, brochures, special mailers, or similar means.

2. Insurance. The location requirements for the insurance disclosures under § 226.18(n) permit them to appear apart from the other disclosures. Therefore,

a creditor may mail an insurance authorization to the consumer and then prepare the other disclosures to reflect whether or not the authorization is completed by the consumer. Creditors may also disclose the insurance cost on a unit-cost basis, if the transaction meets the requirements of § 226.17(g).

17(h) Series of sales--delay in disclosures.

1. Applicability. The creditor may delay the disclosures for individual credit sales in a series of such sales until the first payment is due on the current sale, assuming the 2 conditions in this paragraph are met. If those conditions are not met, the general timing rules in § 226.17(b) apply.

2. Basis of disclosures. Creditors structuring disclosures for a series of sales under § 226.17(h) may compute the total sale price as either:

. The cash price for the sale plus that portion of the finance charge and other charges applicable to that sale; or

. The cash price for the sale, other charges applicable to the sale, and the total finance charge and outstanding principal.

17(i) Interim student credit extensions.

1. Definition. Student credit plans involve extensions of credit for education purposes where the repayment amount and schedule are not known at the time credit is advanced. These plans include loans made under any student credit plan, whether government or private, where the repayment period does not begin immediately. (Certain student credit plans that meet this definition are exempt from Regulation Z. See § 226.3(f).) Creditors in interim student credit extensions need not disclose the terms set forth in this paragraph at the time the credit is actually extended but must make complete disclosures at the time the creditor and consumer agree upon the repayment schedule for the total obligation. At that time, a new set of disclosures must be made of all applicable items under § 226.18.

2. Basis of disclosures. The disclosures given at the time of execution of the interim note should reflect two annual percentage rates, one for the interim

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

period and one for the repayment period. The use of § 226.17(i) in making disclosures does not, by itself, make those disclosures estimates. Any portion of the finance charge, such as statutory interest, that is attributable to the interim period and is paid by the student (either as a prepaid finance charge, periodically during the interim period, in one payment at the end of the interim period, or capitalized at the beginning of the repayment period) must be reflected in the interim annual percentage rate. Interest subsidies, such as payments made by either a state or the Federal government on an interim loan, must be excluded in computing the annual percentage rate on the interim obligation, when the consumer has no contingent liability for payment of those amounts. Any finance charges that are paid separately by the student at the outset or withheld from the proceeds of the loan are prepaid finance charges. An example of this type of charge is the loan guarantee fee. The sum of the prepaid finance charges is deducted from the loan proceeds to determine the amount financed and included in the calculation of the finance charge.

3. Consolidation. Consolidation of the interim student credit extensions through a renewal note with a set repayment schedule is treated as a new transaction with disclosures made as they would be for a refinancing. Any unearned portion of the finance charge must be reflected in the new finance charge and annual percentage rate, and is not added to the new amount financed. In itemizing the amount financed under § 226.18(c), the creditor may combine the principal balances remaining on the interim extensions at the time of consolidation and categorize them as the amount paid on the consumer's account.

4. Approved student credit forms. See the commentary to appendix H regarding disclosure forms approved for use in certain student credit programs.

References

Statute: Sections 121, 122, 124, and 128, and the Higher Education Act of 1965 (20 U.S.C. 1071) as amended by Pub.L. 97-35, August 13, 1981.

Other sections: Section 226.2 and appendix H.

Previous regulation: Sections 226.6 and 226.8.

1981 changes: With few exceptions, the disclosures must now appear apart from all other information, and may not be interspersed with that information. The disclosures must be based on the legal obligation between the parties, rather than any side agreement.

The assumed maturity period for demand loans has been increased from 6 months to 1 year. Any alternate maturity date must be stated in the legal obligation rather than inferred from the documents, in order to form a basis for disclosures.

In multiple-advance transactions, a series of advances up to a certain amount and construction loans that may be permanently financed may be disclosed, at the creditor's option, as either a single transaction or several transactions. Appendix D is applicable only to multiple advances for the construction of a dwelling, whereas its predecessor, Interpretation § 226.813, could be used for all multiple-advance transactions.

If disclosures are made before the date of consummation, the creditor need not provide updated disclosures at consummation unless the annual percentage rate has changed beyond certain limits or a variable rate feature has been added.

Section 226.18--Content of Disclosures

1. As applicable. The disclosures required by this section need be made only as applicable. Any disclosure not relevant to a particular transaction may be eliminated entirely. For example:

. In a loan transaction, the creditor may delete disclosure of the total sale price.

. In a credit sale requiring disclosure of the total sale price under § 226.18(j), the creditor may delete any reference to a downpayment where no downpayment is involved.

Where the amounts of several numerical disclosures are the same, the "as applicable" language also permits creditors to combine the terms, so long as it is done in a clear and conspicuous manner. For example:

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.