**United States District Court**
For the Northern District of California

1
2
3
4                                          **E-FILED on** __03/20/09__
5
6
7
8                   IN THE UNITED STATES DISTRICT COURT
9                  FOR THE NORTHERN DISTRICT OF CALIFORNIA
10                          SAN JOSE DIVISION
11                           NOT FOR CITATION
12

| | |
|---|---|
| 13  BRIAN O'DONNELL; MICHAEL VAN BELLEGHEM; and PATRICIA VAN BELLEGHEM, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF AMERICA; NATIONAL ASSOCIATION a.k.a. BANK OF AMERICA, N.A.; and DOES 1 through 10 inclusive,<br><br>Defendants. | No. C-07-04500 RMW<br><br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT<br><br>**[Re Docket No. 30]** |

21
22        Defendant Bank of America, National Association ("Bank of America") moves to dismiss
23  plaintiffs' second amended complaint ("SAC").  For the reasons set forth below, the court grants in
24  part and denies in part the motion to dismiss.

25                              **I.  BACKGROUND**
26        On June 8, 2005, plaintiff Brian O'Donnell refinanced his existing home loan by purchasing
27  an Option Adjustable Rate Mortgage ("Option ARM") from defendant Bank of America. SAC ¶ 2.
28  On May 25, 2006, plaintiffs Michael and Patricia Van Belleghem ("Van Bellegham") likewise

**United States District Court**
For the Northern District of California

refinanced their existing home loan by buying an Option ARM from Bank of America. *Id.* ¶ 3. Both loans were secured by plaintiffs' primary residences. *Id.* ¶ 2, 3.

The Option ARM loan purchased by plaintiffs that they now allege to be "a deceptively devised financial product" has a variable rate feature with payment caps. *Id.* ¶ 25. The loan product has an initial low teaser interest rate with correspondingly low initial payments. *Id.* ¶¶ 27, 35. The interest begins to adjust approximately one month into the loan *Id.* ¶ 36. While the interest rates are adjusting on the loan, the scheduled payments, which are set to correspond with the initial rate, are subject to a 7.5% annual increase until the loan reaches a "Reamortization Date." *Id.* ¶ 35, 38. Plaintiffs allege that the Option ARM loan purchased by them possessed a low, fixed payment but not a low, fixed interest rate. *Id.* ¶ 32. Following the payment plan provided by Bank of America is certain to result in negative amortization. *Id.* ¶ 42. According to plaintiffs, Bank of America knew or should have known that (i) the payment schedule provided to plaintiffs was insufficient to pay both interest and principal on the loans they obtained; (ii) that negative amortization was certain to occur if plaintiffs made payments according to the payment schedule provided by Bank of America; and (iii) that loss of equity or loss of plaintiffs' residence was substantially certain to occur if plaintiffs made payment according to the schedule provided to them by Bank of America. *Id.* ¶ 40.

The loan documents signed by plaintiffs in conjunction with the loan transactions at issue include (1) a promissory note, entitled "Adjustable Rate Note" (the "Note")[1]; (2) a Federal Truth in Lending Disclosure Statement ("TILDS")[2]; and (3) and Adjustable Rate Rider[3]. All three documents are form documents with blanks for the inclusion of transaction-specific terms.

**A.      The Note**

_____

[1]  Plaintiffs attach the Notes for O'Donnell and van Bellegham as Exhibits 1 and 2 to their second amended complaint. The Note submitted by plaintiffs for van Bellegham is not signed, but neither party appears to dispute for purposes of this motion that Exhibit 2 correctly reflects the Note for the van Bellegham loan.

[2]  Plaintiffs likewise attach the TILDS for O'Donnell and Bellegham as part of Exhibits 1 and 2 to their second amended complaints. Bank of America further submitted these TILDS as Exhibits B and C to the Declaration of Pamela Sullivan ("Sullivan Decl.").

[3]  Bank of America submitted the Adjustable Rate Riders for O'Donnell and van Bellegem as Exhibits D and E of the Sullivan Declaration. Plaintiffs do not appear to object to Bank of America's reference to these documents in support of its motion to dismiss.

**United States District Court**
For the Northern District of California

Section 1 of the Note sets forth the borrower's promise to pay, leaving a blank for the principal amount borrowed.  O'Donnell's principal amount was $468,000; van Bellegham's principal amount was $300,000.  SAC, Exs. 1, 2 at 1 § 1.

Section 2 of the Note sets forth the initial yearly interest rate for the loan and states that "[t]he interest rate I will pay will change in accordance with Section 4 of this Note."  *Id.* § 2.[4]  The interest rate specified for O'Donnell in Section 2 was 1%; the interest rate specified for van Bellegham was 1.125%.  *Id.*

Section 3 of the Note sets forth the borrower's payments.  Section 3 specifies the amount of the initial monthly payments, stating immediately thereafter "[t]his amount may change," and specifies the date on which the borrower is to start making the payments.  It provides that "[t]he Note holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note."  *Id.* § 3(C).  Section 3 also includes the language that is at the heart of many of plaintiffs' claims: "I will pay principal and interest by making a payment every month."  Generally, plaintiffs contend that this language obligates Bank of America to apply each payment by plaintiffs to both principal and interest.  Plaintiffs' arguments will be addressed in further detail below.

Section 4 of the Note is titled "Interest Rate and Monthly Payment Changes" and sets forth the parameters for the interest rate to change and for the changes to the monthly payment.  This section states that the interest rate the borrower will pay under the Note "may change" on the "Rate Change Date."  The "Rate Change Date" is defined as "each date on which my interest rate could change."  *Id.* § 4(A).  For both O'Donnell and van Bellegham, the first Rate Change Date is a little over a month after the date of the Note, and subsequent Rate Change Dates are "on the first date of every month thereafter."  *Id.* (O'Donnell: Note Date of 6/8/05, first Rate Change Date of 8/1/05; van Bellegham: Note Date of 5/25/06, first Rate Change Date of 7/1/06).

---

[4]  For example, Section 2 of O'Donnell's Note reads:
> Interest will be charged on unpaid principal until the full amount of Principal has been paid.  I will pay interest at a yearly rate of 1.000%.  The interest rate I will pay will change in accordance with Section 4 of this Note.

SAC, Ex. 1 at 1 § 2.

1   Section 4 next states that on the first Rate Change Date, "my adjustable rate will be based on

2   an Index" and defines the Index as equal to the LIBOR Annual Monthly Average.  It then sets forth

3   that before each Rate Change Date, the interest rate will be recalculated by adding a specified

4   percentage to the Index.  *Id.* § 4(C) (O'Donnell: 2.125%; van Belleghem: 2.250% ).  The loans are

5   subject to an interest rate limit.  *Id.* § 4(D) (O'Donnell: "My interest rate will never be greater than

6   9.950%"; van Belleghem: "My interest rate will never be greater than 10.075%").

7   Separately, Section 4 sets forth a "Payment Change Date" which occurs annually.  *Id.* § 4(E).

8   The monthly payment that the borrower must make will not increase or decrease by more than 7.5%

9   from the prior payment amount.  This constitutes an "Annual Payment Cap."  *Id.*  The Annual

10   Payment Cap remains in effect until the first "Reamortization Date," which is a payment due date on

11   which the principal balance on the loan would increase to an amount that equals or exceeds 115 %

12   of the original principal balance.  *Id.* § 4(G).  When the Reamortization Date occurs, the Annual

13   Payment Cap no longer applies and the payment due may jump dramatically.  Section 4(G) states

14   I understand that the changes in the interest rate that occur during the final five years
15   of my loan term may make my monthly payments insufficient to pay off my loan over
    the remaining term in equal installments unless I elect to make fully amortizing
16   payments during that period, as provided in Section 4(H) below.  As agreed in
    Section 3(A) above, I will pay off all amounts still owing under this Note on or
17   before the Maturity Date even if this requires a substantially higher payment on the
    Maturity Date than the immediately preceding payment amounts.  Lender is under no
18   obligation to refinance the loan at that time.  I will, therefore, be required to make
    payment out of other assets that I may own, or I will have to find a lender . . . willing
19   to lend me money.

20   *Id.*

21   Finally in Section 4, the Note sets forth three "Payment Options" in Section 4(H): (1) the

22   required payment; (2) "[i]f the Required Payment is insufficient to fully amortize my loan as a result

23   of the application of the Annual Payment Cap or principal balance adjustments, I will have the

24   option to make a fully amortizing payment, which is an amount sufficient to pay off my loan in

25   substantially equal payments over its remaining term at its then interest rate"; or (3)"[i]f the

26   Required Payment is not sufficient to pay all of the interest owed for that month, which would result

27   in negative amortization, I also will have the option to make an interest-only payment, which will be

28

sufficient to pay the monthly interest and avoid negative amortization, but will not reduce the principal balance." *Id.* § 4(H).

Per Section 5, plaintiffs are allowed to prepay their loans without paying any prepayment penalty. *Id.* § 5.[5]

### B.    The TILDS

The TILDS sets forth the APR for the loan (specifying that this is "[t]he cost of your credit as a yearly rate"; the amount financed ("The amount of credit provided to you or on your behalf"), the finance charge ("The dollar amount that the credit will cost you"); and the total of payments ("The amount you will have paid after you have made all payments as scheduled"). *See, e.g.,* SAC, Ex. 1 at 6. The TILDS also sets forth the payment schedule for the loan. *Id.* As set forth in further detail below, the payment schedule shows payments increasing annually. The TILDS also specifies for both O'Donnell and van Bellegham that the loan has a variable rate feature and that there is no prepayment penalty if the loan is repaid early. *Id.* Ex. 1 at 6, Ex. 2 at 6.

## II. ANALYSIS

### A.    Truth in Lending Act ("TILA")

The purpose of the Truth in Lending Act ("TILA") is to promote "the informed use of credit" by assuring "meaningful disclosure of credit terms [to consumers] so that the consumer will be able to . . . avoid the uninformed use of credit." 15 U.S.C. § 1601(a). The TILA statute delegates to the Federal Reserve Board the authority to promulgate regulations. 15 U.S.C. § 1604(a). "Because of their complexity and variety, however, credit transactions defy exhaustive regulation by a single statute. Congress therefore delegated expansive authority to the Federal Reserve Board to elaborate and expand the legal framework governing commerce in credit." *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 559-60 (1980) (citing 15 U.S.C. § 1604). To this end, "[t]he Board executed its responsibility by promulgating Regulation Z, 12 C.F.R. Part 226[], which at least partly

---

[5] This is contrary to the allegations of the complaint asserting that Bank of America's Option Arm loans uniformly "includes a prepayment penalty preventing consumers from securing a new loan for a period of up to three (3) years." SAC ¶ 35.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT—No. C-07-04500 RMW
MAG                                                                                          5

1  fills the statutory gaps."  *Id.* at 560; *see also* 12 C.F.R. § 226 ("Regulation Z").  Those regulations

2  are entitled to deference.  *Ford Motor Credit Co.*, 444 U.S. at 560.

3       Plaintiffs allege that Bank of America violated TILA by failing to meet the disclosure

4  mandates set forth in Regulation Z, specifically 12 C.F.R. §§ 226.17 and 226.19.  As set forth in

5  further detail below, plaintiffs assert seven theories to support their allegations that Bank of America

6  violated TILA.  The theories all rely to some extent on the following allegations: (1) that the Option

7  ARM loans purchased by plaintiffs had the potential for negative amortization; (2) that the loan

8  documents were not clear regarding how plaintiffs could avoid negative amortization; and (3) that

9  Bank of America failed to apply plaintiffs' monthly payments to both interest and principal.  To

10  simplify the discussion below, the court will refer to the loan documents of plaintiff O'Donnell, as

11  both O'Donnell and van Bellegham signed form documents for loans, where the variable terms are

12  similar but not identical.

13             **1.    Theory A:  Failure to Clearly and Conspicuously Disclose that TILDS**
                       **Payment Schedule is Not Based on the Actual Interest Rate**

14

15       Plaintiffs allege that Bank of America violated 12 C.F.R. §§ 226.17 by failing to clearly and

     conspicuously disclose the interest rate upon which the payments listed in the TILDS are based.

16  SAC ¶¶ 66-78.  For the loan transaction at issue, TILA requires that lender make certain disclosures

17  "clearly and conspicuously in writing, in a form that the consumer may keep."  12 C.F.R. §

18  226.17(a)(1).[6]  The content of these required disclosures is set forth in 12 C.F.R. § 226.18.  Among

19  the disclosures are the amount financed, annual percentage rate ("APR"), payment schedule and the

20  total sale price.  *Id.* § 226.18(b), (e), (g), (j).  Additional disclosures are required where the APR may

21  increase after the consummation of the transaction and where, as here, the transaction is "secured by

22  the consumer's principal dwelling with a term greater than one year."  *Id.* § 226.18(f)(2)(i)-(ii).

23

24

25

26  _____

    [6]  Although Bank of America asserts that this "clear and conspicuous" requirement is limited to only
    specific disclosures mandated in Subpart C of Regulation Z, it cites no authority for such a
27  limitation.  The court finds that, with regard to its consideration of defendants' motion to dismiss, it
    would be inconsistent with the purposes of TILA to find that Regulation Z required only some of the
28  mandated disclosures to be "clear and conspicuous."

1   There is no argument that the TILDS sets forth the amount financed, APR and total sale

2   price. Under plaintiffs' theory A, however, the parties dispute whether the payment schedule

3   provided to plaintiffs in the TILDS is compliant with TILA because the payments are not based on

4   the APR or any other expressly disclosed interest rate. Plaintiffs contend that because the payments

5   on the payment schedule were unrelated to any disclosed interest rate, Bank of America was

6   attempting to deceive consumers into believing (1) that they were receiving a lower interest rate than

7   they were and (2) that the payments set forth in the payment schedule were sufficient to pay off both

8   interest and principal. Had Bank of America "clearly and conspicuously disclosed a payment

9   amount sufficient to cover both [principal] and interest, the payment amounts would have to have

10  been almost double the payment amounts listed." SAC ¶ 74.

11      There are three specific interest rates disclosed in the loan documents: the first, set forth in

12  Section 1 of the Note, is the low-interest teaser rate that was only in effect for both O'Donnell and

13  van Bellegham for one month; the second, set forth in Section 4(D) of the Note, is the interest rate

14  limit which represents a cap on the interest rate; the third is the APR, which is set forth at the top of

15  the TILDS. For O'Donnell, the teaser interest rate was 1%, the interest rate limit was 9.950%, and

16  the APR disclosed in the TILDS was 9.945%.

17      The TILDS provided to O'Donnell set forth a payment schedule for his loan of $462,053.18

18  as follows:

| Number of Payments | Payments Are Due Monthly Beginning | Amount of Monthly Payments |
|---|---|---|
| 12 | 08/1/05 | $1505.28 |
| 12 | 08/1/06 | $1618.17 |
| 4 | 08/1/07 | $1739.54 |
| 332 | 12/1/07 | $4748.31 |

SAC, Ex. 1 at 6. The TILDS disclosed that the total payments under this plan would amount to

$1,620,878.48 ($462,053.18 with a finance charge of $1,158,815.30).

    Bank of America argues that the APR is appropriately disclosed and that plaintiffs confuse the

contractual rate set forth in the Notes with the APR calculated for purposes of and disclosed on the

**United States District Court**
For the Northern District of California

TILDS. However, this is not plaintiffs' argument with respect to the payment schedule. Rather, plaintiffs assert that the payments set forth in the payment schedule were not based on either of the specific interest rates disclosed in the Note (1% teaser rate or the 9.95% interest rate limit), nor did the payment schedule reflect the APR in any way that was comprehensible to the plaintiffs. As a result, they contend, Bank of America's TILDS fails to satisfy the disclosure requirement set forth in 12 C.F.R. § 226.18.

Although Bank of America concedes that the payment schedule does not apply any of the three disclosed interest rates set forth above, it contends that the payment schedule need not precisely reflect such rates. Bank of America correctly points out that disclosure of the payment schedule is governed by 12 C.F.R. § 226.18(g), which provides only that the creditor shall disclose "[t]he number, amounts, and timing of payments scheduled to repay the obligation." Referring to the comments to Regulation Z, Bank of America argues that lenders are required to make a number of TILA-mandated assumptions, and that those assumptions necessarily lead to the conclusion that the challenged payment schedules are compliant. For example, Bank of America asserts that the following comment 8 to § 226.17(c)(1) supports its position that its payment schedules are compliant with 12 C.F.R. § 226.18(g):

> Basis of disclosures in variable-rate transactions. The disclosures for a variable-rate transaction must be given for the full term of the transaction and must be based on the terms in effect at the time of consummation. Creditors should base the disclosures only on the initial rate and should not assume that this rate will increase. For example, in a loan with an initial rate of 10 percent and a 5 percentage points rate cap, creditors should base the disclosures on the initial rate and should not assume that this rate will increase 5 percentage points. However, in a variable-rate transaction with a seller buydown that is reflected in the credit contract, a consumer buydown, or a discounted or premium rate, disclosures should not be based solely on the initial terms. In those transactions, the disclosed annual percentage rate should be a composite rate based on the rate in effect during the initial period and the rate that is the basis of the variable-rate feature for the remainder of the term. (See the commentary to § 226.17(c) for a discussion of buydown, discounted, and premium transactions and the commentary to section 226.19(a)(2) for a discussion of the redisclosure in certain residential mortgage transactions with a variable-rate feature).

12 C.F.R. pt. 226, Supp. I, cmts. to 17(c)(1) cmt. 8; *see also id.* cmt. 10 (discussing "Discounted and premium variable-rate transactions" and providing, *inter alia*, that "[t]he effect of the multiple rates must also be reflected in the calculation and disclosure of the finance charge, total of payments, and payment schedule.").

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT—No. C-07-04500 RMW
MAG                                    8

The court disagrees that the "TILA-mandated assumptions" that Bank of America cites lead the court on a motion to dismiss to conclude that Bank of America's payment schedules are TILA-compliant. 12 C.F.R. § 226.17(c)(1) to which comments 8 and 10 pertain, states, "The disclosures shall reflect the terms of the legal obligation between the parties." Comments 8 and 10 themselves do not appear to be meant to provide specific guidance regarding calculation of the payment schedule. Generally, Regulation Z and the commentary thereto (specifically the commentary to 12 C.F.R § 226.18(g) regarding the payment schedule) do not provide detailed instructions to creditors regarding how to calculate payment schedules with respect to variable-rate transactions. However, the court has located an Official Staff Interpretation not referenced by either party which appears to provide some guidance regarding how to disclose the payment schedule for adjustable rate mortgages such as this one. Comment 12 to Section 226.17 § 17(c)(1) provides:

> Graduated payment adjustable rate mortgages. These mortgages involve both a variable interest rate and scheduled variations in payment amounts during the loan term. For example, under these plans, a series of graduated payments may be scheduled before rate adjustments affect payment amounts, or the initial scheduled payment may remain constant for a set period before rate adjustments affect the payment amount. In any case, the initial payment amount may be insufficient to cover the scheduled interest, causing negative amortization from the outset of the transaction. In these transactions, the disclosures should treat these features as follows:
>
> - The finance charge includes the amount of negative amortization based on the assumption that the rate in effect at consummation remains unchanged.
>
> - The amount financed does not include the amount of negative amortization.
>
> - As in any variable-rate transaction, the annual percentage rate is based on the terms in effect at consummation.
>
> - The schedule of payments discloses the amount of any scheduled initial payments followed by an adjusted level of payments based on the initial interest rate. Since some mortgage plans contain limits on the amount of the payment adjustment, the payment schedule may require several different levels of payments, even with the assumption that the original interest rate does not increase.

12 C.F.R. pt. 226, Supp. I, cmts. to 17(c)(1) cmt. 12.

The court at least at this motion to dismiss stage concludes that Bank of America's payment schedule is deficient. As the Supreme Court has acknowledged, "[e]ven Regulation Z . . . cannot speak explicitly to every credit disclosure issue. . . . [T]herefore, interpretation of TILA and Regulation Z demands an examination of their express language; absent a clear expression, it becomes necessary to

1    consider the implicit character of the statutory scheme." *Ford Motor Credit Co.*, 444 U.S. at 560.  Thus,

2    the court concludes that plaintiffs have adequately alleged a claim that the Bank of America payment

3    schedules were not TILA-compliant under 12 C.F.R. § 226.17(c). *See Amparan v. Plaza*, 2008 WL

4    5245497 (N.D. Cal.).

5              **2.    Theory B: Failure to Clearly and Conspicuously Disclose the Legal Obligation**

6

7         12 C.F.R. § 226.17(c)(1) provides, "The disclosures shall reflect the terms of the legal obligation

8    between the parties."  The commentary to Regulation Z further provides, "The disclosures shall reflect

9    the credit terms to which the parties are legally bound as of the outset of the transaction." 12 C.F.R. pt.

10   226, Supp. I, cmts. to 17(c)(1) cmt. 1.  Plaintiffs allege that Bank of America violated 12 C.F.R. §§

11   226.17(c)(1) by failing to clearly and conspicuously disclose what plaintiffs were legally required to pay

12   in the TILDS.  SAC ¶¶ 79-84.

13        Plaintiffs observe that O'Donnell's note lists an interest rate of 1.00% with a beginning principal

14   balance of $468,000.  The amount of each payment to pay the loan off at this 1.00% interest rate over

15   30 years is $1505.28 – this amount  is what is set forth as O'Donnell's monthly payment obligation for

16   the first year in the payment schedule.  However, the TILDS shows an APR of 9.945%.  Applying this

17   interest rate set forth in the TILDS would create a monthly payment of $4088.  Based on the 9.945%

18   interest rate rather than the 1.00% interest rate, O'Donnell's first year monthly payment obligation would

19   create a shortfall of $2,582 each month, representing the negative amortization that O'Donnell would

20   accrue if he paid the $1505.28 specified for the first year.  Plaintiffs argue that this type of disclosure

21   does not clearly and conspicuously disclose the true legal obligation owed on the Note.

22        Bank of America argues that the central feature of plaintiffs' loans was the Annual Payment Cap

23   set forth in Section 4(G) of the Note.  As set forth above, this section provides that the monthly payment

24   that the borrower must make will not increase or decrease by more than 7.5% from the prior payment

25   amount.  The Annual Payment Cap remains in effect until the first Reamortization Date on which date

26   the principal balance on the loan increases to an amount that equals or exceeds 115% of the original

27   principal balance.  Bank of America points out that the TILDS discloses a dramatic leap in payment

28   amount.  Looking at O'Donnell's TILDS, it is true that the first year payment option based on the initial

United States District Court
For the Northern District of California

"teaser" rate of 1.00% is not the only monthly amount listed.  The payments specified for O'Donnell are $1505.28 for the first year, $1618.17 for the second year, then $1739.54 for 4 payments (presumably until the projected Reamortization Date), after which the payment amount jumps sharply to $4748.31 for the remaining 332 months.  This jump occurs in month 29 for O'Donnell and in month 61 for van Bellingham.

Bank of America also points out that plaintiffs concede that the TILDS reflects the parties legal obligations under the Note, specifically referencing plaintiffs' statement in opposition the "the payment amounts listed in the TILDS are, on some level, true (e.g., they are the payment obligations Plaintiffs were required to make)."  Opp'n at 15:20-21.  However, looking at the commentary to 12 C.F.R. §§ 226.17(c)(1), the court cannot conclude on a motion to dismiss that the disclosure of a dramatic jump in the payment amount is sufficient to "reflect the credit terms to which the parties are legally bound as of the outset of the transaction."  12 C.F.R. pt. 226, Supp. I, cmts. to 17(c)(1) cmt. 1.  Nowhere on the TILDS is there any mention of negative amortization and, while the court has found nothing in the TILA that appears to require disclosure of negative amortization on the TILDS, plaintiffs may nevertheless be able to demonstrate at a later stage of this action that disclosure of a substantial jump in payment amount alone does not "reflect the terms of the legal obligation between the parties" for purposes of 12 C.F.R. § 226.17(c)(1) where making payments as specified on a TILDS payment schedule would result in negative amortization.[7]  *See Amparan,* 2008 WL at *7-9.

### 3.   Theory C:  Failure to Clearly and Conspicuously Disclose the Actual Interest Rate

Plaintiffs assert that Bank of America failed to disclose the actual interest rate in the loan documents provided to plaintiffs in a clear and conspicuous manner.  SAC ¶¶ 85-93.  They contend that

-------

[7]  Also troublesome in this respect is that in the loans taken out by plaintiffs the interest rate can change monthly after the initial Rate Change Date, but the payments are fixed for a year on until the Reamortization Date is reached.  Thus, it appears that the interest rate necessarily begins adjusting upward from the initial rate at less than two months into the loan but, due to the payment cap, the payment schedule does not disclose an increase in the payment until a year into the loan – and then, because the payment is limited to a 7.5% increase by the payment cap, the increased payment after the first Payment Change Date does not make any inroads into the principal (that would have been growing under the first year's payments because those payments at the 1.00% interest rates result in negative amortization).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT—No. C-07-04500 RMW
MAG

United States District Court
For the Northern District of California

1    the loan documents do not clearly set forth the actual interest rate to which plaintiffs were subject.

2        As discussed above, there are three specific interest rates disclosed in the loan documents: the

3    low-interest teaser rate set forth in Section 1 of the Note that was only in effect for approximately one

4    month; the interest rate limit set forth in Section 4(D); and the APR set forth at the top of the TILDS.

5    The interest rate applied after the first Rate Change Date is calculated under Section 4(C) which

6    provides that before each Rate Change Date, the new interest rate is ascertained by adding a certain

7    number of percentage points to the Index (defined as the LIBOR as discussed above), rounding to the

8    next highest one-eighth of a percentage point.

9        Plaintiffs contend that the disclosure in the Note is unclear in violation of TILA because the Note

10   states only that the interest rate "may" change, not that it will change. SAC ¶¶ 86-89. For example, in

11   the O'Donnell Note, Section 4(A) setting forth the Rate Change Dates states, "The interest rate I will

12   pay *may* change on the first day of August 2005, and on the first day of every month thereafter." SAC,

13   Ex. 1 at § 4(A) (emphasis added). Plaintiffs contend that this word choice is intended to obfuscate the

14   fact that the low 1.00% rate set forth in Section 2 was certain to change on August 1, 2005 and that the

15   1.00% rate would last for only approximately a month.

16       The note does not say the interest rate *will* necessarily change. Section 4(A) does state that the

17   interest rate set forth in Section 2 may change. As worded, "may change" makes it less clear that on the

18   first Rate Change Date of August 1, 2005, the interest rate will be subject to adjustment under the

19   remaining provisions of Section 4. As set forth above, Section 4(C) discusses how the interest rate

20   changes will be calculated and Section 4(D) sets forth the interest rate limit. As set forth in the Note,

21   plaintiffs may be able to show that it is confusing or deceptive to state that the interest rate *may* change

22   on the Rate Change Date given that the 1.00% rate would necessarily adjust upward on the first Rate

23   Change Date (particularly in light of the fact that Section 4(C) specifies that the new interest rate will

24   be over 2% over the Current Index set forth in Section 4(B), which would necessarily be more than 1%

25   and 1.125% initial teaser rates given to O'Donnell and van Bellegham respectively). Thus, the court

26   finds that plaintiffs have stated a claim that the use of the word "may" in Section 4(A) could make this

27   disclosure confusing, illusory or deceptive.

28

Plaintiffs also assert that the TILDS is confusing and deceptive because it fails to disclose the actual interest rate. Here, Bank of America's argument that plaintiffs confuse the APR and the actual interest rate has more traction. 12 C.F.R. § 226.18 sets forth the required contents of the TILDS. There is no requirement in § 226.18 that the TILDS disclose the actual interest rate. While plaintiffs may state a claim for a TILA violation based on other aspects of the disclosures on the TILDS, the failure to disclose the actual interest rate on the TILDS is not actionable under TILA.

### 4.   Theory D: Failure to Clearly and Conspicuously Disclose Negative Amortization

Plaintiffs next assert that Bank of America's loan documents violate 12 C.F.R. § 226.19, which sets forth additional disclosure requirements for residential home loans. SAC ¶¶ 94-101. Specifically, 12 C.F.R. § 226.19(b)(2)(vii) requires that "[i]f the annual percentage rate may increase after the consummation in a transaction secured by the consumer's principal dwelling with a term greater than one year, the following disclosures must be provided . . . :" "any rules relating to changes in the index, interest rate, payment amount, and outstanding loan balance, including, for example, an explanation of the interest rate or payment limitations, negative amortization, and interest rate carryover." Plaintiffs allege that Bank of America failed to disclose in either the Note or the TILDS that negative amortization would occur if plaintiffs followed the payment schedule provided in the TILDS.

Bank of America argues that the disclosure specified in 12 C.F.R. § 226.19 does not apply to either the Note or the TILDS. Indeed, 12 C.F.R. § 226.19(b)(2) provides that this disclosure quoted above in subsection (b)(2)(vii) must be made in "[a] loan program disclosure for each variable-rate program in which the consumer expresses an interest." Bank of America includes as an attachment to the declaration of Pamela Sullivan the relevant program disclosure for the "1-Month ManyOptions ARM Product." Sullivan Decl., Ex. A. Plaintiffs, asserting that Bank of America has failed to show that plaintiffs received this document, nevertheless argue that this program disclosure as well as the Note itself is deficient. Opp'n at 8:3-9:2. Their main argument is that disclosures are ambiguous and misleading because they do not include a statement that "negative amortization will occur." Plaintiffs contend that because the negative amortization was absolutely certain to occur if they followed the payment schedule provided in the loan documents, Bank of America was required to unequivocally state

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

that negative amortization *will* occur.  Instead, Bank of America only disclosed that  negative amortization was a possibility.

The Note describes negative amortization in Section 4(F), stating, "*If my monthly payment is less than the amount necessary to pay the full amount of interest for that month*, the portion of interest that is unpaid will be added to the principal balance of my loan as of the due date for such payment and will accrue interest at the rate in effect from time to time in accordance with this Note." SAC, Ex. 1 & 2 at 2 § 4(F) (emphasis added).  The Note further discusses negative amortization in Section 4(H):

> *If the Required Payment is insufficient to fully amortize my loan as a result of the application of the Annual Payment Cap or principal balance adjustments*, I will have the option to make a fully amortizing payment, which is an amount sufficient to pay off my loan in substantially equal payments over its remaining term and its then interest rate. *If the Required Payment is not sufficient to pay all of the interest owed for that month, which would result in negative amortization*, I also will have the option to make an interest only payment, which will be sufficient to pay the monthly interest and avoid negative amortization, but will not reduce the principal balance.  Even if these options are available, I may still elect to make only the Required Payment.

*Id.* at 2-3 § 4(H)(emphasis added).[8]  Plaintiffs argue that this language does not set forth clearly that under the default structure of the loan, making the required payments as provided in the TILDS, negative amortization is certain to occur and that Bank of America was required under TILA to so disclose.

The program disclosure for the 1-Month ManyOptions ARM Product likewise does not clearly disclose that following the payment plan provided by Bank of America will necessarily result in negative amortization.  The italicized text at the top of the first page states, "This loan has the potential for deferred interest, also known as negative amortization."  There is also a section titled "Deferred Interest" that explains how "deferred interest, also known as negative amortization" accrues.  But while these statements mention and explain negative amortization, they do so while referring to negative amortization as a possibility, rather than as a certainty.

---

[8]  Bank of America's program disclosure describes the minimum payment and the effect of deferred interest.  It also describes in more detail the three different payment options described in Section 4(H) of the Note and clarifies that the three payment options will be set forth on the borrower's monthly statement.  Sullivan Decl., Ex. A at 2.  The program disclosure advises twice, "You may avoid deferred interest, also known as negative amortization, by payment of either the Interest Only Payment or the Principal and Interest Payment."

1    Section 7 of the program disclosure discusses three payment options, minimum payment, interest

2    only payment, and principal and interest payment.  This section notes that "deferred interest, also known

3    as negative amortization" may be avoided by payment of either the interest only or  principal and

4    interest payment (a statement that is repeated in the "Deferred Interest" section), but nowhere in the loan

5    documents upon which the complaint is based is it clearly stated that following the payment plan as

6    provided by Bank of America will result in negative amortization.  There appears to be no indication

7    whether the payments under the recommended payment are minimum payments, interest only payments,

8    principal and interest payments, or a combination of the three types.

9    Plaintiffs assert that the commentary to 12 C.F.R. § 226.19(b)(2)(vii) makes disclosure of

10    negative amortization mandatory.  Specifically, the commentary provides:

11    A creditor must disclose, where applicable, the possibility of negative amortization. For
       example, the disclosure might state, "If any of your payments is not sufficient to cover

12    the interest due, the difference will be added to your loan amount." Loans that provide
       for more than one way to trigger negative amortization are separate variable-rate

13    programs requiring separate disclosures. (See the commentary to § 226.19(b)(2) for a
       discussion on the definition of a variable-rate loan program and the format for

14    disclosure.) If a consumer is given the option to cap monthly payments that may result
       in negative amortization, the creditor must fully disclose the rules relating to the option,

15    including the effects of exercising the option (such as negative amortization will occur
       and the principal loan balance will increase); however, the disclosure in §

16    226.19(b)(2)(viii) need not be provided.

17    12 C.F.R. pt. 226, Supp. I, cmts. to 19(b)(2)(vii) cmt. 2.  Plaintiffs base their argument in part on the

18    language regarding the option to cap monthly payments which provides that "[i]f a consumer is given

19    the option to cap monthly payments that may result in negative amortization, the creditor must fully

20    disclose the rules relating to the option, including the effects of exercising the option (such as negative

21    amortization will occur and the principal loan balance will increase)."  *Id.*  Bank of America, by

22    contrast, argues that this comment does not apply to the Option ARM sold to plaintiffs because the

23    borrowers here did not have the "option" to cap monthly payments because the program already built

24    in the annual payment cap.

25    The court is not persuaded by Bank of America's position.  Where a cap on payments that may

26    result in negative amortization is built into the loan product, the customer may be said to elect the option

27    to cap payments by selecting the loan product with the built-in caps.  Thus, the court agrees with

28    plaintiffs that on the facts alleged that Bank of America was required to fully disclose the effects of

United States District Court
For the Northern District of California

exercising the option to cap monthly payments, which may require disclosure that "negative amortization *will* occur and the principal loan balance *will* increase." 12 C.F.R. pt. 226, Supp. I, cmts. to 19(b)(2)(vii) cmt. 2 (emphasis added). Plaintiffs have, on the facts alleged, stated a claim under their theory D that Bank of America's disclosures regarding negative amortization (whether in the Note or in the program disclosure statement) were insufficient to disclose the effects of the payment cap option under TILA.

### 5. Theory E: Failure to Clearly and Conspicuously Disclose that the Initial Interest Rate is Discounted

Plaintiffs contend that Bank of America violated TILA by failing to disclose that the initial interest rate was discounted as required under 12 C.F.R. § 226.19(b). SAC ¶¶ 102-110; *see also* 12 C.F.R. § 226.19(b)(2)(v) (requiring disclosure in the loan program disclosure of fact that the interest rate will be discounted). Plaintiffs base this contention on the commentary to 12 C.F.R. § 226.19(b)(2)(v) which states, "If the initial interest rate will be a discount or a premium rate, creditors must alert the consumer to this fact." 12 C.F.R. pt. 226, Supp. I, cmts. to 19(b)(2)(vii) cmt. 2.

As discussed above with respect to theory D, by its plain text, 12 C.F.R. § 226.19(b)(2) and its subsections appear to be disclosures that are to be made in the loan program disclosure. So, even assuming that the Note itself did not clearly disclose that the initial interest rate was discounted, this does not appear to be relevant to any violation of 12 C.F.R. § 226.19(b)(2).[9]

_____

[9]   12 C.F.R. § 226.19(b)(2)(v) provides:

> If the annual percentage rate may increase after consummation in a transaction secured by the consumer's principal dwelling with a term greater than one year, the following disclosures must be provided at the time an application form is provided or before the consumer pays a non-refundable fee, whichever is earlier:
>
> (1) The booklet titled Consumer Handbook on Adjustable Rate Mortgages published by the Board and the Federal Home Loan Bank Board, or a suitable substitute.
>
> (2) *A loan program disclosure* for each variable-rate program in which the consumer expresses an interest. The following disclosures, as applicable, shall be provided:
>
> > [. . .]
>
> > (v) The fact that the interest rate will be discounted, and a statement that the consumer should ask about the amount of the interest rate discount.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT—No. C-07-04500 RMW
MAG

16

The program disclosure for the Option ARM purchased by the plaintiffs provides:

> The initial interest rate may not be based on the index that is used to make later adjustments.  It may be less than the index plus the margin.

Sullivan Decl., Ex. A at 1.  Reading plaintiffs' allegations generously to include an assertion that the program disclosure was deficient, it would appear that plaintiffs may state a claim that Bank of America violated TILA by failing to disclose that the initial interest rate was in fact discounted.  The language in the program disclosure does not indicate that the interest rate will be discounted, only that it *may* be discounted and there is no statement that the consumer should ask about the amount of the interest rate discount.

### 6. Theory F:  Failure to Disclose the Composite Interest Rate

Plaintiffs contend that Bank of America violated TILA by failing to comply with the requirement set forth in the commentary to Regulation Z that requires disclosure of a composite interest rate in the Note.  *See* 12 C.F.R. pt. 226, Supp. I, cmts. to 17(c)(1) cmt. 8 (cited in full in the discussion of theory A above).  It appears that this comment applies to disclosures in the TILDS, not in the Note.  Plaintiffs do not appear to challenge that Bank of America provided an appropriately calculated composite rate in the TILDS, therefore plaintiffs' theory F does not state a claim for violation of TILA.

### 7. Theory G: Failure to Clearly and Conspicuously Disclose the Effect of the Payment Cap on the True Cost of the Loan

Plaintiffs' final theory, theory G, is based on Bank of America's failure to disclose the full effect of the payment cap on the true cost of the loan.  SAC ¶¶ 116-119.  In opposition to the motion to dismiss, plaintiffs argue that because the payment cap limits increases in the monthly payment but does not in any way limit the amount of interest charged on the loan, the effect on the loan was to guarantee negative amortization.  Bank of America argues that its disclosures needed only to disclose the existence of the payment cap, but not its exact effect.

This alleged violation is similar to that in plaintiffs' theories A, B and D above that Bank of America violated TILA by failing to clearly disclose (1) that the payment schedules were not based on the actual interest rate (theory A); (2) the legal obligation (theory B); and (3) that negative amortization

---

(emphasis added)

1  was certain to occur under the payment schedule provided (theory D).  For similar reasons, the court

2  concludes that plaintiffs have stated a claim under this theory, as well.

3        **B.**      **Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing**

4        Plaintiffs' claim for breach of contract appears to rest on a single phrase in the Note: "I will pay

5  principal and interest by making payments every month." SAC, Exs. 1 & 2 at 1 § 3(A).  Plaintiffs claim

6  that Bank of America breached the terms of the Note by preparing, and permitting plaintiffs to pay on,

7  a payment schedule that did not provide for fully amortizing payments.  They allege that the language

8  quoted above required Bank of America to apply their monthly payments to principal and interest.

9        Although at least one court has decided differently, *see Monaco v. Bear Stearns Residential*

10  *Mortg. Corp.*, 2008 WL 867727 (C.D. Cal. 2008), this court finds that the relevant contractual language

11  is not reasonably susceptible to the interpretation that plaintiffs attempt to ascribe to it.  Plaintiffs argue

12  that a reasonable interpretation of this statement is that payments will be applied to both principal and

13  interest, in spite of later statements in the Note that negative amortization is a possibility.  Bank of

14  America on the other hand, argues that the only reasonable interpretation of the statement is that it

15  describes plaintiffs' obligation to make payments, leaving the question of how those payments will be

16  applied to other sections.  The court agrees with the defendants that the language upon which plaintiffs

17  rely can only be reasonably interpreted to state an obligation by plaintiffs, particularly in light of the

18  sentence that follows the one upon which plaintiffs rely.  This sentence, the third in the second

19  paragraph of section 3(A), reads: "Each monthly payment will be applied as of its scheduled due date

20  and will be applied first to current interest, then to prior unpaid interest, and the remainder to Principal."

21  In light of the court's conclusion, there can be no breach of contract claim.  The court likewise finds that

22  plaintiffs' claim for breach of the implied covenant of good faith and fair dealing fails as it relies on

23  plaintiffs' contention that the Note must be interpreted to require each of plaintiffs' payments to be

24  applied to both interest and principal.

25        **C.**      **Fraudulent Omission**

26        [T]he elements of an action for fraud and deceit based on concealment are: (1) the
defendant must have concealed or suppressed a material fact, (2) the defendant must

27  have been under a duty to disclose the fact to the plaintiff, (3) the defendant must
have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4)

28  the plaintiff must have been unaware of the fact and would not have acted as he did if

he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.

*Marketing West, Inc. v. Sanyo Fisher (USA) Corp.*, 6 Cal. App. 4th 603, 612-13 (1992).  Plaintiffs base their fraudulent omission claim on the fact that Bank of America failed to disclose or inform plaintiffs that if they made the required payment as set forth on the TILDS (1) the payment would be insufficient to pay both principal and interest; (2) that negative amortization was certain to occur; and (3) that the plaintiffs would experience loss of equity in their residence.  Although the disclosures could have been more clear and may have violated TILA requirements, the court is not satisfied that plaintiffs have adequately alleged fraud with the mandated particularity.  *See* Fed. R. Civ. P. 9(b).        **E        .**

### Unfair Competition

Defendants challenge plaintiffs' claim for unfair competition under Cal. Bus. & Prof. Code § 17200 solely on the ground that the complaint does not plead fraudulent conduct with sufficient particularity.  Because court has found that plaintiffs have successfully stated a claim for TILA violations, the court concludes that plaintiffs have also successfully stated a UCL claim, which prohibits unlawful and unfair practices, as well as fraudulent ones.  The court thus denies Bank of America's motion to dismiss this claim.  Plaintiffs should note, however, that to the extent that they seek to assert a UCL claim based on any conduct other than the alleged TILA violations, the pleading is inadequate.  For example, the court does not find that plaintiffs have successfully alleged a course of fraudulent conduct (i.e., that Bank of America engaged in a "bait and switch scheme" involving a "pattern of deceptive conduct and concealment," SAC ¶¶ 141, 148).  If they can do so in good faith, plaintiffs may amend their unfair competition claim to attempt to assert a claim with sufficient particularity under the prong of the UCL prohibiting fraudulent practices.

### III.  ORDER

For the foregoing reasons, the court grants in part and denies in part Bank of America's motion to dismiss as follows:

    1.      the motion to dismiss is granted without leave to amend as plaintiffs' theory C (except as to the claim that defendant failed to adequately disclose that the interest rate *will*

United States District Court
For the Northern District of California

*increase*), theory F, and plaintiffs' claim of breach of the implied covenant of good

faith and fair dealing;

2.    the motion to dismiss is denied as to plaintiffs' other theories of violations of TILA;

3.    the motion to dismiss is granted with twenty leave to amend with respect to plaintiffs'

breach of contract and fraud claims; and

4.    the motion to dismiss is denied as to plaintiffs' UCL claim to the extent that claim is

based upon unfair or unlawful conduct consisting of TILA violations, however,

plaintiffs' UCL claim is dismissed with 20 days leave to amend to the extent plaintiffs

seek to proceed based upon fraudulent conduct with respect to an alleged scheme or

pattern involving deceptive conduct.


DATED:        03/20/09                          *Ronald M Whyte*
                                               RONALD M. WHYTE
                                               United States District Judge

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1 **Notice of this document has been electronically sent to:**

2 **Counsel for Plaintiffs:**

3 David M. Arbogast            david@spiromoss.com,emily@spiromoss.com
  Jeffrey K Berns             jberns@jeffbernslaw.com
4 Patrick DeBlase             deblase@kbla.com
  Michael C Eyerly            eyerly@kbla.com
5 Paul R. Kiesel             Kiesel@kbla.com,cgarcia@kbla.com
  Jonathan Shub              jshub@seegerweiss.com,atorres@seegerweiss.com
6 Ira Spiro                  Ira@SpiroMoss.com

7 **Counsel for Defendants:**

8 Michael John Agoglia        magoglia@mofo.com,lazevedo@mofo.com,rarchuleta@mofo.com
  Wendy M. Garbers           wgarbers@mofo.com,bfuller@mofo.com
9 Cathleen Ellis Stadecker    cstadecker@mofo.com

10

11 Counsel are responsible for distributing copies of this document to co-counsel that have not
   registered for e-filing under the court's CM/ECF program.

12

13

14 **Dated:**    ___03/20/09_____            _____JAS_____
                                                   **Chambers of Judge Whyte**
15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' SECOND
AMENDED COMPLAINT—No. C-07-04500 RMW
MAG                                          21